**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| NATIONAL SHOOTING SPORTS FOUNDATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No.: 3:22-cv-6646 |
| | ) |
| MATTHEW J. PLATKIN, ATTORNEY GENERAL | ) |
| OF THE STATE OF NEW JERSEY, | ) |
| | ) |
| Defendant. | ) |

## COMPLAINT

Plaintiff the National Shooting Sports Foundation ("NSSF") brings this complaint against Matthew J. Platkin, in his official capacity as Attorney General of New Jersey.  NSSF brings this complaint based on personal knowledge as to all NSSF facts, and on information and belief as to all other matters.

## PRELIMINARY STATEMENT

1.     This lawsuit challenges the constitutionality of a new New Jersey "public nuisance" statute specifically designed to evade the judgment of Congress—and the Constitution.

2.     On July 5, 2022, New Jersey Governor Murphy signed into law Assembly Bill 1765 ("A1765"), which radically redefines the tort of "public nuisance" in New Jersey as it applies to members of the firearm industry.  Under A1765, the lawful and constitutionally protected "sale, manufacturing, distribution, importing, or marketing of a gun-related product" may be deemed to violate New Jersey law and justify the imposition of sweeping liability if a New Jersey judge or jury later finds that such conduct "knowingly or recklessly create[d], maintain[ed], or contribute[d] to" "any condition" that impinges in any way upon "the health, safety, peace, comfort, or convenience of" New Jerseyans.  N.J. Stat. Ann. §§2C:58-34, 2C:58-35(a)(1).

3.      A1765 is breathtaking in its scope.  Although criminal misuse of a firearm triggers the statute's application, A1765 does not regulate the use of firearms.  Nor does A1765 impose liability on individuals who misuse firearms to the detriment of themselves or others.  Instead, the statute regulates selling, manufacturing, and advertising lawful (and constitutionally protected) firearms and related products.  In other words, A1765 regulates commerce in and speech relating to arms—even when it takes place entirely outside of New Jersey, as will often be the case.  The statute also removes traditional elements of tort law that ensure that judges and juries do not impose liability on private parties for constitutionally protected conduct.  For instance, speech-based torts traditionally required proof of reliance.  A1765 not only does away with that bedrock requirement, but allows judges and juries to impose liability based on truthful, non-misleading speech about lawful products.  Making matters worse, A1765 redefines proximate cause to include criminal misuse by third parties with whom a defendant never dealt—which is not proximate cause at all.

4.      None of that is consistent with the Constitution.  The Commerce Clause prohibits states from regulating commerce (selling, manufacturing, marketing, etc.) that takes place beyond their borders, even when that commerce has effects within the state.  The First Amendment prohibits states from punishing wide swaths of truthful speech about lawful products, even if the products are dangerous or the speech is unpopular.  The Second Amendment protects commerce in arms.  And the Due Process Clause prohibits states from punishing one private party for the conduct of someone else.

5.      All of that is reason enough to invalidate New Jersey's new statute.  But there is an even more obvious problem with A1765:  It is squarely preempted by federal law.  In the late 1990s and early 2000s, several state and local governments sought to use novel applications of common-law theories like negligence and nuisance to impose civil liability on manufacturers and sellers of

firearms and ammunition when third parties misused their products.  Congress saw these lawsuits for what they were: unconstitutional efforts to stamp out lawful and constitutionally protected activity.  To end such incursions, Congress enacted the Protection of Lawful Commerce in Arms Act ("PLCAA") in 2005 by wide margins on a substantially bipartisan basis.  The PLCAA expressly prohibits and preempts state-law civil actions "brought by any person against a manufacturer or seller of [firearms or ammunition] … for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of [firearms or ammunition] by the person or a third party."  15 U.S.C. §7903(5)(A).

6.     New Jersey is now trying to resurrect the very kinds of lawsuits that the PLCAA was enacted to eliminate.  Indeed, A1765 acknowledges on its face that it is crafted to try to evade the PLCAA.  While the state may get credit for its candor, that does not make its law any more consistent with the protections afforded by Congress and the Constitution.

7.     For these reasons and those set forth below, NSSF seeks a declaration that A1765 is preempted and unconstitutional, an injunction preventing New Jersey from enforcing the statute against NSSF or its members, and nominal damages.

## THE PARTIES

8.     NSSF is a Connecticut non-profit, tax-exempt, non-stock corporation with its principal place of business in Connecticut.  It is the trade association for the firearm, ammunition, and hunting and shooting sports industry.  It has a membership of more than 9,000 manufacturers, distributors, and retailers of firearms, ammunition, and related products, as well as other industry members throughout the United States.

9.     NSSF's mission is to promote, protect, and preserve hunting and shooting sports by providing leadership in addressing industry challenges, advancing participation in and

understanding of hunting and shooting sports, reaffirming and strengthening its members' commitment to the safe and responsible sale and use of their products, and promoting a political environment supportive of America's traditional hunting and shooting heritage.

10.     NSSF serves the interests of its members, which are impaired by the threat of sweeping liability under A1765 not only to members, but to their employees and agents as well.

11.     NSSF is authorized by its board of directors to bring this action on its members' behalf.

12.     Defendant Matthew J. Platkin is the Attorney General of New Jersey, the chief law enforcement officer of New Jersey.  Attorney General Platkin is sued in his official capacity and his personal capacity.  At all relevant times, Attorney General Platkin, as well as those subject to his supervision, direction, or control, are and will be acting under color of state law.

## **BACKGROUND**

**Congress Enacted the PLCAA to Prevent State-Law Civil Actions that Unduly Burden the National Firearm Industry and Infringe Fundamental Constitutional Rights.**

13.     The Constitution "confer[s] an individual right to keep and bear arms."  *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111, 2127 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008)); *see* U.S. Const. amend. II.  And "the core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms."  *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017).

14.     Nevertheless, in the late 1990s, state and local governments began trying to use novel applications of state tort law to hold "manufacturers, distributors, dealers, and importers of firearms that operate as designed and intended" accountable "for the harm caused by the misuse of firearms by third parties, including criminals."   15 U.S.C. §7901(a)(3); *see id.* §7901(a)(4). They invoked a variety of theories, including: strict liability for abnormally dangerous activities

or defective design, *Penelas v. Arms Tech., Inc.*, 778 So.2d 1042, 1043-44 (Fla. Ct. App. 2001); negligent marketing, *City of St. Louis v. Cernicek*, 145 S.W.3d 37, 38, 40 (Mo. Ct. App. 2004) (per curiam); negligent distribution, *District of Columbia v. Beretta U.S.A. Corp.*, 847 A.2d 1127, 1131 (D.C. Ct. App. 2004); deceptive trade practices, *Taurus Holdings, Inc. v. U.S. Fidelity & Guar. Co.*, 367 F.2d 1252, 1252-53 (11th Cir. 2004); and public nuisance, *Sills v. Smith & Wesson Corp.*, 2000 WL 33113806, at *7 (Del. Super. Ct. Dec. 1, 2000), among others.

15.    Some of these suits succeeded in stretching the common law far beyond its traditional limits—and in permitting one state's courts to police the business practices of industry members operating elsewhere. *See, e.g.*, *City of Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1143-47 (Ohio 2002); *James v. Arms Tech., Inc.*, 820 A.2d 27, 37-44, 46-47, 50-53 (N.J. Super. Ct. 2003); *City of Gary ex rel. King v. Smith & Wesson Corp.*, 801 N.E.2d 1222, 1231-32, 1241-42 (Ind. 2003).   Others were unsuccessful. *See, e.g.*, *Camden Cnty. Bd. of Chosen Freeholders v. Beretta, U.S.A. Corp.*, 273 F.3d 536, 540 (3d Cir. 2001) (per curiam); *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1147-48 (Ill. 2004).

16.    But the final tally told only part of the story.   Had these sprawling suits been permitted to persist and proliferate, "[t]he legal fees alone" would have been "enough to bankrupt the industry."   Sharon Walsh, *Gun Industry Views Accord as Dangerous Crack in Its Unity*, Wash. Post (Mar. 18, 2000), https://wapo.st./2Zcp5KS.   That, indeed, was in large part the point: "[M]unicipal leaders pressed on regardless of their chance of success, spending taxpayers' money in a war of attrition against the firearms industry."   Recent Legislation, *Protection of Lawful Commerce in Arms Act*, 119 Harv. L. Rev. 1939, 1940 (2006).

17.    It did not take long for Congress to recognize these lawsuits for what they were:  a coordinated effort to try to destroy the firearms industry by saddling it with liability for the acts of

criminals.  States pressed "theories without foundation in hundreds of years of the common law and jurisprudence of the United States" and threatened interstate comity by permitting one state to penalize lawful conduct in another state.  15 U.S.C. §7901(a)(7)-(8).  They did so, moreover, at substantial cost to individual rights, including the Second Amendment right to keep and bear arms, *id.* §7901(a)(2), (a)(6), as well as the rights of industry members to pursue their trade consistent with the Constitution's privileges and immunities guarantee, *id.* §7901(a)(7).  And it was profoundly unfair, to boot, to hold lawful businesses engaged in the lawful sale of constitutionally protected products liable "for the harm caused by those who criminally or unlawfully misuse … products that function as designed and intended."  *Id.* §7901(a)(5).

18.     Congress enacted the PLCAA to put an end to such state-law actions.  Indeed, the PLCAA's very first enumerated "purpose[]" is to "prohibit causes of action against manufacturers, distributors, dealers, and importers of firearms or ammunition products, and their trade associations" based on harm "caused by the criminal or unlawful misuse of firearm products" by third parties.  *Id.* §7901(b)(l); *see also id.* §790l(a)(6) (finding that such suits are "an abuse of the legal system, … threaten[] the diminution of a basic constitutional right and civil liberty, … and constitute[] an unreasonable burden on interstate and foreign commerce").

19.     The statute makes good on that promise, prohibiting all such suits from being "brought in any Federal or State court."  *Id.* §7902(a).  The PLCAA preempts "civil action[s] … brought by any person against a manufacturer or seller of a qualified product, or a trade association, for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party."  *Id.* §7903(5)(A); *see id.* §7903(2)-(4), (6), (8)-(9) (defining "person," "manufacturer," "seller," "trade association," "qualified product," and "unlawful misuse").

20.     Only six enumerated types of claims are not so prohibited.  *See id.* §7903(5)(A).

These exceptions are limited to circumstances in which the manufacturer or seller itself engaged

in some well-defined type of wrongful conduct, such as claims for design or manufacturing defect,

fraudulent transfer, negligent entrustment, and breach of contract or warranty.

21.     None of the enumerated exceptions extends to state laws that authorize imposition

of liability against manufacturers and sellers of firearms and ammunition for alleged "public

nuisance" caused by the criminal conduct of third parties.  In fact, such efforts, founded on novel

expansions of general common-law tort theories, are exactly what the PLCAA was enacted to—

and does—stamp out.  *See* 15 U.S.C. §7901(a)(7); *Camden Cnty.*, 273 F.3d at 540-41 ("To extend

public nuisance law to embrace the manufacture of handguns would be unprecedented….").

**Courts Uphold the PLCAA Against Constitutional Challenges and Routinely Reject Efforts
to Circumvent Its Protections.**

22.     After Congress passed the PLCAA, federal and state courts routinely rejected

efforts to evade the law's protections for the firearms industry.

23.     Some plaintiffs challenged the statute's constitutionality, but courts across the

country rejected such challenges, holding that the PLCAA is a lawful exercise of Congress'

Commerce power, *see, e.g.*, *Adames v. Sheahan*, 909 N.E.2d 742, 765 (Ill. 2009); *City of N.Y. v.

Beretta U.S.A. Corp.*, 524 F.3d 384, 393-95 (2d Cir. 2008); that the PLCAA is consistent with the

Constitution's separation of powers, *see, e.g.*, *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1139-40 (9th Cir.

2009); *District of Columbia v. Beretta*, 940 A.2d 163, 172-73 (D.C. Ct. App. 2008); *City of N.Y.*,

524 F.3d at 395-96; that the PLCAA comports with the Tenth Amendment, *see, e.g.*, *Delana v.

CED Sales, Inc.*, 486 S.W.3d 316, 323-24 (Mo. 2016); *City of N.Y.*, 524 F.3d at 396-97; *Adames*,

909 N.E.2d at 765; and that the PLCAA does not violate the Takings, Equal Protection, Due

Process, or Petition Clauses, *see, e.g.*, *Ileto*, 565 F.3d at 1140-42; *Delana*, 486 S.W.3d at 324;

*District of Columbia*, 940 A.2d at 173-82; *City of N.Y.*, 524 F.3d at 397-98.

24.     Other plaintiffs sought to skirt the PLCAA's general prohibition on covered actions. Just as often, courts carefully policed the statute's ban and rejected efforts to expand its narrow exceptions.  For instance, the Missouri Supreme Court held that, to qualify as a prohibited action "resulting from criminal misuse" of a firearm under §7903(5)(A), the PLCAA does not require the criminal misuse to have resulted in criminal conviction or to have been the sole cause of injury. *Delana*, 486 S.W.3d at 321.  The Supreme Court of Texas rejected an effort to invoke the negligent entrustment exception under §7903(5)(A)(ii) because that state's common law did not recognize such an action.  *In re Academy, Ltd.*, 625 S.W.3d 19, 30-32 (Tex. 2021).  And the Second and Ninth Circuits concluded that statutory codification of state tort law on wrongful death, nuisance, and negligence actions could not satisfy the so-called "predicate exception" set forth in §7903(5)(A)(iii).  *City of N.Y.*, 524 F.3d at 400-04; *Ileto*, 565 F.3d at 1137-38.

**In the Wake of *Bruen*, States Again Attempt to Circumvent the PLCAA.**

25.     Earlier this year, the Supreme Court decided *New York State Rifle & Pistol Association v. Bruen*, 142 S.Ct. 2111 (2022), which confirmed that the right "to keep and bear Arms" means just that—the right to keep *and bear* arms, whether inside or outside of the home. *Id.* at 2134-35.  That guarantee, moreover, is no "second-class right," subject to a unique set of rules or available to only those with "some special need" to exercise it.  *Id.* at 2156.  Accordingly, when evaluating government burdens on the Second Amendment's "unqualified command," courts must assess "this Nation's historical tradition" of regulating firearms—not conduct some means-end balancing.  *Id.* at 2125-34.  Applying that test, the Court invalidated a New York law requiring law-abiding citizens to show special need to carry a firearm outside the home.  *Id.* at 2134-56.

26.     *Bruen* should have prompted states to reconsider their laws to make them more protective of rights the Supreme Court had just reaffirmed as fundamental.  Unfortunately, it has

prompted the opposite reaction in states that are least protective of the Second Amendment right.

Almost immediately, some of the same very few states that had endeavored to keep their law-abiding citizens from carrying firearms undertook efforts "to offset the impact of the court's decision." Giavanni Alves, *N.Y.'s New Gun Control Laws*, Staten Island Live (July 9, 2022), https://bit.ly/3Q8l2K0. Some of those efforts were re-runs. In particular, a few states (following the lead of New York, the state whose restrictive carry regime was invalidated in *Bruen*) passed legislation purporting to authorize civil suits against firearms manufacturers, distributors, and sellers based on the harms caused by gun violence—in other words, purporting to authorize the very same suits that prompted Congress to pass the PLCAA almost 20 years ago. *See, e.g.*, Cal. AB 1594, 2021-2022 Regular Session (July 12, 2022); Del. SB 302 (June 30, 2022); *cf.* N.Y. Gen. Bus. Law §§898-a–898-e (July 6, 2021).

**New Jersey's Recently Enacted Assembly Bill 1765 Authorizes Exactly the Sort of Sprawling Tort Actions that Congress Passed the PLCAA to Prohibit.**

27.     On July 5, 2022, the Governor of New Jersey signed into law Assembly Bill 1765, titled "Act concerning public safety and supplementing Title 2C of the New Jersey Statutes."

28.     A1765 is fundamentally inconsistent with the PLCAA. The statute not only declares its intention to address "legal[] gun-related products" and regulate legal commerce in legal products, N.J. Stat. Ann. §2C:58-33(a), but purports to chart a way around federal law by codifying the very sort of novel tort theories that the PLCAA explicitly forbids. *But see Ileto*, 565 F.3d at 1136 ("[T]he text and purpose of the PLCAA shows that Congress intended to preempt general tort theories of liability even in jurisdictions … that have codified such causes of action.").

29.     A1765 creates a new "cause of action for public nuisance," which applies only to "gun industry member[s]," N.J. Stat. Ann. §2C:58-33, *i.e.*, those "engaged in the sale, manufacturing, distribution, importing or marketing of a gun-related product, and any officer,

agent, employee, or other person authorized to act on behalf of that person or who acts in active concert or participation with one or more such persons," *id.* §2C:58-34.

30.     The new cause of action is sweeping.  A "gun industry member" may be held liable for "the sale, manufacturing, distribution, importing, or marketing of a gun-related product," even if that conduct was fully lawful where it occurred and fully compliant with federal law, if it later is deemed by a New Jersey judge or jury to have "knowingly or recklessly create[d], maintain[ed], or contribute[d] to a public nuisance in this State," *id.* §2C:58-35(a)(1), which is broadly defined as "any condition" that in any way "contributes to the injury or endangerment of the health, safety, peace, comfort, or convenience of others," *id.* §2C:58-34.  Lawful conduct protected by the First Amendment ("marketing") and the Second Amendment ("sale, manufacturing, distribution, importing … of a gun-related product") thus may be the basis of a New Jersey tort action if a product lawfully marketed, lawfully made, and lawfully sold is later used or possessed unlawfully *by someone else* in New Jersey.

31.     And the law does not stop there.  "A gun industry member" may also be held liable under A1765 for failing to "establish, implement, and enforce reasonable controls regarding its manufacture, sale, distribution, importing, and marketing of gun-related products," *id.* §2C:58-35(a)(2), even if the relevant product was not "sold, manufactured, distributed, imported, or marketed" in New Jersey, *id.* §2C:58-34 (defining "gun-related product").

32.     To make matters worse, the statute does not key "reasonable controls" solely to the many federal, state, and local laws with which firearms manufacturers and sellers must already comply.  Nor does it identify what controls beyond compliance with existing statutory obligations are or are not "reasonable."  Instead, the most A1765 does to define "reasonable controls" is supply a recursive gloss:  "'Reasonable controls,'" the law says, "means *reasonable* procedures,

safeguards, and business practices." *Id.* (emphasis added). Then, in a gloss upon this gloss, A1765 points to what such "controls" are supposed to accomplish:

(1)  prevent the sale or distribution of a gun-related product to a straw purchaser, a firearm trafficker, a person prohibited from possessing a firearm under State or federal law, or a person who the gun industry member has reasonable cause to believe is at substantial risk of using a gun-related product to harm themselves or unlawfully harm another or of unlawfully possessing or using a gun-related product;

(2)  prevent the loss of a gun-related product or theft of a gun-related product from a gun industry member;

(3)  ensure that a gun industry member complies with all provisions of State and federal law and does not otherwise promote the unlawful sale, manufacture, distribution, importing, marketing, possession, or use of a gun-related product; and

(4)  ensure that the gun industry member does not engage in an act or practice in violation of any of the regulatory provisions governing firearms set forth in chapters 39 and 58 of Title 2C of the New Jersey Statutes or engage in conduct that constitutes a violation of P.L. 1960, c.39 (C.56:8-2) or any regulations promulgated thereunder.

*Id.*  In other words, "reasonable controls" are all "reasonable procedures" that will achieve goals as sweeping and abstract as preventing criminal conduct by third parties and complying with all federal and state law.  The failure to implement any one of the potentially infinite and unnamed procedures "designed to" achieve those goals likewise "is a public nuisance." *Id.* §2C:58-35(a)(3).

33.     The broad language of A1765 expands the scope of public nuisance law in other unprecedented ways as well.  Most notable, the statute rewrites the definition of "proximate cause" to mean something other than proximate cause.  Under A1765, "the conduct of a gun industry member shall be deemed to constitute a proximate cause of the public nuisance if the harm to the public was a reasonably foreseeable effect of such conduct, notwithstanding any intervening actions, including, but not limited to, criminal actions by third parties." *Id.* §2C:58-35(c). *But see Townsend v. Pierre*, 110 A.3d 52, 61 (N.J. 2015) ("Proximate cause" in New Jersey ordinarily

"consists of 'any cause which in the natural and continuous sequence, *unbroken by an efficient intervening cause*, produces the result complained of and without which the result would not have occurred.'" (citation omitted; emphasis added)).  What is more, the statute explicitly removes the need to prove intent:  Liability may attach under A1765 without regard to whether "the gun industry member acted with the purpose to engage in any public nuisance or otherwise cause harm to the public."  N.J. Stat. Ann. §2C:58-35(c).

34.    A1765 authorizes "the Attorney General" to bring suit seeking "restitution; damages; reasonable attorneys' fees, filing fees, and reasonable costs of suit."  *Id.* §2C:58-35(c).  The Attorney General may also seek "[a]n order providing for abatement of the nuisance at the expense of the defendant."  *Id.*  Last but not least, the Attorney General may seek "an injunction prohibiting the gun industry member from continuing th[e] conduct" that gave rise to the nuisance "or doing any acts in furtherance thereof," *id.*, even if the relevant conduct occurred entirely out of state, will continue to occur entirely out of state, and was and is protected by the Constitution and/or necessary to ensure that law-abiding citizens may exercise their constitutional rights.

35.    The statute gives the Attorney General broad oversight authority.  Whenever "the Attorney General believes it is in the public interest that an investigation should be made to ascertain whether a gun industry member has in fact engaged in, is engaging in, or is about to engage in conduct that violates [the statute], the Attorney General may" require the gun industry member to, among other things, submit testimony under oath, produce documents, turn over records for the Attorney General's impoundment, and more.  *Id.* §2C:58-35(d).

## JURISDICTION AND VENUE

36.    Plaintiff's causes of action arise under 42 U.S.C. §1983 and the United States Constitution.  This Court therefore has jurisdiction pursuant to 28 U.S.C. §1331.

37.    This Court also has jurisdiction under 28 U.S.C. §1343(a)(3) because this action

seeks to "redress the deprivation, under color of a[] State law," of "right[s], privilege[s] or immunit[ies] secured by … an[] Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States."

38.     Venue lies in this district pursuant to 28 U.S.C. §1391 because Defendant is located in and performs his official duties in the District of New Jersey and is therefore considered to reside within this district as a matter of law.

## CLAIMS FOR RELIEF

### COUNT ONE
### (Preemption)

39.     Plaintiff re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

40.     The Supremacy Clause, which provides that the Constitution, federal statutes, and treaties are "the supreme Law of the Land," U.S. Const. art. VI, cl. 2, provides "a rule of decision" for determining whether federal or state law applies in a particular situation.  *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015).  When a federal law "imposes restrictions" and a state law "confers rights … that conflict with the federal law," "the state law is preempted." *Kansas v. Garcia*, 140 S.Ct. 791, 801 (2020).

41.     That is exactly the situation here.  To stamp out unjustified expansions of the common law and undue intrusions into lawful commerce in arms, the PLCAA imposes clear restrictions:  Courts may not entertain any "civil action … against a manufacturer or seller of a [firearms] product … for damages … or other relief, resulting from the criminal or unlawful misuse of a [firearms] product by … a third party."  15 U.S.C. §7903(5)(A).  Yet A1765 explicitly authorizes the New Jersey Attorney General to sue "gun industry member[s]" for damages, injunctions, and other relief resulting from a third party's misuse of an industry member's products.

N.J. Stat. Ann. §2C:58-35(c). That direct effort to countermand federal law is plainly preempted.

42.     Under the PLCAA, a "qualified civil liability action may not be brought in any Federal or State court."  15 U.S.C. §7902(a).  Yet the whole point of A1765 is to authorize "qualified civil liability action[s]."

43.     The PLCAA defines a "qualified civil liability action" as a "[1] civil action … [2] brought by any person" ("including any governmental entity") "[3] against a manufacturer or seller of a qualified product … [4] for damages … or other relief, [5] resulting from the criminal or unlawful misuse of a qualified product by … a third party." *Id.* §7903(5)(A).

44.     A1765 suits satisfy each element.

45.     A suit under A1765 [1] is a "civil action" that [2] can be brought by government officers:  The statute explicitly authorizes the New Jersey "Attorney General" to bring "an action under" its terms.  N.J. Stat. Ann. §2C:58-35(d).

46.     A suit under A1765 [3] can be brought "against a manufacturer or seller of a qualified product, or trade association."  15 U.S.C. §7903(5)(A).  In fact, a suit under A1765 can be brought *only* against such a party; the statute applies to "gun industry member[s]" and them alone.  N.J. Stat. Ann. §2C:58-35(a); *see id.* §2C:58-34 (defining "Gun industry member" to mean "a person engaged in the sale, manufacturing, distribution, importing or marketing of a gun-related product, and any officer, agent, employee, or other person authorized to act on behalf of that person or who acts in active concert or participation with one or more such persons").

47.     Finally, A1765 [4] authorizes recovery of damages and other relief from firearm industry members [5] for injuries "resulting from" third parties' misuse of their products. *See* 15 U.S.C. §7903(5)(A).  Indeed, that is the statute's very reason for being.  As its codified findings explain, A1765 is designed to facilitate efforts to hold those engaged in the "sale, manufacture,

distribution, and marketing of lethal, but nonetheless legal, gun-related products" liable for harms resulting from "gun violence." N.J. Stat. Ann. §2C:58-33(c). And A1765 does just that, subjecting a gun industry member to liability for harm caused by "intervening … criminal actions by third parties," *id.* §2C:58-35(e), if the industry member's "sale, manufacturing, distribution, importing, or marketing" "contribute[s] to" "any condition which … contributes to the injury or endangerment of the health, safety, peace, comfort, or convenience" of the public, *id.* §2C:58-35(a)(1), or if it fails to employ "reasonable procedures, safeguards, and business practices" to keep guns out of the hands of third parties who misuse them, *id.* §2C:58-35(a)(2). A1765 plainly authorizes "qualified civil liability actions" under the PLCAA.

48.     The kind of liability A1765 seeks not impose does not fit within any of the narrow exceptions to the PLCAA's preemptive scope enumerated in 15 U.S.C. §7903(5)(A). The statute does not authorize suits commenced by the U.S. Attorney General to enforce any federal laws (§7903(5)(A)(vi)); and it does not confine liability to instances in which a manufacturer or seller unlawfully transferred a firearm (§7903(5)(A)(i)), negligently entrusted a firearm (§7903(5)(A)(ii)), breached a contract or warranty (§7903(5)(A)(iv)), or defectively made a product (§7903(5)(A)(v)).

49.     Nor does the liability A1765 authorizes fit within the PLCAA's so-called "predicate exception," which exempts "an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought." *Id.* §7903(5)(A)(iii).

50.     As the Second Circuit has explained, the term "applicable" in §7903(5)(A)(iii) must be read "in the context of the surrounding language and of the statute as a whole." *City of N.Y.,*

524 F.3d at 400. And both the immediately surrounding text and the language that immediately follows provide clear indications that the predicate exception exempts from the PLCAA's preemptive reach only statutes that impose concrete obligations and prohibitions that a firearms industry member can understand and comply with, not statutes that merely impose broad duties of care. Indeed, that is the only sensible way to read the predicate exception, as interpreting it to permit states to reinstate exactly the same kinds of novel public nuisance suits that led Congress to enact the PLCAA through the simple expedient of codifying the same amorphous theories in statutes would "allow the predicate exception to swallow the statute." *City of N.Y.*, 524 F.3d at 403.

51.     At a minimum, A1765 is preempted to the extent it authorizes the imposition of liability in the absence of either knowing violations or traditional proximate cause.

52.     The predicate exception exempts only "an action in which a manufacturer or seller of a qualified product *knowingly* violated a State or Federal statute applicable to the sale or marketing of the product, *and the violation was a proximate cause of the harm for which relief is sought*." 15 U.S.C. §7903(5)(A)(iii) (emphases added).

53.     By its terms, A1765 does not require a violation of either of its two categories of prohibited activities to be "knowing."

54.     As to the first category—*i.e.*, "creat[ing], maintain[ing], or contribut[ing] to" "a condition which … contributes to the injury or endangerment of the health, safety, peace, comfort, or convenience of others"—A1765 explicitly permits liability for violating that command either "knowingly *or* recklessly." N.J. Stat. Ann. §§2C:58-34, 2C:58-35(a)(1). As for A1765's second category of prohibited activities—*i.e.*, the absence of "reasonable controls"—that provision does not contain any *mens rea* at all; it sets up a strict liability offense based on any failure to "establish,

implement, and enforce" "reasonable procedures, safeguards, and business practices that are designed to" achieve sweeping goals regarding the sale, manufacture, distribution, importing, or marketing of "gun-related products." *Id.* §§2C:58-34, 2C:58-35(a)(2).  Industry members thus can face liability for each and every failure to abide by that amorphous command, without regard to whether they knew their "procedures, safeguards, and business practices" to be "unreasonable," which (once again) requires blind guessing at what is sufficiently "designed" to "prevent" or "ensure" A1765's abstract goals.  And lest there be any doubt about what role intent has to play for either kind of violation, the statute makes clear that the answer is none:  "To prevail in an action under this section, the Attorney General shall not be required to demonstrate that the gun industry member acted with the purpose to engage in any public nuisance or otherwise cause harm to the public."  *Id.* §2C:58-35(c).

55.    Making matters worse, A1765 does not require "proximate causation" in the traditional sense.  Courts "ordinarily presume that 'Congress intends to incorporate the well-settled meaning of the common-law terms it uses,'" *Jam v. Int'l Fin. Corp.*, 139 S.Ct. 759, 769-70 (2019), and "proximate cause" is a familiar common-law term.  "The term 'proximate cause' is shorthand for a concept:  Injuries have countless causes, and not all should give rise to legal liability."  *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 692 (2011) (emphasis omitted).  To distinguish proximate cause from cause-in-fact, courts have set down several guidelines:  "[F]oreseeability alone is not sufficient to establish proximate cause," *Bank of Am. Corp. v. City of Miami*, 137 S.Ct. 1296, 1305 (2017), and there must be a "direct relation between the injury asserted and the injurious conduct alleged," *Holmes v. Secs. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992).

56.    A1765 explicitly discards any such inquiry.  A "gun industry member's" "conduct" is "*deemed* to constitute a proximate cause of the public nuisance" under A1765 "if the harm to

the public was a reasonably foreseeable effect of [the] conduct, notwithstanding any intervening actions, including, but not limited to, criminal actions by third parties."  N.J. Stat. Ann. §2C:58-35(e) (emphasis added).  That, of course, is consistent with A1765's chief aim—imposing liability on participants in the firearm industry for harms caused by third parties.  But it is fundamentally inconsistent with what the PLCAA demands.  For that reason, too, A1765 is preempted.

## COUNT TWO
### (Commerce Clause)

57.     Plaintiff re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

58.     Consistent with the Framers' "special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce and with the autonomy of the individual States within their respective spheres," the Supreme Court has long held that the Commerce Clause (U.S. Const. art. I, §8, cl. 3) prohibits any state from "control[ling] commerce occurring wholly outside [its] boundaries."  *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 335-36 (1989) (footnote omitted).  A state law that has "'the practical effect' of regulating commerce occurring wholly outside [the] State's borders" thus "exceeds the inherent limits of the enacting State's authority" and is "virtually per se invalid."  *Id.* at 336.  Such a law is unconstitutional even if it "is addressed only to" conduct "in [the state]," *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986), and even if "the regulated commerce has effects within the State," *Healy*, 491 U.S. at 336.

59.     A1765 violates this bedrock constitutional constraint.

60.     A1765 does not define "gun industry member" to require that the entity actually do business in New Jersey.  *See* N.J Stat. Ann. §2C:58-34 ("'Gun industry member' means a person engaged in the sale, manufacturing, distribution, importing or marketing of a gun-related product,

and any officer, agent, employee, or other person authorized to act on behalf of that person or who acts in active concert or participation with one or more such person."). And it defines "gun-related product" to include not just a product "sold, manufactured, distributed, imported, or marketed in this State," but also a product merely "*possessed* in this State." *Id.* (emphasis added). A manufacturer that does not engage in any commerce in New Jersey therefore still could be held liable under A1765 for manufacturing, selling, or marketing its products in *other* states in ways that meet with New Jersey's disapproval.

61.     That is clear on the face of the statute. A1765 prohibits *any* "gun industry member"—not just one that operates in New Jersey—from "knowingly or recklessly creat[ing], maintain[ing] or contribut[ing] to a public nuisance in this State through the sale, manufacturing, distribution, importing, or marketing of a gun-related product." *Id.* §2C:58-35(a)(1). And its requirement that industry members employ "reasonable controls" is not limited to any commercial activities in New Jersey. *Id.* §2C:58-35(a)(1). For instance, if a native of Little Rock, Arkansas, moves to Cherry Hill, New Jersey, with a firearm he lawfully purchased in his old home state and proceeds to misuse the gun in a way that threatens the "comfort" of his new neighbors in New Jersey, A1765 could be deployed to impose liability on a firearms manufacturer operating entirely in Texas and a retail seller operating entirely in Arkansas. *Id.* §§2C:58-34, 2C:58-35(a).

62.     Making matters worse, A1765 authorizes New Jersey courts to *enjoin* practices that violate its terms even if the practices occur entirely out of state and are lawful where they occur. *See id.* §2C:58-35(b).

63.     None of that is remotely consistent with the Commerce Clause. Indeed, imposing state-law liability (and damages and other relief) on out-of-state actors for actions taken entirely out of state is the definition of unconstitutional extraterritorial state regulation.

64.     A1765 is no less unconstitutional vis-à-vis the out-of-state commerce of firearm industry members that do other business in New Jersey.  What matters under the extraterritoriality doctrine is where the regulated commerce takes place:  "If the transaction to be regulated occurs 'wholly outside' the boundaries of the state, the regulation is unconstitutional," even if the actor, *e.g.*, is incorporated in the regulating state or does some other business in that state.  *A.S. Goldmen & Co. v. N.J. Bur. of Sec.*, 163 F.3d 780, 786 (3d Cir. 1999) (citation omitted).

65.     By directly regulating commerce that takes place entirely in other states, A1765 plainly violates the constitutional prohibition on extraterritorial state regulation.

66.     A1765 violates the Commerce Clause in another way as well.  In addition to prohibiting states from regulating conduct that takes place outside of their borders, the Commerce Clause "prohibit[s] States from discriminating against or imposing excessive burdens on interstate commerce" *within* their borders.  *Comptroller of Treasury of Maryland v. Wynne*, 575 U.S. 542, 549 (2015); *see also Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).  A1765 does that too. Because it imposes liability for commercial transactions occurring in other states, A1765 unlawfully discriminates against and burdens out-of-state commercial interests within the state.

## COUNT THREE
### (First Amendment)

67.     Plaintiff re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

68.     A1765 does not just regulate commerce ("the sale, manufacturing, distribution, [and] importing … of a gun-related product").  It also regulates "marketing"—*i.e.*, speech protected by the First Amendment.  "A gun industry member" may be held liable under A1765 if its "marketing" is deemed to have "contribute[d] to a public nuisance" or if it failed to employ "reasonable controls" as to its "marketing."  N.J. Stat. Ann. §2C:58-35(a)(1)-(2).

69.     That is a textbook First Amendment violation.

70.     Laws that single out speech on the basis of its content or viewpoint are subject to the strictest of scrutiny, which they "rare[ly]" survive. *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 790-91, 799 (2011).  A1765 does both of those things.  And far from being narrowly tailored or even closely drawn to achieve a compelling or important government interest, A1765 is radically overbroad in relation to any legitimate objective it may further.

71.     Start with content-based discrimination.  A1765 undoubtedly regulates speech based on its content or "the topic discussed."  *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S.Ct. 1464, 1471 (2022).  After all, the statute does not apply to *all* marketing; it applies only to "marketing *of a gun-related product*."  N.J. Stat. Ann. §2C:58-35(a)(1)-(2) (emphasis added).  Indeed, A1765 does not even apply to all speech about firearms—only the speech of "gun industry member[s]," i.e., those "engaged in the sale, manufacturing, distribution, importing or marketing of a gun-related product."  *Id.* §2C:58-34.  And that speaker-based discrimination is no accident.  A1765 fixates on gun-related speech by gun-related actors because their speech is uniquely likely to communicate a particular *viewpoint* that New Jersey disfavors.  *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564 (2011).

72.     The topics and views that New Jersey has singled out in A1765 do not fall into any "well-defined and narrowly limited classes of speech" unprotected by the First Amendment. *Brown*, 564 U.S. 786, 791.  To be sure, the First Amendment does not preclude imposing liability for false, deceptive, or otherwise "misleading" commercial speech.  *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563 (1980).  But A1765 does not even purport to target speech that is false or misleading.  It authorizes the imposition of liability for speech about lawful products—products expressly protected by the Constitution, no less—*even when that*

*speech is truthful and not misleading*.  Indeed, the words "false," "misleading," and "deceptive" appear nowhere in the statute.  A manufacturer that publishes advertisements containing *entirely accurate* specifications of its lawful products—ammunition size, magazine capacity, weight, retail price, etc.—thus could be liable under A1765 if its advertisement could somehow be deemed inconsistent with the "comfort" or "convenience" of New Jersey residents, N.J. Stat. Ann. §2C:58-35(a)(1).  So too could an industry member who fails to establish what New Jersey deems to be a "reasonable procedure" with respect to its marketing materials (whatever that may be)—again, no matter how accurate its marketing materials are, *id.* §2C:58-35(a)(2).

73.    That the product being marketed is dangerous does not render speech promoting it entitled to any less constitutional protection either.  Truthful speech promoting a lawful product or service is protected by the First Amendment even if the product or service is known to have deleterious health effects.  *See, e.g.*, *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) (tobacco); *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 184-85 (1999) (gambling); *44 Liquormart*, 517 U.S. at 504 (liquor); *Bigelow v. Virginia*, 421 U.S. 809, 818-25 (1975) (abortion).  Simply put, the mere fact that a product is dangerous does not transform promotion of that product (*i.e.*, speech) into a tort for which liability may be imposed.  And that is, of course, true *a fortiori* when it comes to promotion of products that not only are legal, but are protected by the Second Amendment.

74.    New Jersey thus could justify A1765 only by affirmatively proving that it is sufficiently tailored to achieve a sufficiently important state interest.  *Ams. for Prosperity Found. v. Bonta*, 141 S.Ct. 2373, 2384 (2021).  That, it cannot do, as A1765 is both "seriously underinclusive" and "seriously overinclusive" in relation to any public safety interests the state may assert.  *Brown*, 564 U.S. at 805.  While purportedly aimed at an "epidemic of gun violence,"

N.J. Stat. Ann. §2C:58-33, A1765 does *nothing* to police the conduct of *criminals* who misuse firearms to perpetrate that problem and endanger the public's health and safety. Nor does it regulate vast swaths of speech—e.g., action and horror films, video games, direct incitements to violence, and countless other forms of expression—that may actually encourage criminal gun violence, leaving it "wildly underinclusive," *Brown*, 564 U.S. at 801-02, even as a regulation of speech. Conversely, by imposing sweeping liability—and even potentially punitive damages—for *any* firearms marketing that could later be thought to "contribute to a public nuisance" in New Jersey, even if it is nothing more than entirely truthful, non-misleading speech, A1765 is "vastly overinclusive" as well. *Id.* at 804. A1765 thus has the inevitable effect of "prohibit[ing] or chill[ing]" vast swaths of fully protected expression, *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255 (2002), destroying the "breathing space" that "the First Amendment needs," *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973).

75. Not only is A1765 not remotely tailored to any permissible state objective, it also suffers from a fatal vagueness problem. Vagueness "raises special First Amendment concerns because of its obvious chilling effect on free speech." *Reno v. ACLU*, 521 U.S. 844, 871-72 (1997). After all, vague laws risk chilling would-be speakers by forcing them "to steer far wider of the unlawful zone" than they otherwise would "if the boundaries of the forbidden areas were clearly marked." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964). For that reason, laws touching on speech must themselves speak "only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963).

76. A1765 does precisely the opposite. Indeed, the statute makes it virtually impossible for regulated parties to tell what speech is and is not permitted, leaving them with no realistic choice but to err on the side of refraining from exercising their First Amendment rights.

77.     By its terms, A1765 renders unlawful any marketing that could be said to have "recklessly" "contribute[d] to a public nuisance," *id.* §2C:58-35(a)(1), and it defines "public nuisance" so broadly as to sweep in, e.g., marketing that "contributes to the injury or endangerment of the health, safety, peace, comfort, or convenience of others" or is not subject to sufficiently "reasonable procedures, safeguards, and business practices," *id.* §2C:58-34.    A1765 thus necessarily "will provoke uncertainty among speakers," *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 871 (1997), as such incomprehensible and subjective abstractions do not even articulate at all—let alone articulate with "narrow specificity"—what kind(s) of speech may later be deemed to have contributed to a "public nuisance."

78.     That profound uncertainty not only "raises special First Amendment concerns because of its obvious chilling effect on free speech," but creates a "risk of discriminatory enforcement," which make the chilling effect even more acute.  *Id.*  After all, "[i]t is not merely the sporadic abuse of power by the censor but the pervasive threat inherent in its very existence that constitutes the danger to freedom of discussion."  *Thornhill v. Alabama*, 310 U.S. 88, 97 (1940).  And that threat is even more pervasive when, as here, a law "does not aim specifically at evils within the allowable area of State control but, on the contrary, sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech or of the press."  *Id.*  That inherent vagueness dooms A1765 under the First Amendment as well.  *See Reno*, 521 U.S. at 871.

79.     There is another problem here too.  Even when speech about a product is actually false or misleading—which, again, A1765 does not require—the traditional principles that govern judicial actions for misrepresentations, including proof of reliance on the allegedly false speech, have always required a substantial link between that speech and the injury for which redress is

sought before liability may be imposed.  *See, e.g.*, *Restatement (Second) of Torts* §525 (1977); Dee Pridgen & Richard M. Alderman, *Consumer Protection and the Law* §2.26, at 2-64 (2002); *Stewart v. Wyo. Cattle Ranche Co.*, 128 U.S. 383 (1888).  That link is essential to ensure that efforts to impose liability based on speech remain consistent with the First Amendment.  After all, if liability could be imposed for misleading (or even truthful) speech at the behest of plaintiffs who did not rely on it and cannot demonstrate injury from it (as opposed to from the intervening acts of a third party), then the threat of massive tort liability could inhibit a speaker from voicing his view "even though [he] believe[s] [it] to be true and even though it is in fact true." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964).  Yet A1765 does not even require proof of reliance.

80.     Nor does A1765 require a plaintiff to trace alleged injuries directly to the speech in question.  On the contrary, under A1765 "the conduct of a gun industry member," *including its speech*, is "deemed to constitute a proximate cause of the public nuisance if the harm to the public was a reasonably foreseeable effect of such conduct, notwithstanding any intervening actions, including, but not limited to, criminal actions by third parties."  N.J. Stat. Ann. §2C:58-35(e).  The First Amendment demands far more, particularly of speaker-based restrictions on speech.  *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565-66 (2011).

81.     The First Amendment jealously protects speech by guarding against the imposition of massive liability on speech without significant protections.  That is true even of torts that pre-date the Republic and the First Amendment.  And it is true *a fortiori* of novel and extreme theories of liabilities with no comparable historical pedigree.  A1765 flunks First Amendment 101 at every turn.

### COUNT FOUR
### (Second Amendment)

82.     Plaintiff re-alleges and incorporates by reference the preceding allegations as

though fully set out herein.

83.     "[T]he Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense." *Bruen*, 142 S.Ct. at 2125; *see also* 15 U.S.C. §7901(a)(1)-(2).  And "the core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms." *Teixeira*, 873 F.3d 670 at 677.  Commerce in arms is thus constitutionally protected.  *See Andrews v. State*, 50 Tenn. 165, 178 (1871) ("The right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair.").

84.     A1765 infringes this essential component of the Second Amendment right to keep and bear arms.  Under *Bruen*, a law that regulates Second Amendment activity is unconstitutional unless the state can prove that it "is consistent with this Nation's historical tradition."  142 S.Ct. at 2126.  A1765 is not remotely consistent with that tradition.  In fact, the Third Circuit squarely held as recently as 2001 that "[t]o extend public nuisance law to embrace the manufacture of handguns would be unprecedented." *Camden Cnty.*, 273 F.3d at 540-41; *see also* 15 U.S.C. §7901 (Congress finding the same).  New Jersey thus cannot "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S.Ct. at 2130.

85.     As a result, A1765 violates the Second Amendment.

## COUNT FIVE
### (Due Process)

86.     Plaintiff re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

87.      For many of the same reasons that A1765 is unconstitutionally vague with respect to speech protected by the First Amendment, it is also unconstitutionally vague under the Due Process Clause with respect to *all* the conduct it polices.  The Fourteenth Amendment prohibits a

state from "depriv[ing] any person of life, liberty, or property without due process of law."  U.S. Const. amend. XIV, §1.  A law that forbids or requires an act "in terms so vague that men of common intelligence must necessarily guess at its meaning … violates the first essential of due process of law."  *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 390 (1926).  So too does a law with terms so malleable that it authorizes "arbitrary [or] discriminatory enforcement."  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

88.      Because the text of the Fourteenth Amendment applies to all manner of state-sanctioned "depriv[ations]," this anti-vagueness guarantee applies to both criminal and civil laws.  *See id.* at 108-09 (collecting cases); *see also Sessions v. Dimaya*, 138 S.Ct. 1204, 1224-26 (2018) (Gorsuch, J., concurring in part and concurring in the judgment).

89.      For all the reasons already discussed, "[t]he vice of unconstitutional vagueness is further aggravated" in the First Amendment context.  *Cramp v. Bd. of Pub. Instruction of Orange Cty.*, 368 U.S. 278, 287 (1961).  But it is not just First Amendment concerns that demand regulation with especial precision.  A more "stringent" vagueness test applies for statutes that "threaten to inhibit the exercise of constitutionally protected rights" of *any* kind, as well as for statutes that impose "quasi-criminal" penalties.  *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982).  The most protective vagueness standard known to our law thus applies here several times over.  A1765 not only directly regulates speech, but also directly restricts the activities of those engaged in the lawful business of selling arms protected by the Second Amendment to law-abiding citizens who are constitutionally entitled to possess them.  And the liability A1765 threatens is no small matter:  "restitution; damages; reasonable attorneys' fees, filing fees, and reasonable costs of suit; and any other appropriate relief" flowing from downstream gun violence perpetrated by criminals.  N.J. Stat. Ann. §2C:58-35(b), (e).  A1765 thus ushers in

the "possibility of imposing liability on an entire industry," which, among other things, "threatens the diminution of a basic constitutional right" enabled by that industry—namely, individuals' Second Amendment rights to keep and bear arms.  15 U.S.C §7901(a)(6).  As a result, A1765 is subject to a "stringent" vagueness test even apart from its direct regulation of speech.

90.     A1765 flunks that test, as the prohibitions it imposes are hopelessly vague.  The statute makes it unlawful for a "gun industry member" to, *inter alia*, "recklessly … contribute to a public nuisance in [New Jersey] through the sale, manufacturing, distribution, importing, or marketing of a gun-related product" "by conduct either unlawful in itself *or unreasonable under all the circumstances*."  N.J. Stat. Ann. §2C:58-35(a)(1) (emphasis added).  That command leaves industry participants (who already must comply with an interlocking web of federal, state, and local laws) without any guidance on how they are supposed to act—or, more to the point, how they can conduct their businesses without potentially running afoul of the statute.

91.     For starters, the "unreasonable" conduct that A1765 polices may, by definition, be entirely lawful:  What is unreasonable, the statute says, is different from what is already "unlawful in itself" under federal, state, or local law.  *Id.*  Additionally, "all the circumstances" that a court must consider include the circumstances of any nuisance itself, which may not come into being until long after the manufacturer or seller has acted "through the sale, manufacturing, importing, or marketing of a firearm-related product."  *Id.*  There is thus no way to know *ex ante*—i.e., when a product is actually made, sold, or advertised—if a manufacturer or seller's conduct will or will not be deemed "unreasonable under all the circumstances."

92.     Even if an industry member could somehow conceive of all relevant circumstances yet to come, moreover, it remains a mystery what "reasonable controls" means—especially when it is defined to mean something more than complying with the law.  And the statute's modest effort

to supply a definition only makes matters worse:  Rather than identify a firearm industry member's concrete obligations with specificity, A1765 issues a sweeping command that industry members adopt any and all procedures "designed to" "prevent" or "ensure" a litany of abstract goals including (but not limited to) preventing the loss or theft of firearms, preventing illegal arms trafficking, and so on.  And rather than recycle pre-existing common-law nuisance principles, A1765 tasks industry members with predicting abstractions like what befits the "comfort" and "convenience" of New Jersey residents.  Then it directs courts to punish whenever they guess wrong.

93.     To be clear, "[w]hat renders [this] statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely *what that fact is*."  *United States v. Williams*, 553 U.S. 285, 306 (2008) (emphasis added).  The problem with A1765 is not mere imprecision at the margins, but the failure to articulate any standard whatsoever.  Determining, for example, what promotes (or disserves) the public convenience invites "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings."  *Id.*

94.     Indeed, A1765 is "so standardless that it invites arbitrary enforcement."  *Johnson v. United States*, 576 U.S. 591, 595 (2015).  And the common law is no guide, as the suits that A1765 contemplates are a radical departure from any known concept of public nuisance or any other tort.  Given its sheer breadth, its lack of any identifiable standards, and its stark departures from the common law, A1765 "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application."  *Chatin v. Coombe*, 186 F.3d 82, 89 (2d Cir. 1999) (citation omitted).  The Due Process Clause demands far more.

95.     And that is not the only due process problem with A1765.  Proof that the defendant caused the plaintiff's injury is and always has been a core element of tort law.  *See, e.g.*, *Restatement (Second) of Torts* §430 (1965); *Bank of Am. Corp. v. City of Miami*, 137 S.Ct. 1296, 1305 (2017); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132-33 (2014).  Indeed, even strict-liability torts require proof of causation.  *See, e.g.*, *Restatement (Second) of Torts* §§504-05, 507, 509, 519 (1977).  That is not just tradition; it is constitutionally mandated.  It has long been settled that "a presumption that is arbitrary, or that operates to deny a fair opportunity to repel it, violates the due process clause."  *W. & Atl. R.R. v. Henderson*, 279 U.S. 639, 642 (1929).

96.     Denying a defendant a meaningful opportunity to demonstrate that it did not actually cause a plaintiff's injuries would be a paradigm arbitrary deprivation of private property.  Yet A1765 does just that by reimaging proximate cause to include chains of events that extend not only far out of state and back in time, but through the criminal acts of third parties.  *See* N.J Stat. Ann. §2C:58-35(e).  The Constitution does not permit such breathtaking liability.

97.     It makes no difference that A1765 labels its standard "proximate cause" rather than a presumption.  A state cannot get around that bedrock constitutional protection through the simple expedient of eliminating the traditional elements of liability against which a defendant is entitled to defend.  *See Crowell v. Benson*, 285 U.S. 22, 53 (1932) ("[R]egard must be had, as in other cases where constitutional limits are invoked, not to mere matters of form, but to the substance of what is required.").  In short, labeling something "proximate cause" is no substitute for honoring the basic guarantees of due process.

98.     A1765's radical relaxing of the traditional requirements of causation not only compounds the vagueness problem, but independently violates due process.

## PRAYER FOR RELIEF

Plaintiff prays for the following relief from the Court:

1.     a declaration, pursuant to 28 U.S.C. §2202, that A1765 on its face violates the United States Constitution and is therefore void and unenforceable, or, in the alternative, that A1765 is unconstitutional as applied to NSSF and its members;

2.     a preliminary injunction enjoining Attorney General Platkin, as well as all officers, agents, and employees subject to her supervision, direction, and/or control, from enforcing or otherwise bringing suit against NSSF and its members under A1765;

3.     a permanent injunction enjoining Attorney General Platkin, as well as all officers, agents, and employees subject to her supervision, direction, and/or control, from enforcing or otherwise bringing suit against NSSF and its members under A1765;

4.     such costs and reasonable attorneys' fees to which Plaintiff may be entitled by law;

5.     nominal damages; and

6.     any further relief the Court deems just and proper.

### CERTIFICATION PURSUANT TO LOCAL RULE 11.2

I hereby certify that to the best of my knowledge and belief the above matter in controversy is not the subject of any other action pending in any court or of a pending arbitration proceeding, nor at the present time is any other action or arbitration proceeding contemplated.

Respectfully submitted,

  /s/ *Jonathan M. Preziosi*
Jonathan M. Preziosi (ID: 002041992)
Francis G.X. Pileggi (ID: 001991987)
Sean M. Brennecke (ID: 014832005)
**LEWIS BRISBOIS BISGAARD & SMITH**
One Riverfront Plaza, Suite 800
Newark, NJ 07102
973-577-6260
Jonathan.Preziosi@lewisbrisbois.com
Francis.Pileggi@lewisbrisbois.com
Sean.Brennecke@lewisbrisbois.com

Paul D. Clement[*]
Erin E. Murphy[*]
Matthew D. Rowen[*]
Trevor W. Ezell[*]
Nicholas M. Gallagher[*]
**CLEMENT & MURPHY, PLLC**
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

[*] application for admission *pro hac vice* forthcoming

Date: November 16, 2022