IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

**National Shooting Sports Foundation,**

**Plaintiff,**

**vs.**

**Matthew J. Platkin,**
**Attorney General of New Jersey,**

**Defendant.**

**C.A. No. 3:22-cv-06646**

**MOTION RETURN DATE:**
**12/19/2022**

## BRIEF IN SUPPORT OF PLAINTIFF'S
## MOTION FOR PRELIMINARY INJUNCTION

Jonathan M. Preziosi (ID: 002041992)
Francis G.X. Pileggi (ID. 001991987)
Sean M. Brennecke (ID. 014832005)
**LEWIS BRISBOIS BISGAARD & SMITH LLP**
One Riverfront Plaza
1037 Raymond Blvd, Suite 800
Newark, NJ  07012
Jonathan.Preziosi@lewisbrisbois.com
Francis.Pileggi@lewisbrisbois.com
Sean.Brennecke@lewisbrisbois.com

4870-8735-1104.1

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................ii

INTRODUCTION ............................................................................................................. 1

JURISDICTION ............................................................................................................... 3

ARGUMENT ................................................................................................................... 3

I.      NSSF Is Likely To Succeed On The Merits.................................................... 3

        A.      A1765 Is Preempted........................................................................... 3

        B.      At a Minimum, A1765 Is Preempted to the Extent it Requires Neither
                Knowing Violations nor Proximate Cause........................................... 9

        C.      A1765 Violates the Commerce Clause ............................................. 12

        D.      A1765 Violates the First Amendment ............................................... 15

        E.      A1765 Is Void for Vagueness........................................................... 21

        F.      A1765 Violates the Second Amendment .......................................... 23

II.     The Remaining Factors All Favor Injunctive Relief....................................... 24

CONCLUSION............................................................................................................... 27

# TABLE OF AUTHORITIES

**Cases**

*44 Liquormart, Inc. v. Rhode Island*,
   517 U.S. 484 (1996) .................................................................. 23, 24, 25

*A.S. Goldmen & Co. v. N.J. Bur. of Sec.*,
   163 F.3d 780 (3d Cir. 1999) ...................................................... 21

*Ams. for Prosperity Found. v. Bonta*,
   141 S.Ct. 2373 (2021) ................................................................ 25

*Ashcroft v. Free Speech Coalition*,
   535 U.S. 234 (2002) ................................................................... 26

*Baggett v. Bullitt*,
   377 U.S. 360 (1964) ................................................................... 27

*Bank of Am. Corp. v. City of Miami*,
   137 S.Ct. 1296 (2017) ................................................................ 19

*Bigelow v. Virginia*,
   421 U.S. 809 (1975) ................................................................... 24

*BMW of N. Am. Inc. v. Gore*,
   517 U.S. 559 (1997) ................................................................... 23

*Broadrick v. Oklahoma*,
   413 U.S. 601 (1973) ................................................................... 26

*Brown v. Entm't Merchants Ass'n*,
   564 U.S. 786 (2011) ...................................................... 23, 24, 25, 26

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*,
   476 U.S. 573 (1986) ................................................................... 21

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
   447 U.S. 557 (1980) ................................................................... 24

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
   142 S.Ct. 1464 (2022) ................................................................ 23

*City of Cincinnati v. Discovery Network, Inc.*,
   507 U.S. 410 (1993) ................................................................... 25

*City of N.Y. v. Beretta U.S.A. Corp.*,
   524 F.3d 384 (2d Cir. 2008) ................................................... *passim*

*Comptroller of Treasury of Maryland v. Wynne*,
575 U.S. 542 (2015) ............................................................................................ 22

*Connally v. Gen. Constr. Co.*,
269 U.S. 385 (1926) ............................................................................................ 29

*Cramp v. Bd. of Pub. Instruction of Orange Cty.*,
368 U.S. 278 (1961) ............................................................................................ 29

*Ctr. for Investigative Reporting v. Se. Penn. Transp. Auth.*,
975 F.3d 300 (3d Cir. 2020) ............................................................................... 35

*Daniels Sharpsmart, Inc. v. Smith*,
889 F.3d 608 (9th Cir. 2018) ............................................................................. 21

*District of Columbia v. Beretta U.S.A. Corp.*,
940 A.2d 163 (D.C. 2008) .................................................................................. 16

*Fernandez-Vargas v. Pfizer*,
522 F.3d 55 (1st Cir. 2008) ................................................................................ 33

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) ............................................................................................ 29

*Greater New Orleans Broad. Ass'n, Inc. v. United States*,
527 U.S. 173 (1999) ............................................................................................ 24

*Greater Phila. Chamber of Com. v. City of Phila.*,
949 F.3d 116 (3d Cir. 2020) ............................................................................... 25

*Hazardous Waste Treatment Council v. South Carolina*,
945 F.2d 781 (4th Cir. 1991) ............................................................................. 34

*Healy v. Beer Inst., Inc.*,
491 U.S. 324 (1989) ..................................................................................... 20, 21

*Hillman v. Maretta*,
569 U.S. 483 (2013) ............................................................................................ 16

*Holmes v. Secs. Inv. Prot. Corp.*,
503 U.S. 258 (1992) ............................................................................................ 19

*Ileto v. Glock, Inc.*,
565 F.3d 1126 (9th Cir. 2009) ........................................................................... 16

*In re Academy, Ltd.*,
625 S.W.3d 19 (Tex. 2021) ................................................................................ 33

iii

*Issa v. School Dist. of Lancaster*,
   847 F.3d 121 (3d Cir. 2017) ................................................................. 34

*Jam v. Int'l Fin. Corp.*,
   139 S.Ct. 759 (2019) ........................................................................... 19

*Johnson v. United States*,
   576 U.S. 591 (2015) ............................................................................ 31

*Kansas v. Garcia*,
   140 S.Ct. 791 (2020) ........................................................................... 11

*KS&E Sports v. Runnels*,
   72 N.E.3d 892 (Ind. 2017) .................................................................. 33

*Legato Vapors, LLC v. Cook*,
   847 F.3d 825 (7th Cir. 2017) .............................................................. 21

*Lorillard Tobacco Co. v. Reilly*,
   533 U.S. 525 (2001) ............................................................................ 24

*Midland Asphalt Corp. v. United States*,
   489 U.S. 794 (1989) ............................................................................ 33

*Minard Run Oil Co. v. U.S. Forest Serv.*,
   670 F.3d 236 (3d Cir. 2011) ............................................................... 34

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
   142 S.Ct. 2111 (2022) ........................................................................ 31

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
   804 F.3d 242 (2d Cir. 2015) ............................................................... 31

*N.Y. Times Co. v. Sullivan*,
   376 U.S. 254 (1964) ............................................................................ 28

*NAACP v. Button*,
   371 U.S. 415 (1963) ............................................................................ 27

*Ramsay v. Nat'l Bd. of Med. Examiners*,
   968 F.3d 251 (3d Cir. 2020) ............................................................... 34

*Reilly v. City of Harrisburg*,
   858 F.3d 173 (3d Cir. 2017) ......................................................... 11, 34

*Reno v. ACLU*,
   521 U.S. 844 (1997) ...................................................................... 26, 27

iv

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
    141 S.Ct. 63 (2020) ............................................................................................... 11

*Rubin v. Coors Brewing Co.*,
    514 U.S. 476 (1995) .............................................................................................. 25

*Sambrano v. Savage Arms, Inc.*,
    338 P.3d 103 (N.M. Ct. App. 2014) ..................................................................... 33

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) .............................................................................. 23, 25, 29

*Stilp v. Contino*,
    613 F.3d 405 (3d Cir. 2010) ................................................................................. 32

*Thornhill v. Alabama*,
    310 U.S. 88 (1940) ................................................................................................ 28

*Townsend v. Pierre*,
    110 A.3d 52 (N.J. 2015) ........................................................................................ 19

*United States v. Oakland Cannabis Buyers' Coop.*,
    532 U.S. 483 (2001) .............................................................................................. 34

*United States v. Williams*,
    553 U.S. 285 (2008) .............................................................................................. 31

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
    455 U.S. 489 (1982) .............................................................................................. 29

*Wash. State Dep't of Soc. & Health Servs. v. Guardianship Est. of Keffeler*,
    537 U.S. 371 (2003) .............................................................................................. 14

**Constitutional Provision**

U.S. Const. amend. XIV, §1 ............................................................................................ 29

**Statutes**

15 U.S.C. §7901(a)(4) .................................................................................................... 16

15 U.S.C. §7901(a)(5) ........................................................................................... 9, 15, 18

15 U.S.C. §7901(a)(6) ............................................................................................. 22, 30

15 U.S.C. §7901(a)(7) ............................................................................................. 16, 32

15 U.S.C. §7902(a) .................................................................................................... 9, 12

15 U.S.C. §7903(5)(A) .......................................................................................... *passim*

N.J. Stat. Ann. §2C:58-33 ........................................................................................ 26

N.J. Stat. Ann. §2C:58-33(a) .............................................................................. 15, 16

N.J. Stat. Ann. §2C:58-33(c) .................................................................................... 12

N.J. Stat. Ann. §2C:58-34 ...................................................................................... *passim*

N.J. Stat. Ann. §2C:58-35(a)(1) ............................................................................ *passim*

N.J. Stat. Ann. §2C:58-35(b) ........................................................................ 21, 30, 32

N.J. Stat. Ann. §2C:58-35(c) .................................................................................... 18

N.J. Stat. Ann. §2C:58-35(e) .......................................................................... 12, 19, 22, 30

N.J. Stat. Ann. §2C:58-35 ................................................................................... 12, 15

## Other Authorities

*Black's Law Dictionary* (11th ed. 2019) ....................................................................... 19

Br. of the State of California et al. as Amici Curiae, *Estados Unidos Mexicanos v.
Smith & Wesson Brands, Inc.*, No. 1:21-cv-11269 (D. Mass. Jan. 31, 2022),
Dkt.110-1 ........................................................................................................... 33

Ramsin Canon, *Instead of Criminalizing Individuals, Let's Take Down the Gun
Industry*, Truthout (Aug. 9, 2019), https://bit.ly/33pUk8r ...................................... 34

*Governor Murphy Signs Sweeping Gun Safety Package 3.0 to Continue the Fight
Against Gun Violence*, State of N.J. (July 5, 2022), https://bit.ly/3TdiCM0 ......................... 32

Nat'l Shooting Sports Found., *Firearms and Ammunition Industry Economic
Impact Report* 3 (2022), https://bit.ly/3BdsM9p ................................................... 22

*Restatement (Second) of Torts* (1977) .......................................................................... 28

Steven Spearie, *Gun Dealer: New Illinois Law Will 'Put a Hammer' On Us*,
State J. Reg. (July 22, 2019), https://bit.ly/2HjXess ............................................... 34

Sharon Walsh, *Gun Industry Views Accord as Dangerous Crack in Its Unity*,
Wash. Post (Mar. 18, 2000), https://wapo.st./2Zcp5KS ............................................. 33

## INTRODUCTION

In 2005, Congress passed the Protection of Lawful Commerce in Arms Act ("PLCAA") to stamp out efforts to use nebulous state-law "reasonableness" standards to hold law-abiding manufacturers and sellers of firearms liable for harms caused by criminals who misuse their products. That purpose is evident on the face of the statute; Congress declared in the text that the PLCAA's core aim is to prevent lawsuits seeking redress from businesses engaged in lawful commerce "for the harm caused by those who criminally or unlawfully misuse firearm products … that function as designed and intended." 15 U.S.C. §7901(5). To that end, the PLCAA broadly preempts any "civil action" "against a manufacturer or seller of a [firearm or related product]" for injuries "resulting from the … misuse of a [firearm or related product] by … a third party." *Id.* §§7902(a), 7903(5)(A). That rule is subject to only a narrow set of enumerated exceptions, all for suits involving direct and unambiguous misconduct by the manufacturer or seller itself.

New Jersey Assembly Bill 1765 ("A1765") is an unabashed attempt to end-run the PLCAA. Under A1765, a manufacturer or seller of firearms may be held liable if it fails to "establish, implement, and enforce *reasonable* controls regarding its manufacture, sale, distribution, importing, and marketing of gun-related products," N.J. Stat. Ann. §2C:58-35(a)(2) (emphasis added), which the statute (unhelpfully) defines to mean "*reasonable* procedures, safeguards, and business practices that are designed to … [p]revent the loss … or theft of a gun-related product" and "[p]revent the sale or distribution of a gun-related product to … a person prohibited from possessing a firearm," *id.* §2C:58-34 (emphasis added). "A gun industry member" may also be held liable if it "recklessly … contribute[s]," "through the sale, manufacturing, distribution, importing, or marketing of a gun-related product" and "by conduct … *unreasonable under all the circumstances*," to "a public nuisance," *id.* §2C:58-35(a)(1) (emphasis added), which the statute (unhelpfully) defines to mean "any condition which … contributes to the injury or

1

endangerment of the health, safety, peace, comfort, or convenience" of the public," *id.* §2C:58-34. The statute thus allows firearms sellers and manufacturers to be held liable under nebulous state-law "reasonableness" standards for harms caused by third parties.  In other words, it authorizes exactly what the PLCAA prohibits.

New Jersey apparently believes that the PLCAA's so-called "predicate exception," which allows suits alleging that a manufacturer or seller "knowingly violated a State … statute applicable to the sale or marketing of the product" if "the violation was a proximate cause of the harm for which relief is sought," 15 U.S.C. §7903(5)(A)(iii), permits it to revive the very suits that Congress passed the PLCAA to inter simply by enshrining the same ahistorical common-law theories into statutes.  But statutory text, structure, and context—not to mention common sense—foreclose any effort to "allow the predicate exception to swallow the statute."  *City of N.Y. v. Beretta U.S.A. Corp.*, 524 F.3d 384, 403 (2d Cir. 2008).  In reality, the predicate exception exempts actions only under statutes that impose clear and concrete obligations or prohibitions on industry members, not under statutes that, like A1765, merely impose generic duties of reasonableness and redefine proximate cause in the process.

That is reason enough to invalidate A1765, but additional reasons abound.  A1765 regulates commerce in and speech relating to lawful firearms even when the commerce and speech take place *entirely outside of New Jersey*, in clear violation of the CPommerce Clause, which prohibits states from directly regulating commerce (manufacturing, selling, marketing, etc.) that takes place beyond their borders even when that out-of-state commerce has effects within the state.  The statute unconstitutionally restricts and chills speech and invites arbitrary enforcement by imposing liability on firearms industry members for marketing their products "unreasonably," and it green-lights the imposition of liability based on truthful, non-misleading speech about lawful products,

all without proof of reliance, in clear violation of the First Amendment. And it tramples Second Amendment rights and is void for vagueness to boot.

NSSF is likely to succeed on its claims, and the remaining factors likewise favor injunctive relief. Subjecting NSSF members to an unconstitutional law inflicts irreparable harm as a matter of law, and every dollar spent trying to decipher and comply with the new statute is irreparable harm too given the Eleventh Amendment. The balance of equities and public interest support injunctive relief, as enforcement of an unconstitutional law is always contrary to the public interest, and a state and its officers suffer no cognizable harm by being enjoined from enforcing such a law. The Court should enjoin enforcement of A1765.

## JURISDICTION

NSSF challenges the validity of A1765 under 42 U.S.C. §1983 and the U.S. Constitution. This Court has jurisdiction under 28 U.S.C. §1331.

## ARGUMENT

The Court should issue a preliminary injunction because (1) NSSF is "likely to prevail" on the merits, (2) denying an injunction "would lead to irreparable injury," and (3) "granting relief would not harm the public interest." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63, 66 (2020) (per curiam); *see Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017).

## I.    NSSF Is Likely To Succeed On The Merits.

### A.    A1765 Is Preempted.

When a federal law "imposes restrictions" and "a state law confers rights … that conflict with the federal law, the federal law takes precedence and the state law is preempted." *Kansas v. Garcia*, 140 S.Ct. 791, 801 (2020). That is exactly the situation here. The PLCAA imposes clear restrictions:   Courts may not hear any "civil action … against a manufacturer or seller of a [firearms] product … for damages … or other relief, resulting from the criminal or unlawful misuse

of a qualified product by … a third party."  15 U.S.C. §7903(5)(A).  A1765 in turn confers rights

that conflict with the PLCAA:  It explicitly authorizes the imposition of liability on "gun industry

members" for damages, injunctions, and other relief resulting from a third party's misuse of an

industry member's products.  N.J. Stat. Ann. §2C:58-35.  A1765 is thus preempted.

The PLCAA preempts state efforts to subject those who manufacture or sell firearms or

firearm-related products to liablity for harms "resulting from the criminal or unlawful misuse of a

qualified product by … a third party."  15 U.S.C. §7903(5)(A).  That is precisely what A1765 seeks

to do.  Indeed, saddling firearm industry members with damages and other liability for injuries

"resulting from" third parties' misuse of their products is the whole point of the statute.  As its

codified findings explain, A1765 is designed to facilitate efforts to hold those engaged in the "sale,

manufacture, distribution, and marketing of lethal, but nonetheless legal, gun-related products"

liable for harms resulting from "gun violence."  N.J. Stat. Ann. §2C:58-33(c).  And A1765 does

just that, subjecting a gun industry member to liability for harm caused by "intervening … criminal

actions by third parties," *id.* §2C:58-35(e), if its "sale, manufacturing, distribution, importing, or

marketing" is deemed to "contribute to" "a condition which … contributes to the injury or

endangerment of the health, safety, peace, comfort, or convenience" of the public, *id.* §2C:58-

35(a)(1), or if it is deemed to have failed to employ "reasonable procedures, safeguards, and

business practices" to keep firearms out of the hands of third parties who misuse them, *id.* §2C:58-

35(a)(2).  A1765 thus seeks to revive exactly the kind of suits that the PLCAA says "may not be

brought."  15 U.S.C. §7902(a).

The only question, then, is whether A1765 falls within any of the PLCAA's exceptions.  It

does not.  A1765 does not authorize suits by the U.S. Attorney General to enforce any federal laws

(15 U.S.C. §7903(5)(A)(vi)); and it does not it does not confine liability to instances in which a

manufacturer or seller unlawfully transferred a firearm (§7903(5)(A)(i)), negligently entrusted a firearm (§7903(5)(A)(ii)), breached a contract or warranty (§7903(5)(A)(iv)), or defectively made a product (§7903(5)(A)(v)).

A1765 likewise does not fit within the PLCAA's so-called "predicate exception," which exempts "an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought." *Id.* §7903(5)(A)(iii). The predicate exception cannot sensibly be read to exempt any and all statutes that apply to the firearms industry, as such a capacious reading "would allow the predicate exception to swallow the statute, which was intended to shield the firearms industry from vicarious liability for harm caused by firearms that were lawfully distributed into primary markets." *City of N.Y.*, 524 F.3d at 403. Nor can it sensibly be read to exempt the very suits that the PLCAA was enacted to foreclose. Rather, text, structure, context, and common sense all make clear that the predicate exception exempts only statutes that impose clear obligations or prohibitions directly on industry members (and that could be tested for consistency with the Second Amendment), not statutes that, like A1765, impose only duties of care vis-à-vis the misconduct of third parties.

Starting with the statutory text, the term "applicable" in §7903(5)(A)(iii) must be read "in the context of the surrounding language and of the statute as a whole." *Id.* at 400. And both the immediately surrounding text and the language that immediately follows provide clear indications that the predicate exception applies only to laws that impose concrete obligations and prohibitions directly on manufacturers and sellers with respect to manufacturing and sales. By its terms, the exception exempts only civil actions that require proof that the defendant "*knowingly* violated" the relevant statute. 15 U.S.C. §7903(5)(A)(iii) (emphasis added). That presumes some requirement

sufficiently concrete that a manufacturer or seller can actually *knowingly* violate it.  A manufacturer can knowingly comply (or not) with a command to manufacture in certain ways, and a seller can knowingly comply (or not) with a command to conduct a background check, or to keep specified records, or to not sell to someone known to be prohibited from possessing a gun.  But it is hard to fathom how an industry member who complies with all of the multitude of federal, state, and local laws that explicitly state what it may and may not do would "know" that it nonetheless has failed to employ "reasonable procedures, safeguards, and business practices," or has conducted its lawful business in a manner so "unreasonable under all the circumstances" that it can be said to have "contribute[d] to" "a condition which … contributes to the injury or endangerment of the health, safety, peace, comfort, or convenience of others."  N.J. Stat. Ann. §2C:58-35(a)(1), (a)(2).

The illustrative examples Congress supplied of "a State or Federal statute applicable to the sale or marketing of the product," 15 U.S.C. §7903(5)(A)(iii), likewise contemplate statutes that impose concrete obligations and prohibitions on manufacture and sales, not statutes that impose broad duties of care that could be alleged to have been violated years after the manufacture or sale. "The general language … []providing that predicate statutes are those 'applicable to' the sale or marketing of firearms[] is followed by the more specific language referring to statutes imposing record-keeping requirements on the firearms industry, 15 U.S.C. §7903(5)(A)(iii)(I), and statutes prohibiting firearms suppliers from conspiring with or aiding and abetting others in selling firearms directly to prohibited purchasers, 15 U.S.C. §7903(5)(A)(iii)(II)."  *City of N.Y.*, 524 F.3d at 402. "Thus," under basic principles of interpretation, the general "applicable to" language must be "construed to embrace only objects similar to those enumerated by" the two specific examples that follow.  *Id.* (quoting *Wash. State Dep't of Soc. & Health Servs. v. Guardianship Est. of Keffeler*, 537 U.S. 371, 384 (2003)).

Each of those examples requires a violation of a concrete obligation or prohibition.  The first requires a knowing violation of a recordkeeping requirement, *e.g.*, knowingly entering false information, knowingly failing to enter appropriate information, or aiding, abetting, or conspiring with someone to make a false statement material to the lawfulness of a sale.  15 U.S.C. §7903(5)(A)(iii)(I).  The second requires a knowing violation of the obligation not to knowingly facilitate straw purchases, *e.g.*, by aiding, abetting, or conspiring to sell a firearm to someone the seller knows or has reasonable cause to believe is buying it for a prohibited person.  *Id.* §7903(5)(A)(iii)(I).  Those examples look nothing like A1765, which essentially just commands members of the firearms industry to conduct their operations "reasonably," without giving any guidance as to which controls and procedures are "reasonable" or what conduct is "unreasonable under all the circumstances," and which could cover circumstances that become evident only long after the manufacture or sale.  *See* N.J. Stat. Ann. §2C:58-35(a)(1), (a)(2).  The examples Congress provided in §7903(5)(A)(iii) differ from A1765 in another respect too.  Whereas the examples are keyed to "sales" and "marketing," A1765 is all about, and triggered by, remote and downstream "gun violence" and "criminal actions by third parties."  *Id.* §§2C:58-33(a), 2C:58-35.

The PLCAA's expressly enumerated findings reinforce the conclusion that the predicate exception applies only to laws that impose concrete obligations or prohibitions, not just duties of care.  As the statute explains, its chief aim is to foreclose efforts to hold those engaged in "the lawful design, manufacture, marketing, distribution, importation, or sale … of firearms or [related] products" "liable for the harm caused by those who criminally or unlawfully misuse firearm products or ammunition products that function as designed and intended."  15 U.S.C. §7901(a)(5).  And as the Second Circuit has recognized, the term "lawful" there means "done in compliance with statutes like those described in" the immediately preceding finding—*i.e.*, "the Gun Control

Act of 1968, the National Firearms Act, and the Arms Export Control Act." *City of N.Y.*, 524 F.3d at 402; *see* 15 U.S.C. §7901(a)(4). Those statutes do not impose amorphous commands to manufacture, sell, or market firearms "reasonably." They are comprehensive regulatory regimes that impose concrete obligations and prohibitions with which industry members can confidently ensure compliance (or, conversely, can sensibly be said to violate *knowingly*) in real time.

Finally, reading the predicate exception to exempt statutes like A1765 would effectively gut the PLCAA. This is not a case in which one must comb through obscure legislative history to divine "Congress' purposes and objectives." *Hillman v. Maretta*, 569 U.S. 483, 491 (2013). Congress enshrined them right in the statute. The unambiguous objective of the PLCAA is to foreclose efforts to impose liability on those engaged in lawful commerce in firearms through novel and expansive "theories without foundation in hundreds of years of the common law and jurisprudence of the United States." 15 U.S.C. §7901(a)(7). To be sure, the theories being invoked at the time may "traditionally have been embodied in the common law" rather than codified in statutes. *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1135-36 (9th Cir. 2009). But the threat Congress redressed did not come from the form of the lawsuit. It came from targeting the firearms industry with novel theories designed to hold it liable for the criminal misconduct of third parties.

It thus makes no difference that A1765 is a statute. *See id.* at 1138 (holding "that Congress intended to preempt general tort law claims" even when a state "codifie[s] those claims in its civil code"); *District of Columbia v. Beretta U.S.A. Corp.*, 940 A.2d 163, 168-72 (D.C. 2008) (holding similar). The state legislature itself candidly acknowledged that a suit based on exactly the same theories of liability could not be sustained under the common law. *See* N.J. Stat. Ann. §2C:58-33(a). It cannot be the case that the exact same lawsuit is just fine if a state codifies that theory in a statute. Congress' aim in enacting the PLCAA was not to prompt states to codify their novel

8

theories and reinitiate the same litigation all over again.  It barred such lawsuits altogether, while creating a narrow exception for clear requirements that could be complied with (or knowingly violated) in real time, and that could be tested for compliance with the Second Amendment.  To ascribe a contrary meaning to the predicate exception would produce absurd results, as it not only would make the PLCAA trivially easy to evade, but would make preemption of virtually identical suits grounded in virtually identical departures from traditional legal principles turn on the happenstance of whether and how a state has codified those newfangled theories.  Simply put, any reading of the predicate exception that would allow states to sneak in through the back door the very claims that Congress tossed out the front would put the PLCAA at war with itself.

### B.    At a Minimum, A1765 Is Preempted to the Extent it Requires Neither Knowing Violations nor Proximate Cause.

Even assuming A1765 qualified as "a State or Federal statute applicable to the sale or marketing of the product," 15 U.S.C. §7903(5)(A)(iii), that alone would not be enough to rescue A1765 from the preemptive force of the PLCAA.  The predicate exception exempts only "an action in which a manufacturer or seller of a qualified product *knowingly* violated a State or Federal statute applicable to the sale or marketing of the product, *and the violation was a proximate cause of the harm for which relief is sought*."  *Id.* (emphases added).  Yet A1765 authorizes actions that do not comply with either of the italicized conditions.

First, A1765 does not require a violation of either of its categories of prohibited activities to be "knowing."  The first category—"creat[ing], maintain[ing], or contribut[ing] to" "a condition which … contributes to the injury or endangerment of the health, safety, peace, comfort, or convenience of others"—explicitly permits liability for "reckless[]" violations.  N.J. Stat. Ann. §§2C:58-34, 2C:58-35(a)(1).  And the second category—the absence of "reasonable controls"— does not require any *mens rea*; it sets up a strict liability offense based on any failure to "establish,

implement, and enforce" "reasonable procedures, safeguards, and business practices that are designed to" achieve sweeping goals regarding the manufacture, sale, or marketing of "gun-related products." *Id.* §§2C:58-34, 2C:58-35(a)(2).  Industry members can thus violate A1765 under that amorphous command even if (as will generally be true) they did not *know* that their "procedures, safeguards, and business practices" were "unreasonable" at the time they were undertaken.  And lest there be any doubt about what role intent has to play for either kind of violation, A1765 makes clear that the answer is none:  "To prevail in an action under this section, the Attorney General shall not be required to demonstrate that the gun industry member acted with the purpose to engage in any public nuisance or otherwise cause harm to the public." *Id.* §2C:58-35(c).

Those are no minor deviations.  The predicate exception makes a defendant's "knowing[]" state of mind an essential element for a reason.  15 U.S.C. §7903(5)(A)(iii).  While the PLCAA is unquestionably designed to protect the firearms industry from *some* types of lawsuits, Congress did not want to give industry participants blanket immunity to violate the law or to preempt all state efforts to regulate them.  But Congress did very much want to ensure that those engaged in "the lawful design, manufacture, marketing, distribution, importation, or sale to the public of firearms or ammunition products" could not be held "liable for the harm caused by those who criminally or unlawfully misuse firearm products or ammunition products that function as designed and intended." 15 U.S.C. §7901(a)(5).  And one of the central features of the lawsuits that led to the PLCAA was that they sought to impose liability for the criminal acts of third parties based on generic theories of "reckless" or "unreasonable" practices, even if the defendant fully complied with all applicable laws. *See, e.g.*, *City of N.Y.*, 524 F.3d at 399, 403.  By exempting only laws that impose liability only if a defendant "knowingly" violates them, Congress ensured that the predicate exception would not enable states to evade the PLCAA's core command by

10

sneaking the same sweeping "recklessness" or "unreasonableness" theories into their statutes. That is exactly what New Jersey has tried to accomplish via A1765.

Making matters worse, A1765 does not require proximate causation in the ordinary sense. The predicate exception requires the conduct that violates the underlying statute to *be* "a proximate cause of the harm" for which redress is sought.  15 U.S.C. §7903(5)(A)(iii).  New Jersey tried to write around that command by simply declaring that remote sales and marketing practices, perhaps decades and thousands of miles removed from the ultimate harm, "shall be *deemed* to constitute a proximate cause" of downstream gun violence any time such violence by "intervening" criminals could be reasonably foreseeable.  N.J. Stat. Ann. §§2C:58-34, 2C:58-35(e).  But in requiring "proximate cause," Congress plainly did not mean "whatever a state defines to be proximate cause, no matter how attenuated"; it meant "to incorporate the well-settled meaning of the common-law term[] it use[d]." *Jam v. Int'l Fin. Corp.*, 139 S.Ct. 759, 769-70 (2019).  And, under the common law, not only is "foreseeability alone [] not sufficient to establish proximate cause," *Bank of Am. Corp. v. City of Miami*, 137 S.Ct. 1296, 1305 (2017), but there must be a "direct relation between the injury asserted and the injurious conduct alleged," *Holmes v. Secs. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992).  Yet A1765 explicitly discards any such inquiry.  While the common law in New Jersey (and elsewhere) generally treats criminal misconduct as an intervening cause that *defeats* proximate cause for events occurring earlier in the causal chain, *see, e.g.*, *Townsend v. Pierre*, 110 A.3d 52, 61 (N.J. 2015), A1765 expressly inverts the common-law rule that Congress incorporated into the PLCAA.  Indeed, A1765's use of the word "deemed"—a word of forced equivalence, *see* Deemed, *Black's Law Dictionary* (11th ed. 2019) ("To treat something as if (1) it were really something else, or (2) it has qualities that it does not have")—is a telltale sign that A1765 does *not* use proximate cause the way the common law and Congress understood that phrase.  By deploying

a novel variant of "proximate cause" that is explicitly designed to facilitate the very thing the PLCAA forbids—*i.e.*, holding industry members responsible for the criminal misuse of their products by third parties—A1765 once again contravenes the PLCAA.

### C.     A1765 Violates the Commerce Clause.

1.     The Supreme Court has long held that a state law that has "'the practical effect' of regulating commerce occurring wholly outside [the] State's borders" "exceeds the inherent limits of the enacting State's authority" and is "virtually per se invalid." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 335-36 (1989) (footnote omitted).  A1765 violates this bedrock principle.  Under A1765, a manufacturer that does not engage in *any* commerce in New Jersey can still be held liable (and be forced to pay damages to New Jersey) simply for manufacturing, selling, or marketing its products *in other states* in ways that meet with New Jersey's disapproval, even if that conduct was fully lawful where it occurred, if one of its products is later misused by a third party in New Jersey.

That extraterritorial reach is clear on the face of the statute.  A1765 prohibits *any* "gun industry member"—not just one operating in New Jersey—from "knowingly or recklessly creat[ing], maintain[ing], or contribut[ing] to a public nuisance in this State through the sale, manufacturing, distribution, importing, or marketing of a gun-related product."  N.J. Stat. Ann. §2C:58-35(a)(1).  And although A1765 is triggered when a firearm is unlawfully used or possessed in New Jersey, the firearm need not have been "sold, manufactured, distributed, imported, or marketed" in New Jersey," *or even* "*intended to be*." *Id.* §2C:58-34 (emphasis added).  Instead, a manufacturer or seller can be liable under A1765 for recklessly contributing to a public nuisance in New Jersey even if all of its "s[ales], manufactur[ing], … [and] marketing" took place entirely out of state and were fully lawful where they occurred, if a New Jersey judge or jury later finds that it was "reasonably foreseeable that the product would be possessed or used in this State." *Id.*

A1765's command to employ "reasonable controls" is not limited to their activities in New Jersey either. *Id.* §§2C:58-34, 2C:58-35(a)(2). So, for instance, if a native of Arkansas moves to Cherry Hill, New Jersey, with a firearm he lawfully purchased in Arkansas, and proceeds to misuse the gun in a way that endangers the "comfort" of his new neighbors in New Jersey, A1765 could be deployed to impose liability on a manufacturer operating entirely in Texas and a retailer operating entirely in Arkansas, among others with no connection to New Jersey. Making matters worse, A1765 authorizes New Jersey courts to enjoin practices that violate its terms even if they occur entirely out of state and are lawful where they occur. *See id.* §2C:58-35(b).

None of that is remotely consistent with the Commerce Clause. Under settled doctrine, a state law that imposes liability for transactions that take place out of state is flatly unconstitutional, even if it "is addressed only to" conduct "in [the state]," *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986), and even if "the regulated commerce has effects within the State," *Healy*, 491 U.S. at 336. New Jersey's apparent belief that guns are a nuisance is not a justification for regulating out-of-state commerce upstream. "If the transaction to be regulated occurs 'wholly outside' the boundaries of the state, the regulation is unconstitutional." *A.S. Goldmen & Co. v. N.J. Bur. of Sec.*, 163 F.3d 780, 786 (3d Cir. 1999); *see, e.g.*, *Daniels Sharpsmart, Inc. v. Smith*, 889 F.3d 608, 612-16 (9th Cir. 2018); *Legato Vapors, LLC v. Cook*, 847 F.3d 825 (7th Cir. 2017). Indeed, imposing state-law liability (and damages and other relief) for actions taken entirely outside of the regulating state's borders is the definition of unconstitutional extraterritorial state regulation. By directly regulating commerce that takes place entirely in other states, A1765 plainly violates the constitutional prohibition on extraterritorial state regulation.

2.      In addition to prohibiting states from regulating conduct that takes place outside of their borders even when it may have in-state effects, the Commerce Clause "prohibit[s] States from

discriminating against or imposing excessive burdens on interstate commerce." *Comptroller of Treasury of Maryland v. Wynne*, 575 U.S. 542, 549 (2015).  A1765 violates that command too.

Whatever New Jersey may think of the firearms industry, Congress has made a different judgment, recognizing that the industry not only is critical to ensuring that law-abiding Americans can exercise their Second Amendment rights, but contributes to a vibrant sector of America's economy.  That is precisely why Congress declared that the type of liability A1765 seeks to impose "invites the disassembly and destabilization of other industries and economic sectors lawfully competing in the free enterprise system of the United States, and constitutes an unreasonable burden on interstate and foreign commerce of the United States."  15 U.S.C. §7901(a)(6).  And the importance of the firearms industry has only grown since the time of PLCAA.  In 2021 alone, for instance, the firearms industry generated more than $70 billion in economic activity nationwide.  *See* Nat'l Shooting Sports Found., *Firearms and Ammunition Industry Economic Impact Report* 3 (2022), https://bit.ly/3BdsM9p.  That translates to quality jobs and considerable tax revenue.  In 2021, the firearms industry helped employ more than 350,000 people—almost all of them outside of New Jersey—and generated almost $8 billion in taxes.  *Id.*

A1765 discriminates against all that economic activity, which is flourishing elsewhere but languishing in New Jersey.  *See id.* (listing top states for economic output).  And A1765 undoubtedly burdens that economic activity; indeed, in Congress' estimation, efforts to impose liability for "criminal actions by third parties," N.J. Stat. Ann. §2C:58-35(e), inflict "an unreasonable burden on interstate and foreign commerce of the United States," 15 U.S.C. §7901(a)(6).  A1765 inflicts that economic burden, moreover, in an unabashed effort to impose its own views of gun policy on the rest of the country.  But "a State may not impose economic

sanctions … with the intent of changing … lawful conduct in other States." *BMW of N. Am. Inc. v. Gore*, 517 U.S. 559, 572 (1997). For these reasons, too, A1765 violates the Commerce Clause.

**D.      A1765 Violates the First Amendment.**

In addition to regulating the manufacture and sale of firearms, A1765 regulates (and allows courts to enjoin) speech protected by the First Amendment based on vague and unconstitutional standards. A1765 defines "gun industry member[s]"—the only entities to which it applies—to include those engaged in "marketing." N.J. Stat. Ann. §2C:58-34. It authorizes liability for contributing to a public nuisance "through … marketing." *Id.* §2C:58-35(a)(1). And it orders industry members to use "reasonable controls regarding … marketing." *Id.* §2C:58-35(a)(2). That is not remotely consistent with the First Amendment. *See 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 489 (1996) (marketing is protected speech). Laws that single out speech on the basis of content or viewpoint are subject to the strictest of scrutiny, which they "rare[ly]" survive. *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 790-91, 799 (2011). A1765 does both of those things. And far from being narrowly tailored or closely drawn to achieve a compelling government interest, A1765 is radically overbroad in relation to any legitimate objective it may further.

1.      Start with content- and viewpoint-based discrimination. A1765 plainly regulates speech based on its content or "the topic discussed." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S.Ct. 1464, 1471 (2022). After all, the statute does not apply to *all* marketing; it applies only to "marketing *of a gun-related product*." N.J. Stat. Ann. §2C:58-35(a)(1)-(2) (emphasis added). Indeed, A1765 does not even apply to all speech about firearms—only the speech of "gun industry member[s]," those "engaged in the sale, manufacturing, distribution, importing or marketing of a gun-related product." *Id.* §2C:58-34. And the statute fixates on gun-related speech by gun-related actors for a reason, as their speech is uniquely likely to communicate a *viewpoint* the state disfavors. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564 (2011).

15

The topics and views New Jersey has singled out in A1765 do not fall into any "well-defined and narrowly limited classes of speech" unprotected by the First Amendment.  *Brown*, 564 U.S. at 791.  To be sure, the First Amendment does not preclude imposing liability for false, deceptive, or otherwise "misleading" commercial speech.  *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563 (1980).  But A1765 does not even purport to target speech that is false or misleading.  It authorizes the imposition of liability for speech about a product—one expressly protected by the Constitution, no less—*even when that speech is truthful*. Tellingly, the words "false," "misleading," and "deceptive" appear nowhere in the statute.  A manufacturer that publishes advertisements containing *entirely accurate* specifications of its lawful products—ammunition size, magazine capacity, weight, retail price, etc.—would still be liable under A1765 if its advertisements were later deemed to (somehow) have undermined the "comfort" or "convenience" of New Jersey residents, N.J. Stat. Ann. §2C:58-35(a)(1), as would an industry member who fails to establish a "reasonable procedure" with respect to its marketing materials—again, no matter how accurate its advertisements are, *id.* §2C:58-35(a)(2).

That the product being marketed is dangerous does not entitle it to any less constitutional protection either.  Truthful speech promoting a lawful product is protected by the First Amendment, even if the product is known to have deleterious health effects.  *See, e.g.*, *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) (tobacco); *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 184-85 (1999) (gambling); *44 Liquormart*, 517 U.S. at 504 (liquor); *Bigelow v. Virginia*, 421 U.S. 809, 818-25 (1975) (abortion).  The mere fact that a product is dangerous does not transform promotion of that product (*i.e.*, speech) into a tort for which liability may be imposed.  And that is of course true *a fortiori* when it comes to promotion of products that not only are legal, but are protected by the Second Amendment.

16

A1765 thus strikes at the heart of the First Amendment, which furnishes no less protection for truthful commercial speech than it furnishes for other kinds of speech.  After all, "bans that target truthful, nonmisleading commercial messages rarely protect consumers from [the] harms" that may justify greater regulation of commercial speech.  *44 Liquormart*, 517 U.S. at 502-0; *see also, e.g.*, *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 495 (1995) (Stevens, J., concurring in the judgment) ("[A]ny description of commercial speech that is intended to identify the category of speech entitled to less First Amendment protection should relate to the reasons for permitting broader regulation: namely, commercial speech's potential to mislead.").  And states may not "underestimate the value" of speech just because it is commercial.  *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 419-24 (1993); *see also Sorrell*, 564 U.S. at 566.

2.      All of that means that New Jersey must affirmatively prove that A1765 satisfies heightened scrutiny.  Indeed, given the speaker, viewpoint, and content discrimination inherent in the statute, strict scrutiny should apply.  *See Greater Phila. Chamber of Com. v. City of Phila.*, 949 F.3d 116, 139 (3d Cir. 2020) ("[S]omething more than intermediate scrutiny" is required for commercial speech restrictions that single out "some messages or some speakers based on the content of the speech or the identity of the speaker.").  But in all events, no matter which version of heightened scrutiny applies, the state must pursue its goals "by means that are neither seriously underinclusive nor seriously overinclusive."  *Brown*, 564 U.S. at 805; *see also Ams. for Prosperity Found. v. Bonta*, 141 S.Ct. 2373, 2384 (2021) ("Where exacting scrutiny applies, the challenged requirement must be narrowly tailored to the interest it promotes, even if it is not the least restrictive means of achieving that end.").  A1765 flunks that test.

For one thing, it is "wildly underinclusive."  *Brown*, 564 U.S. at 801-02.  While it is ostensibly motivated by a desire to resolve a purported "epidemic of gun violence," N.J. Stat. Ann.

17

§2C:58-33, A1765 does *nothing* to police the conduct of criminals who misuse firearms to perpetrate that problem and endanger public health and safety.  Nor does it regulate vast swaths of speech—*e.g.*, action and horror films, violent video games, direct incitements to violence, and countless other forms of expression—that may actually encourage criminal gun violence.  The statute is thus wildly underinclusive even vis-à-vis the regulation of speech.  *Brown*, 564 U.S. at 801-02.  A1765 is "vastly overinclusive" as well, *id.* at 804, as it imposes sweeping liability for *any* firearms-related marketing that could later be thought to "contribute to a public nuisance" in New Jersey, even if it is nothing more than entirely truthful, non-misleading speech.

Indeed, A1765's scope is breathtaking:  In conceivably any case of gun violence, countless firearm industry members—perhaps thousands of miles away from New Jersey and decades before anyone suffers injury—will have engaged in truthful advertising of their firearm products.  Any such advertisements later deemed to have indirectly *contributed* to gun-related problems in New Jersey, even without the industry member's knowledge, could be grounds for liability for someone else's criminal misuse of their products.  To be grounds for liability under A1765, the marketing does not even have to have led to the purchase of the firearm used to perpetrate crimes.  In short, A1765 "prohibit[s] or chill[s]" vast swaths of fully protected expression, *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255 (2002), destroying the "breathing space" that "the First Amendment needs," *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973).

3.      In its effort to sweep up far more protected speech than could conceivably be necessary to accomplish any permissible state objectives, A1765 also suffers from a fatal vagueness problem.  Vagueness "raises special First Amendment concerns because of its obvious chilling effect on free speech."  *Reno v. ACLU*, 521 U.S. 844, 871-72 (1997).  After all, vague laws risk chilling would-be speakers by forcing them "to steer far wider of the unlawful zone" than they

otherwise would "if the boundaries of the forbidden areas were clearly marked." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964).  For that reason, laws touching on speech must themselves speak "only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963).

A1765 does precisely the opposite.  Indeed, the statute makes it virtually impossible for regulated parties to tell what speech is and is not permitted, leaving them with no realistic choice but to err on the side of refraining from exercising their First Amendment rights.  By its terms, A1765 renders unlawful any marketing that could be said to have "recklessly" "contribute[d] to a public nuisance," N.J. Stat. Ann. §2C:58-35(a)(1), and it defines "public nuisance" so broadly as to sweep in, e.g., truthful marketing that "contributes to the injury or endangerment of the health, safety, peace, comfort, or convenience of others" or is not subject to sufficiently "reasonable procedures, safeguards, and business practices," *id.* §2C:58-34.  A1765 thus necessarily "will provoke uncertainty among speakers," *Reno*, 521 U.S. at 871, as such incomprehensible and subjective abstractions do not articulate *at all*—let alone articulate with "narrow specificity"— what kind of speech may later be deemed to have contributed to a "public nuisance."  *Any* advertisement for a lawful product *anywhere* can be grounds for liability if it is later deemed by a New Jersey factfinder to have indirectly *contributed* to gun-related problems in New Jersey.  By contrast, the "legitimate" sweep of the statute's marketing provisions is miniscule—particularly given that A1765 elsewhere contemplates full compliance with state and federal laws relating to marketing of firearms.  *See id.* §2C:58-34.  A1765's vague command to speak "reasonably" is all but certain to chill constitutionally protected speech.

That profound uncertainty not only "raises special First Amendment concerns because of its obvious chilling effect on free speech," but creates a "risk of discriminatory enforcement," which makes the chilling effect even more acute.  *Reno*, 521 U.S. at 871-72.  A1765 threatens

liability for any marketing that state actors could later say was not subject to reasonable controls. But under our constitutional framework, the state does not get decide, after the fact, whether speech was reasonable.  Unless commercial speech is false or inconsistent with traditional, clear, and *ex ante* restrictions on speech, the First Amendment fully protects it, even if others might deem the speech "unreasonable."  And the threat of discriminatory enforcement is all the more pervasive when, as here, a law "does not aim specifically at evils within the allowable area of State control but, on the contrary, sweeps within its ambit other activities that in ordinary circumstances constitution an exercise of freedom of speech or of the press." *Thornhill v. Alabama*, 310 U.S. 88, 97 (1940).  That inherent vagueness dooms A1765 under the First Amendment as well.

On top of all that, even when speech about a product is actually false or misleading, the traditional principles that govern judicial actions for misrepresentations, including proof of reliance, have always required a substantial link between the speech and the claimed injury.  *See, e.g.*, *Restatement (Second) of Torts* §525 (1977).  That link is essential to ensure that efforts to impose liability based on speech are consistent with the First Amendment.  After all, if liability could be imposed for misleading (or even truthful) speech at the behest of plaintiffs who did not rely on it and cannot demonstrate injury from it, then the threat of massive liability could inhibit a speaker from voicing his view "even though [he] believe[s] [it] to be true and even though it is in fact true." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964).  Yet A1765 does not even require proof of reliance.  Nor does it require a plaintiff to trace alleged injuries directly to the speech in question.  Under A1765, an industry member's speech is "deemed to constitute a proximate cause of the public nuisance if the harm to the public was a reasonably foreseeable effect of such conduct, notwithstanding any intervening actions, including, but not limited to, criminal actions by third

parties." N.J. Stat. Ann. §2C:58-35(e).  The First Amendment demands far more, particularly of speaker-based restrictions on speech.  *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565-66 (2011).

####     E.     A1765 Is Void for Vagueness.

For many of the reasons that A1765 is unconstitutionally vague with respect to speech protected by the First Amendment, it is also unconstitutionally vague under the Due Process Clause with respect to all other conduct it polices.  One of the few things that *is* clear about the statute is that it leaves industry members with no meaningful guidance on how they are supposed to act—or, more to the point, how they can conduct their businesses without running afoul of the statute.

The Fourteenth Amendment prohibits states from "depriv[ing] any person of life, liberty, or property without due process of law."  U.S. Const. amend. XIV, §1.  A law that forbids or requires an act "in terms so vague that men of common intelligence must necessarily guess at its meaning … violates the first essential of due process of law."  *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 390 (1926).  The same is true of a law with terms so malleable that it authorizes "arbitrary [or] discriminatory enforcement."  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

For reasons already discussed, "[t]he vice of unconstitutional vagueness is further aggravated" in the First Amendment context.  *Cramp v. Bd. of Pub. Instruction of Orange Cty.*, 368 U.S. 278, 287 (1961).  But it is not just First Amendment concerns that demand regulation with especial precision.  A more "stringent" vagueness test applies for statutes that "threaten to inhibit the exercise of constitutionally protected rights" of *any* kind, as well as for statutes that impose "quasi-criminal" penalties.  *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982).  The most protective vagueness standard known to our law thus applies here several times over.  A1765 not only regulates speech protected by the First Amendment, but also restricts the conduct of those engaged in the lawful business of selling products protected by the Second Amendment to law-abiding citizens who are constitutionally entitled to possess them.  The

liability A1765 threatens is no small matter—"restitution; damages; reasonable attorneys' fees, filing fees, and reasonable costs of suit; and any other appropriate relief" flowing from downstream gun violence perpetrated by criminals, N.J. Stat. Ann. §2C:58-35(b), (e).  A1765 thereby brings with it the "possibility of imposing liability on an entire industry," which "threatens the diminution of a basic constitutional right" enabled by that industry—namely, individuals' Second Amendment rights to keep and bear arms.  15 U.S.C §7901(a)(6).  As a result, A1765 is subject to a "stringent" vagueness test even apart from its direct regulation of speech.

A1765 flunks that test, as the prohibitions it imposes are hopelessly vague.  The statute renders it unlawful to, *inter alia,* "recklessly … contribute to a public nuisance in [New Jersey] through the sale, manufacturing, distribution, importing, or marketing of a gun-related product" "by conduct either unlawful in itself *or unreasonable under all the circumstances*."  N.J. Stat. Ann. §2C:58-35(a)(1) (emphasis added).  The text of the statute thus confirms that, to fall into the disjunctive "unreasonable" bucket, conduct must be lawful.  Moreover, "all the circumstances" that a court must consider include the circumstances of any nuisance itself, which may not come into being until long after the manufacturer or seller has engaged in "the sale, manufacturing, importing, or marketing of a firearm-related product."  *Id.*  There is thus no way to know *ex ante*— when a product is actually made, sold, or advertised—if a manufacturer or seller's conduct will or will not be deemed "unreasonable under all the circumstances."

And that is not the worst of it.  Even if an industry member could somehow conceive of all relevant circumstances yet to come, it remains a mystery what "reasonable controls" means— especially since the term is defined to mean something more than simply complying with the law. *See* N.J. Stat. Ann. §2C:58-34.  And the statute's modest effort to supply a definition only makes matters worse:   Rather than specify a firearm industry member's concrete obligations with

specificity, A1765 commands them to adopt any and all procedures "designed to" "prevent" or "ensure" a litany of abstract goals including (but not limited to) preventing the loss or theft of firearms, preventing illegal arms trafficking, and so on. *Id.* What is more, rather than recycle pre-existing common-law nuisance principles, A1765 tasks industry members with predicting abstractions like what befits the "comfort" and "convenience" of New Jersey residents. *Id.* That is classic unconstitutional vagueness.

To be clear, "[w]hat renders [this] statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely *what that fact is*." *United States v. Williams*, 553 U.S. 285, 306 (2008) (emphasis added). The problem with A1765 is not mere imprecision at the margins, but the failure to articulate any cognizable standard whatsoever. Determining, for example, what promotes (or disserves) the public convenience invites "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *Id.* Indeed, A1765 is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). That would be problematic enough in any context. When not one, but two, fundamental constitutional rights are concerned, such pervasive vagueness is anathema to the Constitution. *Cf. N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015).

### F.     A1765 Violates the Second Amendment.

Imposing novel liability for lawful commerce in firearms violates the Second Amendment. There is no question that A1765 burdens Second Amendment activity. By its terms, the law singles out the act of manufacturing and selling constitutionally protected arms for the imposition of potentially massive liability. The question is thus whether the state can prove that the burdens A1765 imposes are consistent with "this Nation's historical tradition" of regulating commerce in firearms. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S.Ct. 2111, 2125 (2022). The answer is no.

As Congress itself explained in the PLCAA, efforts to hold those engaged in the lawful manufacture, marketing, and sale of firearms liable for the criminal misuse of their products by third parties are "based on theories without foundation in hundreds of years of the common law and jurisprudence of the United States." 15 U.S.C. §7901(a)(7). Indeed, even the few courts that accepted such theories before Congress enacted the PLCAA did not do so until the turn of the twenty-first century. Simply put, the novel liability A1765 invites lacks any historical pedigree at all, and violates the Second Amendment.

## II.     The Remaining Factors All Favor Injunctive Relief.

1.     The constitutional injuries A1765 is inflicting on NSSF and its members are sufficient irreparable injury in and of themselves to justify injunctive relief, especially given the significant chilling effect A1765 has on constitutionally protected speech. *See Stilp v. Contino*, 613 F.3d 405, 409 (3d Cir. 2010). But they certainly do not stand alone.

First, the process of trying to ascertain what the vague terms of A1765 mean and what steps, if any, industry could try to take today to avoid being deemed to have acted unreasonably tomorrow will be considerable—and, thanks to the Eleventh Amendment, unrecoverable. That is an irreparable and immediate injury. *See* Decl. of Jeffrey K. Reh ¶¶13-17; Decl. of Steven Shawver ¶¶12-14. And industry cannot delay in considering steps to limit future liability. A1765 allows the Attorney General to bring a civil action for practically any kind of relief if he suspects a violation of the statute. *See* N.J. Stat. Ann. §2C:58-35(b). And all indications are that he intends to use that authority. Even before A1765 became law, Attorney General Platkin made public statements supporting the statute and lambasting the industry as purportedly "profit[ing] from … bloodshed." *Governor Murphy Signs Sweeping Gun Safety Package 3.0 to Continue the Fight Against Gun Violence*, State of N.J. (July 5, 2022), https://bit.ly/3TdiCM0. And he has *already* signed onto efforts to use litigation to saddle the firearms industry with crushing liability based on

the criminal acts of others:  Earlier this year, he signed an amicus brief supporting a lawsuit by Mexico seeking to collect more than *$10 billion* from manufacturers for third-party gun violence. *See* Br. of the State of California et al. as Amici Curiae, *Estados Unidos Mexicanos v. Smith & Wesson Brands, Inc.*, No. 1:21-cv-11269 (D. Mass. Jan. 31, 2022), Dkt.110-1.

Second, the text of the PLCAA could not be clearer that the lawsuits A1765 authorizes "*may not be brought* in any Federal or State court."  15 U.S.C. §7902(a) (emphasis added).  That unequivocal language is not just a defense against liability; it is "an explicit statutory … guarantee that trial will not occur."  *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 801 (1989).  It is no wonder, then, that courts across the country have consistently interpreted the statute as creating not just a shield from liability, but an immunity from suit entirely.  *See, e.g.*, *In re Academy, Ltd.*, 625 S.W.3d 19, 32-36 (Tex. 2021); *KS&E Sports v. Runnels*, 72 N.E.3d 892, 897-98 (Ind. 2017); *Sambrano v. Savage Arms, Inc.*, 338 P.3d 103, 104 (N.M. Ct. App. 2014).  No court can make NSSF's members whole for having to defend against suits that should never have been brought in the first place—particularly when they are brought by the state, which would be immune from any later suit to recoup monetary losses.  *See Fernandez-Vargas v. Pfizer*, 522 F.3d 55, 68-69 (1st Cir. 2008) (approving injunction because loss of immunity from suit "would constitute irreparable harm").

Indeed, advocates behind the suits brought before the PLCAA was passed—and those behind A1765—have been remarkably frank about their aims.  Win or lose, "[t]he legal fees alone are enough to bankrupt the industry."  Sharon Walsh, *Gun Industry Views Accord as Dangerous Crack in Its Unity*, Wash. Post (Mar. 18, 2000), https://wapo.st./2Zcp5KS.  In recent years, advocates urged suits like the ones A1765 authorizes for the same, simple reason:  "[U]nleash the plaintiffs' lawyers and attorneys general against the gun industry" to "critically weaken" it.

Ramsin Canon, *Instead of Criminalizing Individuals, Let's Take Down the Gun Industry*, Truthout (Aug. 9, 2019), https://bit.ly/33pUk8r.  Opponents and proponents alike recognize that the actions A1765 invites could cripple the firearms industry regardless of whether they ultimately succeed.

Make no mistake, though; both public and private plaintiffs in these kinds of actions *have* sought millions and billions of dollars and will undoubtedly do the same here if A1765 is not enjoined.  The results could be bankruptcy-inducing.  While some large NSSF members may be able to withstand a litigation firestorm, many others will not be.  *See, e.g.*, Steven Spearie, *Gun Dealer: New Illinois Law Will 'Put a Hammer' On Us*, State J. Reg. (July 22, 2019), https://bit.ly.2HjXess (noting that changes in Illinois law shuttered half of the state's gun dealers).  The economic harm A1765 promises is thus irreparable, as it "threaten[s] the existence of [NSSF members'] business."  *Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 255 (3d Cir. 2011).

2.     Plaintiff's showing on the "two gateway factors"—likelihood of success and irreparable harm—suffices to justify a preliminary injunction.  *Reilly*, 858 F.3d at 179; *Issa v. School Dist. of Lancaster*, 847 F.3d 121, 143 (3d Cir. 2017).  But the public interest favors an injunction as well.  A1765 encroaches on federal authority by flouting Congress' express purposes in passing the PLCAA.  *See, e.g.*, *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497-98 (2001) (public interest favored injunction where state law conflicted with "Congress's policy choice, articulated in a statute"); *Ramsay v. Nat'l Bd. of Med. Examiners*, 968 F.3d 251, 263 (3d Cir. 2020) (same).  A1765 also foments interstate conflict and burdens interstate commerce by setting New Jersey up as the judge of lawful business practices in other states.  *See, e.g.*, *Hazardous Waste Treatment Council v. South Carolina*, 945 F.2d 781, 795 (4th Cir. 1991) (public interest favored injunction where state law burdened interstate commerce).  And it tramples on individual rights—the right to keep and bear arms, the freedom of speech, the privilege of pursuing a common

calling, and more.  *See, e.g.*, *Ctr. for Investigative Reporting v. Se. Penn. Transp. Auth.*, 975 F.3d 300, 317 (3d Cir. 2020) (public interest favored injunction where law burdened constitutional rights).  The public interest does not favor in the slightest keeping in place a statute that poses such a grave threat to fundamental constitutional rights.

## CONCLUSION

For the reasons set forth above, this Court should grant Plaintiff preliminary injunctive relief in the form of the proposed Order submitted herewith.

Respectfully submitted,

/s/ Jonathan M. Preziosi
Jonathan M. Preziosi (ID: 002041992)
Francis G.X. Pileggi (ID. 001991987)
Sean M. Brennecke (ID. 014832005)
**LEWIS BRISBOIS**
**BISGAARD & SMITH LLP**
One Riverfront Plaza
1037 Raymond Blvd, Suite 800
Newark, NJ  07012
Jonathan.Preziosi@lewisbrisbois.com
Francis.Pileggi@lewisbrisbois.com
Sean.Brennecke@lewisbrisbois.com
Counsel for Plaintiff

Paul D. Clement*
Erin E. Murphy*
Matthew D. Rowen*
Trevor W. Ezell*
Nicholas M. Gallagher*
**CLEMENT & MURPHY, PLLC**
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

* application for admission *pro hac vice* forthcoming

*Counsel for Plaintiff*