# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| NATIONAL SHOOTING SPORTS FOUNDATION, | |
| Plaintiff, | Hon. Zahid N. Quraishi, U.S.D.J. |
| v. | Civil Action No. 3:22-cv-6646 |
| MATTHEW J. PLATKIN, Attorney General of New Jersey, | |
| Defendant. | |

## BRIEF IN OPPOSITION TO MOTION FOR A PRELIMINARY INJUNCTION

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
R.J. Hughes Justice Complex
P.O. Box 116
Trenton, New Jersey 08625
Attorneys for Defendant
tim.sheehan@njoag.gov

Sara M. Gregory (NJ Bar #027252010)
  *Assistant Attorney General*
Tim Sheehan (NJ Bar #179892016)
Chandini Jha (NJ Bar #382622021)
Justine M. Longa (NJ Bar #305062019)
Phoenix N. Meyers (NJ Bar #307302019)
Amanda I. Morejón (NJ Bar #405942022)
Samuel L. Rubinstein (NJ Bar #372122021)
  *Deputy Attorneys General*
  Of Counsel and On the Brief

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...............................................................................1

STATEMENT OF FACTS AND PROCEDURAL HISTORY ...............................3

    A. New Jersey's Public Nuisance Statute ...............................................................3

    B. Plaintiff's Complaint and Motion for Preliminary Injunction .......................4

STANDARD FOR PRELIMINARY INJUNCTION ...........................................5

ARGUMENT .........................................................................................................6

POINT I

PLAINTIFF HAS NOT ESTABLISHED IRREPARABLE HARM ....................6

POINT II

PLAINTIFF WILL NOT SUCCEED ON THE MERITS ...................................11

    A. There is no Article III case or controversy at this stage ..............................11

    B. Plaintiff cannot meet its burden for a facial challenge ...............................14

    C. Plaintiff is not likely to succeed on its preemption claims ..........................18

        1.    NSSF misconstrues the meaning of "applicable to" ..........................19

        2.    NSSF misconstrues the exception's scienter requirement .................25

        3.    NSSF misconstrues the meaning of "proximate cause" ....................27

    D. Plaintiff is not likely to succeed on its Commerce Clause challenge ...........30

    E. Plaintiff is not likely to succeed on its void-for-vagueness challenge ..........33

i

F. Plaintiff is not likely to succeed on its First Amendment challenge.............35

G. Plaintiff is not likely to succeed on its Second Amendment challenge ........39

POINT III

THE REMAINING EQUITABLE FACTORS ARE IN ACCORD.......................40

CONCLUSION ...................................................................................................40

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*44 Liquormart v. Rhode Island*,
    517 U.S. 484 (1996)................................................................38

*Abbott v. Perez*,
    138 S. Ct. 2305 (2018)............................................................40

*Acierno v. New Castle Cnty.*,
    40 F.3d 645 (3d Cir. 1994).....................................................6, 8

*Adams v. Freedom Forge Corp.*,
    204 F.3d 475 (3d Cir. 2000)..............................................5, 6, 10

*ADP, Inc. v. Levin*,
    No. 21-2187, 2022 WL 1184202 (3d Cir. Apr. 21, 2022)................10

*Baltimore & Ohio R. Co. v. Oberly*,
    837 F.2d 108 (3d Cir. 1988)...................................................15

*Bank of Hope v. Miye Chon*,
    938 F.3d 389 (3d Cir. 2019)..............................................36, 37

*Bell v. Publix Super Mkts.*,
    982 F.3d 468 (7th Cir. 2020)..................................................38

*Bonsignore v. City of New York*,
    683 F.2d 635 (2d. Cir. 1982) .................................................29

*Braitman v. Overlook Terrace Corp.*,
    346 A.2d 76 (N.J. 1975) .......................................................28

*Brown v. Entertainment Merchants Ass'n*,
    564 U.S. 786 (2011)............................................................36

*Brown v. Pittsburgh*,
    586 F.3d 263 (3d Cir. 2009)...................................................37

*Butler v. Acme Markets*,
    445 A.2d 1141 (N.J. 1982)....................................................29

iii

*Byrd v. Shannon*,
     715 F.3d 117 (3d Cir. 2013)...............................................................20

*Camden Cnty. Bd. of Chosen Freeholders v. Beretta, U.S.A. Corp.*,
     273 F.3d 536 (3d Cir. 2001)...............................................................27

*Campbell Soup Co. v. ConAgra, Inc.*,
     977 F.2d 86 (3d Cir. 1992).................................................................6

*Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*,
     447 U.S. 557 (1980)..........................................................................36

*ChemSol, LLC v. City of Sibley*,
     386 F. Supp. 3d 1000 (N.D. Iowa 2019) ....................................35, 39

*Children's Health Def., Inc. v. Rutgers State Univ. of N.J.*,
     No. 21-15333, 2021 WL 4398743 (D.N.J. Sept. 27, 2021)................8

*City of Austin v. Reagan Nat'l Advert. Of Austin, LLC*,
     142 S. Ct. 1464 (2022)......................................................................36

*City of New York v. Beretta USA Corp.*,
     524 F.3d 384 (2d Cir. 2008)........................................................20, 22

*Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*,
     298 F.3d 201 (3d Cir. 2002)...............................................................31

*CMR D.N. Corp. v. City of Philadelphia*,
     703 F.3d 612 (3d Cir. 2013)..........................................................33, 35

*CSX Transp. v. Ala. Dep't of Revenue*,
     562 U.S. 277 (2011)..........................................................................24

*Delana v. CED Sales, Inc.*,
     486 S.W.3d 316 (Mo. 2016)..............................................................16

*Dep't of Revenue of Ky. v. Davis*,
     553 U.S. 328 (2008)......................................................................30, 33

*District of Columbia v. Heller*,
     554 U.S. 570 (2008)......................................................................39, 40

*Drummond v. Robinson Township*,
    9 F.4th 217 (3d Cir. 2021)...................................................................40

*Ellis v. Westinghouse Elec. Co.*,
    11 F.4th 221 (3d Cir. 2021).................................................................20

*Empire State Rest. & Tavern Ass'n, Inc. v. New York State*,
    360 F. Supp. 2d 454 (N.D.N.Y. 2005)................................................34

*Energy & Env't Legal Inst. v. Epel*,
    793 F.3d 1169 (10th Cir. 2015)......................................................31, 32

*Exxon Mobil Corp. v. Schneiderman*,
    316 F. Supp. 3d 679 (S.D.N.Y. 2018)................................................11

*F.T.C. v. Standard Oil Co. of Cal.*,
    449 U.S. 232 (1980).............................................................................10

*Farina v. Nokia*,
    625 F.3d 97 (3d Cir. 2010).................................................................30

*Felmeister v. Off. of Att'y Ethics*,
    856 F.2d 529 (3d Cir. 1988)..........................................................12, 13

*Ferring Pharms., Inc. v. Watson Pharms., Inc.*,
    765 F.3d 205 (3d Cir. 2014).................................................................6

*Frank's GMC Truck Ctr., Inc. v. Gen'l Motors Corp.*,
    847 F.2d 100 (3d Cir. 1988).................................................................5

*Free Speech Coalition v. Att'y Gen.*,
    825 F.3d 149 (3d Cir. 2016)...............................................................11

*Freedom Holdings v. Spitzer*,
    408 F.3d 112 (2d Cir. 2005).................................................................7

*Freeman v. Corzine*,
    629 F.3d 146 (3d Cir. 2010)...............................................................32

*FTC v. Wyndham Worldwide Corp.*,
    799 F.3d 236 (3d Cir. 2015)...............................................................33

*Heffner v. Murphy*,
    745 F.3d 56 (3d Cir. 2014) ............................................................. 15, 31

*Herrera v. Quality Pontiac*,
    73 P.3d 181 (N.M. 2003) ...................................................................... 29

*Ileto v. Glock*,
    565 F.3d 1126 (9th Cir. 2009) ....................................................... 20, 24

*Instant Air Freight Co. v. C.F. Air Freight, Inc.*,
    882 F.2d 797 (3d Cir. 1989) ................................................................... 9

*Jake's, Ltd. v. Coates*,
    284 F.3d 884 (8th Cir. 2002) ............................................................... 35

*Jam v. Int'l Finance Corp.*,
    139 S. Ct. 759 (2019) ........................................................................... 29

*Kingsley v. Hendrickson*,
    576 U.S. 389 (2015) .............................................................................. 22

*Komlodi v. Picciano*,
    89 A.3d 1234 (N.J. 2014) ..................................................................... 28

*Kos Pharms. Inc. v. Andrx Corp.*,
    369 F.3d 700 (3d Cir. 2004) ............................................................ 6, 40

*Lanin v. Borough of Tenafly*,
    515 F. App'x 114 (3d Cir. 2013) ........................................................... 8

*In re Lead Paint Litig.*,
    924 A.2d 484 (N.J. 2007) ..................................................................... 35

*Lupian v. Joseph Cory Holdings LLC*,
    905 F.3d 127 (3d Cir. 2018) ................................................................ 30

*Lynch v. Scheininger*,
    744 A.2d 113 (N.J. 2000) ..................................................................... 28

*Marxe v. Jackson*,
    833 F.2d 1121 (3d Cir. 1987) ................................................................. 7

*Maryland v. King*,
    567 U.S. 1301 (2012) .........................................................................40

*Mazo v. N.J. Sec. of State*,
    54 F.4th 124 (3d Cir. 2022) ...........................................................15, 37

*MedImmune v. Genentech*,
    549 U.S. 118 (2007) .........................................................................11

*Mugler v. Kansas*,
    123 U.S. 623 (1887) .........................................................................30

*N.Y. State Club Ass'n v. City of N.Y.*,
    487 U.S. 1 (1988) .........................................................................16, 22

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
    142 S. Ct. 2111 (2022) ...................................................................39, 40

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*,
    272 F.3d 104 (2d Cir. 2001) ..............................................................33

*Nat'l Shooting Sports Found., Inc. v. James*,
    _ F. Supp. 3d _, 2022 WL 1659192 (N.D.N.Y. 2022) ..............................*passim*

*Norfolk S. Corp. v. Oberly*,
    822 F.2d 388 (3d Cir. 1987) ..............................................................33

*Oncale v. Sundowner Offshore Servs.*,
    523 U.S. 75 (1998) .........................................................................21

*Pharm. Rsch. & Mfrs. of Am. v. Walsh*,
    538 U.S. 644 (2003) .........................................................................32

*Pharmacia Corp. v. Alcon Labs., Inc.*,
    201 F. Supp. 2d 335 (D.N.J. 2002) .......................................................8

*Pike v. Bruce Church*,
    397 U.S. 137 (1970) .....................................................................31, 32

*Plains All Am. Pipeline L.P. v. Cook*,
    866 F.3d 534 (3d Cir. 2017) ..............................................................15

*Prescott v. Slide Fire Solutions*,
410 F. Supp. 3d 1123 (D. Nev. 2019)................................................................22

*Ransom v. FIA Card Servs., N.A.*,
562 U.S. 61 (2011)...............................................................................................19

*Rappaport v. Nichols*,
156 A.2d 1 (N.J. 1952).........................................................................................29

*Reilly v. City of Harrisburg*,
858 F.3d 173 (3d Cir. 2017)............................................................................6, 11

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
515 U.S. 819 (1995).............................................................................................36

*S. Dakota v. Wayfair, Inc.*,
138 S. Ct. 2080 (2018).........................................................................................30

*In re Sarco, Inc.*,
No. A-1161-8, 2011 WL 1376286 (N.J. Super. Ct. App. Div. Apr. 13,
2011) ....................................................................................................................16

*Sherwin-Williams Co. v. Cnty. of Delaware, Pa.*,
968 F.3d 264 (3d Cir. 2020)........................................................................9, 12, 13

*Singh-Kaur v. Ashcroft*,
385 F.3d 293 (3d Cir. 2004).................................................................................23

*Soto v. Bushmaster Firearms Int'l, LLC*,
202 A.3d 262 (Conn. 2019)......................................................................19, 22, 37

*State v. Rivera*,
16 A.3d 352 (N.J. 2011).......................................................................................26

*Teixeira v. County of Alameda*,
873 F.3d 670 (9th Cir. 2017)...............................................................................39

*Texas v. United States*,
523 U.S. 296 (1998).............................................................................................12

*TitleMax of Delaware, Inc. v. Weissmann*,
24 F.4th 230 (3d Cir. 2022)...........................................................................31, 32

*Townsend v. Pierre*,
110 A.3d 52 (N.J. 2015)...................................................................29

*Travelers Ins. Co. v. Obusek*,
72 F.3d 1148 (3d Cir. 1995)...........................................................12

*United States v. Hoffert*,
949 F.3d 782 (3d Cir. 2020)....................................................34, 39

*United States v. Kaur*,
382 F.3d 1155 (9th Cir. 2004).......................................................25

*United States v. Marcavage*,
609 F.3d 264 (3d Cir. 2010).............................................14, 15, 16

*United States v. Salerno*,
481 U.S. 739 (1987).........................................................................15

*United States v. Ven-Fuel*,
758 F.2d 741 (1st Cir. 1985).........................................................26

*United States v. Williams*,
553 U.S. 285 (2008).........................................................................33

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989).........................................................................38

*Wash. State Dep't of Soc. & Health Servs. v. Guardianship Est. of Keffeler*,
537 U.S. 371 (2003).........................................................................24

*Williams v. BASF Catalysts LLC*,
765 F.3d 306 (3d Cir. 2014)...........................................................13

*Williams-Yulee v. Fla. Bar*,
575 U.S. 433 (2015).........................................................................36

*Wm. Penn Parking Garage v. City of Pittsburgh*,
346 A.2d 269 (Pa. 1975) ...........................................................34, 39

*Wreal, LLC v. Amazon.com, Inc.*,
840 F.3d 1244 (11th Cir. 2016).......................................................8

## Statutes

15 U.S.C. § 7901 ............................................................................................. 2

15 U.S.C. § 7901(a)(6) ........................................................................... 21, 24

15 U.S.C. § 7901(a)(7) .................................................................................. 24

15 U.S.C. § 7901(b)(1) .................................................................................. 24

15 U.S.C. § 7903 ............................................................................................. 2

15 U.S.C. § 7903(4) ...................................................................................... 18

15 U.S.C. § 7903(5)(A) ........................................................................ passim

15 U.S.C. § 7903(5)(B) .................................................................................. 29

18 U.S.C. § 922(b) ........................................................................................ 25

18 U.S.C. § 932(b)(2) .................................................................................... 25

29 U.S.C. § 1105(a)(1) .................................................................................. 22

Del. Code Ann. tit. 6, § 2511(9) ................................................................... 38

Del. Code Ann. tit. 6, § 22512 ..................................................................... 38

N.J. Stat. Ann. § 2A:15-5.6(b)(1) ................................................................ 22

N.J. Stat. Ann. § 2C:2-2(c)(3) ...................................................................... 26

N.J. Stat. Ann. § 2C:39-9(k) ........................................................................ 16

N.J. Stat. Ann. § 2C:58-33 ................................................................... 1, 3, 33

N.J. Stat. Ann. § 2C:58-34 ........................................................... 4, 19, 31, 34

N.J. Stat. Ann. § 2C:58-35 ..................................................................... passim

Tex. Penal Code Ann. § 42.01(a) ................................................................. 22

## Other Authorities

151 Cong. Rec. S8908-01 (July 26, 2005) ................................................... 22

151 Cong. Rec. S9087 (July 27, 2005) ................................................................. 22

Press Release, Office of Atty. Gen., *AG Grewal Announces First-in-the-Nation Settlement with Ghost Gun Co.* (Mar. 18, 2021), https://tinyurl.com/4s6j3532 ................................................................. 17

Restatement (Second) of Torts (1965) ................................................................. 28

Webster's Third New International Dictionary (2002) ........................................... 19

## **PRELIMINARY STATEMENT**

In July 2022, the New Jersey Legislature passed a law to address the misconduct of certain bad actors in the firearms industry: those whose "misconduct results in harm to the public," "fuels the epidemic of gun violence in New Jersey," and contributes to "an illegal secondary market" for guns in the State. N.J. Stat. Ann. § 2C:58-33(a), (c); *see id.* §§ 2C:58-33 to -36 ("Section 58-35"). The law conferred on the Attorney General an exclusive, civil cause of action against industry members who (1) unreasonably or otherwise unlawfully sell, distribute, and/or market their products in a way that knowingly or recklessly creates a public nuisance in the State or (2) fail to establish, implement, or enforce reasonable controls regarding the sale, distribution, or marketing of their products. To support liability, the products must have a sufficient nexus to New Jersey, and industry members are not liable for harms that are not reasonably foreseeable. *See id.* § 2C:58-35.

More than four months later, Plaintiff National Shooting Sports Foundation ("NSSF")—a trade association of over 9,000 unnamed firearms manufacturers and sellers—asked this Court to preliminarily enjoin Section 58-35 in full. NSSF meets no part of its burden to obtain such extraordinary relief. To start, NSSF cannot establish irreparable harm, a gateway requirement. NSSF's baseless intimations that two companies may have to cease advertising and that its members fear a wave of frivolous suits under the law are undercut by NSSF's four-and-a-half-month delay

1

(along with the text of the law itself). And NSSF's attempt to rely on undescribed "compliance" costs and the burdens of speculative future litigation fares no better.

Nor can NSSF prevail on the merits. Indeed, its opening brief ignores two fatal threshold problems. First, NSSF's effort to challenge a hypothetical, future public nuisance action does not present an Article III case or controversy. The Third Circuit has rejected efforts to preemptively challenge public nuisance suits based on supposition about whether a lawsuit will be filed, what claims that action would pursue, and on what facts that suit would rely—just as NSSF does here. Second, NSSF pursues a facial challenge to the statute, and demands a preliminary injunction against *any* enforcement of the law against more than 9,000 members, but it cannot show that there is "no set of circumstances" in which the law could be enforced.

In any event, NSSF's claims are meritless. Section 58-35 as a whole, along with its proximate cause and scienter provisions, are consistent with the Protection of Lawful Commerce in Arms Act ("PLCAA"), 15 U.S.C. §§ 7901-7903. The "dormant" Commerce Clause presents no issue, as Section 58-35 has neither protectionist purpose nor effect. The statute's marketing provisions are permissible regulations of commercial speech, and their terms are not unconstitutionally vague under any standard—which is true of the law as a whole, defeating NSSF's Due Process claim. Finally, the Second Amendment does not confer a freestanding right to *sell* firearms. This Court should deny NSSF's extraordinary motion.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

A.   New Jersey's Public Nuisance Statute.

New Jersey enacted Section 58-35 on July 5, 2022. The State Legislature was prompted by the harms that result from the misconduct of "bad actors in the gun industry." *See* N.J. Stat. Ann. § 2C:58-33(a). The Legislature found that such misconduct fuels both "fuels the epidemic of gun violence in New Jersey" and helps facilitate "an illegal secondary market." *Id.* § 2C:58-33(c). Accordingly, the Legislature created a statutory cause of action allowing the Attorney General (and only the Attorney General) to hold industry members accountable for unreasonable or otherwise unlawful conduct that endangers New Jerseyans. *See id.* § 2C:58-33(d).

Section 58-35 grants the Attorney General an exclusive cause of action against any "person engaged in the sale, manufacturing, distribution, importing, or marketing of a gun-related product" that violates either of two duties identified in subsection (a). N.J. Stat. Ann. §§ 2C:58-35(a)(3), (b). *The first*, subsection (a)(1), covers those industry members who engage in "conduct either unlawful in itself or unreasonable under all the circumstances" and thereby "knowingly or recklessly create, maintain, or contribute to a public nuisance in this State through the sale, manufacturing, distribution, importing, or marketing of a gun-related product." *The second*, subsection (a)(2), requires an industry member to "establish, implement, and enforce reasonable controls regarding its manufacture, sale, distribution, importing,

3

and marketing of gun-related products." *Id.* § 2C:58-35(a)(1)-(2).

Section 58-34 defines the law's operative terms. Whereas Section 38-35 refers to conduct involving "a gun-related product," Section 58-34 explains that the statutory term "gun-related product" is cabined territorially to a firearm product (such as a gun or ammunition) that "was, or was intended to be, sold, manufactured, distributed, imported, or marketed *in this State*, or which product was possessed in this State and as to which it was reasonably foreseeable that the product would be possessed or used *in this State*." *Id.* § 2C:58-34 (emphases added). And Section 58-34 explains that "[r]easonable controls" include business protocols to prevent the "sale or distribution" to straw purchasers and other unlawful buyers; to prevent loss or theft of inventory; and to ensure compliance with federal and state law. *Id.*

Section 58-35 grants the Attorney General pre-litigation subpoena authority to investigate potential violations, *see id.* § 2C:58-35(d), and authorizes him, in response to an apparent violation, to commence a civil action seeking injunctive relief, abatement of the nuisance, restitution, damages, and reasonable attorneys' fees and costs, *id.* § 2C:58-35(b). The Attorney General has not yet filed such a suit.

B.    Plaintiff's Complaint and Motion for Preliminary Injunction.

On November 16, 2022, over four months after the law took effect, NSSF filed this lawsuit against the Attorney General. Dkt. 1. NSSF is a trade association of over 9,000 manufacturers, distributors, and retailers of firearm products

4

"throughout the United States." *Id.*, ¶ 8. The Complaint levels claims based on preemption (Count I), the Commerce Clause (Count II), the First Amendment (Count III), the Second Amendment (Count IV), and due process (Count V). It seeks declaratory and injunctive relief, attorneys' fees and costs, and nominal damages.

On November 23, one week after filing suit and more than four months after Section 58-35 was enacted, NSSF moved for a preliminary injunction, asking this Court to find Section 58-35 facially invalid. Dkt. 4-1. NSSF attached two declarations from industry members asserting, in cursory fashion, that they "could face liability" and the "risk of litigation and potential liability," Dkt. 4-2, Reh Decl. ¶¶ 14, 17, if they do not stop advertising or "shut[] down operations entirely," *id.*, ¶ 15. NSSF demands an order that would preliminarily "enjoin enforcement of" Section 58-35 against NSSF and its members. Dkt. 4-4 at 1. This opposition follows.

## STANDARD FOR PRELIMINARY INJUNCTION

Injunctive relief "is an extraordinary remedy … which should be granted only in limited circumstances." *Frank's GMC Truck Ctr., Inc. v. Gen'l Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988); *see also Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487 (3d Cir. 2000) (confirming that "dramatic and drastic power of injunctive force may be unleashed only against conditions generating a presently existing actual threat"). Courts must consider whether (1) a plaintiff "will suffer irreparable harm if the injunction is denied," (2) a plaintiff establishes a "likelihood of success

5

on the merits," (3) "granting preliminary relief will not result in even greater harm to the nonmoving party," and (4) "the public interest favors such relief." *Kos Pharms. Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004). The moving party bears the burden of "meet[ing] the threshold for the first two 'most critical' factors," and the failure to establish *either* irreparable harm or likelihood of success requires a court to deny the application. *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). "[A] party seeking a mandatory preliminary injunction that will alter the status quo bears a particularly heavy burden in demonstrating its necessity." *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 219 n.13 (3d Cir. 2014).

## **ARGUMENT**

NSSF fails to establish irreparable harm, a likelihood of success, or that the remaining equities support its application. Each shortcoming is dispositive.

## I. **PLAINTIFF HAS NOT ESTABLISHED IRREPARABLE HARM.**

This motion should be denied in full because NSSF has not proven irreparable harm. Courts cannot grant relief "unless the moving party shows that it specifically and personally risks irreparable harm." *Adams*, 204 F.3d at 487. To be irreparable, that harm cannot be speculative: a movant "must make a clear showing of immediate irreparable harm," *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992)), not the "possibility of a remote future injury." *Acierno v. New Castle Cnty.*, 40 F.3d 645, 655 (3d Cir. 1994). And a movant must "produce affirmative evidence"

6

of that irreparable harm. *Marxe v. Jackson*, 833 F.2d 1121, 1127 (3d Cir. 1987).

NSSF falls far short of its burden. NSSF first claims as irreparable harm "the process" of analyzing Section 58-35's meaning and determining "what steps, if any, industry could try to take today." Br. 24. As a threshold matter, the ordinary costs to comply with a government regulation do not establish irreparable harm, *see Freedom Holdings v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005) (collecting cases)—otherwise, every law would work an irreparable harm. And here, NSSF's showing is particularly weak: NSSF does not claim its members actually took steps to comply, much less identify those steps with affirmative evidence or detail any costs. Indeed, NSSF does not even identify its members, or what conduct they fear will lead to their liability. Instead, NSSF relies on two declarations, submitted on behalf of Beretta U.S.A. Corp. and SIG Sauer, alleging that the companies are "unable to determine what advertising or promotional activity might be construed as a violation" of the law, and speculating that the "*only way*" to "avoid liability for such activity would be to *cease all advertising or promotion of its firearm products* not only in New Jersey" but also "throughout the United States." Dkt. 4-2, Reh Decl. ¶ 13; Dkt. 4-3, Shawver Decl. ¶ 13 (emphasis added). The declarations provide no specificity (or proof) that NSSF's members are embarking on any sort of costly compliance process, nor do they address that other States already have similar laws.

These allegations ring hollow given NSSF's four-and-a-half-month delay in

seeking relief. *Supra* at 5. It is blackletter law that delay can "knock[] the bottom out of any claim of immediate and irreparable harm," and that it offers a "dispositive basis" for rejecting a request for a preliminary injunction. *Pharmacia Corp. v. Alcon Labs., Inc.*, 201 F. Supp. 2d 335, 382-83 (D.N.J. 2002); *see also Children's Health Def., Inc. v. Rutgers State Univ. of N.J.*, No. 21-15333, 2021 WL 4398743, at *7 (D.N.J. Sept. 27, 2021); *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016). After all, emergency relief proceeds "under the theory that there is an urgent need for speedy action to protect plaintiffs' rights," but NSSF's long delay in "seeking enforcement of those rights" indicates the opposite, and likewise increases the risk that an injunction will *undermine* (rather than protect) the status quo. *Lanin v. Borough of Tenafly*, 515 F. App'x 114, 117-18 (3d Cir. 2013); *see Acierno*, 40 F.3d at 647 (same). If the companies truly feared such draconian consequences, they would not have waited over four months to file this action.

Indeed, Beretta's and SIG Sauer's own actions undercut their claims. Despite Section 58-35's having been in effect since July, neither company has "cease[d] all advertising or promotion of" their firearms. Instead, both companies continue marketing to this day, including in various social media posts accessible in New Jersey. *See* Decl. of Aziza Salikhova, ¶¶ 4-13. And there is no record evidence that either Beretta or SIG Sauer has made changes to its operations in response to Section 58-35. The fact that, after so much time has elapsed, neither company has taken the

drastic measures they claim are mandated by Section 58-35's existence confirms the harm they allege is not immediate, let alone a clear showing. *See Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 802 (3d Cir. 1989) (no irreparable harm where record did not support allegations that a party would go out of business).

NSSF's sole remaining asserted irreparable harm—that its members will face a flood of actions from which they have immunity—is equally baseless. Once again, NSSF relies on sheer speculation unsupported by any proof: its declarations say only that two companies "*could* face liability" and face the "*risk of* litigation and *potential* liability," Dkt. 4-2, Reh Decl. ¶¶ 14, 17, if they do not "shut[] down entirely," *id.*, ¶ 15 (emphases added). And there are clear reasons to question whether that speculative risk will be borne out: the statute confers enforcement power solely on the Attorney General, meaning there is *no* risk of being inundated with private-party suits, and the industry has certainly not shut down operations since July. But even ignoring the failures of proof, the Third Circuit has held a company cannot establish imminent harm from "the specter of" the government's "potential lawsuit," even if the plaintiff alleges that the theory behind that future suit would be unconstitutional, because that would require the court "to assume not only that the [government] will sue, but also its theory of liability, its litigation tactics, and that the [government] will prevail." *Sherwin-Williams Co. v. Cnty. of Delaware, Pa.*, 968 F.3d 264, 270 (3d Cir. 2020). That speculative chain is precisely what NSSF pursues here.

9

Moreover, even if one of NSSF's members *does* face the risk of defending a lawsuit in the future, it is unclear why that would constitute irreparable harm today. If NSSF is correct that its members are immune from liability, then they should have no problem "rais[ing] those claims as affirmative defenses in state court" and prevailing in short order. *Id.* NSSF seems to believe the Attorney General's sovereign immunity means that the industry's inability to get future litigation costs in that hypothetical suit makes harm from future litigation irreparable, but litigation costs generally do not qualify as irreparable harm. *See F.T.C. v. Standard Oil Co. of Cal.*, 449 U.S. 232, 244 (1980) ("Mere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury." (citation omitted)). And even if money damages that cannot be recovered from a public official are sometimes deemed an irreparable injury, nonetheless, they still must be non-speculative and established by evidence. *See Adams*, 204 F.3d at 488; *ADP, Inc. v. Levin*, No. 21-2187, 2022 WL 1184202, at *3 (3d Cir. Apr. 21, 2022).

None of NSSF's remaining assertions come close to proving irreparable harm. NSSF oddly cites two isolated statements by advocates, including one from 2000, to suggest what will happen under Section 58-35—and worries both about "plaintiffs' lawyers" and "private plaintiffs" seeking "millions and billions of dollars." Br. 25-26. But that ignores that the challenged statute confers enforcement power solely on the Attorney General. N.J. Stat. Ann. § 2C:58-35(b). And it ignores that statements

by third parties are not attributable to the Attorney General. *See Exxon Mobil Corp. v. Schneiderman*, 316 F. Supp. 3d 679, 708 (S.D.N.Y. 2018). Finally, NSSF's odd reference to an Illinois *licensing* law that (it says) put thousands of dealers out of business, Br. 26, merely highlights its failure to identify any remotely comparable business changes in the months since Section 58-35 passed. NSSF's failure to satisfy this "gateway factor," *Reilly*, 858 F.3d at 179, requires that its motion be denied.

## II.    PLAINTIFF WILL NOT SUCCEED ON THE MERITS.

NSSF also fails to establish the other "gateway" requirement: likelihood of success on the merits. The harms NSSF alleges are too abstract for Article III jurisdiction at this stage. NSSF's facial attack cannot meet the heavy burden necessary for such relief. And NSSF's preemption, Commerce Clause, vagueness, First Amendment, and Second Amendment claims are all unavailing.

A.    <u>There is no Article III case or controversy at this stage</u>.

NSSF's merits showing fails out of the gate because this lawsuit is premature. When a party brings a pre-enforcement challenge, Article III's case-or-controversy requirement can be described in terms of standing or ripeness, because both turn on "whether the threat of future harm under [a challenged law] is sufficiently immediate to constitute a cognizable injury." *Free Speech Coalition v. Att'y Gen.*, 825 F.3d 149, 167 n.15 (3d Cir. 2016); *MedImmune v. Genentech*, 549 U.S. 118, 128 n.8 (2007). Ripeness law "works to determine whether a party has brought an action prematurely

… and counsels abstention until such a time as a dispute is sufficiently concrete to satisfy the constitutional and prudential requirements of the doctrine." *Sherwin-Williams*, 968 F.3d at 271-72. A lawsuit is not ripe "if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998); *see also Felmeister v. Off. of Att'y Ethics*, 856 F.2d 529, 537 (3d Cir. 1988) ("until it is shown that plaintiffs wish to engage in an activity that would be prohibited … , their challenge lacks the level of factual specificity necessary"); *Travelers Ins. Co. v. Obusek*, 72 F.3d 1148, 1154 (3d Cir. 1995) (suit for declaratory relief "must demonstrate that the probability of that future event occurring is real and substantial [and] of sufficient immediacy and reality").

Particularly relevant here, the Third Circuit recently dismissed, for lack of standing and ripeness, a party's effort to challenge the constitutionality of a public nuisance action that it thought *would be* filed against it. *Sherwin-Williams*, 968 F.3d at 269-71. After Sherwin-Williams was sued by two counties for public nuisance based on its sale and manufacture of lead-based paint, it sued three *other* counties, claiming their anticipated future enforcement actions on the same theory would violate its rights. *Id.* at 267. The Third Circuit rejected that chain of conjectures as a basis for jurisdiction, noting that "[t]he County might sue Sherwin-Williams, but it might not. It might advance the same arguments as other counties, but it might not. The uncertainty surrounding these fundamental questions renders these claims unfit

12

for judicial resolution." *Id.* at 272; *see also, e.g.*, *Williams v. BASF Catalysts LLC*, 765 F.3d 306, 328 (3d Cir. 2014) (similar attempt to preempt future suit was not ripe as "[t]he identity of the parties, the nature of the claims and defenses, and the substantive law to be applied are all unknown.").

NSSF's arguments for invoking this Court's jurisdiction are even more flawed than in *Sherwin-Williams*. As in that case, NSSF seeks to invoke Article III jurisdiction to preempt a hypothetical future public nuisance suit. And also as in *Sherwin-Williams*, NSSF fails to show that "defending against a lawsuit (rather than pursuing this one) would" be infeasible. 968 F.3d at 270-71. But even worse, NSSF fails to identify any actions by its members implicating Section 58-35, or *anything* about their sale, control, marketing, distribution, or manufacturing practices. Although NSSF attached two declarations, both offer only general statements confirming that Beretta and SIG Sauer sell firearms. That "dearth of factual material in the record referable to these particular plaintiffs and their particular" conduct makes this suit "purely hypothetical." *Felmeister*, 856 F.2d at 537. Far from a "clarification of its rights" to engage in a specific course of "affirmative business action," NSSF's demand for full relief from this law seeks to "preempt the [State's] supposedly imminent lawsuit with affirmative defenses it could raise in response to any suit that might be filed." *Sherwin-Williams*, 968 F.3d at 270.

NSSF's brief confirms this shortcoming. Its preemption theory is predicated,

13

among other things, on its assumption that the hypothetical future lawsuit would involve conduct that was not otherwise illegal. *E.g.*, Br. 8. Its Commerce Clause theory assumes that such a suit would not involve an in-state defendant. Br. 12-13. And its First Amendment theory assumes such a suit would be based on non-misleading marketing. Br. 15. NSSF cannot even identify which products, locations, or practices would be at issue in future litigation, and Article III does not confer jurisdiction to litigate based on free-floating hypotheticals.

      B.    <u>Plaintiff cannot meet its burden for a facial challenge.</u>

NSSF seeks invalidation of Section 58-35 and a preliminary injunction barring *any* enforcement of the law against NSSF or its 9,000+ unnamed members. Br. 2-3; Dkt. 4-4 at 1. In substance, that is a facial attack. And NSSF cannot meet the heavy burden necessary to obtain such relief on any of its claims.

A "facial attack tests a law's constitutionality based on its text alone and does not consider the facts or circumstances of a particular case," whereas an as-applied suit "does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right." *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010). NSSF has leveled a direct challenge to the statute, without putting forward specific practices it believes are implicated by the statute. *See supra* at 13. Its requested relief confirms as much: NSSF asks this Court to "enjoin enforcement of" Section 58-35

in toto, and its proposed Order seeks an injunction barring any enforcement of the law "against [NSSF], its members, or their agents and licensees," Dkt. 4-4 at 1—an unknown group that likely includes the lion's share of the industry. *See* Compl. ¶ 8.

Although NSSF name-checks the idea of as-applied relief, Compl. at 31, NSSF does not plead "particular" facts that would support an as-applied challenge, such as an actual practice by its members that it fears would violate Section 58-35. *See Marcavage*, 609 F.3d at 273. However styled, such a broad-based, generalized grievance raises only a facial challenge. *See Mazo v. N.J. Sec. of State*, 54 F.4th 124, 134 n.6 (3d Cir. 2022) (construing suit that "purport[s] to raise both a facial and an as-applied challenge" as raising only a facial attack given similarly unspecific pleadings); *Heffner v. Murphy*, 745 F.3d 56, 65 (3d Cir. 2014).

NSSF's claims are thus subject to the demanding standard that governs facial challenges—the "most difficult challenge to mount successfully." *United States v. Salerno*, 481 U.S. 739, 745 (1987). For its PLCAA and other non-First Amendment claims, NSSF cannot prevail unless it meets the burden of showing "that 'no set of circumstances exists under which the [law] would be valid.'" *Plains All Am. Pipeline L.P. v. Cook*, 866 F.3d 534, 543 (3d Cir. 2017); *Mazo*, 54 F.4th at 134 (same). On this posture, then, New Jersey needs simply to "identify a possible application of" Section 58-35 that would likely survive scrutiny. *Baltimore & Ohio R. Co. v. Oberly*, 837 F.2d 108, 116 (3d Cir. 1988). And for its First Amendment claim, NSSF must

establish that "a substantial number of [the law's] applications are unconstitutional, judged in relation to the [law's] plainly legitimate sweep." *Marcavage*, 609 F.3d at 273; *see N.Y. State Club Ass'n v. City of N.Y.*, 487 U.S. 1, 11 (1988) (insisting on "'a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court").

NSSF cannot meet its burdens. For one, numerous applications of Section 58-35 comport with even NSSF's views of PLCAA, the Commerce Clause, vagueness, and the Second Amendment. Take, for example, a New Jersey dealer that repeatedly sells guns to straw purchasers despite red flags, or that allows its employees to engage in unlawful sales out the back door. *Cf. In re Sarco, Inc.*, No. A-1161-8, 2011 WL 1376286, at *1-4 (N.J. Super. Ct. App. Div. Apr. 13, 2011); *State v. Fleet Farm LLC*, No. 27-cv-22-14473, Compl. (Minn. Dist. Ct.), *available at* https://tinyurl.com/c79xbw44. Or a dealer in Pennsylvania that sells ghost guns into New Jersey, despite the State's prohibition on such weapons. *Compare New York v. Arm or Ally, LLC*, No. 22-cv-6124, Compl., Dkt. 1-1 (S.D.N.Y.), *with* N.J. Stat. Ann. § 2C:39-9(k). Or the seller who supplied a gun to a buyer despite knowing she "was severely mentally ill" and had previously attempted suicide. *Cf. Delana v. CED Sales, Inc.*, 486 S.W.3d 316, 319, 325-26 (Mo. 2016) (holding PLCAA did not preempt claim). Such conduct would violate Section 58-35, but NSSF offers no reason to believe a resulting action would run afoul of PLCAA, the Commerce

Clause, due process, or the Second Amendment. The parties have profound disagreements over NSSF's legal arguments, *see infra* Sections II.C-G, but these applications are enough to deny an injunction against all enforcement of the law against 9,000+ unnamed dealers.

Nor does NSSF carry its burden with regard to First Amendment overbreadth. NSSF does not dispute that laws targeting false, misleading, or unlawful commercial speech are permissible. Br. 16. Section 58-35, meanwhile, addresses "marketing" involving either unlawful or unreasonable conduct or a lack of reasonable controls. N.J. Stat. Ann. § 2C:58-35(a). Even on NSSF's theory, New Jersey could enforce the statute against a gun seller who advertised as "completely legal" to New Jerseyans sales that were not.[1] As explained below, none of Section 58-35 violates the First Amendment, but regardless, applications to unlawful, false, or misleading advertisements certainly bar a successful *facial* attack.

Without offering a reason to believe such suits would violate its own theories, NSSF asks this Court to issue an order enjoining enforcement of the law against an unknown roster of 9,000 members, Compl. ¶ 8—along with any number of "agents and licensees," Dkt. 4-4 at 1—for any conduct, at any place, at any time. While

---

[1] *Cf.* Press Release, Office of Atty. Gen., *AG Grewal Announces First-in-the-Nation Settlement with Ghost Gun Co.* (Mar. 18, 2021) (consumer-fraud action against company that marketed and shipped ghost gun kits and an assault firearms kit to in-state buyers, having advertised online, "Is it legal?: YES!"), https://tinyurl.com/4s6j3532.

NSSF will perhaps explain what as-applied relief it seeks at a future stage, its failure to meet its facial burden is a sufficient reason to deny the relief it currently demands.

C.   Plaintiff is not likely to succeed on its preemption claims.

NSSF's primary claim is that Section 58-35 violates PLCAA, but it misreads that statute. PLCAA states that a "qualified civil liability action," which the statute says cannot be brought, is one against a manufacturer or seller of a qualified product, defined to include a "firearm … or ammunition," seeking relief "resulting from the criminal or unlawful misuse of a qualified product by the person or a third party." 15 U.S.C. § 7903(4), (5)(A). But PLCAA expressly *excludes* from that category any "action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought." *Id.* § 7903(5)(A)(iii). That carve out—the "predicate exception"—fits Section 58-35 perfectly. Although NSSF contends that Section 58-35 is not "applicable to" the sale or marketing of firearms, is not limited to "knowing" violations, and permits civil liability without true "proximate cause," each argument collapses under scrutiny. [2]

---

[2] NSSF implicitly concedes that a suit under Section 58-35 would not be preempted where it does not hinge on the subsequent misuse of a firearm by a third party, 15 U.S.C. § 7903(5)(A), or involves negligent entrustment or negligence per se, *id.* § 7903(5)(A)(ii), does not implicate PLCAA at all (if, say, the seller is not federally licensed), or where it is premised on a theory of knowledge and causation that even NSSF would accept, *see, e.g.*, Br. 3-5—further reason that facial invalidation is improper.

1.    *NSSF misconstrues the meaning of "applicable to."*

Contrary to NSSF's primary facial theory, Section 58-35 is "a State … statute *applicable to* the sale or marketing of the [firearms] product." *Id.* § 7903(5)(A)(iii) (emphasis added). Where a statute "does not define 'applicable,'" courts "look to the ordinary meaning of the term." *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 69 (2011). As the Supreme Court has noted, "'[a]pplicable' means 'capable of being applied: having relevance' or 'fit, suitable, or right to be applied: appropriate.'" *Id.* (quoting Webster's Third New International Dictionary 105 (2002)); *see id.* (holding that "applicable" in a bankruptcy statute permitted debtor to claim a particular type of expense if there was a sufficient "correspondence to [the] individual debtor's financial circumstances"). Here, Section 58-35 corresponds to the sale and marketing activities of firearms industry members by express reference. *See* N.J. Stat. Ann. § 2C:58-35(a)(1)-(2) (regulating the "sale" and "marketing" of "gun-related products" by "gun industry members"); *id.* § 2C:58-34 (defining the relevant terms). It applies to (fits, has relevance to, is suitable and appropriate to) unlawful sales and marketing conduct by industry members. *See Soto v. Bushmaster Firearms Int'l, LLC*, 202 A.3d 262, 302, 321 (Conn. 2019), *cert. denied*, 140 S. Ct. 513 (2019) (exception encompasses statute that "specifically regulates" wrongful marketing of firearms even if the state statute is not "*exclusively* applicable to firearms").

Even the cases on which NSSF relies, *see* Br. 6, confirm the match between

PLCAA's predicate exception and Section 58-35. *See City of New York v. Beretta USA Corp.*, 524 F.3d 384, 404 (2d Cir. 2008) (holding state statutes that "expressly regulate firearms" or "that courts have applied to the sale and marketing of firearms" fit the exception); *Ileto v. Glock*, 565 F.3d 1126, 1136 (9th Cir. 2009) (exception covers "statutes that regulate manufacturing, importing, selling, marketing, and using firearms or that regulate the firearms industry"). Indeed, in rejecting NSSF's challenge to a similar New York law, a court held that "[n]o reasonable interpretation of 'applicable to' can exclude a statute which imposes liability exclusively on gun manufactures for the manner in which guns are manufactured, marketed, and sold." *Nat'l Shooting Sports Found., Inc. v. James*, _ F. Supp. 3d _, 2022 WL 1659192, at *4 (N.D.N.Y. 2022). Plain meaning and precedent foreclose NSSF's theory.

NSSF's strained, alternative reading does not pass muster. NSSF claims that a law is only "applicable to" the sale or marketing of a firearm product if that law imposes a *sufficiently concrete* duty. Br. 6. That runs into a number of defects. Most obviously, a limiting principle of "sufficiently concrete" is nowhere in the text. *See Ellis v. Westinghouse Elec. Co.*, 11 F.4th 221, 234 (3d Cir. 2021) (courts reject efforts to "add to or alter the words employed"). Nor is this a plausible reading of "applicable," and NSSF offers no dictionary or case to prove that "applicable" means concrete. *See Byrd v. Shannon*, 715 F.3d 117, 122-23 (3d Cir. 2013) ("If the language of the statute has a reasonably plain meaning, then our sole function is to enforce the

statute's language."). A university requirement that students refrain from "annoying others" in the library is a policy that *applies to* the library regardless of whether it is concrete; the two are wholly independent. And it makes no sense to assume Congress wanted State Legislatures to guess whether their laws are "concrete" enough.

Though it identifies no case adopting its atextual reading, NSSF pushes three arguments that "applicable to" really means "sufficiently concrete." None succeeds. NSSF first points to PLCAA's purpose to bar lawsuits against the gun industry based on a third party's "criminal[] or unlawful[] misuse" of "products that function as designed and intended." Br. 7 (quoting 15 U.S.C. § 7901(a)(5)). But vague assertions about the problem that animated a statute cannot overcome the plain text, for "it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 79 (1998). And NSSF is not even correct in its characterization of PLCAA's purpose; Congress made clear its concern was about "imposing liability on an entire industry for harm that is *solely* caused by others." 15 U.S.C. § 7901(a)(6) (emphasis added); *see also id.* § 7901(b)(1). That is not what Section 58-35 does; instead, it focuses on industry members' *own misconduct* that contributes to a public nuisance. *See also James*, 2022 WL 1659192, at *4 (rejecting identical claim that New York law "is not the type of law that Congress intended to authorize," calling NSSF's

theory "untethered from the text of the predicate exception itself").[3]

NSSF next claims that predicate statutes must impose a sufficiently concrete duty of care, because otherwise there could be no "knowing" violations. *See* Br. 5-6 (citing 15 U.S.C. § 7903(5)(A)(iii)). But NSSF is incorrect: tort and criminal law are replete with laws that impose liability for "knowingly" breaching a more general duty of care.[4] It is thus no surprise that courts have repeatedly upheld statutes imposing general duties of care on the firearms industry under PLCAA. *See, e.g.*, *Soto*, 202 A.3d at 302 (law prohibiting "unfair methods of competition and unfair or deceptive acts or practices"); *Prescott v. Slide Fire Solutions*, 410 F. Supp. 3d 1123,

---

[3] Given NSSF's effort to supplant plain language with purpose, it is striking that legislative history undermines its position. *See* 151 Cong. Rec. S9087, S9088 (July 27, 2005) (sponsor explaining PLCAA "does not create a legal shield for anybody who manufactures or sells a firearm" and "does not prevent them from being sued for their own misconduct"); 151 Cong. Rec. S8908-01, S8911 (July 26, 2005) (another sponsor adding PLCAA is "incredibly narrow" and that "[p]laintiffs can go to court if the gun dealers do not follow the law, if they negligently sell the gun, if they … sell to someone they know should not be sold to or did not follow steps to determine whether the individual was properly subject to buying a gun"); *see also City of N.Y.*, 524 F.3d at 403 (discussing PLCAA's legislative history).

[4] *See, e.g.*, 29 U.S.C. § 1105(a)(1) (ERISA liability for fiduciary who "participates knowingly in, or knowingly undertakes to conceal" another fiduciary's breach); Tex. Penal Code Ann. § 42.01(a) (defining disorderly conduct to include "intentionally or knowingly" making "unreasonable noise in a public place"); N.J. Stat. Ann. § 2A:15-5.6(b)(1)(b) (liability for host who "knowingly provide[s] alcoholic beverages" to person "visibly intoxicated under circumstances manifesting reckless disregard"); *Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015) (under section 1983, "pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable").

1138 (D. Nev. 2019) (prohibiting "[k]nowingly mak[ing] a false representation [as] to the characteristics … of goods … for sale"); *James*, 2022 WL 1659192, at *4 (analogous public nuisance statute).

NSSF's last argument—based on the fact that PLCAA gives two examples of statutes that would fit the predicate exception, *see* Br. 6-7—is equally untenable. As NSSF correctly notes, PLCAA allows suits to proceed when based on violations of "a State … statute applicable to the sale or marketing of the product, … *including*" suits involving record-keeping failures or falsifications and suits "in which the manufacturer or seller aided, abetted, or conspired" to sell a gun "knowing, or having reasonable cause to believe, that the actual buyer of the qualified product was prohibited from possessing" that weapon. 15 U.S.C. § 7903(5)(A)(iii)(I)-(II) (emphasis added). But NSSF's two inferential leaps—that the predicate exception is limited to whatever these examples have in common, and that what they have in common is concreteness—are baseless.

For one, there is no reason to think that Congress's decision to offer examples that fit within the predicate exception was meant to limit its reach. Instead, PLCAA says the exception "*includes*" its examples, which denotes "that Congress intended to illustrate a broad concept rather than narrowly circumscribe a term with exclusive categories." *E.g.*, *Singh-Kaur v. Ashcroft*, 385 F.3d 293, 298 (3d Cir. 2004). And that structure—a broad term ("applicable to") that "includes" two distinct

23

examples—distinguishes PLCAA from cases analyzing different types of text. *Compare Wash. State Dep't of Soc. & Health Servs. v. Guardianship Est. of Keffeler*, 537 U.S. 371, 384 (2003) (cited at Br. 6) (when "general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to … the preceding specific words"), *with CSX Transp. v. Ala. Dep't of Revenue*, 562 U.S. 277, 295 (2011) (that canon of interpretation is inapplicable where a law states two "distinct and independent" prohibitions).

Even assuming that the illustrative examples *could* change the meaning of "applicable to," the operative rule would not be NSSF's "concrete[ness]" test. After all, both examples involve *legislative* enactments, rather than common law suits— the latter being a core concern behind PLCAA. *See* 15 U.S.C. § 7901(a)(7) (decrying common law suits that expand liability in ways not contemplated "by the legislatures of the several States"). Both apply specifically to the firearms industry, rather than industry writ large. *See Ileto*, 565 F.3d at 1136. And both involve wrongdoing by the defendant, rather than hinging solely on third parties. *See* 15 U.S.C. §§ 7901(a)(6), (b)(1); *supra* at 21. NSSF is forced to gerrymander a construction that avoids those commonalities for one reason: Section 58-35 fits them all. But the sole "commonality" NSSF identifies, concreteness, makes little sense: one of the two examples permits liability when the seller has "reasonable cause to believe" the actual buyer was not allowed to have the weapon, which is hardly the sort of specific

24

duty NSSF is demanding. 15 U.S.C. § 7903(5)(A)(iii)(II); *see also*, *e.g.*, 18 U.S.C. § 922(b)(1)-(3), (d), (i)-(j), (x)(1) (gun laws tied to "reasonable cause to believe" standard); *id.* § 932(b)(2) (same). So even using NSSF's atextual methodology, Section 58-35 is an "applicable" state law under the predicate exception.

### 2.   *NSSF misconstrues the exception's scienter requirement.*

NSSF's claim that Section 58-35 does not require "knowing" violations and thus cannot fit the predicate exception, Br. 9, misunderstands both New Jersey law and PLCAA. Section 58-35 *does* require knowing conduct, in the way that the exception does. Specifically, it requires knowledge as to the core act, but not as to all possible elements—for example, whether a particular course of conduct is unreasonable or whether an actual buyer is legally prohibited from possessing a gun.

As NSSF implicitly concedes, that is fully consistent with the predicate exception. That must be so, given that one of Congress's *own* examples of regulable conduct is (1) (knowingly) aiding, abetting, or conspiring with another to sell a firearm while (2) "knowing, *or having reasonable cause to believe*, that the actual buyer" is not allowed to possess or receive it. 15 U.S.C. § 7903(5)(A)(iii)(II) (emphasis added); *see United States v. Kaur*, 382 F.3d 1155, 1157 (9th Cir. 2004) (the "knowing or having reasonable cause to believe" legal standard "clearly presents" these "as two distinct alternatives"); *accord* Br. 7 (describing this example in the same fashion). In other words, PLCAA itself makes clear that a permissible

25

suit can involve a knowing core act (aiding, abetting, or conspiring with another to sell a firearm), and a mental state of at least negligence as to other elements (*e.g.*, the actual buyer being a prohibited person). *See United States v. Ven-Fuel*, 758 F.2d 741, 758 (1st Cir. 1985) (equating "without reasonable cause to believe" with "negligence"). If the predicate exception really required knowledge across the board, Br. 9, then PLCAA would flunk its own test. That cannot be.

Both prongs of Section 58-35 sit comfortably within these general bounds. *First*, subsection (a)(1) follows the exact pattern that the exception's example does: it requires knowledge as to the core act (the conduct undertaken in selling, manufacturing, distributing, importing, or marketing a gun), but not as to whether that conduct is "unlawful" or "unreasonable under all circumstances" or whether it "create[s], maintain[s], or contribute[s] to a public nuisance." N.J. Stat. Ann. § 2C:58-35(a)(1). *Second*, as to subsection (a)(2), a "knowingly" requirement is read into otherwise-silent text housed (as this law is) within Title 2C. *See* N.J. Stat. Ann. § 2C:2-2(c)(3); *State v. Rivera*, 16 A.3d 352, 359 n.6 (N.J. 2011) (relying on this "gap-filler" provision). Thus, subsection (a)(2) likewise requires knowledge of the core act, without requiring that a seller *know* whether a given control is "reasonable." It thus functions just like the predicate exception's second example, under which a seller need not *know*—rather, can have "reasonable cause to believe"—that "the actual buyer of the qualified product [is] prohibited from possessing or receiving" it.

26

15 U.S.C. § 7903(5)(A)(iii)(II).

### 3.    *NSSF misconstrues the meaning of "proximate cause."*

Equally unavailing is NSSF's claim that suits under New Jersey's law will contravene the predicate exception's requirement that the defendant's "violation" be "a proximate cause of the harm for which relief is sought." *Id.* § 7903(5)(A)(iii)."[5] NSSF misunderstands PLCAA, New Jersey law, and tort law.

Most importantly, Section 58-35 is consistent with hornbook tort principles. The statute defines proximate cause to cover actions where "harm to the public was a reasonably foreseeable effect of [a defendant's own] conduct, notwithstanding any intervening actions, including, but not limited to, criminal actions by third parties." N.J. Stat. Ann. § 2C:58-35(e). That *cabins* liability, ensuring defendants do not face liability for conduct that is "too attenuated." *Compare, e.g.*, *Camden Cnty. Bd. of Chosen Freeholders v. Beretta, U.S.A. Corp.*, 273 F.3d 536, 541 (3d Cir. 2001). And while NSSF says that this language "redefine[s] proximate cause," Br. 11, it is well established that "intervening causes that are 'foreseeable' or the 'normal incidents of the risk created' will not break the chain of causation and relieve a defendant of liability." *Komlodi v. Picciano*, 89 A.3d 1234, 1252 (N.J. 2014). That is consistent

---

[5] This argument is also a perfect illustration of why NSSF's claims are unripe (*supra* at 11-14) and why a facial attack is inappropriate (*supra* at 14-18): NSSF imagines that the hypothetical facts in a future suit by the Attorney General would not satisfy NSSF's preferred view of proximate cause. That is pure speculation.

with the predicate exception's use of "*a* proximate cause," in contrast to PLCAA's use of "the *sole* proximate cause" in its product defect exception, 15 U.S.C. § 7903(5)(A)(v)—an approach that makes little sense if proximate cause under the former were defeated anytime a third party's conduct contributed to an injury.

Instead, NSSF is confusing "intervening" and "superseding" causes—the latter of which is a type of extraordinary harm that would *not* be reasonably foreseeable from a defendant's own misconduct. *See* Restatement (Second) of Torts §§ 440-42 (1965) (distinguishing the two); *Lynch v. Scheininger*, 744 A.2d 113, 122-26 (N.J. 2000) (same, and cataloguing cases establishing the line between intervening and superseding causes). Confirming that a foreseeable intervening cause does not cut off proximate causation is no more out of place in a state statute than it is on a 1L torts exam.

NSSF argues that "proximate cause" should at least exclude intervening criminal acts, *see* Br. 11, but that finds no support either. State common law does not use one single definition of proximate causation, and many states (including New Jersey) have long held, in various contexts, that foreseeable criminal acts do not cut off liability when a defendant's actions heightened that risk. *See Braitman v. Overlook Terrace Corp.*, 346 A.2d 76, 82-84 & n.8 (N.J. 1975) (intervening criminal act does not preclude liability if the act was "reasonably to be anticipated," citing

examples);[6] *Bonsignore v. City of New York*, 683 F.2d 635, 637-38 (2d. Cir. 1982) (same, involving misuse of guns). Pre-PLCAA cases held that proximate cause from leaving a car unlocked and unattended is not superseded by the burglar's decision to steal it, *see Herrera v. Quality Pontiac*, 73 P.3d 181, 195 (N.M. 2003); that property owners could be liable for foreseeable on-premises criminal acts, *see Butler v. Acme Markets*, 445 A.2d 1141, 1147-48 (N.J. 1982) (mugging in grocery-store parking lot); and that a tavern providing alcohol to guests can be the proximate cause of a foreseeable drunk-driving accident, *see Rappaport v. Nichols*, 156 A.2d 1, 9 (N.J. 1952).[7] PLCAA did not divest the States of power to clarify capacious tort principles, and the predicate exception certainly did not do so with regard to "proximate cause."

*          *          *

---

[6] NSSF suggests that, in New Jersey, an intervening criminal act consistently ends causation, *see* Br. 11 (citing *Townsend v. Pierre*, 110 A.3d 52, 61 (N.J. 2015)), but *Townsend* says nothing of the sort. *See* 110 A.3d at 61 (finding no evidence that defendant's negligence in maintaining shrubbery caused the harm of a car crash).

[7] PLCAA's use of "proximate cause" is thus unlike scenarios in which Congress uses a term with a settled, monolithic meaning, such as "foreign sovereign immunity." *See Jam v. Int'l Finance Corp.*, 139 S. Ct. 759, 770 (2019). (Indeed, notwithstanding the language NSSF puts in quotes, Br. 11, *Jam* never refers to causation.) Instead, as explained, "proximate cause" has long enjoyed an array of meanings across States, and there is no evidence Congress intended to privilege some over others. Where Congress intended a single version of such a term, it said so. *See* 15 U.S.C. § 7903(5)(B) (defining "negligent entrustment"). Nothing in the predicate exception purports to displace varied meanings of "proximate cause."

One final point remains. As explained, the plain reading of the predicate exception's text saves Section 58-35 from preemption, and none of NSSF's atextual arguments prevail. But to the degree that this Court believes the questions are close, or that the text is ambiguous, it must still reject NSSF's theory. That is so because federal courts "apply a presumption against preemption" when reviewing federal statutes that pertain to "'areas of traditional state regulation' or police power," *Lupian v. Joseph Cory Holdings LLC*, 905 F.3d 127, 131 & n.5 (3d Cir. 2018), such as public nuisance regulation, *e.g.*, *Mugler v. Kansas*, 123 U.S. 623, 669 (1887). That presumption applies even if federal law includes an express preemption provision. *Lupian*, 905 F.3d at 131 & n.5. And that presumption requires the party claiming preemption to show that its construction is the *only* plausible reading of the federal law. *See Farina v. Nokia*, 625 F.3d 97, 118 (3d Cir. 2010) (quoting *Altria Grp. v. Good*, 555 U.S. 70, 77 (2008)). NSSF cannot do so.

> D.    <u>Plaintiff is not likely to succeed on its Commerce Clause challenge.</u>

Section 58-35 in no way offends the Commerce Clause's "dormant" aspect, which "is driven by concern about 'economic protectionism.'" *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337 (2008). In general, statutes that "discriminate against interstate commerce" are usually unconstitutional, while "laws that 'regulate even-handedly to effectuate a legitimate local public interest will be upheld unless the burden imposed on such commerce is *clearly excessive* in relation to the putative

local benefits.'" *S. Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2091 (2018) (emphasis added) (describing "*Pike* balancing test," named for *Pike v. Bruce Church*, 397 U.S. 137, 142 (1970)). States can protect health and safety, but not at the expense of "discrimination against out-of-state rivals or consumers." *Energy & Env't Legal Inst. v. Epel*, 793 F.3d 1169, 1173 (10th Cir. 2015) (Gorsuch, J.).

As an initial matter, there is no merit to NSSF's contention that New Jersey is "discriminating" against interstate commerce. *See* Br. 14. The law on its face applies "evenhandedly" to all members of the gun industry, whether in-state or out-of-state, *see TitleMax of Delaware, Inc. v. Weissmann*, 24 F.4th 230, 238 (3d Cir. 2022), and it does not have "the effect of eliminating a competitive advantage possessed by out-of-state firms," *Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*, 298 F.3d 201, 211 (3d Cir. 2002).[8] And the mere fact that much industry activity exists elsewhere, *see* Br. 14-15, makes no difference. *See Heffner v. Murphy*, 745 F.3d 56, 73 (3d Cir. 2014) (if a law "imposes the very same burdens on" in-state and out-of-state entities, it imposes "a burden on commerce without discriminating against interstate commerce"); *see also, e.g.*, *Epel*, 793 F.3d at 1173.

NSSF's other contention—that absent discrimination, New Jersey flunks the "dormant" Commerce Clause based on the extraterritorial reach of its law—is also

---

[8] Indeed, Section 58-35's requirement that it be "reasonably foreseeable that the product would be possessed or used in this State" is *more* likely to be true for an in-state seller than for an out-of-state seller. N.J. Stat. Ann. § 2C:58-34.

wrong. The Third Circuit has rejected the claim that "[w]here the extraterritoriality doctrine has been invoked," as here, "discrimination does not matter and is not an element of the claim." *TitleMax*, 24 F.4th at 238 n.7; *see also Freeman v. Corzine*, 629 F.3d 146, 162 (3d Cir. 2010) (plaintiff challenging a law based on extraterritoriality must show the law "forc[es] producers or consumers in other States [to] surrender whatever competitive advantages they may possess"). In balancing harms to interstate commerce against local benefits under *Pike*, "[t]he only burdens to be considered in the balancing test are those that 'discriminate against interstate commerce.'" *TitleMax*, 24 F.4th at 240. As a result, "once it is clear that the laws do not discriminate between in-staters and out-of-staters, 'the inquiry as to the burden on interstate commerce should end' and further analysis of the local benefits is unnecessary." *Id.* at 241. If it were otherwise, courts would have to "strike down state health and safety regulations" of all sorts. *Epel*, 793 F.3d at 1175.[9]

Even under *Pike* balancing, NSSF fails to make its showing. Because its prohibitions apply with the same force to in-state and out-of-state sellers and do not benefit in-state entities at the expense of out-of-state competitors, Section 58-35

---

[9] While some precedents have referred to extraterritorial effects in invalidating "price control or price affirmation" laws, the Court has (unanimously) made clear that those decisions are "not applicable" to a state law, like Section 58-35, that does neither. *Pharm. Rsch. & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 669 (2003); *see Epel*, 793 F.3d at 1173 (cabining those cases). This statute's effect "in no way differs from the extraterritorial effect of the myriad of safety state laws and regulations with which every industry must comply." *James*, 2022 WL 1659192, at *8.

operates no differently from any other nondiscriminatory law that regulates a chain of commercial activity that starts out-of-state and ends in-state. *See, e.g.*, *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 110 (2d Cir. 2001) (rejecting similar challenge to Vermont labeling law's application to mercury-containing light bulbs). In contrast to this lack of "cognizable burdens" against interstate commerce, *Norfolk S. Corp. v. Oberly*, 822 F.2d 388, 405 (3d Cir. 1987), Section 58-35's local benefits are undeniable: it was enacted to curb, *e.g.*, "an illegal secondary market for" firearms (and to prevent the attendant harms), N.J. Stat. Ann. § 2C:58-33(c), which is a quintessentially valid health and safety interest removed from the protectionism the Clause targets. *See Davis*, 553 U.S. at 337-38. And NSSF did not attempt to develop a contrary record on this preliminary posture.

E.   <u>Plaintiff is not likely to succeed on its void-for-vagueness challenge</u>.

NSSF's claim that Section 58-35 is void for vagueness under the Due Process Clause fails. Section 58-35 provides "fair notice of what is prohibited" and neither "authorizes [n]or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008); *see also CMR D.N. Corp. v. City of Phila.*, 703 F.3d 612, 631-32 (3d Cir. 2013) (that a law "may contain some ambiguities does not render it impermissibly vague"). Vagueness doctrine is "especially lax for civil statutes that regulate economic activities." *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 250 (3d Cir. 2015). "For such statutes, a party lacks fair notice when the

33

relevant standard is 'so vague as to be no rule or standard at all.'" *Id.* at 250.

Section 58-35 easily satisfies that standard. The statute covers only conduct that is either "unlawful in itself or unreasonable under all the circumstances," or that reflects a failure to establish "reasonable controls" (which the Legislature clarified through a four-part definition). N.J. Stat. Ann. §§ 2C:58-34, -35(a). Laws require "reasonableness" all the time, *e.g.*, *Wm. Penn Parking Garage v. City of Pittsburgh*, 346 A.2d 269, 292 (Pa. 1975) (noting that "'reasonableness' pervades the common law" and collecting state laws), and thus "statutes that employ the term 'unreasonable' have survived constitutional challenges based upon vagueness time and time again, as 'unreasonable' is a 'widely used and well understood word,'" *Empire State Rest. & Tavern Ass'n, Inc. v. New York State*, 360 F. Supp. 2d 454, 463 (N.D.N.Y. 2005) (collecting examples) (quoting *Cameron v. Johnson*, 390 U.S. 611, 616 (1968)); *see United States v. Hoffert*, 949 F.3d 782, 789 (3d Cir. 2020) (even in criminal context, that a jury must assess "reasonableness is not sufficient to make [a statute] too vague to afford a practical guide to permissible conduct"); *James*, 2022 WL 1659192, at *11 (rejecting vagueness challenge to New York's public nuisance law because "[c]ourts regularly provide meaning to the term unreasonable" and "whether an action contributed to a result is neither a vague nor esoteric inquiry").

NSSF's complaint that Section 58-35 requires industry to predict what actions would reasonably protect health and safety would effectively render all public-

nuisance doctrine void for vagueness.[10] *See Jake's, Ltd. v. Coates*, 284 F.3d 884, 890 (8th Cir. 2002) (rejecting "as frivolous" the contention that "an ordinance authorizing revocation if the licensee is 'a menace to the health, safety, or general welfare of the community' confers unbridled discretion," given that such a rule is "a specific discretion-limiting standard not unlike the definition of a public nuisance long known to the law."); *ChemSol, LLC v. City of Sibley*, 386 F. Supp. 3d 1000, 1021 (N.D. Iowa 2019) (noting that "public nuisance" test is "a concept long known to and upheld by the law" and is not "unconstitutionally vague"); *cf. In re Lead Paint Litig.*, 924 A.2d 484, 497 (N.J. 2007) (noting that while public nuisance is "expressed in rather general terms," they "are not without meaning"). Section 58-35 is hardly "so vague as to be no rule or standard at all." *CMR*, 703 F.3d at 632.

F.     Plaintiff is not likely to succeed on its First Amendment challenge.

NSSF's First Amendment challenge fails because the marketing provisions are a commercial-speech regulation that satisfies the intermediate scrutiny that applies. To start, the law is clearly not viewpoint discriminatory: NSSF points to nothing in the law that targets "particular views taken by speakers" or that is based on "the specific motivating ideology or the opinion or perspective of the speaker."

---

[10] NSSF's suggestion that it is impossible to define such a standard, Br. 22-23, is also belied by the fact that it has devised its own protocols to mitigate the kinds of harms that Section 58-35 is aimed at addressing. *See* Salikhova Decl. ¶¶ 18-19 (NSSF's protocols for dealers to identify and deter straw purchases).

*Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995). The "marketing" being regulated, meanwhile, is commercial, since it "does no more than propose a commercial transaction"—that is, it (1) is an advertisement, (2) refers to "a specific product or service," and (3) is at least partly economically motivated. *Bank of Hope v. Miye Chon*, 938 F.3d 389, 395 n. (3d Cir. 2019). And a viewpoint-neutral regulation of commercial speech like this one is subject to intermediate scrutiny under *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N. Y.*, 447 U.S. 557 (1980), whether it is *content*-based or not. *See City of Austin v. Reagan Nat'l Advert. Of Austin, LLC*, 142 S. Ct. 1464, 1474 (2022).[11]

Under *Central Hudson*, "speech that is misleading or concerns illegal activity is unprotected" altogether. *Bank of Hope*, 938 F.3d at 395. By contrast, "if the speech is lawful and not misleading," three more prongs kick in: (1) the State "must have a

---

[11] To be clear, the marketing provisions are better understood as content neutral. *See id.* Otherwise, a huge number of regulations—from securities disclosure to workplace safety—would be content discriminatory "simply because they refer to particular content." *See id.* at 1477 (Breyer, J., concurring). Relatedly, NSSF's position that Section 58-35 is "underinclusive" because it does not regulate "action and horror films, violent video games," and other "expression," Br. 17-18, fails because the "State need not address all aspects of a problem in one fell swoop." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449 (2015). NSSF's reliance on *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 801-02 (2011), to argue this point ignores that there is no "freestanding" underinclusiveness test in the First Amendment, *see Williams-Yulee*, 575 U.S. at 449; that *Brown* was not about commercial speech; and that establishing such a test would likewise upend a heap of regulations. In any event, the Legislature detailed why this law was needed.

substantial interest," (2) "the restriction must directly advance that interest," and (3) it "must be no broader than necessary." *Id.* Here, much (if not all) of what the marketing provisions regulate is not protected speech at all, given that subsection (a)(1) applies to marketing that is "either unlawful in itself or unreasonable under all the circumstances."[12] Most likely applications would thus not even reach the three-pronged test. *E.g.*, Press Release, *supra*, at 17 n.1 (company that advertised illegal weapons with "Is it legal?: YES!"); *Soto*, 202 A.3d at 311 n.56 (suit involving marketing that "promoted unlawful activity, namely, the civilian use" of a weapon "as a combat weapon ... for the purpose of waging war and killing").[13]

Nor are these provisions vague—a claim Plaintiff repeats under both the Due Process Clause and the First Amendment. "[S]peculation about possible vagueness in hypothetical situations … will not support a facial attack on a statute when it is surely valid in the vast majority of its intended applications." *Brown v. Pittsburgh*, 586 F.3d 263, 291 n.34 (3d Cir. 2009). And as explained above, NSSF's claim falls

---

[12] Even if some advertising could theoretically be "unreasonable" but *not* unlawful or misleading, NSSF fails to identify a disproportionately "substantial number" of such potential applications. *See Mazo*, 54 F.4th at 134.

[13] In any event, even if the marketing provisions *were* enforced against truthful, non-misleading speech—an issue that any defendant could litigate with particularity at that time—they satisfy the rest of the analysis. The State has a substantial interest in preventing the harms from unlawful or heedless marketing of dangerous weapons, and the provisions advance that interest. And the fact that the provisions are unlikely to trigger the remaining three prongs of the test in the first place just underscores that they are "no broader than necessary," *Bank of Hope*, 938 F.3d at 395.

into exactly that trap: it insists upon levels of "perfect clarity and precise guidance" that "have never been required even of regulations that restrict expressive activity," *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989), notwithstanding the cases applying the concept of reasonableness and rejecting vagueness challenges to it. *See supra* at 34. Nor is there anything constitutionally suspect in requiring reasonable conduct in commercial advertising. *See, e.g.*, *44 Liquormart v. Rhode Island*, 517 U.S. 484, 498 (1996) (noting that States may regulate such speech to prevent deceptiveness or "undue influence"); *Bell v. Publix Super Mkts.*, 982 F.3d 468, 474-75 (7th Cir. 2020) (citing laws addressing labels "likely to deceive reasonable consumers"); Del. Code Ann. tit. 6, §§ 2511(9), 2512 (protecting consumers from practices that are "likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition").

Because NSSF is wrong about the statute's vagueness, it also errs in arguing that their members' speech will be chilled or that their members are facing a risk of discriminatory enforcement. *See* Br. 19. As a matter of fact, NSSF puts nothing into this record to show that its members' speech has been chilled, and the State's own evidence suggests advertising has not ceased. *See supra* at 8-9. And as a matter of law, that makes sense: a provision that companies are only liable if they engage in unlawful or unreasonable marketing will actually "mitigate [the] law's vagueness,"

because it provides leeway for marketing without fear of liability for a good-faith mistake. *Hoffert*, 949 F.3d at 789; *see ChemSol*, 386 F. Supp. 3d at 1021 (upholding nuisance ordinance and noting that "plaintiffs' argument focuses on one word in the statute and ignores the remaining context"). Nor does NSSF explain how use of a standard tort-law duty creates a risk of discriminatory enforcement any more than in any other public nuisance context. *See Wm. Penn Parking*, 346 A.2d at 292 (citing negligence law as the "most notable example" of widespread legal standards "no more definite than a requirement of 'reasonableness'"). Here too, in short, NSSF's theory goes too far, belying any likelihood of success on the merits.

G.   Plaintiff is not likely to succeed on its Second Amendment challenge.

NSSF's final claim—that selling firearms is protected by the Second Amendment (Br. 23)—is baseless. A Second Amendment claim must establish, at the outset, that the Amendment's "plain text covers an individual's conduct." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2126-27 (2022). NSSF's claim fails at that threshold, because the Amendment's text has never been understood to confer a freestanding right to *sell* arms. *See id.* at 2134 ("'bear arms' refers to the right to 'wear, bear, or carry … for the purpose … of being armed and ready … in a case of conflict'" (quoting *District of Columbia v. Heller*, 554 U.S. 570, 584 (2008)); *see also Teixeira v. County of Alameda*, 873 F.3d 670, 683, 686-87 (9th Cir. 2017) (en banc) (surveying historical evidence). *Heller* itself stressed that "nothing in [the]

opinion should be taken to cast doubt on … laws imposing conditions and qualifications on the commercial sale of arms." 554 U.S. at 626-27; *Drummond v. Robinson Township*, 9 F.4th 217, 230 (3d Cir. 2021) ("We know of no court, modern or otherwise, to hold that the Second Amendment secures a standalone right to *sell* guns[.]"). NSSF does not even allege that Section 58-35 impairs the public's ability to possess firearms. Because NSSF claims a burden on conduct outside the Second Amendment's scope, the analysis "stop[s] there." *Bruen*, 142 S. Ct. at 2126.

## III.   THE REMAINING EQUITABLE FACTORS ARE IN ACCORD.

The equities and the public interest likewise favor the State. *Kos*, 369 F.3d at 708. The State's "inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018). And that harm is especially pronounced if there is "an ongoing and concrete harm to [a State's] law enforcement and public safety interests." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). Enjoining Section 58-35 would deprive all New Jerseyans of the benefits of the law, which the Legislature passed months ago to "protect the health, safety, and welfare of the people of New Jersey." *Id.* § 2C:58-33(d). NSSF offers no grounds to justify its extraordinary insistence on enjoining the Attorney General from carrying out his mandate in its entirety.

## CONCLUSION

This Court should deny Plaintiff's motion for a preliminary injunction.

Respectfully submitted,

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY

By:   /s/ Tim Sheehan
       Tim Sheehan
       Deputy Attorney General

## **CERTIFICATE OF SERVICE**

I certify that on December 23, 2022, I electronically filed the foregoing Brief

in Opposition to Motion for a Preliminary Injunction and accompanying papers with

the Clerk of the United States District Court for the District of New Jersey. Counsel

for all parties are registered CM/ECF users and will be served via CM/ECF.


Dated:  December 23, 2022                         /s/ Tim Sheehan
                                                  Tim Sheehan