## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| NATIONAL SHOOTING SPORTS FOUNDATION, | |
| Plaintiff, | Hon. Zahid N. Quraishi, U.S.D.J. |
| v. | Civil Action No. 3:22-cv-6646 |
| MATTHEW J. PLATKIN, Attorney General of New Jersey, | |
| Defendant. | |

---

### BRIEF IN SUPPORT OF MOTION FOR STAY PENDING APPEAL

---

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
R.J. Hughes Justice Complex
P.O. Box 116
Trenton, New Jersey 08625
Attorneys for Defendant
tim.sheehan@njoag.gov

Michael L. Zuckerman (NJ Bar #427282022)
 *Deputy Solicitor General*
Sara M. Gregory (NJ Bar #027252010)
 *Assistant Attorney General*
Tim Sheehan (NJ Bar #179892016)
Chandini Jha (NJ Bar #382622021)
Amanda I. Morejón (NJ Bar #405942022)
 *Deputy Attorneys General*
 Of Counsel and On the Brief

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ............................................................................ 1

STATEMENT OF FACTS AND PROCEDURAL HISTORY ............................ 3

      A.   New Jersey's Public Nuisance Statute. ................................................. 3

      B.   Plaintiff's Complaint and Motion for Preliminary Injunction. .............. 4

ARGUMENT....................................................................................................... 5

  I.   DEFENDANT WILL MAKE A SUFFICIENTLY STRONG SHOWING ON APPEAL, INCLUDING ON THE MERITS, JURSIDICTION, AND IRREPARABLE HARM. ................................................................... 6

      A.   PLCAA Does Not Preempt Section 58-35. ......................................... 6

      B.   NSSF Has Not Established Article III Jurisdiction. ............................16

      C.   NSSF Has Not Established Irreparable Harm. ....................................19

  II.  THE EQUITIES COMPEL A STAY TO PROTECT PUBLIC SAFETY....23

CONCLUSION .................................................................................................29

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Acierno v. New Castle Cty.*,
  40 F.3d 645 (3d Cir. 1994)................................................................................ 5

*Adams v. Freedom Forge Corp.*,
  204 F.3d 475 (3d Cir. 2000)............................................................................21

*ADP, Inc. v. Levin*,
  No. 21-2187, 2022 WL 1184202 (3d Cir. Apr. 21, 2022)...................................21

*Altria Grp. v. Good*,
  555 U.S. 70 (2008).........................................................................................14

*Byrd v. Shannon*,
  715 F.3d 117 (3d Cir. 2013)............................................................................10

*Children's Health Def., Inc. v. Rutgers State Univ. of N.J.*,
  No. 21-15333, 2021 WL 4398743 (D.N.J. Sept. 27, 2021)...............................21

*City of New York v. Beretta USA Corp.*,
  524 F.3d 384 (2d Cir. 2008).......................................................................8, 19

*CSX Transp., Inc. v. Ala. Dep't of Revenue*,
  562 U.S. 277 (2011).......................................................................................12

*Dayton Bd. of Educ. v. Brinkman*,
  439 U.S. 1358 (1978) (Rehnquist, J., in chambers) ........................................ 5

*Delana v. CED Sales, Inc.*,
  486 S.W.3d 316 (Mo. 2016)............................................................................26

*Drake v. Filko*,
  724 F.3d 426 (3d Cir. 2013)............................................................................23

*Ellis v. Westinghouse Elec. Co.*,
  11 F.4th 221 (3d Cir. 2021).............................................................................. 9

*Farina v. Nokia,*
    625 F.3d 97 (3d Cir. 2010)................................................................................14

*Felmeister v. Off. of Att'y Ethics,*
    856 F.2d 529 (3d Cir. 1988)........................................................................18, 19

*Freedom Holdings v. Spitzer,*
    408 F.3d 112 (2d Cir. 2005)..............................................................................21

*Ileto v. Glock,*
    565 F.3d 1126 (9th Cir. 2009)........................................................................8, 13

*In re Revel AC, Inc.,*
    802 F.3d 558 (3d Cir. 2015)................................................................................ 5

*In re Trans World Airlines, Inc.,*
    18 F.3d 208 (3d Cir. 1994)................................................................................. 5

*Kingsley v. Hendrickson,*
    576 U.S. 389 (2015)..........................................................................................11

*Lupian v. Joseph Cory Holdings LLC,*
    905 F.3d 127 (3d Cir. 2018)..............................................................................14

*Maryland v. King,*
    567 U.S. 1301 (2012) (Roberts, C.J., in chambers) ...........................................23

*Mugler v. Kansas,*
    123 U.S. 623 (1887)..........................................................................................14

*N.J. Retail Merchants Ass'n v. Sidamon-Eristoff,*
    669 F.3d 374 (3d Cir. 2012)..............................................................................20

*N.J. Bankers Ass'n v. Att'y Gen. New Jersey,*
    49 F.4th 849 (3d Cir. 2022)...............................................................................19

*Nat'l Shooting Sports Found., Inc. v. James,*
    _ F. Supp. 3d _, 2022 WL 1659192 (N.D.N.Y. 2022)...............................*passim*

*Nken v. Holder,*
    556 U.S. 418 (2009)........................................................................................... 5

*Oncale v. Sundowner Offshore Servs.*,
    523 U.S. 75 (1998)..........................................................................13

*Pharmacia Corp. v. Alcon Labs., Inc.*,
    201 F. Supp. 2d 335 (D.N.J. 2002)............................................20, 29

*Prescott v. Slide Fire Solutions*,
    410 F. Supp. 3d 1123 (D. Nev. 2019) .........................................15

*Ransom v. FIA Card Servs., N.A.*,
    562 U.S. 61 (2011)...................................................................... 7

*Reilly v. City of Harrisburg*,
    858 F.3d 173 (3d Cir. 2017)........................................................21

*Sherwin-Williams Co. v. County of Delaware, Pa.*,
    968 F.3d 264 (3d Cir. 2020)...............................................*passim*

*Singh-Kaur v. Ashcroft*,
    385 F.3d 293 (3d Cir. 2004)........................................................12

*Soto v. Bushmaster Firearms Int'l, LLC*,
    202 A.3d 262 (Conn. 2019) ................................................7, 8, 15

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014)....................................................................17

*United States v. Rare Breed Triggers, LLC*,
    No. 23-0369, 2023 WL 504992 (E.D.N.Y. Jan. 25, 2023)................27

*Wash. State Dep't of Soc. & Health Servs. v. Guardianship Est. of Keffeler*,
    537 U.S. 371 (2003).....................................................................12

*Williams v. BASF Catalysts LLC*,
    765 F.3d 306 (3d Cir. 2014)........................................................17

**Statutes**

15 U.S.C. § 7901..........................................................................12, 13

15 U.S.C. § 7903(5)(A).............................................................*passim*

18 U.S.C. § 922 ..............................................................................10, 16

N.J. Stat. Ann. § 2A:15-5.6(b)(1)(b) ...........................................11

N.J. Stat. Ann. § 2C:58-34 .......................................................3, 7

N.J. Stat. Ann. § 2C:58-35 ...................................................*passim*

N.Y. Gen. Bus. Law § 898-e .......................................................... 9

Tex. Penal Code Ann. § 42.01(a)(5)..............................................11

## Other Authorities

151 Cong. Rec. S8908-01 (July 26, 2005)...........................................13

Anthony A. Braga, et al., *Strategies for Disrupting Illegal Firearm Markets: A Case Study of Los Angeles*, RAND CORP. 5 (2008)...............................26

*Applicable*, Black's Law Dictionary (11th ed. 2019)............................... 7

Garen Wintermute, *Firearm Retailers' Willingness to Participate in an Illegal Gun Purchase*, 87 No. 5 J. Urban Health 865 (2010)...................................28

Press Release, Manhattan Dist. Att'y's Office, *D.A. Bragg and Commissioner Sewell Announce 32-Count Indictment in Ghost Gun Takedown* (Oct. 11, 2022)....................................................................25

Press Release, Office of the Att'y Gen., *AG Platkin: 15 Alleged Members of a Paterson Gun Trafficking Ring Charged with Transporting Guns from South Carolina for Illegal Sale in NJ* (Nov. 3, 2022)..................................26

Press Release, U.S. Dep't of Justice (D.N.J.), *Firearms Dealer Gets Over Five Years In Prison For Selling More Than 200 Guns To Drug Dealer, Other Criminals In South Jersey* (Oct. 25, 2016) .......................................26

Press Release, U.S. Dep't of Justice (D.N.J.), *Four New Jersey Men Charged with Roles in 'Ghost Gun' Trafficking Network* (Jan. 31, 2023)...............................25

Press Release, U.S. Dep't of Justice (D.N.J.), *Nine Men Charged with Roles in Gang-Led Drug and Gun Trafficking Network* (Jan. 5, 2023) ...........................24

Press Release, U.S. Dep't of Justice (S.D.N.Y.), *Licensed Firearms Dealer From East Greenbush Sentenced In White Plains Federal Court For Illegally Trafficking Firearms With Obliterated Serial Numbers* (Dec. 22, 2015)...........27

Webster's Third New International Dictionary 105 (2002)..................................... 7

**Regulations**

Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24652 (Apr. 26, 2022)...................................................................................23, 24

## PRELIMINARY STATEMENT

On January 31, 2023, this Court granted Plaintiff National Shooting Sports Foundation's ("NSSF's") request for a preliminary injunction. This Court enjoined New Jersey's Attorney General from enforcing N.J. Stat. Ann. § 2C:58-35 ("Section 58-35") against anyone, for any type of conduct, no matter how clearly such conduct would violate state law, and no matter how clearly such conduct would be barred by federal law. *See* Dkt. 18. And it did so without NSSF pointing to *any* conduct that any members planned to undertake that would contravene Section 58-35, without pointing to a specific threat of enforcement, and without any real showing of harm.

This Court should stay its injunction pending appeal. This Court reached its conclusion only by reading "applicable" in the Protection of Lawful Commerce in Arms Act ("PLCAA"), 15 U.S.C. § 7903(5)(A)(iii), to mean an obligation that is "concrete." That reading finds no support in any dictionary or common usage—and NSSF cited none. That reading also conflicts with every federal court to have construed section 7903(5)(A)(iii) in the past. Indeed, no opinion—not even a concurrence or dissent—has ever before adopted that reading. Another district court held, just last year, that construing "applicable" to preempt statutes like Section 58-35 is not even "reasonable." *Nat'l Shooting Sports Found., Inc. v. James*, _ F. Supp. 3d _, 2022 WL 1659192, at *4 (N.D.N.Y. 2022). Yet this Court adopted NSSF's outlier reading, and it did so without even addressing the presumption against

1

preemption, which requires courts to interpret any ambiguity *in favor of* the State's exercise of its police powers. Given this backdrop, and given NSSF's failures to demonstrate Article III standing and irreparable harm, the State will at the very least be able to make a sufficiently strong showing on appeal to justify granting a stay.

Further, the consequences of the preliminary injunction resoundingly support this stay motion. The State suffers a harm any time a democratically-enacted law is enjoined, and that harm is particularly profound when public safety is at stake. This Court's order prevents the Attorney General from taking action under Section 58-35 in response to even the worst acts by a gun-industry member, no matter how blatant. That includes companies that sell ghost-gun parts to residents without even making sure those individuals can pass a background check. It includes a seller who provides a gun to a buyer despite knowing the buyer is at risk of attempting suicide or has displayed overt signs of an intent to commit a mass shooting. And it includes one who engages in a clear pattern and practice of selling to straw purchasers in the face of obvious red flags that weapons are being diverted to prohibited possessors. On the other side of the ledger, any harms from a stay pending appeal of the preliminary injunction in the Third Circuit are wholly speculative. Indeed, it is not even likely the appeal would last much longer than the amount of time NSSF waited to seek injunctive relief in the first place. In short, the danger to public safety from upsetting the status quo outweighs any risk to NSSF or its members. A stay is warranted.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

A.   New Jersey's Public Nuisance Statute.

New Jersey enacted Section 58-35 on July 5, 2022. The statute grants the Attorney General an exclusive cause of action against any industry member "engaged in the sale, manufacturing, distribution, importing, or marketing of a gun-related product" that violates either of two duties identified in subsection (a). N.J. Stat. Ann. §§ 2C:58-35(a)(3), (b). The first, subsection (a)(1), covers those industry members who engage in "conduct either unlawful in itself or unreasonable under all the circumstances" and thereby "knowingly or recklessly create, maintain, or contribute to a public nuisance in this State through the sale, manufacturing, distribution, importing, or marketing of a gun-related product." The second, subsection (a)(2), requires an industry member to "establish, implement, and enforce reasonable controls regarding its manufacture, sale, distribution, importing, and marketing of gun-related products." *Id.* § 2C:58-35(a)(1)-(2).

Section 58-34 defines the law's operative terms. It explains that the statutory term "gun-related product" is cabined territorially to a firearm product (like a gun or ammunition) that "was, or was intended to be, sold, manufactured, distributed, imported, or marketed in this State, or which product was possessed in this State and as to which it was reasonably foreseeable that the product would be possessed or used in this State." *Id.* § 2C:58-34. And Section 58-34 explains that "[r]easonable

3

controls" include business protocols to prevent the "sale or distribution" to straw purchasers and other unlawful buyers; to prevent loss or theft of inventory; and to ensure compliance with federal and state law. *Id.*

B.  Plaintiff's Complaint and Motion for Preliminary Injunction.

On November 16, 2022, over four months after the law took effect, NSSF filed this lawsuit against the Attorney General. Dkt. 1. NSSF is a trade association of over 9,000 manufacturers, distributors, and retailers of firearm products "throughout the United States." *Id.* ¶ 8. One week later, NSSF moved for a preliminary injunction. Dkt. 4-1. NSSF attached two declarations from industry members asserting, in cursory fashion, that they "could face liability" and the "risk of litigation and potential liability," Dkt. 4-2, Reh Decl. ¶¶ 14, 17, if they do not stop advertising or "shut[] down operations entirely," *id.* ¶ 15; Dkt. 4-3, Shawver Decl.

On January 31, 2023, this Court granted NSSF's motion. Dkt. 17 ("Op."). After concluding that NSSF had satisfied Article III standing, Op. at 6, this Court's opinion concluded that Section 58-35 was preempted by PLCAA by reading the word "applicable" in PLCAA's predicate exception to require a "concrete obligation with which industry members can confidently ensure compliance," Op. at 12. It also concluded that NSSF established irreparable harm because Section 58-35 permits the Attorney General to commence an action to enforce the provision, and because the Attorney General created an office to do so. Op. at 17. This Court's order

enjoined state officers "from enforcing the provisions of N.J.S.A. 2C:58-35," Dkt. 18, even if the defendant is not a member of NSSF, and even where the enforcement action does not rely on PLCAA's predicate-exception whatsoever.

The Attorney General filed his notice of appeal, Dkt. 19, and now moves for a stay pending appeal. The parties agreed to an expedited briefing schedule so that this Court could swiftly resolve the motion.

## ARGUMENT

In considering whether a movant is entitled to a stay, courts evaluate whether the applicant has made a "strong showing that [it] is likely to succeed on the merits," and whether the equities—irreparable injury, balance of the equities, and the public interest—support a stay. *In re Revel AC, Inc.*, 802 F.3d 558, 568, 571 (3d Cir. 2015). The review is a "sliding scale," and likelihood of success need "not [be] greater than 50%." *Id.* at 571. Because a stay "simply suspend[s] judicial alteration of the status quo" while the court considers the merits, *Nken v. Holder*, 556 U.S. 418, 429 (2009), the State's burden is not "particularly heavy," *Acierno v. New Castle Cty.*, 40 F.3d 645, 653 (3d Cir. 1994). That makes sense because "the maintenance of the status quo is an important consideration in granting a stay." *Dayton Bd. of Educ. v. Brinkman*, 439 U.S. 1358, 1359 (1978) (Rehnquist, J., in chambers); *see also In re Trans World Airlines, Inc.*, 18 F.3d 208, 215 (3d Cir. 1994) (noting that a stay "does not decide the ultimate issue"). Both the merits and the equities support a stay here.

# I.   DEFENDANT WILL MAKE A SUFFICIENTLY STRONG SHOWING ON APPEAL, INCLUDING ON THE MERITS, JURSIDICTION, AND IRREPARABLE HARM.

The merits justify a stay. The Attorney General is likely to succeed on appeal for three reasons, any one of which supports granting a stay. First, PLCAA does not preempt Section 58-35. Second, NSSF has not established Article III jurisdiction. And third, NSSF has not shown any irreparable harm to justify this injunction.

## A.   PLCAA Does Not Preempt Section 58-35.

On appeal, the State will be able to present a sufficiently strong showing that this Court erred in two respects. First, that this Court misread PLCAA. Second, that its injunction is overbroad even accepting its outlier interpretation.

**1.** This Court held Section 58-35 preempted because it does not fit PLCAA's predicate exception, 15 U.S.C. § 7903(5)(A)(iii), but its analysis cannot withstand scrutiny. As the Court noted, that exception excludes from PLCAA preemption any "action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute *applicable to* the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought." Op. at 11 (citing 15 U.S.C. § 7903(5)(A)(iii)). The Court's conclusion that Section 58-35 falls outside this exception is refuted by the text, ordinary meaning, and precedent.

The operative text—"a State … statute *applicable to* the sale or marketing of the [firearms] product" (emphasis added)—fits Section 58-35 hand in glove. Where

a statute leaves the word "applicable" undefined, as PLCAA does, courts "look to the ordinary meaning of the term." *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 69 (2011). As the Supreme Court has concluded (and this Court agreed, Op. at 12), "'[a]pplicable' means 'capable of being applied: having relevance' or 'fit, suitable, or right to be applied: appropriate.'" *Id.* (quoting Webster's Third New International Dictionary 105 (2002)). Black's Law Dictionary confirms the same. *See Applicable*, Black's Law Dictionary (11th ed. 2019) ("1. Capable of being applied; fit and right to be applied. 2. (Of a rule, regulation, law, etc.) affecting or relating to a particular person, group, or situation; having direct relevance."). That is dispositive, because Section 58-35 *expressly* applies to sales and marketing by gun industry members— that is, it applies or relates to those practices. *See* N.J. Stat. Ann. § 2C:58-35(a)(1)-(2); *id.* § 2C:58-34 (defining terms).

Notably, while there is debate among jurists about what "applicable" means in the context of PLCAA, both sides of the debate—and *every single opinion* weighing in on it to date—support New Jersey here. Some courts have understood the term "applicable" to mean statutes that simply *encompass* sales or marketing by gun-industry members, even if they apply to sales or marketing by other industries too. *See, e.g.*, *Soto v. Bushmaster Firearms Int'l, LLC*, 202 A.3d 262, 302-24 (Conn. 2019) (reading "applicable" to cover statute that encompassed gun marketing despite not doing so exclusively), *cert. denied*, 140 S. Ct. 513 (2019). Other courts have held

that the term "applicable" only covers statutes that explicitly relate to sales or marketing by gun-industry members. *See, e.g.*, *Ileto v. Glock*, 565 F.3d 1126, 1136 (9th Cir. 2009) (reading "applicable" to cover "statutes that regulate manufacturing, importing, selling, marketing, and using firearms or that regulate the firearms industry"); *Soto*, 202 A.3d at 327-28 (Robinson, J., dissenting in part) (concluding that "applicable" covers "only those statutes that govern the sale and marketing of firearms and ammunition specifically"). And some fall somewhere in between those two. *See City of New York v. Beretta USA Corp.*, 524 F.3d 384, 404 (2d Cir. 2008) (concluding that "applicable" refers to statutes that "expressly regulate firearms" or "that courts have applied to the sale and marketing of firearms").[1]

But no court has ever before done what this Court did. All of the opinions laid out above share something in common: they understand that "applicable to" means whether the state statute *relates to* the gun industry (either generally or specifically), not how *concrete* the state law obligations themselves are. And they all agree that a law like Section 58-35, which expressly and exclusively governs gun-industry sales-

---

[1] This Court erred in particular in citing *Beretta* for support. The Second Circuit held that "applicable to" "mean[s] statutes that clearly can be said to regulate the firearms industry," 524 F.3d at 402, not that a law is only "applicable" when it is concrete. In other words, this Court's opinion actually split with the very opinion in *Beretta* from which it claimed to find support, because *Beretta* held that state laws that "expressly regulate firearms" or "that courts have applied to the sale and marketing of firearms" fit the exception. *Id.* at 404. While that was not true of New York's criminal nuisance statute in *Beretta*, *see id.*, it is undeniably true of Section 58-35.

and-marketing practices, is "applicable to the sale or marketing of" guns under PLCAA. In fact, the State is not aware of a single opinion until last week that made such an interpretive shift, from "applicable" to "concrete." Just the opposite: when another district court confronted the same dispute over PLCAA's scope and canvassed these opinions, it found that "[n]o reasonable interpretation of 'applicable to' can exclude a statute which imposes liability exclusively on gun manufactures for the manner in which guns are manufactured, marketed, and sold." *NSSF v. James*, 2022 WL 1659192, at *4.[2] That certainly provides at least significant evidence that the State will have a strong case to present on appeal.

There is a good reason why no court to date has adopted this reading: it does not fit with the plain words of the predicate exception. This Court agreed with NSSF that a state law is only "applicable to" the sale of firearms if it "impose[s] a concrete obligation with which industry members can confidently ensure compliance." Op. at 12. But federal courts are not permitted to write new words into duly enacted federal laws that Congress did not see fit to include. *See Ellis v. Westinghouse Elec. Co.*, 11 F.4th 221, 234 (3d Cir. 2021). Rather, if "the language of the statute has a reasonably

---

[2] While other features of New York's gun-related public nuisance law differ from Section 58-35 (for example, New York's law allows any private plaintiff to bring a suit, N.Y. Gen. Bus. Law § 898-e, whereas Section 58-35 allows enforcement only by the Attorney General), the two state statutes are either both "applicable" under PLCAA's predicate exception, or neither is.

plain meaning, then [the court's] sole function is to enforce the statute's language."
*Byrd v. Shannon*, 715 F.3d 117, 122-23 (3d Cir. 2013). Here, NSSF pointed this
Court to no source—not a dictionary, not common usage, not legal precedent—
showing the word "applicable" means "concrete." To the contrary, the dictionary
definitions and cases cited above indicate just the opposite. *See supra* at 7-8.

A number of common examples demonstrate that "applicable" is only about
the relation of the statute to the industry, not about the *concreteness* or *specificity* of
the state statute's industry-focused obligations. To take an example from federal law,
Congress requires gun sellers to refrain from providing firearms or ammunition to
people that they have "reasonable cause to believe" are not allowed to possess them.
*E.g.*, 18 U.S.C. § 922(b)(1)-(3), (d). Whether or not those statutes impose "concrete"
obligations on gun sellers, it would be impossible to deny that this law is "applicable
to" gun sellers. So too a law barring unreasonable police use of force is "applicable
to" a law enforcement officer, and a statute prohibiting serving alcohol to individuals
who are "visibly intoxicated" is one "applicable to" a bar, even if a police officer or
bartender does not find them specific enough to comply "with confidence." No
policy objection to that result can change the meaning of "applicable."

The State will also present strong arguments on appeal regarding the Court's
other bases for its interpretation of the phrase "applicable to." *First*, this Court relied
on NSSF's contention that PLCAA's reference to "knowing" requires "a sufficiently

10

concrete duty to have knowingly violated a relevant statute." Op. at 12. But for one, PLCAA does not require the predicate statute to include a knowledge component itself; it simply requires that cases brought under the statute satisfy those terms. (This is a central problem with resolving this case in the context of a facial challenge to hypothetical enforcement.) And for another, NSSF was simply wrong. Tort and criminal law, for instance, are replete with statutes and doctrines that impose liability for knowingly breaching a more general duty of care. *See, e.g.*, N.J. Stat. Ann. § 2A:15-5.6(b)(1)(b) (liability for host who "knowingly provide[s] alcoholic beverages" to person "visibly intoxicated under circumstances manifesting reckless disregard"); Tex. Penal Code Ann. § 42.01(a)(5) (defining disorderly conduct to include "intentionally or knowingly" making "unreasonable noise in a public place"); *Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015) (under section 1983, "pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable").

*Second*, the State will make a strong showing that PLCAA's two examples do not convert the word "applicable" into a synonym for "concrete." *See* Op. at 13 (discussing two express exceptions). As an initial matter, PLCAA says only that the predicate exception "includes" these illustrative examples. But the word *include* shows "that Congress intended to illustrate a broad concept rather than narrowly circumscribe a term with exclusive categories." *Singh-Kaur v. Ashcroft*, 385 F.3d

293, 298 (3d Cir. 2004). Sometimes Congress gives lists and then offers a catch-all term at the end, with the catch-all term taking meaning from the specific examples that precede it. *See, e.g.*, *Wash. State Dep't of Soc. & Health Servs. v. Guardianship Est. of Keffeler*, 537 U.S. 371, 384 (2003) (cited at Op. at 13). But NSSF points to no case where a court made that move when confronted with a list of two "distinct and independent" examples that are simply "include[d]" within a much broader— and otherwise quite plain—statutory meaning. *See, e.g.*, *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 295 (2011).

Even if the two illustrative examples could redefine the word "applicable," its new definition still would not be "concrete." Most obviously, neither of the examples are especially concrete. Example I turns on what representations are "material to the lawfulness of" a sale, which is not a terribly specific term. And it is not "pellucid," NSSF Reply at 9, whether a particular seller had "reasonable cause to believe" that an actual buyer in a straw purchase was a prohibited possessor under Example II. *See* 15 U.S.C. § 7903(5)(A)(iii)(I)-(II). Instead, there are other commonalties these two examples do share that are *consistent* with every other opinion interpreting this provision, and that are inconsistent with this Court's preliminary injunction. Both are legislative enactments, rather than common law lawsuits—the latter being a core concern behind PLCAA. *See* 15 U.S.C. § 7901(a)(7) (decrying common law lawsuits that expand liability in ways not contemplated "by the legislatures"). Further, both

apply specifically to the firearms industry. *See Ileto*, 565 F.3d at 1136. And both involve wrongdoing by the gun-industry member, rather than liability turning *solely* on the acts of third parties. *See* 15 U.S.C. §§ 7901(a)(6), (b)(1). But under any of those commonalities, Section 58-35 would still qualify for the exception. That is why NSSF had to gerrymander its "applicable means concrete" theory.

    *Third*, there is no basis to replace the clear, ordinary meaning of the statute's words with general views of its underlying purpose. *See* Op. at 13. In general, the Supreme Court has been clear that general senses of a law's intent cannot overcome the plain text Congress employed. *See Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 79 (1998) ("[I]t is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed."). But regardless, NSSF has misunderstood Congress's purposes. It is true, as this Court held, that PLCAA did seek to bar lawsuits against the gun industry "for the harm solely caused by the criminal or unlawful misuse of firearm products or ammunition products by others." Op. at 13 (quoting 15 U.S.C. § 7901(b)(1)). But that purpose is consistent with Section 58-35, because Section 58-35 targets bad-apple industry members' *own misconduct. See James*, 2022 WL 1659192, at *4-5 (rejecting NSSF's similar arguments as a matter of both text and purpose). And on that front, there is considerable legislative history supporting New Jersey's position. *See, e.g.*, 151 Cong. Rec. S8908-01, S8911 (July 26, 2005) (then-Senator Jeff Sessions, one of the

sponsors, explaining that PLCAA was "incredibly narrow" and that "[p]laintiffs can go to court if the gun dealers do not follow the law, if they negligently sell the gun, if they … sell to someone they know should not be sold to or did not follow steps to determine whether the individual was properly subject to buying a gun").

*Finally*, even if the interpretive question were close, the presumption against preemption would require this Court to construe PLCAA preemption narrowly and in favor of the State's public safety authority. Federal courts "apply a presumption against preemption" when reviewing federal laws pertaining to "'areas of traditional state regulation' or police power." *Lupian v. Joseph Cory Holdings LLC*, 905 F.3d 127, 131 & n.5 (3d Cir. 2018). Public-nuisance regulation is an area of traditional state regulation. *See, e.g.*, *Mugler v. Kansas*, 123 U.S. 623, 669 (1887). And the presumption applies even if federal law includes an express preemption provision. *Lupian*, 905 F.3d at 131 & n.5. The presumption requires NSSF to establish that its construction is the *only plausible reading* of the law. *See Farina v. Nokia*, 625 F.3d 97, 118 (3d Cir. 2010) (quoting *Altria Grp. v. Good*, 555 U.S. 70, 77 (2008)). NSSF cannot do so, especially given all the contrary case law cited above. Yet this Court never even mentioned the presumption against preemption, let alone explained why NSSF's belief that "applicable" means "concrete" is the only plausible approach. A stay is at the very least warranted given the impact of that venerable rule.

Multiple courts have upheld under PLCAA state statutes that similarly impose

normal duties of care upon gun-industry members. *See, e.g.*, *Soto*, 202 A.3d at 302 (state law prohibiting "unfair methods of competition and unfair or deceptive acts or practices"); *Prescott v. Slide Fire Solutions,* 410 F. Supp. 3d 1123, 1138 (D. Nev. 2019) ("[k]nowingly mak[ing] a false representation [as] to the characteristics … of goods … for sale"). Another court even upheld a gun-related public-nuisance statute similar to Section 58-35, and rejected the statutory interpretation and reasoning that supported the instant preliminary injunction. *See James*, 2022 WL 1659192, at *4. And *no* court has come out the same way as the decision last week. That all combines to a sufficiently strong showing of success on appeal to justify a stay.

**2.** Even accepting this Court's interpretation of PLCAA's predicate exception, this Court's injunction is still overbroad. The Court's only merits holding was that an enforcement suit under Section 58-35 cannot proceed under PLCAA's predicate exception. But there are other theories under which the State can proceed that would not involve the predicate exception, and yet are (possibly inadvertently) barred under the phrasing of the current preliminary injunction. *See* Dkt. 18 (enjoining the State "from enforcing the provisions of N.J.S.A. 2C:58-35"). Under this Court's current order, the Attorney General cannot enforce Section 58-35 even where:

- The industry member's misconduct is wholly independent of any third-party misconduct, even though PLCAA is exclusively concerned with vicarious liability. 15 U.S.C. § 7903(5)(A).

- The industry member's misconduct is based entirely on a theory of negligent entrustment or negligence per se, even though PLCAA expressly excludes

such enforcement from preemption. *Id.* § 7903(5)(A)(ii).

- The industry member has engaged in fraudulent or faulty record-keeping, even though PLCAA expressly excludes such enforcement from preemption. *Id.* § 7903(5)(A)(iii)(I).

- The industry member sells firearms to straw purchasers, "knowing, or having reasonable cause to believe, that the actual buyer" is prohibited under 18 U.S.C. § 922(g) or (n), even though PLCAA expressly excludes such enforcement from preemption. 15 U.S.C. § 7903(5)(A)(iii)(II).

- The industry member is not federally licensed at all, even though PLCAA applies only to federally licensed sellers. *Id.* § 7903(6).

The breadth of this Court's order is thus not supported by its opinion.

Consequently, while the Attorney General's motion asks for the entire order to be stayed, given the showing he will make on appeal regarding the meaning of PLCAA, he is at least entitled to a stay pending appeal of the injunction insofar as it applies to enforcement of Section 58-35 based on (1) no third-party misconduct, *see* 15 U.S.C. § 7903(5)(A); (2) a theory of negligent entrustment or negligence per se, *id.* § 7903(5)(A)(ii); (3) fraudulent or faulty record-keeping, *id.* § 7903(5)(A)(iii)(I); (4) knowing or reckless straw sales to prohibited purchasers, *id.* § 7903(5)(A)(iii)(II); or (5) misconduct by non-federally licensed actors, *id.* § 7903(6).

B.    NSSF Has Not Established Article III Jurisdiction.

The State will also make a strong showing that there is not yet any Article III case or controversy. Although this Court's opinion distinguished *Sherwin-Williams Co. v. County of Delaware, Pa.*, 968 F.3d 264 (3d Cir. 2020), the State will again at

least make a strong showing based on that highly analogous precedent that the Third Circuit's law forecloses ripeness and standing here.

In *Sherwin-Williams*, after the paint company Sherwin-Williams was sued by two counties for public nuisance based on the sale and manufacture of lead-based paint, it sued three other counties, claiming their anticipated future enforcement actions on the same theory would violate its rights. *Id.* at 267. The Third Circuit rejected that chain of conjectures as a basis for jurisdiction, noting that "[t]he County might sue Sherwin-Williams, but it might not. It might advance the same arguments as other counties, but it might not. The uncertainty surrounding these fundamental questions renders these claims unfit for judicial resolution." *Id.* at 272; *see also, e.g.*, *Williams v. BASF Catalysts LLC*, 765 F.3d 306, 328 (3d Cir. 2014) (similar attempt to preempt future suit was not ripe as "[t]he identity of the parties, the nature of the claims and defenses, and the substantive law to be applied are all unknown.").

NSSF's arguments for invoking jurisdiction are even more speculative. As in *Sherwin-Williams*, NSSF seeks to preempt a hypothetical future public nuisance suit. And as in *Sherwin-Williams*, NSSF fails to show that "defending against a lawsuit (rather than pursuing this one) would" be infeasible. 968 F.3d at 270-71. Worse still, NSSF fails to identify any actions or practices by its members that even "arguably" implicate Section 58-35, let alone "a substantial threat of future enforcement." *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161 (2014).

The State has a strong argument that the sole basis on which this Court relied to find standing and ripeness—that "NSSF members' manufacturing, marketing, and sale of firearms and related products" is conduct proscribed by Section 58-35, Op. at 4-5—cannot do that work. After all, Section 58-35 does not in fact create liability for the mere act of manufacturing, marketing, or selling firearms. Instead, Section 58-35 imposes liability only for industry members' *misconduct*, whether unlawful or otherwise unreasonable. N.J. Stat. Ann. § 2C:58-35(a). Nothing in this record even hints that any gun-industry member engages in activity that would arguably be covered. That "dearth of factual material in the record referable to these particular plaintiffs and their particular" conduct makes the present suit "purely hypothetical." *Felmeister v. Off. of Att'y Ethics*, 856 F.2d 529, 537 (3d Cir. 1988).

This Court offered one basis to distinguish *Sherwin-Williams*: that *Sherwin-Williams* involved hypothetical enforcement of the common law public nuisance, as opposed to hypothetical enforcement of a statute. Op. at 5-6. But the fact that the dreamed-of future suits in *Sherwin-Williams* would hypothetically have been based on a common law theory was irrelevant to the Third Circuit's holding. Instead, Judge Hardiman's opinion for the unanimous panel made clear that the problem—as to standing and ripeness—was that plaintiff could offer nothing more than speculation that it would be sued, and could only speculate as to the theories on which suit would be brought. 968 F.3d at 269-72. Nothing about that reasoning turns on whether that

hypothesized suit is based on a body of common law or positive law.

New Jersey Bankers Ass'n v. Attorney General New Jersey, 49 F.4th 849 (3d Cir. 2022), is also distinct. In that case, the plaintiff stated the exact conduct it wished to undertake: "to make independent expenditures and contributions to political parties and campaigns for state and local office in New Jersey." *Id.* at 853. That conduct was explicitly prohibited by the challenged law. *Id.* And the State *agreed* that this specific course of conduct brought the plaintiff within the prohibition. *Id.* at 858. NSSF, by contrast, offered nothing more than evidence that two members— Beretta and SIG Sauer—sell firearms. But that act alone is obviously not proscribed by Section 58-35. As the Third Circuit has explained, "until it is shown that plaintiffs wish to engage in an activity that would be prohibited … , their challenge lacks the level of factual specificity necessary" to satisfy Article III. *Felmeister*, 856 F.2d at 537. NSSF did not make that showing at this stage.

C.     NSSF Has Not Established Irreparable Harm.

Finally, whatever result might be proper at the conclusion of this lawsuit, the State will make a strong showing on appeal that NSSF at the very least did not create a sufficient record to justify the extraordinary remedy of a preliminary injunction. In short, NSSF's reliance on conclusory compliance costs or hypothetical litigation costs did not prove irreparable harm.

This Court's conclusion that NSSF satisfied irreparable harm boils down to a

finding that the association's members are "faced with the same dilemma as the plaintiff-companies in [*N.J. Retail Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374 (3d Cir. 2012)]; they are required to either comply with the statute … or be faced with prosecution and fees upon [Section 58-35's] enforcement for noncompliance." Op. at 17. But as New Jersey will argue on appeal, *Sidamon-Eristoff* is a materially different case. The plaintiffs there were issuers of gift cards that had been deemed abandoned by operation of law, meaning they were required by the challenged law to pay to the State the remaining value of the cards. 669 F.3d at 383-84. In other words, there were actual funds—"the remaining value of existing gift cards"—that everyone agreed plaintiffs had to turn over, and those plaintiffs would have undeniably faced "prosecution and fines" if they didn't. *Id.* at 388. In other words, that case featured clear conduct, clear costs, a clear dispute, and clear risk.

Nothing about NSSF's theory of irreparable harm is remotely so clear. NSSF does not claim its members actually took steps to comply with Section 58-35, much less identify what those steps were. It does not identify any practice or actions that it thinks could arguably implicate Section 58-35. It does not explain why it waited four-and-a-half months to seek a preliminary injunction, a delay that by all rights "knocks the bottom out of" its claim of irreparable harm. *See Pharmacia Corp. v. Alcon Labs., Inc.*, 201 F. Supp. 2d 335, 382-83 (D.N.J. 2002); *see also Children's Health Def., Inc. v. Rutgers State Univ. of N.J.*, No. 21-15333, 2021 WL 4398743,

at *7 (D.N.J. Sept. 27, 2021); N.J. Stat. Ann. § 2C:58-35 (effective date July 5, 2022). And a bare allegation that a party will incur *some* future costs is insufficient for irreparable harm. *See Freedom Holdings v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005). That is true even if money damages cannot be later recovered due to sovereign immunity, because the costs must still be non-speculative and based in evidence. *See Adams v. Freedom Forge Corp.*, 204 F.3d 475, 488 (3d Cir. 2000); *ADP, Inc. v. Levin*, No. 21-2187, 2022 WL 1184202, at *3 (3d Cir. Apr. 21, 2022).

Nor can NSSF's failure to meet its burden be excused simply because the "enforcement of [Section 58-35] is specifically articulated within the statute." Op. at 17. After all, nearly every statute confers authority to enforce its provisions, but that alone is insufficient to show that a particular party "specifically and personally risks irreparable harm." *Adams*, 204 F.3d at 487. If it were otherwise, every statute on the books would establish irreparable harm, rendering this threshold requirement a nullity. *See Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017).

Likewise, the mere existence of an office designated to enforce Section 58-35 does nothing to show that anyone faces imminent or irreparable harm. *See Adams*, 204 F.3d at 487; *Sherwin-Williams*, 968 F.3d at 270 (confirming parties cannot show imminent harm from "the specter of" the government's "potential lawsuit"). Though it addressed "irreparable injury" in the context of Article III jurisdiction, *id.* at 271, *Sherwin-Williams* is again instructive. After all, the unanimous Third Circuit panel

there noted that the counties the paint company sued "seemed poised to file with the assistance of outside counsel motivated by a contingent-fee-arrangement," yet even that was insufficient. *Id.* at 266; *see also id.* at 272 ("In fact, according to Sherwin-Williams's complaint, the only action Delaware County has taken towards filing suit is hiring outside counsel. The County might sue Sherwin-Williams, but it might not. It might advance the same arguments as other counties, but it might not. The uncertainty surrounding these fundamental questions renders these claims unfit for judicial resolution."). *Sherwin-Williams* itself, in other words, confirms that the creation of an office does not constitute "imminent" *or* "irreparable" harm. *See id.* at 270-71.[3] Moreover, the office-demonstrates-irreparable-harm argument proves far too much: it would suggest that any company could challenge New Jersey's Consumer Fraud Act, without pointing to reasons to believe they are imminently being harmed by its terms, simply because the Department of Law and Public Safety contains a Division of Consumer Affairs charged with enforcement of that Act.

   Given the particular weakness of the irreparable harm showing on this record, the State will have another strong argument on appeal that a preliminary injunction

---

[3] Nor does the existence of such an office address the even-more-foundational problem *Sherwin-Williams* raised: that the nature of the relevant conduct and the alleged enforcement action themselves remained too speculative for an Article III case or controversy. *E.g.*, 968 F.3d at 270 ("Specifically, Sherwin-Williams asks us to assume not only that the County will sue, but also its theory of liability, its litigation tactics, and that the County will prevail.").

is not warranted at this time.

## II.   THE EQUITIES COMPEL A STAY TO PROTECT PUBLIC SAFETY.

Because the preliminary injunction will interfere with a critical public safety tool adopted by the New Jersey Legislature, a stay is warranted. There is no dispute that the State "has … a significant, substantial and important interest in protecting its citizens' safety." *Drake v. Filko*, 724 F.3d 426, 437 (3d Cir. 2013). So while New Jersey "suffers … irreparable injury" any time it is "enjoined … from effectuating statutes," the injury is especially profound where there is "an ongoing and concrete harm to … law enforcement and public safety interests." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers).

Here, this Court's injunction undermines the State's public safety interests by foreclosing enforcement of Section 58-35 against a vast swath of dangerous conduct. Four examples illustrate the problems:

*First*, the Attorney General is prohibited from enforcing Section 58-35 even against a seller that delivers products to customers without undertaking background checks—such as the increasing problem of ghost gun sales in New Jersey. Ghost guns are unserialized firearms that can be built at home from easily assembled weapon parts kits or partially complete framers or receivers. *See* Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24652, 24662 (Apr. 26, 2022) (to be codified at 27 C.F.R. pts. 447, 478, 479). Because the finished

product is unserialized, law enforcement is often unable to track the gun if it is later used in a crime. 87 Fed. Reg. 24655-56. Persons who are prohibited from possessing firearms—including felons, domestic abusers, even terrorists—are increasingly gravitating to ghost guns, because they can easily acquire these "without a background check" (which they could not pass). 87 Fed. Reg. 24655, 245656-57 & n.20, 24663. And these are proliferating in New Jersey: the number of ghost guns recovered at crime scenes increased from 55 guns in 2019 to 296 in 2022, with many used to commit violent crimes. *See VanDerStok v. Garland*, No. 22-11071, Dkt. 37-1, Br. of District of Columbia et al., 14-15 (5th Cir. Dec. 27, 2022); *see also* Decl. of Ravi Ramanathan, Director of the Statewide Affirmative Firearms Enforcement Office ("SAFE") ¶¶ 19-21 (detailing dangers to New Jerseyans posed by ghost guns, including that "ghost guns represent an increasing percentage of all firearms recovered by New Jersey law enforcement").

The New York Attorney General has been able to bring enforcement actions against sellers of ghost guns pursuant to New York's statutory analog to Section 58-35. *See New York v. Arm or Ally, LLC*, No. 22-cv-6124, Compl., Dkt. 1-1 (S.D.N.Y.) (public-nuisance suit against sellers of ghost gun kits who avoided FFL licensure); *cf.* Press Release, U.S. Dep't of Justice (D.N.J.), *Nine Men Charged with Roles in Gang-Led Drug and Gun Trafficking Network* (Jan. 5, 2023) (indictment of nine Latin Kings members accused of operating a trafficking network that included ghost

guns and other firearms);[4] Press Release, U.S. Dep't of Justice (D.N.J.), *Four New Jersey Men Charged with Roles in 'Ghost Gun' Trafficking Network* (Jan. 31, 2023);[5] Press Release, Manhattan Dist. Att'y's Office, *D.A. Bragg and Commissioner Sewell Announce 32-Count Indictment in Ghost Gun Takedown* (Oct. 11, 2022) (indictment of defendant alleged to have purchased $7,000 worth of ghost gun parts, including a machine that could create such guns "with the touch of a button").[6] The preliminary injunction here, however, deprives the New Jersey Attorney General of the ability to pursue that kind of action.

*Second*, the Attorney General is currently prohibited from enforcing Section 58-35 against a dealer who persistently sells guns to straw purchasers and actively ignores even obvious red flags that the weapons are being diverted to actual buyers who are prohibited possessors under federal law. *Cf. State v. Fleet Farm LLC*, No. 27-cv-22-14473, Compl. at ¶¶ 36-43, 53-58 (Minn. Dist. Ct.) (dealer that disregarded multiple red flags in selling to straw purchasers, including multiple purchases of identical or similar guns over short periods of time, with staggered visits specifically

---

[4]   https://www.justice.gov/usao-nj/pr/nine-men-charged-roles-gang-led-drug-and-gun-trafficking-network.

[5]   https://www.justice.gov/usao-nj/pr/four-new-jersey-men-charged-roles-ghost-gun-trafficking-network.

[6]   https://www.manhattanda.org/d-a-bragg-commissioner-sewell-announce-32-count-indictment-in-ghost-gun-takedown/.

designed to avoid reporting requirements). This problem is acute nationwide, particularly because it is such a common tool of would-be criminals seeking guns. *See* Anthony A. Braga, et al., *Strategies for Disrupting Illegal Firearm Markets: A Case Study of Los Angeles*, RAND CORP. 5 (2008).[7] And New Jersey is no exception. *See* Press Release, U.S. Dep't of Justice (D.N.J.), *Firearms Dealer Gets Over Five Years In Prison For Selling More Than 200 Guns To Drug Dealer, Other Criminals In South Jersey* (Oct. 25, 2016) (New Jersey resident imprisoned for selling over 200 firearms to criminal actors);[8] Press Release, Office of the Att'y Gen., *AG Platkin: 15 Alleged Members of a Paterson Gun Trafficking Ring Charged with Transporting Guns from South Carolina for Illegal Sale in NJ* (Nov. 3, 2022) (charges against firearms trafficking ring for transporting more than 120 guns into New Jersey).[9]

*Third*, the Attorney General is now prohibited from enforcing Section 58-35 against a seller who sold a gun to a buyer despite knowing the buyer was at risk of attempting suicide or displayed overt signs of an intent to commit a mass shooting. *Cf. Delana v. CED Sales, Inc.*, 486 S.W.3d 316, 319 (Mo. 2016) (gun dealer that sold gun to buyer who later used it to shoot her father, two days after buyer's mother

---

[7] https://www.ncjrs.gov/pdffiles1/nij/grants/241135.pdf.

[8] https://www.justice.gov/usao-nj/pr/firearms-dealer-gets-over-five-years-prison-selling-more-200-guns-drug-dealer-other.

[9] https://www.njoag.gov/ag-platkin-15-alleged-members-of-a-paterson-gun-trafficking-ring-charged-with-transporting-guns-from-south-carolina-for-illegal-sale-in-nj/.

called dealer to explain that her daughter had attempted suicide with a gun purchased from the same dealer the previous month and said to store manager, "I'm begging you as a mother, if she comes in, please don't sell her a gun"); *Camacho v. Uvalde*, No. 2:22-cv-48, Dkt. 12, First Am. Compl. ¶¶ 89-96 (W.D. Tex.) (gun dealer that sold $3,000 of guns and ammunition to Uvalde shooter days after his eighteenth birthday despite store witnesses detailing concerns about him). This kind of extreme misconduct by particular bad-apples in the industry threatens public safety, but the preliminary injunction disempowers New Jersey from confronting it.

Finally, the Attorney General is further prohibited from enforcing Section 58-35 against a retailer who repeatedly breaks the law even by selling illegal devices or obscuring sales of such devices. *Cf. United States v. Rare Breed Triggers, LLC*, No. 23-0369, 2023 WL 504992, at *1-2 (E.D.N.Y. Jan. 25, 2023) (seller of devices that allow user to convert a gun into an unlawful machine gun, known as "FRT-15s," allegedly failed to register any of the new devices despite boasting selling "thousands per week"); Press Release, U.S. Dep't of Justice (S.D.N.Y.), *Licensed Firearms Dealer From East Greenbush Sentenced In White Plains Federal Court For Illegally Trafficking Firearms With Obliterated Serial Numbers* (Dec. 22, 2015).[10]

---

[10] https://www.justice.gov/usao-sdny/pr/licensed-firearms-dealer-east-greenbush-sentenced-white-plains-federal-court-illegally.

These risks are unfortunately not speculative, and while many members of the gun industry comply with the law, Section 58-35 provides authority for dealing with the misconduct of those who do not. *See* Ramanathan Decl. ¶¶ 8-17 (collecting evidence of misconduct by gun-industry members generally); Garen Wintermute, *Firearm Retailers' Willingness to Participate in an Illegal Gun Purchase*, 87 No. 5 J. Urban Health 865 (2010) (study finding that 30 of 149 (20%) licensed sellers in California were expressly willing to engage in a straw purchase).[11] New Jersey has not been immune from gun-industry misconduct, *see* Ramanathan Decl. ¶¶ 15-17, nor is there any reason to believe that the misconduct seen in other States could not happen here. And while federal enforcement as to some of this misconduct is possible, it has been historically spotty, *see id.* ¶ 24, and its existence does not change the fact that *New Jersey* is still prohibited from using Section 58-35 to protect its residents.

On the other side of the balance, meanwhile, the harms *are* speculative, and a stay would pose no hardship to NSSF or its members. NSSF's pre-enforcement challenge is premised on the specter of a hypothetical lawsuit prompted by the acts of third parties. That concern is unsubstantiated. And any defendant facing such a hypothesized lawsuit could of course raise those arguments as a defense, all while

---

[11] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2937134.

citing this Court's opinion. Nor can NSSF reasonably claim that allowing Section 58-35 to remain in effect for the duration of a stay poses any hardship to its members, when it itself delayed seeking an injunction for almost the same amount of time. *See Pharmacia*, 201 F. Supp. 2d at 382-83 (delays undercut claim of irreparable harm); *see also* N.J. Stat. Ann. § 2C:58-35 (effective date July 5, 2022). Indeed, after NSSF lost its challenge to the almost-identical New York public nuisance law that has been in effect *since 2021*, NSSF sought no injunctive relief on appeal, underscoring that the mere existence of such laws leaves its members no worse off. *See generally NSSF v. James*, No. 22-1374 (2d Cir.). No law-abiding entity will be harmed by a stay of this Court's order while the order is being litigated on appeal, whereas public safety would very much benefit from granting the State's motion.

## CONCLUSION

This Court should stay the preliminary injunction pending appeal.

Respectfully submitted,

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY

By:   /s/ Tim Sheehan
      Tim Sheehan
      Deputy Attorney General

## <u>CERTIFICATE OF SERVICE</u>

I certify that on February 7, 2023, I electronically filed the foregoing Brief in Support of Motion for Stay Pending Appeal and accompanying papers with the Clerk of the United States District Court for the District of New Jersey. Counsel for all parties are registered CM/ECF users and will be served via CM/ECF.

Dated:  February 7, 2023          /s/ Tim Sheehan
                                           Tim Sheehan