UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| NATIONAL SHOOTING SPORTS FOUNDATION,<br><br>  Plaintiff,<br><br>v.<br><br>MATTHEW J. PLATKIN, Attorney General of New Jersey,<br><br>  Defendant. | No. 22-6646 (ZNQ) (TJB) |

**DECLARATION OF RAVI RAMANATHAN**

I, Ravi Ramanathan, of full age, declare as follows:

1. I serve as the Director of the Statewide Affirmative Firearms Enforcement Office ("SAFE") with the Office of the New Jersey Attorney General. I have served in that role since October 11, 2022. Previously, I served as Director of Investigations at the New Jersey Office of the State Comptroller.

2. As the Director of SAFE, I am responsible for, among other things, overseeing the enforcement of P.L. 2022, c. 56, the firearms-specific public-nuisance statute (codified at N.J. Stat. Ann. §§ 2C:58-33 to -36) ("Section 58-35").

3. I submit this Declaration in support of the Attorney General's motion for a stay pending appeal. As the Director of SAFE, I am familiar with all factual

1

|   |   |
|---|---|
|   | matters set forth herein, either from personal knowledge or based on documents or information that I have reviewed. |
| 4. | One of SAFE's primary concerns is holding firearm industry members accountable for misconduct that directly harms the health and safety of New Jersey residents. Section 58-35 provides the Attorney General with enforcement authority to do just that. |
| 5. | Enforcement of Section 58-35, however, is currently enjoined by the preliminary injunction issued in this litigation, *National Shooting Sports Foundation v. Platkin*, on January 31, 2023. |
| 6. | That injunction poses a specific threat to public safety in New Jersey because gun-specific public-nuisance statutes such as Section 58-35 combat well-documented public-safety problems. |
| 7. | Section 58-35 responds to these public-safety problems by promoting responsible business practices and providing remedies (such as injunctive relief) when gun industry members engage in harmful conduct. |
| 8. | Misconduct by gun industry members is sadly all too common. The preliminary injunction prevents SAFE from exercising its authority under Section 58-35 to address such misconduct when it harms the health and safety of New Jersey residents. |

9. As publicly documented, unscrupulous gun dealers knowingly sell weapons to felons, domestic abusers, and other prohibited persons, often foregoing or disregarding federally mandated background checks, and/or altering records to conceal the evidence of their wrongdoing.[1]

10. Unscrupulous gun dealers have also knowingly sold weapons to high-risk persons. In 2016, a Missouri gun store sold a firearm to Colby Weathers, a woman they knew to be severely mentally ill and to have attempted suicide after procuring a different gun from the same store the previous month. Despite receiving a call from Weathers's mother informing them of these facts and saying, "I'm begging you. I'm begging you as a mother, if she comes in, please don't sell her a gun," the store sold Weathers a gun and ammunition two days later. Weathers later shot and killed her father with that gun.[2]

11. Other gun dealers have engaged in repeated "straw purchases"—an illegal gun purchase in which the actual buyer of the firearm is not the person who completes the required paperwork and background check. In a recent example, Minnesota brought a public-nuisance lawsuit against a federal firearms licensee ("FFL") who sold at least 37 firearms to two straw

---

[1] *E.g.*, Brian Freskos et al., *The ATF Catches Thousands of Lawbreaking Gun Dealers Every Year. It Shuts Down Very Few*, The Trace (May 26, 2021), https://www.thetrace.org/2021/05/atf-inspection-report-gun-store-ffl-violation.

[2] *Delana v. CED Sales, Inc.*, 486 S.W. 3d 316, 319 (Mo. Sup. Ct. Apr. 5, 2016).

purchasers over the course of 16 months.[3] One of these weapons was involved in a mass shooting that ended in the death of a 27-year old woman, while another was found by a six-year-old child in front of his family home.[4] As Minnesota alleged, Fleet Farm had "disregarded well known and blatant warning signs of straw purchasing, including … : (1) multiple purchases of similar handguns (especially 9mm caliber); (2) buying sprees over concentrated periods of time; and (3) staggered visits to different Fleet Farm locations to elude multiple-sale reporting requirements."[5]

12. These are not isolated examples. A study in the Journal of Urban Health found that one in five of the gun dealers in its sample were willing to sell firearms to customers who were explicitly asking to buy a gun on behalf of another person, without conducting a background check or obtaining the necessary paperwork from the actual intended user of the firearm.[6] Similarly, a national

---

[3] Compl. at 1, *Minnesota v. Fleet Farm LLC*, No. 27-cv-22-14473 (Minn. Henn. Cty. Dist. Ct. Oct. 5, 2022).

[4] *Id*.

[5] *Id*. at 12.

[6] Garen Wintermute, *Firearm Retailers' Willingness to Participate in an Illegal Gun Purchase*, 87 No. 5 J. Urban Health 865 (2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2937134.

phone survey of 120 retail dealers found that over seventy percent were willing to sell a handgun "regardless of the stated end user of the gun."[7]

13. FFLs or other dealers also sell weapons that are modified in ways that are illegal under state or federal law. For example, federal prosecutors recently brought charges against New York gun retailers selling devices to convert AR-15s into illegal machine guns.[8] In 2015, a New York FFL dealer was also sentenced to federal prison for transporting and selling firearms with obliterated serial numbers.[9]

14. There are also well-documented concerns about how gun dealers store firearms. In 2021, FFLs reported 10,325 firearms as lost or stolen.[10] New Jersey FFLs account for few of those reported thefts, a credit to New Jersey's effective FFL safety and storage requirements. Section 58-35 reinforces those requirements by making violations easier to ascertain and remedy.

---

[7] S.B. Sorenson et al., *Buying a handgun for someone else: Firearm dealers' willingness to sell*, 9 Inj. Prevention 147, 148 (2003), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1730960/pdf/v009p00147.pdf.

[8] Compl., *United States v. Rare Breed Triggers, LLC*, No. 23-cv-369 (E.D.N.Y. Jan. 25, 2023).

[9] *Press Release*, U.S Dep't of Justice (S.D.N.Y.) (Dec. 22, 2015), https://www.justice.gov/usao-sdny/pr/licensed-firearms-dealer-east-greenbush-sentenced-white-plains-federal-court-illegally.

[10] *Federal Firearms Licensee Theft/Loss Report—2021*, Bureau of Alcohol, Tobacco, Firearms, and Explosives (Jan. 18, 2022), https://www.atf.gov/resource-center/federal-firearms-licensee-theftloss-report-2021.

15. I am aware of instances of gun-industry misconduct in New Jersey in the past, and I am concerned that similar or worse misconduct could happen again in the future without effective enforcement. SAFE is, of course, currently enjoined from enforcing Section 58-35 against any misconduct.

16. At one New Jersey FFL, a total of 43 guns went missing and could not be found.[11] The same New Jersey firearms retailer had a "gun room containing unsecured weapons" that was accessible to "most of" its 40 employees, despite only 16 having the proper credentials.[12]

17. That same New Jersey FFL had modified firearms in ways that are illegal in New Jersey.[13] I am aware of another incident in which a New Jersey seller was charged with keeping illegal assault weapons off the books for a friend under federal indictment, allegedly conspiring to conceal the rifles from state and federal law enforcement.[14]

18. Additionally, Section 58-35 allows the State to commence enforcement actions against irresponsible parties who are not federally licensed as sellers

---

[11] *In re Sarco, Inc.*, No. A-1161-08T4, 2011 WL 1376286, at *1-3 (N.J. Super. Ct. App. Div. Apr. 13, 2011).

[12] *Id.* at *2.

[13] *Id.*

[14] The defendant ultimately pled guilty to second-degree unlawful possession of an assault firearm under N.J. Stat. Ann. § 2C:39-5(f). *See* Judgment of Conviction, *State v. Amaro*, No. OCN-19-2067 (N.J. Super. Ct. Nov. 13, 2020).

or manufacturers at all, such as backdoor sellers and criminal gangs. This is an important distinction with respect to PLCAA, which applies only to "civil action[s] . . . against a manufacturer or seller of a qualified product."[15]

19. In particular, unregistered, unidentifiable weapons made by unlicensed manufacturers—known as "ghost guns"—pose a significant new danger. Because ghost guns do not have serial numbers, it is very difficult for law enforcement to associate them with an owner. For that reason, ghost guns are popular among people who intend to use guns for crime or who are prohibited from possessing firearms at all.

20. Ghost guns are rapidly proliferating around the country.[16] New Jersey State Police report that at least 37 unmarked ghost guns have been used in a shooting in New Jersey since the start of 2020.[17] Moreover, ghost guns

---

[15] 15 U.S.C. § 7903(5)(A).

[16] Law enforcement officers went from recovering about 1,700 self-made guns in 2016 to over 19,000 in 2021, an eleven-fold increase. *See* Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24652, 24656 (Apr. 26, 2022). Altogether, officers recovered about 45,240 self-made guns during that five-year period—more than 40 percent of which were recovered in 2021 alone. *Id.*; *see also* Travis Taniguchi et al., Nat'l Police Found., *The Proliferation of Ghost Guns: Regulation Gaps and Challenges for Law Enforcement* 15 (2021), https://www.policinginstitute.org/publication/the-proliferation-of-ghost-guns-regulation-gaps-and-challenges-for-law-enforcement.

[17] Letter from States Att'ys Gen. to the Hon. Merrick Garland, U.S. Att'y Gen. 7, (Aug. 19, 2021), https://nj.gov/oag/newsreleases21/Final_Frame_or_Receiver_Comment.pdf.

represent an increasing percentage of all firearms recovered by New Jersey law enforcement.[18]

21. Recent criminal cases in New Jersey show the danger that ghost guns can pose. In 2021, New Jersey prosecuted several defendants who sold illegal weapons, including ghost guns.[19] Just last week, federal prosecutors charged four members of a New Jersey trafficking network with manufacturing and dealing ghost guns.[20] The group sold 11 ghost guns to undercover agents.[21]

22. New York's first use of its own firearms-specific public-nuisance law was to bring charges against ten ghost-gun distributors, alleging that these distributors sold tens of thousands of illegal unfinished frames and receivers to New York residents that were then converted into unserialized ghost guns.[22] Section 58-35 would allow New Jersey to likewise deter and address the

---

[18] *Id.* at 6.

[19] *Press Release*, Off. of the N.J. Att'y Gen. (Aug. 19, 2021), https://www.njoag.gov/acting-ag-bruck-announces-criminal-charges-against-gun-trafficking-ring-that-sold-assault-rifles-untraceable-ghost-guns-into-new-jersey.

[20] *Press Release*, U.S Dep't of Justice (D.N.J.) (Jan. 31, 2023), https://www.justice.gov/usao-nj/pr/four-new-jersey-men-charged-roles-ghost-gun-trafficking-network.

[21] *Id.*

[22] *See* Compl., *New York v. Arm or Ally LLC et al.,* No. 22-cv-6124 (S.D.N.Y. Dec. 22, 2022); *see also* Compl., *City of New York v. Arm or Ally LLC et al.,* No. 22-cv-5525 (S.D.N.Y. June 29, 2022) (substantially-identical public nuisance case brought by New York City).

manufacture and dissemination of such weapons but for the preliminary injunction issued in this case.

23. Combatting gun trafficking is another important priority for New Jersey. In 2016, a New Jersey resident faced federal criminal charges after he sold over 200 firearms to a drug dealer and other criminals.[23] Moreover, the State recently brought criminal charges against 15 alleged members of a trafficking ring for transporting more than 120 guns from another state into New Jersey. The Attorney General is currently enjoined from using Section 58-35 to address the misconduct of these trafficking rings or any accomplices.[24]

24. Finally, while some of this industry misconduct also implicates federal requirements, I am aware that the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") has only limited enforcement tools. For example, federal evidence laws require "very high standards of evidence for license revocation or criminal prosecutions" of FFLs.[25] ATF may conduct only one compliance

---

[23] *Press Release*, U.S. Dep't of Justice (D.N.J.) (Oct. 25, 2016), https://www.justice.gov/usao-nj/pr/firearms-dealer-gets-over-five-years-prison-selling-more-200-guns-drug-dealer-other.

[24] *Press Release,* Off. of the N.J. Att'y Gen. (Nov. 3, 2022), https://www.njoag.gov/ag-platkin-15-alleged-members-of-a-paterson-gun-trafficking-ring-charged-with-transporting-guns-from-south-carolina-for-illegal-sale-in-nj.

[25] Daniel W. Webster et al., *Effects of State-Level Firearm Accountability Policies on Firearm Trafficking*, 86 No. 4 J. Urban Health 525, 525 (2009), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2704273.

inspection per FFL per year,[26] and most FFLs are inspected less often than that. In 2020, ATF inspected only 7.5% of FFLs, but found "2,400 of those dealers ... to have committed violations."[27]

25. In this context, Section 58-35 is a particularly important tool to promote responsible industry practices. Based on my personal knowledge of this field, if SAFE is not able to enforce Section 58-35, there is a significant risk that compliance will suffer and the safety of New Jerseyans will suffer as a result.

I declare under penalty of perjury under the laws of the United States that the foregoing statements are true and correct to the best of my personal knowledge.

                                                    _____
                                                    RAVI RAMANATHAN
                                                    Director, Statewide Affirmative Firearms
                                                    Enforcement Office
                                                    Office of the New Jersey Attorney General

Dated: February 7, 2023

---

[26] 18 U.S.C. § 923(g)(1)(B)(ii).

[27] Freskos et al., *supra* note 1.