# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| NATIONAL SHOOTING SPORTS FOUNDATION, )<br><br>*Plaintiff*, )<br><br>v. )<br><br>MATTHEW J. PLATKIN, Attorney General of<br>New Jersey, )<br><br>*Defendant*. ) | No. 3:22-cv-06646-ZNQ-TJB |

## <u>AMENDED COMPLAINT</u>

Plaintiff the National Shooting Sports Foundation, Inc. ("Plaintiff" or "NSSF") brings this Amended Complaint against Matthew J. Platkin, in his official capacity as Attorney General of New Jersey.  NSSF brings this Amended Complaint based on personal knowledge as to all NSSF facts, and on information and belief as to all other matters.

## PRELIMINARY STATEMENT

1.      This lawsuit challenges the constitutionality of a recently enacted New Jersey "public nuisance" statute specifically designed to evade the judgment of Congress—and the Constitution.

2.      On July 5, 2022, New Jersey Governor Murphy signed into law Assembly Bill 1765 ("A1765"), which radically redefines the tort of "public nuisance" in New Jersey as it applies to members of the firearm industry.  Under A1765, the lawful and constitutionally protected "sale, manufacturing, distribution, importing or marketing of a gun-related product" may be deemed to violate New Jersey law and justify the imposition of sweeping liability if a New Jersey judge or jury later finds that such conduct "knowingly or recklessly create[d], maintain[ed], or contribute[d] to" "any condition" that impinges in any way upon "the health, safety, peace, comfort, or convenience of" New Jerseyans.  N.J. Stat. Ann. §§2C:58-34, 2C:58-35(a)(1).

3.      A1765 is breathtaking in its scope.  Although criminal misuse of a firearm triggers the statute's application, A1765 does not regulate the use of firearms.  Nor does A1765 impose liability on individuals who criminally misuse firearms to the detriment of themselves or others.  Instead, the statute regulates selling, manufacturing, and advertising legal (and constitutionally protected) firearms and related products.  In other words, A1765 regulates commerce in and speech relating to arms—even when it takes place entirely outside of New Jersey, as will often be the case.  The statute also removes traditional elements of tort law that ensure that judges and juries do not impose liability on private parties for constitutionally protected conduct.  For instance, speech-

based torts traditionally require proof of reliance. A1765 not only does away with that bedrock requirement, but allows judges and juries to impose liability based on truthful, non-misleading speech about legal products. Making matters worse, A1765 redefines proximate cause to include criminal misuse by third parties with whom a defendant never dealt—which is not proximate cause at all.

4.      None of that is consistent with the Constitution. The Commerce Clause prohibits states from regulating commerce (selling, manufacturing, marketing, etc.) that takes place beyond their borders, even when that commerce has effects within the state. The First Amendment prohibits states from punishing wide swaths of truthful speech about legal products, even if the products are dangerous or the speech is unpopular. The Second Amendment protects commerce in arms. And the Due Process Clause prohibits states from punishing one private party for the conduct of another.

5.      All of that is reason enough to invalidate New Jersey's new statute. But there is an even more glaring problem with A1765: It runs head-on into a federal statute. In the late 1990s and early 2000s, several state and local governments sought to use novel applications of common-law theories like negligence and nuisance to impose civil liability on manufacturers and sellers of firearms and ammunition when third parties misused their products. Congress saw these lawsuits for what they were: unconstitutional efforts to stamp out lawful and constitutionally protected activity. To end such incursions, Congress enacted the Protection of Lawful Commerce in Arms Act, 15 U.S.C. §§7901-03 ("PLCAA"), in 2005 by wide margins on a substantially bipartisan basis. The PLCAA expressly prohibits state-law civil actions "brought by any person against a manufacturer or seller of [firearms or ammunition] … for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the

criminal or unlawful misuse of [firearms or ammunition] by the person or a third party." *Id.* §7903(5)(A).

6.      New Jersey enacted A1765 to resurrect the very kinds of lawsuits that the PLCAA was enacted to eliminate. Indeed, A1765 acknowledges on its face that it is crafted to try to evade the PLCAA. While the state may get credit for its candor, that does not make its law any more consistent with the protections afforded by Congress and the Constitution.

7.      Recognizing the dire threat that A1765 poses to its members, NSSF brought this lawsuit shortly after the law was enacted and promptly sought to preliminarily enjoin the Attorney General from using A1765 to bring lawsuits against NSSF's members that violate the PLCAA and/or the Constitution. While this Court granted that relief, New Jersey's Attorney General managed to secure vacatur and dismissal for lack of standing on appeal, both by arguing that it was not yet clear whether he would actually sue NSSF members, and by disavowing any intention to sue industry members for engaging in lawful commerce in arms.

8.      Mere months after procuring dismissal, however, the Attorney General appeared to start to go back on his word, initiating lawsuits against industry members (including companies that do not even operate in New Jersey) under A1765 seeking to hold them responsible for the criminal misuse of their products by third parties. And the Attorney General's efforts have only escalated since: Just before the new year, he brought a lawsuit against NSSF member Glock, Inc. ("Glock"), seeking not only to permanently enjoin the sale of the most popular pistols in the country, but to hold Glock responsible for the criminal acts of third parties who have unlawfully converted those legal pistols into illegal machineguns.

9.      Whatever uncertainty there may have been in a preenforcement posture about how the Attorney General intends to utilize A1765 has therefore now been lain definitively to rest: He

plans to deploy this powerful new weapon in his arsenal to wage warfare against NSSF's members just for engaging in lawful commerce in arms, and to hold them liable for the acts of third parties who use their legal products to commit heinous crimes.  In other words, he intends to deploy A1765 to accomplish precisely what the PLCAA and the Constitution prohibit.

10.    For these reasons and those set forth below, NSSF seeks a declaration that A1765 is preempted and unconstitutional, an injunction preventing New Jersey from enforcing the statute against NSSF or its members, and nominal damages.

## THE PARTIES

11.    NSSF is a Connecticut non-profit, tax-exempt, non-stock corporation with its principal place of business in Connecticut.  It is the trade association for the firearm, ammunition, and hunting and shooting sports industry.  It has a membership of more than 10,000 manufacturers, distributors, and retailers of firearms, ammunition, and related products, as well as other industry members throughout the United States.

12.    NSSF's mission is to promote, protect, and preserve hunting and shooting sports by providing leadership in addressing industry challenges, advancing participation in and understanding of hunting and shooting sports, reaffirming and strengthening its members' commitment to the safe and responsible sale and use of their products, and promoting a political environment supportive of America's traditional hunting and shooting heritage.

13.    NSSF serves the interests of its members, which are impaired by the threat of sweeping liability under A1765 not only to members, but to their employees and agents as well.

14.    NSSF is authorized by its board of directors to bring this action on its members' behalf.

15.    Defendant Matthew J. Platkin is the Attorney General of New Jersey, the chief law enforcement officer of New Jersey.  Attorney General Platkin is sued in his official capacity and

in his personal capacity.  At all relevant times, Attorney General Platkin, as well as those subject to his supervision, direction, or control, are and will be acting under color of state law.

## BACKGROUND

**Congress Enacted the PLCAA to Prevent State-Law Civil Actions That Unduly Burden the National Firearm Industry and Infringe Fundamental Constitutional Rights.**

16.    The Constitution "confer[s] an individual right to keep and bear arms." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 20 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008)); *see* U.S. Const. amend. II.  And "the core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms." *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017).

17.    Nevertheless, in the late 1990s, state and local governments began trying to use novel applications of state tort law to hold "manufacturers, distributors, dealers, and importers of firearms that operate as designed and intended" accountable "for the harm caused by the misuse of firearms by third parties, including criminals."  15 U.S.C. §7901(a)(3); *see id.* §7901(a)(4). They invoked a variety of theories, including:  strict liability for abnormally dangerous activities or defective design, *Penelas v. Arms Tech., Inc.*, 778 So.2d 1042, 1043-44 (Fla. Dist. Ct. App. 2001); negligent marketing, *City of St. Louis v. Cernicek*, 145 S.W.3d 37, 38, 40 (Mo. Ct. App. 2004) (per curiam); negligent distribution, *District of Columbia v. Beretta, U.S.A., Corp.*, 847 A.2d 1127, 1131 (D.C. 2004); deceptive trade practices, *Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 367 F.3d 1252, 1252-53 (11th Cir. 2004) (per curiam); and public nuisance, *Sills v. Smith & Wesson Corp.*, 2000 WL 33113806, at *7 (Del. Super. Ct. Dec. 1, 2000), among others.

18.    Some of these suits succeeded in stretching the common law far beyond its traditional limits—and in permitting one state's courts to police the business practices of industry members operating elsewhere.  *See, e.g.*, *City of Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d

1136, 1143-47 (Ohio 2002); *James v. Arms Tech., Inc.*, 820 A.2d 27, 37-44, 46-47, 50-53 (N.J. Super. Ct. App. Div. 2003); *City of Gary ex rel. King v. Smith & Wesson Corp.*, 801 N.E.2d 1222, 1231-32, 1241-42 (Ind. 2003).  Others were unsuccessful.  *See, e.g.*, *Camden Cnty. Bd. of Chosen Freeholders v. Beretta, U.S.A. Corp.*, 273 F.3d 536, 540 (3d Cir. 2001) (per curiam); *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1147-48 (Ill. 2004).

19.    But the final tally told only part of the story.  Had these sprawling suits been permitted to persist and proliferate, "[t]he legal fees alone" would have been "enough to bankrupt the industry."  Sharon Walsh, *Gun Industry Views Accord as Dangerous Crack in Its Unity*, Wash. Post (Mar. 18, 2000), https://wapo.st/2Zcp5KS.  That, indeed, was in large part the point: "[M]unicipal leaders pressed on regardless of their chance of success, spending taxpayers' money in a war of attrition against the firearms industry."  Recent Legislation, *Protection of Lawful Commerce in Arms Act*, 119 Harv. L. Rev. 1939, 1940 (2006).

20.    It did not take long for Congress to recognize these lawsuits for what they were:  a coordinated effort to try to destroy the firearms industry by saddling it with liability for the acts of criminals.  States pressed "theories without foundation in hundreds of years of the common law and jurisprudence of the United States" and threatened interstate comity by permitting one state to penalize lawful conduct in another state.  15 U.S.C. §7901(a)(7)-(8).  They did so, moreover, at substantial cost to individual rights, including the Second Amendment right to keep and bear arms, *id.* §7901(a)(2), (a)(6), as well as the rights of industry members to pursue their trade consistent with the Constitution's privileges and immunities guarantee, *id.* §7901(a)(7).  And it was profoundly unfair, to boot, to hold lawful businesses engaged in the lawful sale of constitutionally protected products liable "for the harm caused by those who criminally or unlawfully misuse … products that function as designed and intended."  *Id.* §7901(a)(5).

21.     Congress enacted the PLCAA to put an end to such state-law actions.  Indeed, the PLCAA's very first enumerated "purpose[]" is to "prohibit causes of action against manufacturers, distributors, dealers, and importers of firearms or ammunition products, and their trade associations" based on harm "caused by the criminal or unlawful misuse of firearm products" by third parties.  *Id.* §7901(b)(l); *see also id.* §790l(a)(6) (finding that such suits are "an abuse of the legal system, … threaten[] the diminution of a basic constitutional right and civil liberty, … and constitute[] an unreasonable burden on interstate and foreign commerce").

22.     The statute makes good on that promise, prohibiting all such suits from being "brought in any Federal or State court."  *Id.* §7902(a).  The PLCAA preempts "civil action[s] … brought by any person against a manufacturer or seller of a qualified product, or a trade association, for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party."  *Id.* §7903(5)(A); *see id.* §7903(2)-(4), (6), (8)-(9) (defining "person," "manufacturer," "seller," "trade association," "qualified product," and "unlawful misuse").

23.     Only six enumerated types of claims are not so prohibited.  *See id.* §7903(5)(A).  These exceptions are limited to circumstances in which the manufacturer or seller itself engaged in some well-defined type of wrongful conduct, such as claims for design or manufacturing defect, fraudulent transfer, negligent entrustment, breach of contract or warranty, or violation of a statutory or regulatory requirement.

24.     None of the enumerated exceptions extends to state laws that authorize imposition of liability against manufacturers and sellers of firearms and ammunition for alleged "public nuisance" caused by the criminal conduct of third parties.  In fact, such efforts, founded on novel expansions of general common-law tort theories, are exactly what the PLCAA was enacted to—

and does—stamp out. *See* 15 U.S.C. §7901(a)(7); *Camden Cnty.*, 273 F.3d at 540-41 ("To extend public nuisance law to embrace the manufacture of handguns would be unprecedented ….").

**Courts Uphold the PLCAA Against Constitutional Challenges and Routinely Reject Efforts to Circumvent Its Protections.**

25.     After Congress passed the PLCAA, federal and state courts routinely rejected efforts to evade the law's protections for the firearms industry.

26.     Some plaintiffs challenged the statute's constitutionality, but courts across the country rejected such challenges, holding that the PLCAA is a lawful exercise of Congress' power under the Commerce Clause, *see, e.g.*, *Adames v. Sheahan*, 909 N.E.2d 742, 765 (Ill. 2009); *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 393-95 (2d Cir. 2008); that the PLCAA is consistent with the Constitution's separation of powers, *see, e.g.*, *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1139-40 (9th Cir. 2009); *District of Columbia v. Beretta U.S.A. Corp.*, 940 A.2d 163, 172-73 (D.C. 2008); *City of New York*, 524 F.3d at 395-96; that the PLCAA comports with the Tenth Amendment, *see, e.g.*, *Delana v. CED Sales, Inc.*, 486 S.W.3d 316, 323-24 (Mo. 2016); *City of New York*, 524 F.3d at 396-97; *Adames*, 909 N.E.2d at 764-65; and that the PLCAA does not violate the Takings, Equal Protection, Due Process, or Petition Clauses, *see, e.g.*, *Ileto*, 565 F.3d at 1140-42; *Delana*, 486 S.W.3d at 324; *District of Columbia*, 940 A.2d at 173-82; *City of New York*, 524 F.3d at 397-98.

27.     Other plaintiffs sought to skirt the PLCAA's general prohibition on covered actions. Just as often, courts carefully policed the statute's ban and rejected efforts to expand its narrow exceptions. For instance, the Missouri Supreme Court held that, to qualify as a prohibited action "resulting from the criminal … misuse" of a firearm under §7903(5)(A), the PLCAA does not require the criminal misuse to have resulted in criminal conviction or to have been the sole cause of injury. *Delana*, 486 S.W.3d at 321. The Supreme Court of Texas rejected an effort to invoke

the negligent entrustment exception under §7903(5)(A)(ii) because that state's common law did not recognize such an action. *In re Academy, Ltd.*, 625 S.W.3d 19, 30-32 (Tex. 2021). And the Second and Ninth Circuits concluded that statutory codification of state tort law on wrongful death, nuisance, and negligence actions could not satisfy the so-called "predicate exception" set forth in §7903(5)(A)(iii). *City of New York*, 524 F.3d at 400-04; *Ileto*, 565 F.3d at 1137-38.

**In the Wake of *Bruen*, States Again Attempt to Circumvent the PLCAA.**

28.    In the decades since the PLCAA was enacted, the Supreme Court has repeatedly made clear that the Second Amendment protects an individual and fundamental right. *Heller*, 554 U.S. at 592 (2008); *McDonald v. City of Chicago*, 561 U.S. 742, 749-50 (2010). More recently, the Court confirmed that the right "to keep and bear Arms" protects the right to keep and bear arms both inside and outside the house. *See Bruen*, 597 U.S. at 70-71 (2022). In doing so, moreover, the Court instructed that when the government seeks to restrict the exercise of Second Amendment rights, the government bears the burden of proving that its law is "consistent with this Nation's historical tradition" of regulating firearms. *Id.* at 17-31; *see also United States v. Rahimi*, 602 U.S. 680, 691 (2024) ("[W]hen the Government regulates arms-bearing conduct, as when the Government regulates other constitutional rights, it bears the burden to 'justify its regulation.'" (quoting *Bruen*, 597 U.S. at 24)).

29.    *Bruen* should have prompted states to reconsider their laws to make them more protective of rights the Supreme Court had just reaffirmed as fundamental. Unfortunately, it prompted the opposite reaction in states that are least protective of Second Amendment rights. Almost immediately, some of the same very few states that had endeavored to prevent their law-abiding citizens from carrying firearms undertook efforts "to offset the impact of the court's decision." Giavanni Alves, *N.Y.'s New Gun Control Laws*, Staten Island Live (July 9, 2022), https://bit.ly/3Q8l2K0. Some of those efforts are re-runs. In particular, nine states (including New

York, the state whose restrictive carry regime was invalidated in *Bruen*) have passed legislation purporting to authorize civil suits against firearms manufacturers, distributors, and sellers based on the harms caused by gun violence—in other words, purporting to authorize the very same suits that prompted Congress to pass the PLCAA almost 20 years ago. *See, e.g.*, Cal. Civ. Code §3273.51; Colo. Rev. Stat. §6-27-104; 10 Del. Code §3930; Haw. Rev. Stat. §134-102(b)(2); 815 Ill. Comp. Stat. 505/2DDDD; N.J. Stat. Ann. §2C:58-35(a); Md. Code Ann., Cts. & Jud. Proc. §3-2502; N.Y. Gen. Bus. Law §898-b-c; Wash. Rev. Code §7.48.330.

**New Jersey's Assembly Bill 1765 Authorizes Exactly the Sort of Sprawling Tort Actions that Congress Passed the PLCAA to Prohibit.**

30.    On July 5, 2022, the Governor of New Jersey signed into law Assembly Bill 1765, titled "An Act concerning public safety and supplementing Title 2C of the New Jersey Statutes."

31.    A1765 is fundamentally inconsistent with the PLCAA.  The statute not only declares its intention to address "legal[] gun-related products" and regulate legal commerce in legal products, N.J. Stat. Ann. §2C:58-33(c), but purports to chart a way around federal law by codifying the very sort of novel tort theories that the PLCAA explicitly forbids. *But see Ileto*, 565 F.3d at 1136 ("[T]he text and purpose of the PLCAA shows that Congress intended to preempt general tort theories of liability even in jurisdictions … that have codified such causes of action.").

32.    A1765 creates a new "cause of action for public nuisance," which applies only to "gun industry members," N.J. Stat. Ann. §2C:58-33, *i.e.*, those "engaged in the sale, manufacturing, distribution, importing or marketing of a gun-related product, and any officer, agent, employee, or other person authorized to act on behalf of that person or who acts in active concert or participation with one or more such persons," *id.* §2C:58-34.

33.    The new cause of action is sweeping.  A "gun industry member" may be held liable for "the sale, manufacturing, distribution, importing, or marketing of a gun-related product," even

if that conduct was fully lawful where it occurred and fully compliant with federal law, if it later is deemed by a New Jersey judge or jury to have "knowingly or recklessly create[d], maintain[ed], or contribute[d] to a public nuisance in this State," *id.* §2C:58-35(a)(1), which is broadly defined as "any condition" that in any way "contributes to the injury or endangerment of the health, safety, peace, comfort, or convenience of others," *id.* §2C:58-34. Lawful conduct protected by the First Amendment ("marketing") and the Second Amendment ("sale, manufacturing, distribution, importing … of a gun-related product") thus may be the basis of a New Jersey tort action if a product lawfully marketed, lawfully made, and lawfully sold is later used or possessed unlawfully *by someone else* in New Jersey.

34.     And the law does not stop there. "A gun industry member" may also be held liable under A1765 for failing to "establish, implement, and enforce reasonable controls regarding its manufacture, sale, distribution, importing, and marketing of gun-related products," *id.* §2C:58-35(a)(2), even if the relevant product was not "sold, manufactured, distributed, imported, or marketed" in New Jersey, *id.* §2C:58-34 (defining "[g]un-related product").

35.     To make matters worse, the statute does not key "reasonable controls" solely to the many federal, state, and local laws with which firearms manufacturers and sellers must already comply. Nor does it identify what controls beyond compliance with existing statutory obligations are or are not "reasonable." Instead, the most A1765 does to define "reasonable controls" is supply a recursive gloss: "'Reasonable controls,'" the law says, "means *reasonable* procedures, safeguards, and business practices." *Id.* (emphasis added). Then, in a gloss upon this gloss, A1765 points to what such "controls" are supposed to accomplish:

(1)  prevent the sale or distribution of a gun-related product to a straw purchaser, a firearm trafficker, a person prohibited from possessing a firearm under State or federal law, or a person who the gun industry member has reasonable cause to believe is at substantial risk of using a gun-related product to harm

themselves or unlawfully harm another or of unlawfully possessing or using a gun-related product;

(2)  prevent the loss of a gun-related product or theft of a gun-related product from a gun industry member;

(3)  ensure that a gun industry member complies with all provisions of State and federal law and does not otherwise promote the unlawful sale, manufacture, distribution, importing, marketing, possession, or use of a gun-related product; and

(4)  ensure that the gun industry member does not engage in an act or practice in violation of any of the regulatory provisions governing firearms set forth in chapters 39 and 58 of Title 2C of the New Jersey Statutes or engage in conduct that constitutes a violation of P.L.1960, c.39 (C.56:8-2) or any regulations promulgated thereunder.

*Id.*  In other words, "reasonable controls" are all "reasonable procedures" that will achieve goals as sweeping and abstract as preventing criminal conduct by third parties and complying with all federal and state law.  The failure to implement any one of the potentially infinite and unnamed procedures that might help achieve those goals likewise is a "public nuisance."  *Id.* §2C:58-35(a)(3).

36.    The broad language of A1765 expands the scope of public nuisance law in other unprecedented ways as well.  Most notable, the statute rewrites the definition of "proximate cause" to mean something other than proximate cause.  Under A1765, "the conduct of a gun industry member shall be deemed to constitute a proximate cause of the public nuisance if the harm to the public was a reasonably foreseeable effect of such conduct, notwithstanding any intervening actions, including, but not limited to, criminal actions by third parties."  *Id.* §2C:58-35(e).  *But see Townsend v. Pierre*, 110 A.3d 52, 61 (N.J. 2015) ("Proximate cause" in New Jersey ordinarily "consists of 'any cause which in the natural and continuous sequence, *unbroken by an efficient intervening cause*, produces the result complained of and without which the result would not have occurred.'" (emphasis added)).  What is more, the statute explicitly removes the need to prove

12

intent:  Liability may attach under A1765 without regard to whether "the gun industry member acted with the purpose to engage in any public nuisance or otherwise cause harm to the public." N.J. Stat. Ann. §2C:58-35(c).

37.    A1765 authorizes "the Attorney General" to bring suit seeking "restitution; damages; reasonable attorneys' fees, filing fees, and reasonable costs of suit." *Id.* §2C:58-35(b). The Attorney General may also seek "an order providing for abatement of the nuisance at the expense of the defendant." *Id.*  Last but not least, the Attorney General may seek "an injunction prohibiting the gun industry member from continuing th[e] conduct" that gave rise to the nuisance "or doing any acts in furtherance thereof," *id.*, even if the relevant conduct occurred entirely out of state, will continue to occur entirely out of state, and was and is protected by the Constitution and/or necessary to ensure that law-abiding citizens may exercise their constitutional rights.

38.    The statute gives the Attorney General broad oversight authority.  Whenever "the Attorney General believes it is in the public interest that an investigation should be made to ascertain whether a gun industry member has in fact engaged in, is engaging in, or is about to engage in conduct that violates [the statute], the Attorney General may" require the gun industry member to, among other things, submit testimony under oath, produce documents, turn over records for the Attorney General's impoundment, and more.  *Id.* §2C:58-35(d).

**Recognizing New Jersey's Overreach, This Court Preliminarily Enjoined A1765.**

39.    On November 16, 2022, NSSF filed suit against Matthew J. Platkin, in his capacity as Attorney General for the state of New Jersey, challenging the legality and constitutionality of A1765 and seeking declaratory and injunctive relief and nominal damages.  Dkt.1.

40.    Shortly thereafter, NSSF filed a motion for a preliminary injunction prohibiting the Attorney General from enforcing A1765.  Dkt.4.  After the matter was fully brief, this Court ruled in NSSF's favor and issued a preliminary injunction on January 31, 2023.  *Nat'l Shooting Sports*

*Found. v. Att'y Gen. of N.J.*, 2023 WL 1380388 (Jan. 31, 2023, D.N.J.) (Dkt.17).

41.     In its order, this Court began by rejecting the Attorney General's standing argument that NSSF's lawsuit was premature because its members did not face a credible threat of prosecution under A1765.  Dkt.17 at 3-6.  Since the challenged statute "specifically vested" the Attorney General "with the authority to carry out enforcement actions against gun industry members for violating A1765," and the Attorney General promptly "create[ed] … an office to bring such actions," this Court concluded that NSSF and its members—who regularly engage in conduct implicating a "constitutional interest" that is "proscribed by the statute"—faced a "concrete threat of future enforcement of A1765."  Dkt.17 at 4-6 (quotation marks omitted).

42.     As to the likelihood of success on the merits, this Court found that A1765 is likely "in direct conflict with the PLCAA's [text and] purpose," that it likely "does not fall within the predicate exception of the PLCAA," and that A1765 is therefore likely "preempted by the PLCAA."  Dkt.17 at 6-14.  The Court also expressed "concerns as to whether A1765 can survive scrutiny under NSSF's other constitutional claims, but it did "not address th[os]e Constitutional issues" given its holding that A1765 is likely preempted by the PLCAA.  Dkt.17 at 14.

43.     As to the remaining injunction factors, the Court found that NSSF faced a threat of irreparable harm because "recovering money damages from either complying with A1765 or the fines assessed for noncompliance will be unrecoverable in State or Federal Court under the Eleventh Amendment."  Dkt.17 at 17.  New Jersey, by contrast, "does not have a legitimate interest in the enforcement of an unconstitutional law" and failed to "present any argument of potential damages that would result in the event the Court issued a preliminary injunction."  Dkt.17 at 18. The Court therefore concluded that "the public interest favors granting Plaintiff's motion for a preliminary injunction."  Dkt.17 at 19.

**On Appeal, the Third Circuit Vacated the Injunction for Lack of Standing, Based in Part on Representations Made by the Attorney General.**

44.     Shortly after this Court issued its injunction, Dkt.18, the Attorney General filed a notice of appeal to the Third Circuit, Dkt.19.  After this Court denied a stay pending appeal, Dkt.30, the Attorney General renewed that request to the Third Circuit, 3d.Cir.Dkt.11.

45.     The Third Circuit denied that request in substantial part, leaving the injunction largely intact pending appeal.  But it stayed the injunction (1) as applied to "anyone other than National Shooting Sports Foundation, its members, or their agents or licensees"; (2) "against anyone who does not qualify as a 'manufacturer,' 'seller,' or 'trade association' within the meaning of 15 U.S.C. § 7903(2), (6), (7)"; (3) as to "cases not predicated on harm 'resulting from the criminal or unlawful misuse of a qualified product by the person or a third party' within the meaning of 15 U.S.C. § 7903(5)(A)," and (4) as to "actions that fall within the exceptions set forth in 15 U.S.C. § 7903(5)(A)(ii), (iii)(I), or (iii)(II)."  3d.Cir.Dkt.16.

46.     On appeal, the Third Circuit vacated the injunction—but not on the likelihood of success on the merits.  The Court instead ordered the case dismissed for lack of standing because it was not persuaded that NSSF's members faced a "credible" and "substantial" threat of prosecution under the statute.  *Nat'l Shooting Sports Found. v. Att'y Gen. of N.J.*, 80 F.4th 215, 220 (3d Cir. 2023) (Dkt. 32-2).

47.     In reaching that conclusion, the Court placed particular emphasis on two things.  First, "the Law ha[d] not been enforced against anyone, let alone the Foundation or its members." *NSSF*, 80 F.4th at 220.  Second, at oral argument the Attorney General expressly "disavowed prosecuting [NSSF] or its members just for participating in 'lawful commerce'" and promised that he would file suits under A1765 premised only on "industry members' 'own *misconduct*,'" not on the misconduct of third parties outside the control of NSSF or its members.  *Id.* at 221 (quoting

Oral Arg. at 5:23-35 and NJ AG Br. at 15).  Given those assurances, the Court deemed it too "uncertain[]" whether the Attorney General would in fact "'sue' [NSSF] or its members," and so deemed the case premature and ordered it dismissed.  *Id.* at 222.

48.    On September 8, 2023, the Third Circuit panel issued its mandate to this Court. Dkt.32.  Five days later, this Court dismissed NSSF's complaint "without prejudice."  Dkt.34.

**After Obtaining Dismissal, New Jersey Promptly Begins Prosecuting Industry Members for Harms Caused by Third Parties.**

49.    Mere months after New Jersey convinced the Third Circuit to order dismissal based in part on its promise not to sue industry members under A1765 "just for participating in 'lawful commerce,'" or for harms caused by third party "misconduct" that they cannot control, the Attorney General began doing just that.  Starting in December 2023, through the office that he created for the sole purpose of bringing lawsuits against firearms industry members under A1765, the Attorney General filed a trio of lawsuits in the Superior Court of New Jersey against industry members, each seeking to hold them liable for lawful commerce, and sometimes for injuries caused by the illegal acts of third parties too.

50.    The first suit arises out of an incident in which a "group of individuals … broke" into industry member, FSS Armory, Inc.'s store "and stole twenty guns," then allegedly sold the guns to people who used them to commit crimes.  *See* Complaint ¶2, *Platkin v. FSS Armory, Inc.*, No. MRS-C-000102-23 (N.J. Super. Ct. Ch. Div. Dec. 12, 2023) (attached as Ex.A).  Though FSS Armory, Inc. ("FSS Armory") had bars on its store windows and an alarm system and promptly "reported the theft to" law enforcement, Ex.A ¶¶24-25, 37, the Attorney General nevertheless sued FSS Armory for the crime that was perpetrated against it.  The Attorney General accuses FSS Armory of having created or contributed to a "public nuisance" by "facilitat[ing] [the] criminals' theft of" its own firearms, and it seeks, *inter alia*, recovery of the "costs of deterring, responding

to, investigating, and prosecuting crimes committed with these guns," as well as other unspecified monetary and punitive damages.  *See* Ex.A ¶¶11, 90.

51.    The second suit seeks to hold Eagle Shows and JSD Supply liable for the lawful sale in Pennsylvania of firearm parts kits that cannot lawfully be sold in New Jersey.  *See* Amended Complaint, *Platkin v. Patriot Enters. Worldwide LLC*, No. MER-C-000093-23 (N.J. Super. Ct. Ch. Div. Dec. 14, 2023) (attached as Ex.B).  According to the Attorney General, these industry members should be held liable in New Jersey for transactions that are legal where they take place because "felons, convicted sex offenders, minors, people subject to domestic violence restraining orders, and others who cannot legally own, possess, or purchase a gun—as well as traffickers of illegal guns" may purchase those kits, use them to assemble firearms that they cannot lawfully possess, illegally bring them into New Jersey, and use them to commit crimes there.  Ex.B ¶¶4, 186-206.  In addition to seeking to enjoin the defendants' out-of-state conduct, the lawsuit demands that the defendants pay all costs attributable to "abating the public nuisances" of third parties using firearms assembled from these parts kits to commit crimes in New Jersey, as well as unspecified amounts of monetary and punitive damages and restitution for injuries cause third parties' criminal conduct.  Ex.B at 66.

52.    The third suit involves industry member Point Blank Guns and Ammo LLC ("Point Blank") and arises out of its lawful sale of a 10-round pistol magazine and a case of rifle ammunition to two customers over a span of 10 days.  *See* Complaint, *Platkin v. Point Blank Guns & Ammo LLC*, No. MRS-C-000123-24 (N.J. Super. Ct. Ch. Div. Nov. 13, 2024) (attached as Ex.C). The Attorney General does not contend, however, that either of these transactions was illegal.  He instead contends that they were not "reasonable" under A1765 because Point Blank did not demand proof that the customers were not prohibited from possessing firearms—even though neither

federal nor New Jersey law requires sellers to demand any such proof for sales of magazines or rifle ammunition.  *See* Ex.C ¶30.[1]

53.    While NSSF was certainly tracking (and concerned about) these aggressive lawsuits against industry members, it hoped the Attorney General would at least refrain from filing similar actions against NSSF members, given his promise to the Third Circuit not long ago.  All hope was lost, however, after the Attorney General trained his sights the most popular pistols in the country.  Shortly before the new year, the Attorney General filed a lawsuit against NSSF member Glock in the Superior Court of New Jersey seeking to use A1765 to enjoin it from selling an entire line of pistols that are legal in New Jersey.  *See* Complaint, *Platkin v. Glock, Inc.*, No. ESX-C-000286-24 (N.J. Super. Ct. Ch. Div. Dec. 12, 2024) (attached as Ex.D); *cf.* N.J. Stat. Ann. §§2C:39-1(w), 2C:39-5(f), 2C:39-9(g), 2C:58-5.  Simply because Glock is aware that some third parties have illegally converted its pistols into machine guns, New Jersey makes the exceedingly strained claim that Glock has "knowingly caused machine guns to be manufactured," and thereby "knowingly or recklessly created, maintained, or contributed to a public nuisance" under A1765. Ex.D ¶¶2-15, 170-71.  Not content with trying to bar the lawful sale of legal (and constitutionally protected) pistols, the Attorney General also seeks untold sums in abatement and restitution owing to injuries caused by the third parties who illegally convert their Glock pistols into machineguns and then use them to commit crimes in New Jersey.  Ex.D at 66.

---

[1] While the Attorney General's complaint suggests that it was unlawful for Point Blank to sell a magazine and rifle ammunition without first requiring that the purchasers "exhibit a valid and applicable state firearms permit," the state and federal laws that the complaint cites address only the sale of rifles, shotguns, handguns, and handgun ammunition, not magazines or rifle ammunition.  *See* Ex.C ¶18 (citing N.J.S.A. 2C:58-2(a)(4)-(5); N.J.S.A. 2C:58-3.3(b); 18 U.S.C. § 922(t); N.J.S.A. 2C:58-2(b)).  The Attorney General also cites various state and federal laws identifying "categories of persons" prohibited from "possessing a firearm," but he does not allege that Point Blank sold a firearm to a prohibited person.  *See id.* ¶¶19-27.

54.     As those intervening developments confirm, whatever room for doubt there may have been about how the Attorney General planned to utilize A1765 when he had not yet started doing so, it is now plain that he plans to weaponize A1765 to prosecute NSSF members for engaging in lawful commerce, and to try to hold them responsible for injuries caused by the criminal acts of third parties who are outside their control.  *See NSSF*, 80 F.4th at 220 ("A strong sign of future enforcement is that a law has been enforced against the plaintiff, a closely related party, or others for similar conduct.").  In short, the Attorney General's actions since NSSF's initial complaint was dismissed make abundantly clear that "the stakes are high and close at hand," as the Attorney General can no longer claim that NSSF's members lack a "credible" and "substantial" fear of being sued under A1765 for "simply making, marketing, or selling guns," *id.* at 220-21, 223, when he is now actively suing an NSSF member (and other industry members) for doing just that.

## JURISDICTION AND VENUE

55.     Plaintiff's causes of action arise under 42 U.S.C. §1983 and the United States Constitution.  This Court therefore has jurisdiction pursuant to 28 U.S.C. §1331.

56.     This Court also has jurisdiction under 28 U.S.C. §1343(a)(3) because this action seeks to "redress the deprivation, under color of a[] State law," of "right[s], privilege[s] or immunit[ies] secured by … an[] Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States."

57.     Venue lies in this district pursuant to 28 U.S.C. §1391 because Defendant is located in and performs his official duties in the District of New Jersey and is therefore considered to reside within this district as a matter of law.

## CLAIMS FOR RELIEF

### COUNT ONE
### (Preemption)

58.    Plaintiff re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

59.    The Supremacy Clause, which provides that the Constitution, federal statutes, and treaties are "the supreme Law of the Land," U.S. Const. art. VI, cl. 2, provides "a rule of decision" for determining whether federal or state law applies in a particular situation. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015). When a federal law "imposes restrictions" and a state law "confers rights … that conflict with the federal law," "the state law is preempted." *Kansas v. Garcia*, 589 U.S. 191, 202 (2020).

60.    That is exactly the situation here. To stamp out unjustified expansions of the common law and undue intrusions into lawful commerce in arms, the PLCAA imposes clear restrictions: Courts may not entertain any "civil action … against a manufacturer or seller of a [firearms] product … for damages … or other relief, resulting from the criminal or unlawful misuse of a [firearms] product by … a third party." 15 U.S.C. §7903(5)(A). Yet A1765 explicitly authorizes the New Jersey Attorney General to sue "gun industry member[s]" for damages, injunctions, and other relief resulting from a third party's misuse of an industry member's products. N.J. Stat. Ann. §2C:58-35(c). That direct effort to countermand federal law is plainly preempted.

61.    Under the PLCAA, a "qualified civil liability action may not be brought in any Federal or State court." 15 U.S.C. §7902(a). Yet the whole point of A1765 is to authorize "qualified civil liability action[s]."

62.    The PLCAA defines a "qualified civil liability action" as a "[1] civil action … [2] brought by any person" ("including any governmental entity") "[3] against a manufacturer or

20

seller of a qualified product … [4] for damages … or other relief, [5] resulting from the criminal or unlawful misuse of a qualified product by … a third party." *Id.* §7903(3), (5)(A).

63.    A1765 suits satisfy each element.

64.    A suit under A1765 [1] is a "civil action" that [2] can be brought by government officers:  The statute explicitly authorizes the New Jersey "Attorney General" to bring "an action under" its terms.  N.J. Stat. Ann. §2C:58-35(c)-(d).

65.    A suit under A1765 [3] can be brought "against a manufacturer or seller of a qualified product, or a trade association."  15 U.S.C. §7903(5)(A).  In fact, a suit under A1765 can be brought *only* against such a party; the statute applies to "gun industry member[s]" and them alone.  N.J. Stat. Ann. §2C:58-35(a); *see id.* §2C:58-34 (defining "Gun industry member" to mean "a person engaged in the sale, manufacturing, distribution, importing or marketing of a gun-related product, and any officer, agent, employee, or other person authorized to act on behalf of that person or who acts in active concert or participation with one or more such persons").

66.    Finally, A1765 [4] authorizes recovery of damages and other relief from firearm industry members [5] for injuries "resulting from" third parties' misuse of their products.  *See* 15 U.S.C. §7903(5)(A).  Indeed, that is the statute's very reason for being.  As its codified findings explain, A1765 is designed to facilitate efforts to hold those engaged in the "sale, manufacture, distribution, and marketing of lethal, but nonetheless legal, gun-related products" liable for harms resulting from "gun violence."  N.J. Stat. Ann. §2C:58-33(c).  And A1765 does just that, subjecting a gun industry member to liability for harm caused by "intervening … criminal actions by third parties," *id.* §2C:58-35(e), if the industry member's "sale, manufacturing, distribution, importing, or marketing" "contribute[s] to" "any condition which … contributes to the injury or endangerment of the health, safety, peace, comfort, or convenience" of the public, *id.* §§2C:58-34, 2C:58-

3435(a)(1), or if it fails to employ "reasonable procedures, safeguards, and business practices" to keep guns out of the hands of third parties who misuse them, *id.* §§2C:58-34, 2C:58-35(a)(2). A1765 plainly authorizes the filing of "qualified civil liability actions" prohibited by the PLCAA.

67.    A1765 does not fit within any of the narrow exceptions to the PLCAA's preemptive scope enumerated in 15 U.S.C. §7903(5)(A).  The statute does not authorize suits commenced by the U.S. Attorney General to enforce any federal laws (*id.* §7903(5)(A)(vi)); and it does not confine liability to instances in which a manufacturer or seller unlawfully transferred a firearm (*id.* §7903(5)(A)(i)), negligently entrusted a firearm (*id.* §7903(5)(A)(ii)), breached a contract or warranty (*id.* §7903(5)(A)(iv)), or defectively made a product (*id.* §7903(5)(A)(v)).

68.    Nor does A1765 fit within the PLCAA's so-called "predicate exception," which exempts "an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought."  *Id.* §7903(5)(A)(iii).

69.    As the Ninth Circuit has explained, the term "applicable" in §7903(5)(A)(iii) must be read in light of both "the specific context in which [it] is used" and "the broader context of the statute as a whole."  *Ileto*, 565 F.3d at 1134 (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)); *accord City of New York*, 524 F.3d at 400.  And both the immediately surrounding text and the language that immediately follows provide clear indications that the predicate exception exempts from the PLCAA's preemptive reach only statutes that impose concrete obligations and prohibitions that a firearms industry member can understand and comply with, not statutes that merely impose broad duties of care.  Indeed, that is the only sensible way to read the predicate exception, as interpreting it to permit states to reinstate exactly the same kinds of novel public nuisance suits that led Congress to enact the PLCAA through the simple expedient of codifying

the same amorphous theories in statutes would "allow the predicate exception to swallow the statute." *City of New York*, 524 F.3d at 403; *see also Ileto*, 565 F.3d at 1137 (noting that, in enacting the PLCAA, "Congress was primarily concerned with novel nuisance cases like *Ileto*").

70.     At a minimum, A1765 is preempted to the extent it authorizes the imposition of liability in the absence of either knowing violations or traditional proximate cause.

71.     The predicate exception exempts only "an action in which a manufacturer or seller of a qualified product *knowingly* violated a State or Federal statute applicable to the sale or marketing of the product, *and the violation was a proximate cause of the harm for which relief is sought*." 15 U.S.C. §7903(5)(A)(iii) (emphases added).

72.     By its terms, A1765 does not require a violation of either of its two categories of prohibited activities to be "knowing."

73.     As to the first category—*i.e.*, "creat[ing], maintain[ing], or contribut[ing] to" "any condition which … contributes to the injury or endangerment of the health, safety, peace, comfort, or convenience of others"—A1765 explicitly permits liability for violating that command either "knowingly *or* recklessly." N.J. Stat. Ann. §§2C:58-34, 2C:58-35(a)(1) (emphasis added). As for A1765's second category of prohibited activities—*i.e.*, the absence of "reasonable controls"—that provision does not contain any *mens rea* at all; it sets up a strict liability offense based on any failure to "establish, implement, and enforce" "reasonable procedures, safeguards, and business practices that are designed to" achieve sweeping goals regarding the sale, manufacture, distribution, importing, or marketing of "gun-related products." *Id.* §§2C:58-34, 2C:58-35(a)(2). Industry members thus can face liability for each and every failure to abide by that amorphous command, without regard to whether they knew their "procedures, safeguards, and business practices" to be "unreasonable," which (once again) requires blind guessing at what is sufficiently

23

"designed" to "prevent" or "ensure" A1765's abstract goals. And lest there be any doubt about what role intent has to play for either kind of violation, the statute makes clear that the answer is none: "To prevail in an action under this section, the Attorney General shall not be required to demonstrate that the gun industry member acted with the purpose to engage in any public nuisance or otherwise cause harm to the public." *Id.* §2C:58-35(c).

74.    The various lawsuits that the Attorney General has recently levied against industry members, including an NSSF member, pursuant to A1765, *see supra*, ¶¶49-53, prove beyond cavil that the threat NSSF members face under those scienter-less provisions is real. The Attorney General's A1765 claim against Point Blank Guns and Ammo, for example, demands no mens rea; it seeks to hold Point Blank Guns liable simply for purportedly failing to institute "reasonable controls." *See, e.g.*, Ex.C ¶30. The Attorney General's claims against FSS Armory fare no better, as they expressly rest on a theory of recklessness, not knowing violation of the law. *See, e.g.*, Ex.A ¶52 (alleging that FSS Armory is liable under A1765 because it "recklessly disregarded obvious and extraordinary public safety risks"). So too with the Attorney General's A1765 claims against Eagle Shows, JSD Supply, and Glock; none rests only a theory of having knowingly violated some law. *See, e.g.*, Ex.D ¶158 (alleging that Glock's purportedly "unreasonable conduct has knowingly *or recklessly* created, maintained, or contributed to a public nuisance" (emphasis added)); Ex.B ¶191 (alleging that Eagle Shows and JSD Supply have "knowingly and/*or recklessly* created, maintained, or contributed to a public nuisance in New Jersey" (emphasis added)).

75.    Making matters worse, A1765 does not require "proximate causation" in the traditional sense. Courts "ordinarily presume that 'Congress intends to incorporate the well-settled meaning of the common-law terms it uses,'" *Jam v. Int'l Fin. Corp.*, 586 U.S. 199, 211 (2019), and "proximate cause" is a familiar common-law term. "The term 'proximate cause' is shorthand

for a concept:  Injuries have countless causes, and not all should give rise to legal liability." *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 692 (2011) (emphasis omitted).  To distinguish proximate cause from cause-in-fact, courts have set down several guidelines:  "[F]oreseeability alone is not sufficient to establish proximate cause," *Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 201 (2017), and there must be a "direct relation between the injury asserted and the injurious conduct alleged," *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992).

76.    A1765 explicitly discards any such inquiry.  A "gun industry member['s]" "conduct" is "*deemed* to constitute a proximate cause of the public nuisance" under A1765 "if the harm to the public was a reasonably foreseeable effect of [the] conduct, notwithstanding any intervening actions, including, but not limited to, criminal actions by third parties."  N.J. Stat. Ann. §2C:58-35(e) (emphasis added).

77.    Again, the Attorney General's recent lawsuits against industry members underscore that this new standard has nothing to do with traditional proximate cause.  To take just one particularly obvious example, the Attorney General seeks to hold Glock liable for the "death and destruction" wrought by any and all criminals who illegally convert legal Glock pistols into machine guns and then use those unlawful arms in nefarious ways.  *See, e.g.*, Ex.D ¶¶1-12.  Yet the Attorney General does not even purport to claim any connection between Glock and those criminal acts beyond the bare fact that Glock manufactured the pistols.  Ex.D ¶¶2-15.

78.    That kind of lawsuit, of course, is consistent with A1765's chief aim—imposing liability on participants in the firearm industry for harms ultimately caused by third parties.  But it is fundamentally inconsistent with the traditional notions of proximate cause that the PLCAA incorporates.  For that reason, too, the PLCAA preempts A1765, either in whole or in part.

25

## COUNT TWO
### (Commerce Clause)

79.     Plaintiff re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

80.     Consistent with the Framers' "special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce and with the autonomy of the individual States within their respective spheres," the Supreme Court has long held that the Commerce Clause (U.S. Const. art. I, §8, cl. 3) prohibits any state from "control[ling] commerce occurring wholly outside [its] boundaries." *Healy v. Beer Inst.*, 491 U.S. 324, 335-36 (1989) (footnote omitted).  A state law that has "the 'practical effect' of regulating commerce occurring wholly outside th[e] State's borders" thus "exceeds the inherent limits of the enacting State's authority, *id.* at 332, 336, and is "virtually *per se* invalid," *Oregon Waste Sys., Inc. v. Dep't of Env't Quality of State of Or.*, 511 U.S. 93, 99 (1994).  Such a law is unconstitutional even if it "is addressed only to" conduct "in [the state]," *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 583 (1986), and even if "the [regulated] commerce has effects within the State," *Healy*, 491 U.S. at 336.

81.     A1765 violates this bedrock constitutional constraint.

82.     A1765 does not define "gun industry member" to require that the entity actually do business in New Jersey.  *See* N.J Stat. Ann. §2C:58-34 ("'Gun industry member' means a person engaged in the sale, manufacturing, distribution, importing or marketing of a gun-related product, and any officer, agent, employee, or other person authorized to act on behalf of that person or who acts in active concert or participation with one or more such persons.").  And it defines "[g]un-related product" to include not just a product "sold, manufactured, distributed, imported, or marketed in this State," but also a product merely "*possessed* in this State." *Id.* (emphasis added).

A manufacturer that does not engage in any commerce in New Jersey therefore still could be held liable under A1765 for manufacturing, selling, or marketing its products in *other* states in ways that meet with New Jersey's disapproval.

83.    That is clear on the face of the statute.  A1765 prohibits *any* "gun industry member"—not just one that operates in New Jersey—from "knowingly or recklessly creat[ing], maintain[ing], or contribut[ing] to a public nuisance in this State through the sale, manufacturing, distribution, importing, or marketing of a gun-related product."  *Id.* §2C:58-35(a)(1).  And its requirement that industry members employ "reasonable controls" is not limited to any commercial activities in New Jersey.  *Id.* §2C:58-35(a)(2).  For instance, if a native of Little Rock, Arkansas, moves to Cherry Hill, New Jersey, with a firearm he lawfully purchased in his old home state and proceeds to misuse the firearm in a way that threatens the "comfort" of his new neighbors in New Jersey, A1765 could be deployed to impose liability on a firearms manufacturer operating entirely in Texas and a retail seller operating entirely in Arkansas.  *Id.* §§2C:58-34, 2C:58-35(a).

84.    Making matters worse, A1765 authorizes New Jersey courts to *enjoin* practices that violate its terms even if the practices occur out of state and are lawful where they occur.  *See id.* §2C:58-35(b).  Indeed, the Attorney General is actively deploying the law to try to do exactly that right now.  *See supra* ¶51.

85.    None of that is remotely consistent with the Commerce Clause.  To the contrary, imposing state-law liability (and damages and other relief) on out-of-state actors for actions taken entirely out of state is the definition of unconstitutional extraterritorial state regulation.

86.    A1765 is no less unconstitutional vis-à-vis the out-of-state commerce of firearm industry members that do other business in New Jersey.  What matters under the extraterritoriality doctrine is where the regulated commerce takes place:  "If the transaction to be regulated occurs

'wholly outside' the boundaries of the state, the regulation is unconstitutional," even if the actor, *e.g.*, is incorporated in the regulating state or does some other business in that state. *A.S. Goldmen & Co. v. N.J. Bureau of Sec.*, 163 F.3d 780, 786 (3d Cir. 1999).

87.    By directly regulating commerce that takes place entirely in other states, A1765 plainly violates the constitutional prohibition on extraterritorial state regulation.

88.    A1765 violates the Commerce Clause in another way as well.    In addition to prohibiting states from regulating conduct that takes place outside of their borders, the Commerce Clause "prohibit[s] States from discriminating against or imposing excessive burdens on interstate commerce" *within* their borders. *Comptroller of Treasury of Maryland v. Wynne*, 575 U.S. 542, 549 (2015); *see also Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).  A1765 does that too. Because it imposes liability for commercial transactions occurring in other states, A1765 unlawfully discriminates against and burdens out-of-state commercial interests within the state.

### COUNT THREE
### (First Amendment)

89.    Plaintiff re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

90.    A1765 does not just regulate commerce ("the sale, manufacturing, distribution, [and] importing … of a gun-related product").  It also regulates "marketing"—*i.e.*, speech protected by the First Amendment.  "A gun industry member" may be held liable under A1765 if its "marketing" is deemed to have "contribute[d] to a public nuisance" or if it failed to employ "reasonable controls" as to its "marketing."  N.J. Stat. Ann. §2C:58-35(a)(1)-(2).

91.    That is a textbook First Amendment violation.

92.    Laws that single out speech on the basis of its content or viewpoint are subject to the strictest of scrutiny, which they "rare[ly]" survive. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786,

790-91, 799 (2011).  A1765 does both of those things.  And far from being narrowly tailored or even closely drawn to achieve a compelling or important government interest, A1765 is radically overbroad in relation to any legitimate objective it may further.

93.    Start with content-based discrimination.  A1765 undoubtedly regulates speech based on its content or "the topic discussed."  *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022).  After all, the statute does not apply to *all* marketing; it applies only to "marketing *of a gun-related product*."  N.J. Stat. Ann. §2C:58-35(a)(1)-(2) (emphasis added).  Indeed, A1765 does not even apply to all speech about firearms—only the speech of "[g]un industry member[s]," i.e., those "engaged in the sale, manufacturing, distribution, importing or marketing of a gun-related product."  *Id.* §2C:58-34.  And that speaker-based discrimination is no accident.  A1765 fixates on gun-related speech by gun-related actors because their speech is uniquely likely to communicate a particular *viewpoint* that New Jersey disfavors.  *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564 (2011).

94.    The topics and views that New Jersey has singled out in A1765 do not fall into any "well-defined and narrowly limited classes of speech" unprotected by the First Amendment. *Brown*, 564 U.S. 786, 791.  To be sure, the First Amendment does not preclude imposing liability for false, deceptive, or otherwise "misleading" commercial speech.  *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563-64 (1980).  But A1765 does not even purport to target speech that is false or misleading.  It authorizes the imposition of liability for speech about legal products—products expressly protected by the Constitution, no less—*even when that speech is truthful and not misleading*.  Indeed, the words "false," "misleading," and "deceptive" appear nowhere in the statute.  A manufacturer that publishes advertisements containing *entirely accurate* specifications of its legal products—ammunition size, magazine

capacity, weight, retail price, etc.—thus could be liable under A1765 if its advertisement could somehow be deemed inconsistent with the "comfort" or "convenience" of New Jersey residents, N.J. Stat. Ann. §§2C:58-34, 2C:58-35(a)(1).  So too could an industry member who fails to establish what New Jersey deems to be a "reasonable procedure[]" with respect to its marketing materials (whatever that may be)—again, no matter how accurate its marketing materials are, *id.* §§2C:58-34, 2C:58-35(a)(2).  Indeed, the Attorney General is actively seeking to hold Glock liable for the bare marketing of legal pistols to civilians, full stop.  *See* Ex.D ¶150 (alleging that Glock is liable for "designing, manufacturing, assembling, marketing, advertising, and distributing" its pistols "into New Jersey"); Ex.D at 66 (requesting "an order enjoining Glock" from conducting all of those  activities in New Jersey).

95.    That the product being marketed is dangerous does not render speech promoting it entitled to any less constitutional protection either.  Truthful speech promoting a legal product or service is protected by the First Amendment even if the product or service is known to have deleterious health effects.  *See, e.g.*, *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) (tobacco); *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 184-85 (1999) (gambling); *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 504 (1996) (liquor) (plurality opinion); *Bigelow v. Virginia*, 421 U.S. 809, 818-25 (1975) (abortion).  Simply put, the mere fact that a product is dangerous does not transform promotion of that product (*i.e.*, speech) into a tort for which liability may be imposed.  And that is, of course, true *a fortiori* when it comes to promotion of products that not only are legal, but are protected by the Second Amendment.

96.    New Jersey thus could justify A1765 only by affirmatively proving that it is sufficiently tailored to achieve a sufficiently important state interest.  *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 608-10 (2021).  That, it cannot do, as A1765 is both "seriously

underinclusive" and "seriously overinclusive" in relation to any public safety interests the state may assert. *Brown*, 564 U.S. at 805. While purportedly aimed at an "epidemic of gun violence," N.J. Stat. Ann. §2C:58-33(a), A1765 does *nothing* to police the conduct of criminals who misuse firearms to perpetrate that problem and endanger the public's health and safety. Nor does it regulate vast swaths of speech—e.g., action and horror films, video games, direct incitements to violence, and countless other forms of expression—that may actually encourage criminal gun violence, leaving it "wildly underinclusive," *Brown*, 564 U.S. at 801-02, even as a regulation of speech. Conversely, by imposing sweeping liability—and even potentially punitive damages—for *any* firearms marketing that could later be thought to "contribute to a public nuisance" in New Jersey, even if it is nothing more than entirely truthful, non-misleading speech, A1765 is "vastly overinclusive" as well. *Id.* at 804. A1765 thus has the inevitable effect of "prohibit[ing] or chill[ing]" vast swaths of fully protected expression, *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002), destroying the "breathing space" that "the First Amendment needs," *Broadrick v. Oklahoma*, 413 U.S. 601, 611 (1973).

97.     Not only is A1765 not remotely tailored to any permissible state objective; it also suffers from a fatal vagueness problem. Vagueness "raises special First Amendment concerns because of its obvious chilling effect on free speech." *Reno v. ACLU*, 521 U.S. 844, 871-72 (1997). After all, vague laws risk chilling would-be speakers by forcing them "to 'steer far wider of the unlawful zone'" than they otherwise would "if the boundaries of the forbidden areas were clearly marked." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964). For that reason, laws touching on speech must themselves speak "only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963).

98.     A1765 does precisely the opposite. Indeed, the statute makes it virtually impossible

for regulated parties to tell what speech is and is not permitted, leaving them with no realistic choice but to err on the side of refraining from exercising their First Amendment rights.

99.    By its terms, A1765 renders unlawful any marketing that could be said to have "recklessly" "contribute[d] to a public nuisance," N.J. Stat. Ann. §2C:58-35(a)(1), and it defines "public nuisance" so broadly as to sweep in, e.g., marketing that "contributes to the injury or endangerment of the health, safety, peace, comfort, or convenience of others" or is not subject to sufficiently "reasonable procedures, safeguards, and business practices," *id.* §2C:58-34. A1765 thus necessarily "will provoke uncertainty among speakers," *Reno*, 521 U.S. at 871, as such incomprehensible and subjective abstractions do not even articulate at all—let alone articulate with "narrow specificity"—what kind(s) of speech may later be deemed to have contributed to a "public nuisance."

100.    That profound uncertainty not only "raises special First Amendment concerns because of its obvious chilling effect on free speech," but creates a "risk of discriminatory enforcement," which make the chilling effect even more acute. *Id.* at 871-72. After all, "[i]t is not merely the sporadic abuse of power by the censor but the pervasive threat inherent in its very existence that constitutes the danger to freedom of discussion." *Thornhill v. Alabama*, 310 U.S. 88, 97 (1940). And that threat is even more pervasive when, as here, a law "does not aim specifically at evils within the allowable area of State control but, on the contrary, sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech or of the press." *Id.* That inherent vagueness dooms A1765 under the First Amendment as well. *See Reno*, 521 U.S. at 870-72.

101.    There is another problem too. Even when speech about a product is actually false or misleading—which, again, A1765 does not require—the traditional principles that govern

judicial actions for misrepresentations, including proof of reliance on the allegedly false speech, have always required a substantial link between that speech and the injury for which redress is sought before liability may be imposed. *See, e.g.*, *Restatement (Second) of Torts* §525 (1977); Dee Pridgen & Richard M. Alderman, *Consumer Protection and the Law* §2.26, at 2-64 (2002); *Stewart v. Wyo. Cattle Ranche Co.*, 128 U.S. 383 (1888). That link is essential to ensure that efforts to impose liability based on speech remain consistent with the First Amendment. After all, if liability could be imposed for misleading (or even truthful) speech at the behest of plaintiffs who did not rely on it and cannot demonstrate injury from it (as opposed to from the intervening acts of a third party), then the threat of massive tort liability could inhibit a speaker from voicing his view "even though [he] believe[s] [it] to be true and even though it is in fact true." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964). Yet A1765 does not even require proof of reliance.

102.    Nor does A1765 require a plaintiff to trace alleged injuries directly to the speech in question. On the contrary, under A1765 "the conduct of a gun industry member," *including its speech*, is "deemed to constitute a proximate cause of the public nuisance if the harm to the public was a reasonably foreseeable effect of such conduct, notwithstanding any intervening actions, including, but not limited to, criminal actions by third parties." N.J. Stat. Ann. §2C:58-35(e). The First Amendment demands far more, particularly of speaker-based restrictions on speech. *See Sorrell* , 564 U.S. at 565-66 (2011).

103.    The First Amendment jealously protects speech by guarding against the imposition of massive liability on speech without significant protections. That is true even of torts that pre-date the Republic and the First Amendment. And it is true *a fortiori* of novel and extreme theories of liabilities with no comparable historical pedigree. A1765 flunks First Amendment 101 at every turn.

## COUNT FOUR
### (Second Amendment)

104.    Plaintiff re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

105.    "[T]he Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense." *Bruen*, 597 U.S. at 17; *see also* 15 U.S.C. §7901(a)(1)-(2).  And "the core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms." *Teixeira*, 873 F.3d at 677.  Commerce in arms is thus constitutionally protected.  *See Andrews v. State*, 50 Tenn. 165, 178 (1871) ("The right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair.").

106.    A1765 infringes this essential component of the Second Amendment right to keep and bear arms.  A law that regulates Second Amendment activity is unconstitutional unless the state can prove that it "is consistent with this Nation's historical tradition." *Bruen*, 597 U.S. at 17; *see also Rahimi*, 602 U.S. at 689.  A1765 is not remotely consistent with that tradition.  In fact, the Third Circuit squarely held as recently as 2001 that "[t]o extend public nuisance law to embrace the manufacture of handguns would be unprecedented." *Camden Cnty.*, 273 F.3d at 540-41; *see also* 15 U.S.C. §7901 (Congress finding the same).  New Jersey thus cannot "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

107.    That is especially obvious now given the Attorney General's claim that A1765 permits the state to enjoin Glock from selling "the most popular" pistol in America to law-abiding citizens in New Jersey.  *See, e.g.*, Ex.D ¶50 & p.66.

108.    There is no doubt, A1765 violates the Second Amendment.

## COUNT FIVE
### (Due Process)

109.    Plaintiff re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

110.    For many of the same reasons that A1765 is unconstitutionally vague with respect to speech protected by the First Amendment, it is also unconstitutionally vague under the Due Process Clause with respect to *all* the conduct it polices.  The Fourteenth Amendment prohibits a state from "depriv[ing] any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, §1.  A law that forbids or requires an act "in terms so vague that men of common intelligence must necessarily guess at its meaning … violates the first essential of due process of law." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 390 (1926).  So too does a law with terms so malleable that it authorizes "arbitrary [or] discriminatory enforcement." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

111.    Because the text of the Fourteenth Amendment applies to all manner of state-sanctioned "depriv[ations]," this anti-vagueness guarantee applies to both criminal and civil laws. *See id.* at 108-09 & nn.3-8 (collecting cases); *see also Sessions v. Dimaya*, 584 U.S. 148, 175-80 (2018) (Gorsuch, J., concurring in part and concurring in the judgment).

112.    For all the reasons already discussed, "[t]he vice of unconstitutional vagueness is further aggravated" in the First Amendment context. *Cramp v. Bd. of Pub. Instruction of Orange Cty.*, 368 U.S. 278, 287 (1961).  But it is not just First Amendment concerns that demand regulation with especial precision.  A more "stringent" vagueness test applies for statutes that "threaten to inhibit the exercise of constitutionally protected rights" of *any* kind, as well as for statutes that impose "quasi-criminal" penalties. *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982).  The most protective vagueness standard known to our law thus applies here

several times over.  A1765 not only directly regulates speech, but also directly restricts the activities of those engaged in the lawful business of selling arms protected by the Second Amendment to law-abiding citizens who are constitutionally entitled to possess them.  And the liability A1765 threatens is no small matter:  "restitution; damages; reasonable attorneys' fees, filing fees, and reasonable costs of suit; and any other appropriate relief" flowing from downstream gun violence perpetrated by criminals.  N.J. Stat. Ann. §2C:58-35(b), (e).  A1765 thus ushers in the "possibility of imposing liability on an entire industry," which, among other things, "threatens the diminution of a basic constitutional right" enabled by that industry—namely, individuals' Second Amendment rights to keep and bear arms.  15 U.S.C §7901(a)(6).  As a result, A1765 is subject to a "stringent" vagueness test even apart from its direct regulation of speech.

113.    A1765 flunks that test, as the prohibitions it imposes are hopelessly vague.  The statute makes it unlawful for a "gun industry member" to, *inter alia*, "recklessly … contribute to a public nuisance in [New Jersey] through the sale, manufacturing, distribution, importing, or marketing of a gun-related product" "by conduct either unlawful in itself *or unreasonable under all the circumstances*."  N.J. Stat. Ann. §2C:58-35(a)(1) (emphasis added).  That command leaves industry participants (who already must comply with an interlocking web of federal, state, and local laws) without any guidance on how they are supposed to act—or, more to the point, how they can conduct their businesses without potentially running afoul of the statute.

114.    For starters, the "unreasonable" conduct that A1765 polices may, by definition, be entirely lawful:  What is unreasonable, the statute says, is different from what is already "unlawful in itself" under federal, state, or local law.  *Id.*  Additionally, "all the circumstances" that a court must consider include the circumstances of any nuisance itself, which may not come into being until long after the manufacturer or seller has acted "through the sale, manufacturing, importing,

or marketing of a firearm-related product." *Id.* There is thus no way to know *ex ante*—i.e., when

a product is actually made, sold, or advertised—if a manufacturer or seller's conduct will or will

not be deemed "unreasonable under all the circumstances."

115.    Even if an industry member could somehow conceive of all relevant circumstances

yet to come, moreover, it remains a mystery what "reasonable controls" means—especially when

it is defined to mean something more than complying with the law. And the statute's modest effort

to supply a definition only makes matters worse: Rather than identify a firearm industry member's

concrete obligations with specificity, A1765 issues a sweeping command that industry members

adopt any and all procedures "designed to" "prevent" or "ensure" a litany of abstract goals

including (but not limited to) preventing the loss or theft of firearms, preventing illegal arms

trafficking, and so on. And rather than recycle pre-existing common-law nuisance principles,

A1765 tasks industry members with predicting abstractions like what befits the "comfort" and

"convenience" of New Jersey residents. Then it directs courts to punish industry members

whenever they guess wrong.

116.    To be clear, "[w]hat renders [this] statute vague is not the possibility that it will

sometimes be difficult to determine whether the incriminating fact it establishes has been proved;

but rather the indeterminacy of precisely *what that fact is*." *United States v. Williams*, 553 U.S.

285, 306 (2008) (emphasis added). The problem with A1765 is not mere imprecision at the

margins, but the failure to articulate any standard whatsoever. Determining, for example, what

promotes (or disserves) the public convenience invites "wholly subjective judgments without

statutory definitions, narrowing context, or settled legal meanings." *Id.*

117.    Indeed, A1765 is "so standardless that it invites arbitrary enforcement." *Johnson*

*v. United States*, 576 U.S. 591, 595 (2015). And the common law is no guide, as the suits that

A1765 contemplates are a radical departure from any known concept of public nuisance or any other tort.  Given its sheer breadth, its lack of any identifiable standards, and its stark departures from the common law, A1765 "impermissibly delegates basic policy matters to policemen, judges and juries for resolution on an ad hoc and subjective basis," with the attendant dangers of arbitrary and discriminatory application.  *Chatin v. Coombe*, 186 F.3d 82, 89 (2d Cir. 1999).  The Due Process Clause demands far more.

118.    And that is not the only due process problem with A1765.  Proof that the defendant caused the plaintiff's injury is and always has been a core element of tort law.  *See, e.g.*, *Restatement (Second) of Torts* §430 (1965); *Bank of Am.*, 581 U.S. at 201; *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132-33 (2014).  Indeed, even strict-liability torts require proof of causation.  *See, e.g.*, *Restatement (Second) of Torts* §§504-05, 507, 509, 519 (1977).  That is not just tradition; it is constitutionally mandated.  It has long been settled that "a presumption that is arbitrary, or that operates to deny a fair opportunity to repel it, violates the due process clause."  *W. & Atl. R.R. v. Henderson*, 279 U.S. 639, 642 (1929).

119.    Denying a defendant a meaningful opportunity to demonstrate that it did not actually cause a plaintiff's injuries would be a paradigm arbitrary deprivation of private property.  Yet A1765 does just that by reimaging proximate cause to include chains of events that extend not only far out of state and back in time, but through the criminal acts of third parties.  *See* N.J Stat. Ann. §2C:58-35(e).  The Constitution does not permit such breathtaking liability.

120.    It makes no difference that A1765 labels its standard "proximate cause" rather than a presumption.  A state cannot get around that bedrock constitutional protection through the simple expedient of eliminating the traditional elements of liability against which a defendant is entitled to defend.  *See Crowell v. Benson*, 285 U.S. 22, 53 (1932) ("[R]egard must be had, as in other cases

where constitutional limits are invoked, not to mere matters of form, but to the substance of what is required.").  In short, labeling something "proximate cause" is no substitute for honoring the basic guarantees of due process.

121.   A1765's radical relaxing of the traditional requirements of causation not only compounds the vagueness problem, but independently violates due process.

**PRAYER FOR RELIEF**

Plaintiff prays for the following relief from the Court:

1.   a declaration, pursuant to 28 U.S.C. §2202, that A1765 on its face violates the United States Constitution and is therefore void and unenforceable, or, in the alternative, that A1765 is unconstitutional as applied to NSSF and its members;

2.   a preliminary injunction enjoining Attorney General Platkin, as well as all officers, agents, and employees subject to his supervision, direction, and/or control, from enforcing or otherwise bringing suit against NSSF and its members under A1765;

3.   a permanent injunction enjoining Attorney General Platkin, as well as all officers, agents, and employees subject to his supervision, direction, and/or control, from enforcing or otherwise bringing suit against NSSF and its members under A1765;

4.   such costs and reasonable attorneys' fees to which Plaintiff may be entitled by law;

5.   nominal damages; and

6.   any further relief the Court deems just and proper.

**<u>CERTIFICATION PURSUANT TO LOCAL RULE 11.2</u>**

I hereby certify that to the best of my knowledge and belief the above matter in controversy is not the subject of any other action pending in any court or of a pending arbitration proceeding, nor at the present time is any other action or arbitration proceeding contemplated.

Respectfully submitted,

s/Daniel L. Schmutter

DANIEL L. SCHMUTTER
HARTMAN & WINNICKI, PC
74 Passaic Street
Ridgewood, NJ 07450
(201) 967-8040
dschmutter@hartmanwinnicki.com


PAUL D. CLEMENT
ERIN E. MURPHY
MATTHEW D. ROWEN
NICHOLAS A. AQUART*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

*Supervised by principals of the firm who are members of the Virginia Bar. (Application for admission *pro hac vice* forthcoming.)


*Counsel for Plaintiff*

April 4, 2025

# EXHIBIT A

| | |
|---|---|
| MATTHEW J. PLATKIN, Attorney General of the STATE OF NEW JERSEY,<br><br>        Plaintiff,<br><br>        v.<br><br>FSS ARMORY, INC.,<br><br>        Defendant. | SUPERIOR COURT OF NEW JERSEY CHANCERY DIVISION – MORRIS COUNTY<br><br>DOCKET NO.:_____<br><br><u>Civil Action</u> |

**<u>COMPLAINT</u>**

The New Jersey Attorney General (the "Attorney General"), by and through his undersigned counsel, hereby alleges as follows against Defendant FSS Armory, Inc. ("FSS Armory" or "FSS"):

**<u>INTRODUCTION</u>**

1.        FSS Armory, a state-licensed gun dealer, stored stacks of guns within easy reach of a ground-floor window adjacent to its sales floor and glass-doored entrance. It did not secure either the window or the guns. FSS Armory showcased these unlawful and reckless practices, posting images of the unsecured weapons and window to the homepage of its website and to the store's Google Maps business listing. *See* Screenshots A and B below.

Screenshot A: Entrance doorway, ground floor window, loose guns, and gun boxes



Screenshot B: Close-up view of window, guns, and gun boxes



2.      After searching for "gun stores in nj" on their cell phone, a group of individuals found FSS Armory, drove there, broke the glass window, reached through, and stole twenty guns. The burglars promptly trafficked the guns. Some have since been since recovered in criminal investigations. Others have been used in crimes or recovered at active crime scenes. Most remain unaccounted for.

3.      The pictures, which still appear on FSS Armory's website, broadcast the vulnerable condition of the store to anyone who accessed that website or viewed the store's business listing on Google Maps—the same listing that appeared as a search result for the burglars who looked up "gun stores in nj."

4.      FSS Armory's substandard storage and security practices violated New Jersey law. The New Jersey Code of Criminal Justice grants a gun dealer license "subject to the . . . condition[]" that "[n]o firearm or imitation thereof shall be placed in any window or in any other part of the premises where it can be readily seen from the outside." N.J.S.A. 2C:58-2(a)(3). The Code also directs the State Police to "prescribe standards and qualifications for retail dealers of firearms and their employees for the protection of the public safety, health and welfare." N.J.S.A. 2C:58-2. The implementing regulations require that "[e]ach retail dealer shall install a system for the prevention and detection of the theft of firearms or ammunition from the business premises," N.J.A.C. 13:54-3.11, and specify what that system must contain, N.J.A.C. 13:54-6.

5.      Gun industry members like FSS Armory that flout these laws allow guns to flow from their storefronts to criminals. Guns in the wrong hands are dangerous, and in the hands of bad actors, black market guns threaten the safety and peace of every New Jersey resident. Indeed, it has long been New Jersey law that a licensed gun dealer that fails to safeguard its

inventory bears responsibility,[1] which extends to civil liability when those guns are taken and harm the public.[2]

6.      The consequences of FSS Armory's violations of law were foreseeable. In the middle of the night in January 2023, burglars in a stolen car smashed the store window, reached through the broken pane, and stole twenty guns.

7.      No alarm sounded, at least not loudly enough to generate a response. No silent alarm notified the store owner, any of the store's employees, or law enforcement.

8.      The next morning, Ross Osias, the owner and operator of FSS Armory, discovered the burglary and reported it to law enforcement. By that time, the stolen FSS Armory guns were well on their way to criminal use, generating multi-agency police responses and large-scale investigations spanning this State and others.

9.      Effective July 5, 2022, the New Jersey Legislature empowered the Attorney General to bring a civil case against any gun industry member whose misconduct creates, maintains, or contributes to a public nuisance within the state. See N.J.S.A. 2C:58-35(a)(1). The Attorney General may also sue gun industry members who fail to implement and enforce reasonable safeguards and business practices to, in particular, prevent loss or theft of products and ensure compliance with New Jersey law. See N.J.S.A. 2C:58-35(a)(2).

10.     Guns acquired through theft and burglary directly contribute to the public nuisance of gun crime and gun violence. Between 2001 and 2021, firearms killed over 9,400

---

[1]  See N.J.S.A. 2C:39-10(a)(1).

[2]  See Gallara v. Koskovich, 364 N.J. Super. 418, 435–37 (Law. Div. 2003) (citing Palmisano v. Ehrig, 171 N.J. Super. 310, 408 (App. Div. 1979)).

people in New Jersey.[3] Gun crime harms New Jerseyans' health, safety, peace, comfort, and convenience in manifold other ways, too.

11.     By failing to safeguard its guns as required by law, and by advertising that failure on the internet, FSS Armory facilitated criminals' theft of twenty of those guns. FSS Armory thereby contributed to and perpetuated the public nuisance of illegal guns plaguing the State of New Jersey. Until all of those guns are recovered, the State must bear the cost of fielding multi-agency police responses and large-scale investigations—sometimes in collaboration with other jurisdictions—to identify perpetrators and locate missing gun inventory.

12.     The Attorney General brings this suit to remedy FSS Armory's endangerment of the people of New Jersey and imposition of costs on their government.

## THE PARTIES

13.     Plaintiff is the Attorney General of the State of New Jersey. The Attorney General is authorized and charged with the responsibility to enforce N.J.S.A. 2C:58-35. The Attorney General brings the Section 58-35 claims in this action by and through the Statewide Affirmative Firearms Enforcement Office ("SAFE"). SAFE was created within the Office of the Attorney General by Attorney General Administrative Executive Directive No. 2022-08, which also delegated to SAFE the Attorney General's statutory authority.

14.     The Attorney General also asserts in this case the State's proprietary interest and, under the Attorney General's *parens patriae* authority, New Jersey's "quasi-sovereign" interests in protecting the safety, health, and welfare of its residents.

---

[3] WISQARS Fatal and Nonfatal Injury Reports, Ctrs. for Disease Control & Prevention, https://wisqars.cdc.gov/reports/?o=MORT&y1=2001&y2=2021&t=0&d=&i=0&m=20890&g=34&me=0&s=0&r=0&ry=0&e=0&yp=65&a=ALL&g1=0&g2=199&a1=0&a2=199&r1=INTENT&r2=NONE&r3=NONE&r4=NONE (last visited Dec. 11, 2023).

15.     Defendant FSS Armory is a licensed retail firearms dealer incorporated as of

October 15, 2019, as a domestic for-profit corporation under the laws of the State of New Jersey.

FSS Armory received its New Jersey firearms retail license, 4300 FSS, on December 9, 2019.

FSS Armory operates a store under the name "FSS Armory," located at 36 U.S. 46 West, in Pine

Brook, New Jersey 07058 ("FSS Armory's Store" or the "Store"). At that retail location, FSS

Armory sells guns, ammunition, gun accessories, and other gun-related products.

## JURISDICTION AND VENUE

16.     Jurisdiction over FSS Armory is proper because it is a business incorporated,

licensed to do business, and operating in New Jersey, the state in which FSS Armory's unlawful

conduct took place.

17.     Pursuant to R. 4:3-2(a)(2) of the New Jersey Court Rules, venue is proper in this

Court because the cause of action arose in Morris County, where FSS Armory's Store is located,

and where FSS Armory engaged in the illegal and tortious conduct at issue in this case.

## FACTS

**A.     FSS Armory's Background**

18.     FSS Armory's Store opened in approximately December 2019. The Store sells

handguns, rifles, shotguns, ammunition, gun parts and accessories, and knives. FSS Armory also

operates a publicly accessible website at "www.fssarmory.com," where it advertises its services

and inventory, and posts customer reviews.

19.     Ross Osias is the owner and manager of FSS Armory. Osias runs FSS Armory's

day-to-day business and is responsible for its compliance with applicable gun dealer licensing

laws. Osias completed and signed FSS Armory's New Jersey firearms license application, and

has publicly promoted the store through public appearances on television and other means.

As owner of FSS Armory, Osias has completed the New Jersey firearms retail licensing process for himself, his business, and his employees. This process informed him of New Jersey's firearm dealer licensing conditions, including the applicable rules regarding the safeguarding of firearms.

20.     During FSS Armory's initial mandatory inspection by the New Jersey State Police in 2019, Osias signed a report stating that he was familiar with the licensing process and acknowledging that he was informed of current gun laws and dealer procedures.

21.     Osias has been a gun industry member in New Jersey since at least 2014. Prior to FSS Armory, Osias was affiliated with Firearms Support and Storage LLC, which operated a retail store in Whippany, New Jersey. Osias was a member of that LLC, and registered with the State Police as one of the store's employees authorized to handle firearms.

**B.     FSS Armory's Deficient Storage and Security Practices**

22.     Beginning no later than July 2022, FSS Armory stored loose rifles and stacks of handguns and gun boxes in an open room directly in front of a ground-floor window of the Store, adjacent to a glass-doored entrance from the Store's parking lot.

23.     The stacks of loose guns and gun boxes were visible from outside the Store through the ground-floor window, and were close enough to that window that they could be accessed by anyone standing outside who reached in through the window, without actually entering the Store.

24.     The ground-floor window had minimal safeguards against access or entry. The interior side was protected only by two or three narrow metal bars running from top to bottom, with gaps between them wide enough for an adult to reach through.

25.     On information and belief, the window had only a battery-operated alarm affixed to its pane, which was designed to trigger an alert if the window was opened, but not if the glass was shattered.

26.     The loose guns and gun boxes would also have been obvious to anyone inside the Store. The guns and gun boxes were located in an area that was open to the Store floor, mere steps away from the rest of the Store's inventory.

27.     In approximately July 2022, FSS Armory worked with a third-party vendor to capture images of the interior of the Store in the interactive style of Google's Street View. The vendor posted those images to Google Maps, where they were associated with the business listing of FSS Armory's Store. FSS Armory updated the homepage of its website to include the same content. Anyone visiting either Google Maps or FSS Armory's website could then navigate their way through FSS Armory's Store, as if the internet visitor were inside and walking and looking around.

28.     These images display the Store's reckless practices. They show at least one loose handgun, one loose rifle, and numerous loose gun cases stacked in front of the ground-floor window. They also show the lack of security on the window itself.

29.     FSS Armory's posting of the images to prominent internet locations also meant that FSS Armory publicly broadcasted its shoddy storage and security conditions, further increasing the risk. The images allowed any member of the public, just by browsing online, to see that the loose guns inside the Store were easily accessible from outside through the window.

30.     These unlawful and irresponsible storage practices and general lack of safeguards persisted until at least January 2023.

31.     In or about November 2022, four months after FSS Armory publicized the images of the Store, Osias twice appeared on national television on behalf of FSS Armory. He professed knowledge and sophistication about the requirements for New Jersey gun dealers. Appearing on the Fox Business channel's "Varney & Co." as part of a panel discussing crime, Osias referred to

New Jersey as one of the "top three most stringent states in the country to own a gun," and explained the "lengthy process" one must follow to purchase a gun. He repeatedly said that the demand for guns was rapidly rising, and he identified his Store and its location.

### C.    The Burglary of FSS Armory and Theft of Its Guns

32.    Two months later, on Friday, January 6, 2023, between 1:40 a.m. and 2:00 a.m., burglars outside FSS Armory's Store smashed its poorly secured ground-floor window, and stole twenty guns that were sitting within arm's reach.

33.    Surveillance video captured the burglars as they arrived in a car, broke the Store's ground-floor window, and then methodically loaded FSS Armory's guns into the car. There is no indication that any alarm was triggered or that there was real-time notification to law enforcement.

34.    The car used in the burglary had been reported stolen three days earlier from the driveway of a private residence in a nearby town.

35.    Subsequent police investigation revealed that, shortly before the burglary, one of the burglars had searched for "gun stores in nj" on his cell phone, and that FSS Armory was on the list of search results.[4] Looking at the Store on Google Maps or on FSS Armory's website would have revealed all of the security vulnerabilities exploited by the burglars, making the Store an attractive target for a burglar seeking to commit a profitable crime with low risk of detection.

---

[4] See Affidavit of Probable Cause at 4, New Jersey v. Martinez, Indictment/Accusation No. 23-10-00900-A (N.J. Sup. Ct. July 27, 2023); see also Affidavit of Probable Cause at 4-5, New Jersey v. Acevedo, Complaint No. W-2023-000106-1421 (N.J. Sup. Ct. Sep. 21, 2023).

36.     Several hours after the burglary, individuals matching the description of the burglars and driving the same stolen car as the burglars robbed a jewelry store at gunpoint in Passaic County, apparently using the guns they stole from FSS Armory.

37.     Osias did not discover the burglary until later in the morning, at 9:20 a.m. He reported the theft to the Montville Police Department at 9:22 a.m., and the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") was notified at 11:00 a.m. The ATF loss report described the way in which the firearms were stolen as: "2 windows broken and **items removed within arms [sic] reach**" (emphasis added). Osias signed the report, attesting to its accuracy.

38.     In total, the burglars stole eight pistols, six shotguns, five rifles, and one revolver. The specific guns that that were stolen are as follows:

| Manufacturer | Model | Type | Serial Number |
|---|---|---|---|
| Mossberg | Maverick 88 | Shotgun | MV0668784 |
| Remington | Sportsman 48 | Shotgun | 3066131 |
| Remington | 11-48 | Shotgun | 5105604 |
| Wards Western Field | Mauser | Rifle | 4144 |
| Mauser | K98 | Rifle | 8504 |
| Remington | 700 | Rifle | 300008 |
| Colt | Police Positive | Revolver | 81859 |
| Para Ordinance | LDA C-6 | Pistol | P120062 |
| Beretta | 92X | Pistol | BST36007 |
| CZ | 75B | Pistol | F185441 |
| Winchester | 12 | Shotgun | 1155602 |
| Ruger | AR 556 | Rifle | 1852-27859 |
| Pedersoli | Muzzle LDR | Rifle | BB14743 |
| Smith & Wesson | M&P9 Shield | Pistol | JRP6216 |
| Taurus | G2C | Pistol | ADL860793 |
| T Barker | -- | Shotgun | -- |
| Heckler & Koch | P30 | Pistol | 129-113197 |
| Sears | 101.100 | Shotgun | -- |
| Glock | 43X | Pistol | BYXR622 |
| Sig Sauer | 1911 Max Michel | Pistol | 54B013573 |

**D.     Use and Trafficking of FSS's Stolen Guns**

39.     Within weeks of the burglary, the guns stolen from FSS Armory were in the

hands of gun traffickers. The guns passed from the burglars to others who have been formally

charged with the selling of guns and narcotics. Over the course of the next three months, the

stolen guns were trafficked through multiple counties in New Jersey and in New York, and likely

beyond.

40.     On January 17, 2023, trafficking suspects sold the stolen FSS Armory Ruger rifle

in Queens, New York, during a controlled-buy operation.

41.     In the months that followed, the Office of the Special Narcotics Prosecutor for the

City of New York and the New York Police Department initiated an investigation into guns and

fentanyl sales coming into New York from New Jersey. The investigation identified three

suspects, all from New Jersey, who sold four additional stolen FSS Armory shotguns and one

stolen FSS Armory pistol over the course of the next few months.[5]

42.     On or about January 28, 2023, the Paterson Police Department recovered the

stolen FSS Armory Taurus pistol during a sweep of an illegal nightclub after a patron likely

discarded it on the floor in response to police arrival.

**E.     The Harm and Costs of Trafficked Illegal Guns**

43.     When traffickers disseminate once-lawful firearms into the illegal gun market,

they set off a cascading set of harms and costs to the New Jersey public.

---

[5]  The three suspects have all been charged by the Office of the Special Narcotics Prosecutor for
the City of New York for offenses related to illegal firearms sales, illegal firearms possession,
and selling controlled substances. See Indictment, New York v. Duarte et al, Indictment No.
IND-73848-23 (N.Y. Sup. Ct. Sep. 21, 2023) (referencing the sale of stolen FSS Armory
firearms).

44.     Illegal guns not only make crime and violence more likely, but more deadly. In particular, the trade in illegal guns enables persons prohibited in New Jersey from obtaining a lawful firearm—such as convicted felons or domestic abusers—to more readily acquire one. This subversion of New Jersey's strong public safety laws threatens and injures public safety and the public peace, and obligates law enforcement to expend resources to protect the public, through interdiction, deterrence, investigation, and prosecution.

45.     Gun crime exacts a heavy personal and economic toll on the people of New Jersey. The direct impact of gun crime on victims is profound. Crime fueled by guns creates pervasive public fear. And the costs to the State to abate those impacts can be high.

46.     Gun thefts from licensed gun dealers are a key source of trafficked illegal guns. In 2022, approximately 5,500 firearms were stolen from licensed gun dealers in the United States, an increase from approximately 4,000 in 2021.[6] And gun crime and gun violence disproportionately result from stolen guns such as those taken from FSS. For example, the majority of 23,000 stolen firearms recovered by law enforcement nationally between 2010 and 2016 were connected with crimes, including more than 1,500 violent acts.[7]

47.     The harms of gun violence are especially stark. In 2021, there were 276 gun-related homicides in New Jersey. That same year, the number of non-fatal criminal shooting victims was several times greater. Even people who are not shot or killed, but are present for gun violence, face mental health risks. As for cost, in 2022, the National Institute for Criminal Justice

---

[6] ATF, Federal Firearms Licensee Theft/Loss Report – 2022 (last updated July 14, 2023), https://www.atf.gov/resource-center/federal-firearms-licensee-theftloss-report-2022; ATF, Federal Firearms Licensee Theft/Loss Report – 2021 (last updated July 14, 2023), https://www.atf.gov/resource-center/federal-firearms-licensee-theftloss-report-2021.

[7] Brian Freskos, Missing Pieces, The Trace, Nov. 20, 2017, https://www.thetrace.org/2017/11/stolen-guns-violent-crime-america.

Reform ("NICJR") set out to measure the taxpayer cost alone of gun violence, specifically in the City of Newark. NICJR took into account six categories of costs: crime scene response, hospital and rehabilitation, criminal justice, incarceration, victim support (such as burial expenses) through the New Jersey Victim of Crime Compensation Office, and lost tax revenue. In total, NICJR estimated that each homicide shooting costs taxpayers $2,188,700, and each non-fatal shooting costs taxpayers $1,007,077. And taxpayer costs are only part of the story.

### F.   Arrest of the Burglars

48.     In July 2023, six months after the FSS Armory burglary, law enforcement apprehended one of the suspected burglars, and the Morris County Prosecutor's Office charged him with burglary and firearm offenses.[8]

49.     A search of that burglar's cell phone browsing history revealed the web search for "gun stores in nj" prior to the burglary and the appearance of FSS Armory's in the search result list, as described above. See ¶ 35, supra.

50.     In approximately September 2023, law enforcement apprehended and charged a second suspected burglar.[9] She gave a statement that revealed, in substance and in part, that the burglars planned their burglary in advance and insinuated that they had monitored FSS Armory as a possible target in the days immediately prior to the burglary.

---

[8]  See Municipal Complaint at 1-26, New Jersey v. Martinez, Indictment/Accusation No. 23-10-00900-A (N.J. Sup. Ct. July 25, 2023) (charging nine counts of Unlawful Possession of a Handgun (N.J.S.A. 2C:39-5(b)), eleven counts of Unlawful Possession of a Rifle/Shotgun (N.J.S.A. 2C:39-5(c)), and related burglary offenses).

[9]  See Municipal Complaint at 1-25, New Jersey v. Acevedo, Complaint No. W-2023-000106-1421 (N.J. Sup. Ct. Sep. 14, 2023) (likewise charging nine counts of Unlawful Possession of a Handgun (N.J.S.A. 2C:39-5(b)), eleven counts of Unlawful Possession of a Rifle/Shotgun (N.J.S.A. 2C:39-5(c)), and related burglary offenses).

51.     By the time the burglars and traffickers were apprehended and charged, only seven of the twenty stolen FSS Armory guns had been reported as recovered. Every gun recovered thus far has been found at a crime scene or in the hands of a criminal, including persons trafficking FSS Armory's guns into the black market. Guns stolen from FSS Armory, and recovered to date, have been used against business owners in Passaic, found loaded at an underground nightclub crowded with patrons in Paterson, and have moved around the streets, highways, and towns of New Jersey on their way to criminal misuse.

52.     FSS Armory's cavalier firearms storage and lax security practices not only violated FSS Armory's express statutory and regulatory duties, but were contrary to reason and common sense, and recklessly disregarded obvious and extraordinary public safety risks. FSS Armory compounded its failures by publicly broadcasting them on its website and Google Maps. FSS Armory thereby contributed to the ongoing public nuisance of gun crime and gun violence in New Jersey.

## CAUSES OF ACTION

### Count One

### (Contribution to Public Nuisance by Conduct Unlawful in Itself)
### (Public Law 2022, c. 56, N.J.S.A. 2C:58-35(a)(1))

53.     The Attorney General repeats and realleges the foregoing allegations as if set forth in their entirety herein.

54.     The Attorney General brings this count pursuant to N.J.S.A. 2C:58-35.

55.     Under Section 58-35(a)(1), "[a] gun industry member shall not, by conduct [] unlawful in itself . . . , knowingly or recklessly create, maintain, or contribute to a public nuisance in this State through the sale, manufacturing, distribution, importing, or marketing of a gun-related product."

56.    A "'[g]un industry member' means a person engaged in the sale, manufacturing, distribution, importing, or marketing of a gun-related product, and any officer, agent, employee, or other person authorized to act on behalf of that person or who acts in active concert or participation with one or more such persons." N.J.S.A. 2C:58-34. A "'[p]erson' means any natural person, firm, corporation, company, partnership, society, joint stock company, or any other entity or association." Id.

57.    Defendant FSS Armory—a retailer engaged in the sale, distribution, and/or marketing of gun-related products—is a gun-industry member within the meaning of Sections 58-34 and 58-35.

58.    A "'[g]un-related product' means any firearm, ammunition, ammunition magazine, firearm component or part including, but not limited to, a firearm frame and a firearm receiver, or firearm accessory . . . which product was possessed in this State and as to which it was reasonably foreseeable that the product would be possessed or used in this State." N.J.S.A. 2C:58-34.

59.    Each of the twenty guns stolen from FSS Armory is a "gun-related product" within the meaning of Sections 58-34 and 58-35.

60.    FSS Armory stored the guns that were later taken by the burglars as part of its business as a licensed New Jersey gun dealer engaged in the sale, distribution, and/or marketing of firearms.

61.    FSS Armory's conduct has been "unlawful in itself." FSS Armory stored guns in front of a transparent window; the window was not properly secured; the guns were accessible from the street level to anyone reaching through the window; and the guns were not properly safeguarded during non-business hours. FSS Armory's conduct therefore violated New Jersey

statutory provisions governing licensed gun dealers, see N.J.S.A. 2C:58-2(a), and implementing regulations, including as follows:

- FSS Armory unlawfully stored firearms in front of a ground-floor window where they could be readily seen from the outside, in violation of N.J.S.A. 2C:58-2(a)(3) and N.J.A.C. 13:54-3.9(a)(3);

- FSS Armory unlawfully failed to prevent firearms from being accessible to or handled by anyone unless directly supervised by a licensed dealer or licensed employee, in violation of N.J.A.C. 13:54-6.5(a)(1); and

- FSS Armory unlawfully failed to provide internal security methods for the safeguarding of firearms during non-business hours, in violation of N.J.A.C. 13:54-6.5(b).

62.    FSS Armory's unlawful conduct has knowingly or recklessly created and/or contributed to a public nuisance. A public nuisance is "any condition which injures, endangers, or threatens to injure or endanger or contributes to the injury or endangerment of the health, safety, peace, comfort, or convenience of others or which otherwise constitutes a public nuisance under common law." See N.J.S.A. 2C:58-34. FSS Armory's ill-secured and prominently displayed firearms endangered and threatened to injure the public from the outset, and thus constituted a public nuisance that FSS Armory knowingly or recklessly created. Upon being taken from the store, the twenty burglarized guns constituted a public nuisance that FSS Armory's unlawful conduct knowingly or recklessly created. Gun crime and/or gun violence constitute a public nuisance to which FSS Armory's unlawful conduct knowingly or recklessly contributed. Defendant's conduct proximately caused the ensuing harms to the State and the public.

63.    FSS Armory's unlawful conduct consists of knowing acts or omissions that constitute a knowing violation of N.J.S.A. 2C:58-35(a)(1), and of N.J.S.A. 2C:58-2(a)(3), N.J.A.C. 13:54-3.9(a)(3), N.J.A.C. 13:54-6.5(a)(1), and N.J.A.C. 13:54-6.5(b).

64.     FSS Armory's unlawful actions and/or omissions were undertaken with actual malice or accompanied by wanton and willful disregard of persons who foreseeably might be harmed by those actions or omissions, within the meaning of the Punitive Damages Act, N.J.S.A. 2A:15-5.12. FSS Armory is therefore liable for punitive damages.

65.     Defendant's violation of Section 58-35(a) entitles the Attorney General to "an injunction prohibiting [Defendants] from continuing that conduct or engaging therein or doing any acts in furtherance thereof." N.J.S.A. 2C:58-35(b). Such injunctive relief is necessary here to prevent further, continuing, irreparable injury.

## Count Two

### (Contribution to Public Nuisance by Conduct Unreasonable Under the Circumstances) (Public Law 2022, c. 56, N.J.S.A. 2C:58-35(a)(1))

66.     The Attorney General repeats and realleges the foregoing allegations as if set forth in their entirety herein.

67.     The Attorney General brings this count pursuant to N.J.S.A. 2C:58-35.

68.     Under Section 58-35(a)(1), "[a] gun industry member shall not, by conduct . . . unreasonable under all the circumstances, knowingly or recklessly create, maintain, or contribute to a public nuisance in this State through the sale, manufacturing, distribution, importing, or marketing of a gun-related product."

69.     As a gun industry member subject to all the regulations applicable to licensed firearms retailers in New Jersey, FSS Armory was aware of the unique and extraordinary risks that accompany operating a gun store, including that the inventory of guns and gun-related products are particularly attractive targets for theft. FSS Armory was aware that gun industry members have a duty to take all reasonable steps to safeguard their products from theft.

70.     FSS Armory's conduct leading up to the burglary on January 6, 2023 was unreasonable under all the circumstances, and knowingly or recklessly created or contributed to a public nuisance. Specifically, and among other things:

- FSS Armory unreasonably and recklessly stored guns, knowingly leaving a pile of loose guns and gun boxes within reach of a minimally secured, transparent ground-floor window.

- FSS Armory unreasonably and recklessly broadcasted to the public its security vulnerabilities by uploading images on its website of the poorly safeguarded guns.

71.     Through these knowing acts and omissions, FSS Armory foreseeably increased the risk that their guns would be stolen.

72.     FSS Armory's unreasonable conduct constitutes a knowing violation of N.J.S.A. 2C:58-35(a)(1), and of N.J.S.A. 2C:58-2(a)(3), N.J.A.C. 13:54-3.9(a)(3), N.J.A.C. 13:54-6.5(a)(1), and N.J.A.C. 13:54-6.5(b).

73.     FSS Armory's unlawful actions and/or omissions were undertaken with actual malice or accompanied by wanton and willful disregard of persons who foreseeably might be harmed by those actions or omissions, within the meaning of the Punitive Damages Act, N.J.S.A. 2A:15-5.12. FSS Armory is therefore liable for punitive damages.

74.     Defendant's violation of Section 58-35(a) entitles the Attorney General to "an injunction prohibiting [Defendants] from continuing that conduct or engaging therein or doing any acts in furtherance thereof." N.J.S.A. 2C:58-35(b). Such injunctive relief is necessary here to prevent further, continuing, irreparable injury.

**Count Three**

**(Failure to Establish, Implement, and Enforce Reasonable Controls)**
**(Public Law 2022, c. 56, N.J.S.A. 2C:58-35(a)(2))**

75.     The Attorney General repeats and realleges the foregoing allegations as if set forth in their entirety herein.

76.     The Attorney General brings this count pursuant to N.J.S.A. 2C:58-35.

77.     Under Section 58-35(a)(2), "a gun industry member shall establish, implement, and enforce reasonable controls regarding its manufacture, sale, distribution, importing, and marketing of gun-related products."

78.     "Reasonable controls" means "reasonable procedures, safeguards, and business practices that are designed to:

> (1) prevent the sale or distribution of a gun-related product to a straw purchaser, a firearm trafficker, a person prohibited from possessing a firearm under State or federal law, or a person who the gun industry member has reasonable cause to believe is at substantial risk of using a gun-related product to harm themselves or unlawfully harm another or of unlawfully possessing or using a gun-related product;

> (2) prevent the loss of a gun-related product or theft of a gun-related product from a gun industry member;

> …

> (4) ensure that the gun industry member does not engage in an act or practice in violation of any of the regulatory provisions governing firearms set forth in chapters 39 and 58 of Title 2C of the New Jersey Statutes or engage in conduct that constitutes a violation of P.L. 1960 c.39 (C.56:8-2) or any regulations promulgated thereunder.

> N.J.S.A. 2C:58-34.

79.     FSS Armory stored unsecured guns in front of a poorly secured ground-floor window, fully visible within the Store, or to anyone looking through the window from street level, and readily accessible to anyone in the Store or reaching through the window. FSS Armory

did not maintain an adequate alarm system, if any alarm system at all, or other security measures that would alert it or the police in real time to a burglary that involved breaking the window. These actions made FSS Armory's Store an obvious and attractive target for anyone looking to steal guns, and in fact made it easy for burglars to steal guns.

80.     FSS Armory's building security and firearms storage was inadequate and in violation of New Jersey gun dealer regulatory requirements, including, at minimum: N.J.S.A. 2C:58-2(a)(3), N.J.A.C. 13:54-3.9(a)(3), and N.J.A.C. 13:54-6.5(a) and (b). FSS Armory's marketing program posted images of these security vulnerabilities to prominent internet locations, including the publicly available page for its Store on Google Maps and the homepage of its website.

81.     By these knowing acts and omissions, FSS Armory failed to establish, implement, and enforce reasonable safeguards and business practices designed (1) to prevent the distribution of guns to prohibited possessors or firearms traffickers, (2) to prevent the loss or theft of guns, . . . or (4) to ensure that FSS Armory did not engage in an act or practice in violation of any of the regulatory provisions governing firearms. N.J.S.A. 2C:58-34.

82.     FSS Armory's control failures constitute a knowing violation of N.J.S.A. 2C:58-35(a)(2), and are in further knowing violation of N.J.S.A. 2C:58-2(a)(3), N.J.A.C. 13:54-3.9(a)(3), N.J.A.C. 13:54-6.5(a)(1), and N.J.A.C. 13:54-6.5(b).

83.     FSS Armory's unlawful actions and/or omissions were undertaken with actual malice or accompanied by wanton and willful disregard of persons who foreseeably might be harmed by those actions or omissions, within the meaning of the Punitive Damages Act, N.J.S.A. 2A:15-5.12. FSS Armory is therefore liable for punitive damages.

84.     Defendant's violation of Section 58-35(a) entitles the Attorney General to "an injunction prohibiting [Defendants] from continuing that conduct or engaging therein or doing any acts in furtherance thereof." N.J.S.A. 2C:58-35(b). Such injunctive relief is necessary here to prevent further, continuing, irreparable injury.

## Count Four

### (Negligence)

85.     The Attorney General repeats and realleges the foregoing allegations as if set forth in their entirety herein.

86.     Under New Jersey common law, a Defendant is liable for negligence if: (1) Defendant owed plaintiff a duty of care, (2) Defendant breached that duty of care, and (3) that breach of duty was the proximate cause of (4) actual damages.

87.     Firearms are inherently dangerous instrumentalities. In conducting business as a gun dealer, FSS Armory owed a legal duty to the public to abide by laws and regulations relating to store security and safeguarding inventory, and to otherwise exercise due care to prevent firearms from falling into the wrong hands and being used for harmful or criminal purposes.

88.     FSS Armory failed to appropriately safeguard its store and the guns within, and advertised its weak security for anyone to see on the internet. In doing so, FSS Armory breached its duty of care. FSS's conduct wantonly and willfully disregarded the safety, health, and welfare of persons who could foreseeably be harmed.

89.     FSS's breach foreseeably caused the theft of twenty guns and the ensuing criminal use and distribution of many of these stolen firearms. This has injured the public and continues to injure and threaten the public.

90.     As a result of FSS Armory's negligence, the State of New Jersey and other public entities have expended significant resources mitigating and investigating crimes already

committed with, or threatened by, the twenty guns taken by burglars from FSS Armory. Specifically, and among other things, New Jersey has incurred and is likely to continue to incur damages in the form of costs of deterring, responding to, investigating, and prosecuting crimes committed with these guns, costs of attempting to recover the stolen guns, and other costs.

91.      The Attorney General seeks appropriate remedies on behalf of the State and in the Attorney General's *parens patriae* capacity for the benefit of the general public and as are necessary to protect the safety, health, and welfare of New Jersey's residents.

92.      FSS Armory's negligence consists of knowing acts and omissions that also constitute knowing violations of N.J.S.A. 2C:58-35(a), N.J.S.A. 2C:58-2(a)(3), N.J.A.C. 13:54-3.9(a)(3), N.J.A.C. 13:54-6.5(a)(1), and N.J.A.C. 13:54-6.5(b).

93.      FSS Armory's unlawful actions and/or omissions were undertaken with actual malice or accompanied by wanton and willful disregard of persons who foreseeably might be harmed by those actions or omissions, within the meaning of the Punitive Damages Act, N.J.S.A. 2A:15-5.12. FSS Armory is therefore liable for punitive damages.

## **PRAYER FOR RELIEF**

**WHEREFORE,** the Attorney General requests judgment in his favor and against Defendant FSS Armory, Inc. as follows:

A.  Ordering injunctive relief as is necessary to prevent continuing harm;

B.  Pursuant to N.J.S.A. 2C:58-35(b), ordering Defendant to pay accrued and future costs that the State of New Jersey and any other person or entity incurs in abating the public nuisance caused by the twenty guns stolen from FSS Armory;

C.  Pursuant to N.J.S.A. 2C:58-35(b) and N.J.S.A. 2A:15-5.12, awarding the Attorney General monetary damages and punitive damages in an amount to be determined at trial, including interest thereon;

D.  Pursuant to N.J.S.A. 2C:58-35(b), awarding the Attorney General the costs and expenses incurred in connection with this action, including attorneys' fees;

E.  Pursuant to the common law of the State of New Jersey, awarding the Attorney
    General monetary damages and punitive damages in an amount to be determined at
    trial, including interest thereon;

F.  Awarding the Attorney General such other and further relief as the Court deems just
    and proper.

Dated: December 12, 2023
Newark, New Jersey

                                        MATTHEW J. PLATKIN
                                        ATTORNEY GENERAL OF NEW JERSEY
                                        Attorney for Plaintiff

                                        By:  /s/ David Leit
                                             David Leit [024351995]
                                             Emily Erwin [405362022]
                                             Jonathan B. Mangel [281382018]
                                             Giancarlo Piccinini [414322022]

                                             Attorney General of New Jersey
                                             Division of Law
                                             124 Halsey Street
                                             Newark, NJ 07101

## CERTIFICATION OF COMPLIANCE

I certify that confidential personal identifiers will be redacted from all documents submitted in the future in accordance with <u>R.</u> 1:38-7(b).

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
Attorney for Plaintiff


By:   <u>    /s/ David Leit        </u>
      David Leit
      Assistant Attorney General

Dated: December 12, 2023
Newark, New Jersey

## DESIGNATION OF TRIAL COUNSEL

Pursuant to <u>R.</u> 4:25-4, Assistant Attorney General David Leit is hereby designated as trial counsel on behalf of the Plaintiff.

> MATTHEW J. PLATKIN
> ATTORNEY GENERAL OF NEW JERSEY
> Attorney for Plaintiff
>
>
> By:    /s/ David Leit
>         David Leit
>         Assistant Attorney General

Dated: December 12, 2023
Newark, New Jersey

# EXHIBIT B

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
By:    David Leit (Attorney ID No. 024351995)
      Assistant Attorney General
      Emily Erwin (Attorney ID No. 405362022)
      Jonathan B. Mangel (Attorney ID No. 281382018)
      Giancarlo Piccinini (Attorney ID No. 414322022)
      Deputy Attorneys General
Tel: (973) 648-2500
Email:  David.Leit@law.njoag.gov
        Emily.Erwin@law.njoag.gov
        Jonathan.Mangel@law.njoag.gov
        Giancarlo.Piccinini@law.njoag.gov
124 Halsey Street
PO Box 45029
Newark, NJ 07101
[Additional attorneys listed on signature page]

|  |  |
|---|---|
| MATTHEW J. PLATKIN, Attorney General of the STATE OF NEW JERSEY,<br><br>          Plaintiff,<br><br>v.<br><br>PATRIOT ENTERPRISES WORLDWIDE LLC *doing business as* EAGLE SHOWS and NOT AN LLC *doing business as* JSD SUPPLY,<br><br>          Defendants. | SUPERIOR COURT OF NEW JERSEY CHANCERY DIVISION – MERCER COUNTY<br><br>DOCKET NO.:__C-93-23_____<br><br><u>Civil Action</u> |

**<u>AMENDED COMPLAINT</u>**

## TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................... 1

NATURE OF THE ACTION ........................................................................... 3

PARTIES ........................................................................................................ 6

JURISDICTION AND VENUE ...................................................................... 8

FACTS ............................................................................................................ 11

   I.  Defendants' Ghost Gun Products ........................................................... 11

       A.  Ghost Guns .................................................................................... 11

       B.  To Elude Restrictions on Completed Ghost Guns, the Ghost Gun Industry
           Sells Ghost Gun Parts .................................................................... 12

           1.  Ghost Gun Frames ................................................................. 13

           2.  Ghost Gun Kits ...................................................................... 16

           3.  Ghost Gun Products for 3D-Printed Frames .......................... 17

           4.  Products to Enhance Ghost Gun Lethality ............................. 19

           5.  Defendants' Goal Is to Help Customers Make Ghost Guns ... 20

       C.  Ghost Gun Design .......................................................................... 22

   II.  New Jersey's Ghost Gun Laws .............................................................. 24

       A.  The Evolution of New Jersey Ghost Gun Law .............................. 24

           1.  New Jersey Bans Ghost Gun Kits and Frames ...................... 25

           2.  New Jersey Then Bans Possessing or Trafficking Ghost Guns ........................... 26

           3.  New Jersey's Statutory Public Nuisance Law ....................... 27

           4.  New Jersey Notifies the Public that Ghost Gun Product Sales Will Not Be
               Tolerated, Including by Out-of-State Actors .......................... 28

       B.  New Jersey Firearms Purchase and Possession Laws..................... 29

       C.  Trafficking Indicators .................................................................... 30

   III.  Defendants' History of Developing and Operating a Robust, Integrated Ghost
       Gun Business ....................................................................................... 31

       A.  Vinroe Founds JSD Supply and Targets New Jersey Through Eagle Gun
           Shows ............................................................................................ 31

       B.  JSD Expands into Manufacturing ................................................. 32

       C.  Vinroe Purchases Eagle Shows, Giving Him Control of the Point of Sale ............... 33

       D.  JSD Supply and Eagle Shows Combine and Expand Their Ghost Gun Strategy....... 36

   IV.  Defendants Specifically Target Their Business to New Jersey ......................................... 39

A. Defendants' Knowledge of New Jersey Law and Specific Targeting of the New Jersey Ghost Gun Market ............................................................................ 39

B. Ghost Gun Products Sold by Defendants to New Jerseyans Are Ubiquitous in New Jersey ................................................................................................... 41

1. New Jersey Residents Arrested for Unlawful Possession of Defendants' Ghost Gun Products ............................................................................. 42

2. Other JSD Ghost Guns Are Recovered in New Jersey ........................... 44

V. Defendants' Unlawful Conduct Contributes to a Public Nuisance in New Jersey .......... 45

A. Ghost Guns Account for a Disproportionate, and Growing, Share of Crime Guns in New Jersey ...................................................................................... 45

B. The Harms and Costs of Ghost Gun Violence ........................................... 46

1. Victims and Their Families .................................................................... 46

2. Family and Community Impacts ............................................................. 47

3. Economic Costs ...................................................................................... 48

CAUSES OF ACTION ..................................................................................................... 49

PRAYER FOR RELIEF .................................................................................................... 66

The New Jersey Attorney General (the "Attorney General"), by and through undersigned counsel, hereby alleges as follows against Defendants Patriot Enterprises Worldwide LLC d/b/a Eagle Shows ("Eagle Shows" or "Eagle") and Not An LLC d/b/a JSD Supply ("JSD Supply" or "JSD" and, collectively, "Defendants"):

## INTRODUCTION

1.      The Attorney General brings this action to stop and remedy Defendants' unlawful sale to New Jersey residents of products designed to create unserialized, untraceable firearms—commonly known as "Ghost Guns."  Defendants, who know full well that Ghost Guns are illegal in New Jersey, deliberately sell their products at gun shows just across the New Jersey–Pennsylvania border.  They do so to make Ghost Guns readily accessible to New Jersey residents—even though such weapons have been illegal in New Jersey for years.

2.      Defendant JSD sells kits, frames, and other parts for making Ghost Guns.  At the point of sale, JSD does not conduct background checks or require buyers to demonstrate that they are not disqualified from purchasing or possessing a firearm.  Moreover, at gun shows, JSD often processes sales in all-cash transactions that leave little or no purchase record.  The JSD website boasts:  "Thanks to our products, you can put together a firearm that is identical to options available straight from the manufacturer.  The custom handgun you build from our . . . kit looks, feels and operates just like any other gun.  But they don't require a background check or a serial number."[1]  Defendants' common owner, Jordan Vinroe, touts the fact that JSD's proprietary Ghost Gun is "super easy to put together."[2]

---

[1]  See Polymer 80 Parts and Kits, JSD Supply, https://jsdsupply.com/brand/polymer-80 (last visited Dec. 10, 2023) (emphasis added).

[2]  Is It Local, Ep. 10 | Jordan Vinroe - JSD Supply, YouTube, at 41:00 (Oct. 9, 2020), https://www.youtube.com/watch?v=zePZxR9uFIo) [hereinafter "Is It Local Interview"].  All quoted language in this complaint is quoted in relevant part.

3.      Defendant Eagle Shows hosts gun shows ("Eagle Gun Shows") deliberately set up just across the New Jersey–Pennsylvania border, at which Defendant JSD and other Ghost Gun product vendors sell their products to New Jersey residents.  Vinroe has stated publicly that the New Jersey market is a prime target for JSD's sale of Ghost Gun kits, frames, and other parts.

4.      Defendants' lack of point-of-sale controls means that felons, convicted sex offenders, minors, people subject to domestic violence restraining orders, and others who cannot legally own, possess, or purchase a gun—as well as traffickers of illegal guns—can easily acquire lethal weapons.  To do so, they need only purchase parts from JSD and/or through other Eagle Shows vendors, and then assemble the guns themselves.  Indeed, using nothing more than a simple drill and an online video, anyone can quickly assemble these products into fully functional guns.  The products Defendants and other vendors at Eagle Gun Shows make available are, in fact, specifically designed to be assembled quickly into fully functional Ghost Guns.

5.      Ghost Guns are fast becoming a weapon of choice for illegal gun traffickers and violent felons.  Though a relatively new technology, Ghost Guns already represent approximately 8 percent of all guns recovered in New Jersey in connection with crimes.  That percentage has quadrupled since 2020.

6.      Because of Ghost Guns' unique dangers, New Jersey has responded to the threat posed by Ghost Guns by building upon the State's longstanding criminal prohibitions against firearms with a defaced serial number.  See N.J.S.A. 2C:39-3(d), 2C:39-9(e).

7.      In 2018, New Jersey criminally prohibited purchasing kits and frames to make Ghost Guns.  N.J.S.A. 2C:39-9(k).  In 2019, New Jersey criminally prohibited completed Ghost Guns.  N.J.S.A. 2C:39-3(n), 2C:39-9(n).  And, since 2022, any entity that contributes to a public

nuisance by violating such laws, or that fails to institute reasonable controls in their sale of Ghost Guns kits or any other Ghost Gun parts, is civilly liable to the State.  N.J.S.A. 2C:58-35.

8.     Notwithstanding these laws, Defendants actively market and sell to New Jersey residents parts to make untraceable Ghost Guns—without checking their purchasers' residency, age, felony status, or qualifications to purchase or possess a firearm—and without filtering out traffickers making multiple purchases.

9.     Defendants' actions knowingly violate New Jersey law and are otherwise tortious. Their conduct has contributed and is contributing to a dangerous public nuisance in the State of New Jersey.  The Attorney General therefore now brings this action to put a stop to this unlawful and dangerous activity.

## NATURE OF THE ACTION

10.     Defendants JSD Supply and Eagle Shows, both headquartered in Western Pennsylvania, are owned and operated by the same individual, Jordan Vinroe.

11.     Vinroe founded JSD Supply in 2013.  JSD quickly became a regular vendor at Eagle Shows, which was then separately owned.  From the start, JSD's principal business strategy has been the marketing and sale of products to make untraceable Ghost Guns.  In the words of JSD's website in August 2022:  "JSD was founded in a love of guns and hate of paperwork.  Since 2013, we've helped thousands of people build their own gun from the privacy of their garage.  No serialization, no background check, no government fee."[3]

12.     In 2021, after Eagle Shows began facing scrutiny about its vendors' sales to gun traffickers, Eagle announced that it would ban the sale of Ghost Gun kits and frames at its shows.

---

[3] About Us, JSD Supply, Aug. 8, 2022,
https://web.archive.org/web/20220808020500/https://jsdsupply.com/about-us.

In response, Vinroe led a successful pressure campaign for Eagle to reverse course. A few months later, Vinroe formed a new business entity and purchased Eagle, eliminating any risk of Eagle's owners ever again interfering with the lucrative Ghost Gun marketplace at Eagle Gun Shows.

13.     Vinroe's acquisition of Eagle Shows not only gave JSD the uninterrupted ability to continue selling its Ghost Gun products at Eagle Gun Shows, but also created an integrated Ghost Gun enterprise.

14.     Since coming under common ownership, Defendants JSD Supply and Eagle Shows have been able to coordinate and synergize multiple layers of the business of deliberately distributing Ghost Gun kits, frames, and other parts into New Jersey.

15.     JSD has brought to that integrated enterprise what Vinroe has described as the largest retailer of Ghost Gun frames in the country. But that is not all: JSD also has manufactured and sold the Vinroe-patented Modular Universal Pistol ("MUP-1"), which serves as the frame for a Ghost Gun clone of the popular Sig Sauer 320 gun, as well as a "jig" that makes it particularly easy for JSD's customers to finish their Ghost Guns.

16.     By acquiring Eagle Shows, Vinroe has also gained control of gun-product bazaars held year-round in Pennsylvania locales near the New Jersey border. Vinroe has oriented those Eagle Gun Shows toward Ghost Gun product sales, and has moved them even closer to the New Jersey border. He advertises those shows in New Jersey. Vinroe has thereby ensured his control over the point of sale for multiple Ghost Gun product vendors selling to New Jerseyans.

17.     Vinroe also has prominently positioned JSD's retail booths and products to stand out among the many vendors at Eagle Gun Shows—up to 1500 vendors at the largest show.

4

18.     Defendants' marketing message to their customers makes it clear that they expect customers to use their products to make Ghost Guns, and that the principal selling points for their products include that they are (1) untraceable, (2) do not require a background check to purchase, and (3) are otherwise identical to "name brand" firearms.

19.     In short, Defendants, acting in concert, operate as a major player—perhaps the dominant player—in the market for Ghost Guns in New Jersey, deeply involving themselves in the manufacture, distribution, marketing, and sale of the parts needed to create untraceable firearms.

20.     Defendants' conduct endangers New Jerseyans and is illegal.  New Jersey law criminally prohibits individuals in the State from obtaining a finished or unfinished unserialized frame with the purpose to make a Ghost Gun, and also prohibits a person from possessing, selling, or transporting a completed Ghost Gun.  N.J.S.A. 2C:39-9(k); 2C:39-3(n); 2C:39-9(n).  Nevertheless, Defendants promoted, facilitated, solicited, and aided New Jerseyans in purchasing frames (finished and unfinished) to make Ghost Guns and in possessing, transporting, and trafficking completed Ghost Guns.  Defendants' conduct thus violates the law under longstanding principles of accomplice liability.  N.J.S.A. 2C:2-6.  Further, New Jersey law holds civilly liable any entity that violates such laws or fails to institute reasonable controls in the selling of any Ghost Gun part.  N.J.S.A. 2C:58-35(a).

21.     As Vinroe himself boldly explained in an October 2020 podcast, he considers New Jersey's gun laws a particularly good business opportunity for JSD: "What's really good is when you get closer to places that are very restrictive, so a New Jersey, New York, Connecticut,

5

Washington State.  Anywhere where their gun laws are very strict, is where you see people wanting products the most."[4]

22.     Vinroe has exploited this opportunity by perching Defendants' points of sale just across the border in Pennsylvania, and then consciously luring large numbers of New Jersey buyers, including through placing billboards for Eagle Gun Shows on the New Jersey Turnpike.

23.     Defendants' Ghost Gun-related sales have thus put Ghost Guns into the hands of particularly dangerous New Jersey residents, and contributed to a burgeoning Ghost Gun public nuisance in our State.

24.     While some of Defendants' purchasers have been arrested in New Jersey and their products confiscated, many others are still at large and either remain in possession of illegal products acquired from or through Defendants or have since trafficked such products.

25.     Defendants, acting in concert via their common ownership, have thereby jeopardized, and continue to jeopardize, the health and safety of all New Jerseyans, in order to exploit what they see as a lucrative business opportunity.

26.     The Attorney General therefore brings this Action to seek all authorized and appropriate relief against Defendants.

<u>**PARTIES**</u>

27.     Plaintiff is the Attorney General of the State of New Jersey.  The Attorney General is authorized and charged with the responsibility to enforce N.J.S.A. 2C:58-35 ("Section 58-35").  The Attorney General brings the claims under Section 58-35 by and through the Statewide Affirmative Firearms Enforcement Office ("SAFE").  SAFE was created within the Office of the Attorney General by Attorney General Administrative Executive Directive No.

---

[4]  Is It Local Interview, at 15:06.

2022-08, which also delegates to SAFE the Attorney General's statutory authority under Section 58:35.

28.    The Attorney General also asserts in this case the State's proprietary interest and, under the Attorney General's <u>parens patriae</u> authority, New Jersey's "quasi-sovereign" interests in protecting the safety, health, and welfare of its residents.

29.    Defendant Not An LLC d/b/a JSD Supply is a Pennsylvania limited liability company with a registered office of 106 Poplar Lane, Portersville, Pennsylvania 16051. The fictitious name "JSD Supply" is registered as a Pennsylvania business with a principal address of 1052 New Castle Road, Prospect, Pennsylvania 16052, and the registration identifies JSD Supply's owner as Jordan Vinroe of 106 Poplar Lane, Portersville, Pennsylvania 16051. Public records indicate that Vinroe is associated with 106 Poplar Lane, Portersville, Pennsylvania 16051 in his personal capacity.

30.    JSD Supply is a leading manufacturer and retailer of Ghost Gun kits, Ghost Gun frames, and other Ghost Gun parts.

31.    Defendant Patriot Enterprises Worldwide LLC d/b/a Eagle Shows is a Pennsylvania limited liability company with a registered office of 106 Poplar Lane, Portersville, Pennsylvania 16051. The fictitious name "Eagle Shows" is registered as a Pennsylvania business with a principal address of 106 Poplar Lane, Portersville, Pennsylvania 16051.

32.    Eagle Shows describes itself as the "home of the largest gun shows in the Keystone State."[5]

33.    Non-Party Jordan Vinroe has held himself out as the owner of both JSD Supply and Eagle Shows.

---

[5] <u>Eagle Shows</u>, https://eagleshows.com (last visited Dec. 10, 2023).

## JURISDICTION AND VENUE

34.     This Court's jurisdiction is proper because the action arises from the Defendants' deliberate targeting of New Jersey residents and Defendants' regular, repeated, and systematic contacts with New Jersey.  Defendants have also engaged in intentional acts calculated to create an actionable event in the New Jersey forum, and could reasonably anticipate being haled into court in New Jersey.

35.     Defendants have, in particular, deliberately solicited New Jersey residents for their business, and have knowingly sold Ghost Gun products to New Jersey residents, who foreseeably return with them to New Jersey.  This course of business has included placing billboard advertisements in New Jersey targeting New Jersey residents, a webpage specifically directed at New Jersey residents, and emails to New Jersey residents who have provided their physical and email addresses to Defendants.

36.     For example, Defendants advertised their October 2023 and August 2023 Eagle Gun Shows on a billboard at milepost 70.2 on the New Jersey Turnpike:





37.     Defendants also advertised their October 2023 and March–April 2023 Eagle Gun Shows on a billboard above South Crescent Boulevard, in Pennsauken, New Jersey, less than five miles from the Pennsylvania border:





38.     Vinroe has admitted that he deliberately sets up shop near the New Jersey border because New Jersey is a jurisdiction "where you see people wanting [JSD's] products the most."[6]

39.     Through their targeted solicitation of New Jersey residents, Defendants have purposely availed themselves of this New Jersey forum and accordingly had fair warning that their activities could subject them to New Jersey courts' jurisdiction.

40.     Pursuant to R. 4:3-2(a)(2) of the New Jersey Court Rules, venue is proper in this Court because the causes of action alleged herein arose in Mercer County, into which Defendants' Ghost Gun products were transported and prepared for resale.

## FACTS

### I.     Defendants' Ghost Gun Products

#### A.     Ghost Guns

41.     Ghost Guns are firearms[7] that lack a serial number on their frame or receiver. Generally speaking, a frame is the part of a handgun that houses internal components, such as the trigger mechanism.  A receiver is the analogous part of a rifle.  The terms are sometimes used interchangeably and, unless otherwise noted, the use of the term "frame" in this Complaint encompasses a "receiver," and vice versa.  Frames and receivers are sometimes also referred to as a firearm's "lower."

---

[6]  Is It Local Interview, at 15:06.

[7]  The relevant portion of the New Jersey statutory definition of "firearm" is "any handgun, rifle, shotgun, machine gun, automatic or semi-automatic rifle, or any gun, device or instrument in the nature of a weapon from which may be fired or ejected any solid projectable ball, slug, pellet, missile or bullet, or any gas, vapor or other noxious thing, by means of a cartridge or shell or by the action of an explosive or the igniting of flammable or explosive substances."  N.J.S.A. 2C:39-1(f).  Other jurisdictions' definitions of "firearm" may differ.

42.     In New Jersey, as elsewhere, it is a crime to sell a Ghost Gun. N.J.S.A. 2C:39-9(n).  It is also a crime in New Jersey to knowingly possess a Ghost Gun. N.J.S.A. 2C:39-3(n).

43.     These prohibitions against Ghost Guns reflect law enforcement and regulatory authorities' strong interest in firearms serialization.  Serialization aids in interdicting and investigating gun crime, and has a strong deterrent effect on the commission of crimes with guns. Thus, since long before Ghost Guns began to proliferate, it has been a crime in New Jersey to possess a firearm with a defaced serial number.  N.J.S.A. 2C:39-3(d).

44.     Ghost Guns' lack of serialization generally renders law enforcement unable to trace Ghost Guns to their sellers or purchasers.  This impedes policing and investigation; hinders deterrence; and attracts, in particular, those purchasers and possessors who are prohibited by law from acquiring a firearm, or who want a gun to aid in other crime.

45.     Ghost Guns sell for more money than comparable serialized, fully assembled firearms because Ghost Gun product sales do not require a background check and the weapons themselves cannot be traced.[8]

46.     All this combines to make Ghost Guns particularly dangerous and costly to the New Jersey public.

B.     **To Elude Restrictions on Completed Ghost Guns, the Ghost Gun Industry Sells Ghost Gun Parts**

47.     To serve (and profit from) the market for Ghost Guns while evading prohibitions on selling completed Ghost Guns, members of the Ghost Gun industry—including Defendants—

---

[8] Glenn Thrush, Ghost Guns: Firearm Kits Bought Online Fuel, Epidemic of Violence, N.Y. Times, Nov. 14, 2021, https://www.nytimes.com/2021/11/14/us/ghost-guns-homemade-firearms.html.

sell the constituent parts of Ghost Guns ("Ghost Gun Parts") for their customers to then assemble into working firearms. This is a core element of Defendants' businesses.

48.     JSD and other Eagle vendors sell Ghost Gun Parts as both standalone, separate products and in various combinations. In particular, JSD (and others) have sold unfinished, un-serialized frames ("Ghost Gun Frames") for making Ghost Guns, including as part of "Ghost Gun Kits." Under New Jersey law, purchasing a Ghost Gun Frame is illegal, too. N.J.S.A. 2C:39-9(k).

49.     More recently, JSD has marketed Ghost Gun Parts bundles, designed to be used with a Ghost Gun Frame built by the user at home using a 3D printer, i.e., a commercially available printer that can use digital instructions to create a three-dimensional physical object from thin layers of plastic or other material.

### 1.     Ghost Gun Frames

50.     Ghost Gun Frames are unserialized firearm frames or receivers.

51.     When JSD and Eagle's other Ghost Gun vendors sell Ghost Gun Frames, they do so in unfinished form. The unfinished frames require minor steps—additional drill holes, bending, or milling—to be ready for use in a gun. The products are designed for users to finish the frames themselves. The end result is a usable, unserialized frame.

52.     In a December 2020 interview, Vinroe claimed to be the largest retailer of Ghost Gun handgun Frames in the country.[9]

53.     The unfinished nature of Defendants' Ghost Gun Frames is distinct from the other Ghost Gun Parts sold by JSD and/or through Eagle. Other Ghost Gun Parts, such as slides,

---

[9] John Crump Live, Fireside Chats 154: Jordan Vinroe - JSD Supply, at 27:40 (Dec. 15, 2020), https://podcast.crumpy.com/e/fireside-chats-154-jordan-vinroe-jsd-supply-more-p80-information.

barrels, triggers, and magazines, are ready at the time of sale for assembly into, and use in, a functional firearm without requiring user alteration.

54.     The unfinished nature of Ghost Gun Frames is the purported basis for Defendants' unique approach to them, as unfinished Ghost Gun products may be subject to different treatment from finished Ghost Gun products by other jurisdictions.

55.     Although unfinished, Defendants' Ghost Gun Frames are designed to make finishing by customers easy, even for a novice, using household tools.  Defendants further assist in this process by telling their purchasers which specific tools (such as drill bits) are needed for the finishing, and in fact providing those tools.  Defendants provide "how-to" instructional materials as well.

56.     To make the process even easier, JSD and other Eagle vendors have provided customers with "jigs"—manufacturer-designed and manufacturer-issued bracketing that marks and lines up the drill holes and secures the unfinished frame in place.

57.     By way of illustration, JSD and other Eagle vendors have sold Ghost Gun Frames made by the leading manufacturer of such products, Polymer80.  Those frames are pieces of plastic molded to nearly perfectly resemble the grip portion of a Glock handgun, i.e., its entire "lower."  The retailers have sold, alongside or included within the frame, a red plastic jig that enables users to envelop the unfinished frame with bracketing that contains openings showing where the user needs to drill holes.  The retailers also have provided drill bits that correspond to those holes.  Such kits can be seen on the Polymer80 website, for example this model with a molded black frame:[10]

---

[10]   PF940V2 80% Full Size Frame Kit - Gray, Polymer80,
https://www.polymer80.com/PF940v2-80-Full-Size-Frame-Kit-Gray_2 (last visited Dec. 10, 2023).

14



58.     Polymer80's website provides complete instructions on how to use these tools to finish the Ghost Gun Frame, and then join the Ghost Gun Frame with other Ghost Gun Parts, to make a working Ghost Gun.[11]

59.     Another example is JSD's proprietary MUP-1 Ghost Gun Frame ("MUP-1 Frame"), designed to make a Ghost Gun clone of the popular Sig Sauer P-320 handgun.  The MUP-1 Frame is a cast or molded piece of stainless steel that closely resembles a Sig Sauer handgun's "Fire Control Unit."  The jig is steel and has a lid to hold the MUP-1 Frame in place. The jig has labeled holes corresponding to where users are to drill or mill.  Defendants have posted instructional materials, including videos, showing how that finishing is done.  As Vinroe

---

[11]  How To, Polymer80, https://www.polymer80.com/how-to-manuals (last visited Dec. 10, 2023).

explained in an interview:  "You gotta drill some holes and bend those tabs that are sticking up, that's what would make the rail that a slide would go on."[12]

60.    JSD's MUP-1 Frame (top image) and its finishing jig (bottom image) can be found below:



### 2.    Ghost Gun Kits

61.    JSD and others at Eagle Gun Shows have often sold Ghost Gun Frames as part of Ghost Gun Kits.  Ghost Gun Kits are combination packages of Ghost Gun Frames along with tools to make finishing easy, often combined with certain other Ghost Gun Parts needed to finish and assemble a Ghost Gun.

62.    In addition to selling Ghost Gun Kits, JSD and others at Eagle Gun Shows also sell (or have sold) all types of Ghost Gun Parts separately or in other types of combinations.

63.    Many of Defendants' Ghost Gun Kits have included every tool and part needed to readily make a Ghost Gun.  In this way, buying Defendants' Ghost Gun Kits has been like

---

[12]  Is It Local Interview, at 37:37.

buying furniture from a store like IKEA: the purchaser buys all the parts needed to make the finished product, but assembles it themselves. Just as it is commonly understood that IKEA sells <u>furniture</u> (rather than "furniture kits"), Vinroe has said that, when speaking colloquially, he tells people that he sells "firearms," not kits.[13]

### 3.     Ghost Gun Products for 3D-Printed Frames

64.     JSD Supply also sells product bundles that include every Ghost Gun Part <u>except</u> the frame. To support those sales, JSD explicitly targets its marketing message at purchasers who will use a 3D printer to make their own frame for the Ghost Gun, with Ghost Gun product vendors supplying the remaining parts.

65.     JSD's website boasts:

> A 3D printed gun frame can be the perfect way to enter the hobby of homemade guns while giving you a quality firearm you can be proud of on the range. Additive manufacturing, often referred to as 3D printing, lets you build a professional-looking frame at home, then finish it with your labor and the right 3D gun parts for a tailor-made shooting experience. . . . <u>We're proud to offer the parts you need to turn your 3D printed gun frame into a functional firearm you can depend on</u>.[14]

66.     In September 2023, JSD's email newsletter touted a particular bundle of Ghost Gun Parts known as the "Avidity Arms PD10 Complete Parts Set." It said: "The 3DPD10 Parts Kit includes every part needed to complete a build on a printed 3DPD10 Frame, using the file released by Avidity Arms through DefCad.com. This is the first time a traditional firearms manufacturer has released a printing optimized frame file to the gun making community!"

---

[13]  Is It Local Interview, at 6:47.

[14]  <u>3D Printed Gun Frames & Accessories</u>, <u>JSD Supply</u>, https://jsdsupply.com/category/3d-printed-gun-frames/ (last visited Dec. 10, 2023) (emphasis added).

67.     The email included a picture of the completed Ghost Gun that can be readily built from the Avidity Arms PD10 Complete Parts Set:



68.     To complement their business line in Ghost Gun Parts exclusive of frames, JSD has actively promoted the 3D printing of frames, i.e., the final piece of the puzzle for assembling a working Ghost Gun.  For example, last year, JSD hosted the "JSD Invitational"—a design competition for making Ghost Guns out of 3D-printed Ghost Gun Frames and JSD Ghost Gun Parts.

69.     JSD summarized the terms of the competition on the social media platform then known as Twitter:  "16 competitors, 3d printed glock style frames being judged on cosmetic changes, $5,000 in prize money, $7,500 in parts sent to competitors."

70.    The invitational had a bracket:



71.    Vinroe has described 3D printing as an increasingly inexpensive way to make

Ghost Gun Frames at scale.  In an August 2021 interview, Vinroe stated:

> It's just getting cheaper and cheaper and better too, you know the
> next five years is going to be crazy with home building and 3D
> printing. . . . You figure [in addition to around $300 for the printer]
> the filament is what, like twenty-five bucks for a spool, and I don't
> even know how many you can make—I just keep printing until it
> runs out and throw another one on so yeah, you can make like 10
> receivers, like Glock-style pistols.  I don't know, it's a lot.[15]

### 4.    Products to Enhance Ghost Gun Lethality

72.    JSD and other Eagle vendors do more than just sell products to make a Ghost

Gun:  they also sell products to make a Ghost Gun handgun even deadlier.  Amongst such

products are Large Capacity Magazines, which can hold a surplus number of rounds so that more

shots can be fired without reloading.[16]

---

[15]  The Rogue Banshee, For the Love of Guns //Episode 4// Jordan Vinroe from JSD Supply, YouTube, at 35:42 (Aug. 16, 2021), https://www.youtube.com/watch?v=SyPKPPOGMzQ.

[16]  New Jersey law defines Large Capacity Magazines as "a box, drum, tube or other container which is capable of holding more than 10 rounds of ammunition to be fed continuously and

73.    Additional lethality-enhancing products include Trigger Pull-Releases, which allow a gun to fire twice in rapid succession, both as the trigger is pulled and released.  A video made over a year ago at an exhibition shows the effects of a JSD-manufactured Trigger Pull-Release paired with a JSD-sold Ghost Gun.  The narrator in the video stands next to "Bob" from JSD, wearing JSD-branded clothing.  After saying "we've got JSD Supply here" the narrator test-fires the gun, firing two shots with each trigger pull and release.[17]

### 5.    Defendants' Goal Is to Help Customers Make Ghost Guns

74.    In Defendants' manufacturing, selling, hosting the sale of, and/or marketing Ghost Gun Parts, Defendants' explicitly stated business model has been to put working Ghost Guns in the hands of users.  In an October 2020 interview, Vinroe acknowledged this:

| | |
|---|---|
| Interviewer: | "[Y]our business is basically people want [the MUP-1 Frame and jig] to build a firearm." |
| Vinroe: | "Right." |
| Interviewer: | "You provide that." |
| Vinroe: | "That's what I do."[18] |

75.    Similarly, in the same interview, Vinroe said:  "We could make real guns, serialized guns . . . but, I don't want to right now.  We are doing this, and this is our focus, and we are 100 percent dedicated to the home builder and . . . this product segment."[19]

---

directly therefrom into a semi-automatic firearm."  N.J.S.A. 2C:39-1(y).  New Jersey categorically prohibits the possession of such Large Capacity Magazines by any non-military, non-law enforcement individual who does not have a specific registration.  N.J.S.A. 2C:39-3.

[17]  Black Diamond Guns and Gear, Binary Block Trigger at the PSA Gathering, YouTube (Mar. 22, 2022), https://www.youtube.com/watch?v=02oDLsXZOmE.

[18]  Is It Local Interview, at 42:07.

[19]  Is It Local Interview, at 45:48.

76.     Vinroe's patent application[20] for the MUP-1 Frame explicitly states that the purpose of his invention is to build a fully functional gun: "[T]he invention is specifically fashioned to allow a completed article of manufacture into a pistol receiver which will accept parts manufactured to fit a Sig Sauer brand receiver such as a P320." "Article of manufacture," as used in the patent application, means the MUP-1 Frame.  The patent application continues: "The tool jig also has various holes pre-drilled which are fashioned such as to emulate the machining and drill holes that would be necessary to finalize the firearm receiver [i.e., frame] to work with the factory parts that are commonly available other than the firearm receiver itself. Such parts would readily attach to the receiver completed using the invention thereby allowing a complete firearm to be constructed."

77.     To ensure that users can easily complete their Ghost Guns, Defendants have provided users with extensive instructional resources, including seminars conducted at Eagle Gun Shows, demonstrating how to finish Ghost Gun Frames and assemble the Ghost Gun Parts.

78.     For the MUP-1 Frame, JSD has created and disseminated demonstration videos showing (a) how to finish an MUP-1 Frame using the associated jig,[21] and (b) how to join the MUP-1 Frame with other Ghost Gun Parts to prepare it for final assembly.[22]  As Vinroe bragged to one interviewer:  "It's super easy to put together."[23]

---

[20]  U.S. Patent No. 11,117,199 (filed Oct. 23, 2019) (issued Sept. 14, 2021); U.S. Patent No. D881,313 (filed Oct. 23, 2018) (issued Apr. 14, 2020).

[21]  JSD Supply, MUP 1 Jig Instructions, GunStreamer, (Nov. 16, 2019), https://gunstreamer.com/watch/mup-1-jig-instructions_dicMdqzIwrAtj53.html.

[22]  JSD Supply, MUP 1 Small Parts Assembly, YouTube (Sept. 21, 2019), https://www.youtube.com/watch?v=1lw-ad4WVFU.

[23]  Is It Local Interview, at 41:00.

79.     Defendants further trumpet unserialized firearm construction in their email newsletter.  In November 2022, JSD announced that it was launching the sale of the "Ghost Gunner 3" in celebration of Vinroe's birthday.[24]  In April 2023, JSD announced that, for a new design, "the first 10 <u>builds</u>" would win a free patch and t-shirt.[25]

80.     In these ways, and in many others, Defendants have aggressively promoted the use of their Ghost Gun Kits to make Ghost Guns, not only extolling the ease of doing so but also actively training consumers on how to assemble a completed Ghost Gun.

## C.     Ghost Gun Design

81.     Once assembled, a Ghost Gun closely resembles, and operates similarly to, a name-brand serialized firearm sold by licensed firearms dealers.  The most common Ghost Guns resemble, by design, Glock handguns, with interchangeable parts.  The leading manufacturer of Glock-style Ghost Gun Kits is Polymer80.  Polymer80's products are or have been sold by JSD and other vendors at Eagle Gun Shows.

82.     Polymer80's Glock-style Ghost Guns look very similar to Glock handguns, and function with equivalent lethality.  An image of a completed Polymer80 "P80" Ghost Gun is on the left, and a Glock G17 is on the right:[26]

---

[24] JSD Supply, <u>Jordan's Birthday Deals</u>, <u>DealTown</u> (Nov. 1, 2022), https://deal.town/jsd-supply/jordans-birthday-deals-FKUMZMZPD.

[25] JSD Supply, <u>Avidity Arms PD10 Parts Set!</u>, <u>DealTown</u> (Apr. 28, 2023), https://deal.town/jsd-supply/avidity-arms-pd10-parts-set-P3PU37LX9 (emphasis added).

[26] <u>P80 PFS9$^{TM}$ Pistol - Black - 10RD Magazine</u>, <u>Polymer80</u>, https://www.polymer80.com/P80-PFC9-Pistol-Black_10 (last visited Dec. 10, 2023); <u>Glock 17 – The Original</u>, <u>Glock</u>, https://us.glock.com/en/pistols/g17 (last visited Dec. 10, 2023).



83.     In describing Polymer80 Ghost Gun products, JSD says on its website: "Finishing a custom Polymer 80 parts build is easy when you shop with us.  Thanks to our products, you can put together a firearm that is identical to options available straight from the manufacturer. The custom handgun you build from our Polymer 80 kit looks, feels and operates just like any other gun.  But they don't require a background check or a serial number, making them the best solution when privacy is the main concern."[27]

84.     One vendor of Ghost Gun Parts at Eagle Gun Shows even uses the website domain www.p80glocks.com (emphasis added), appealing to customers seeking a Glock-style gun that can be acquired without a serial number or background check.[28]

85.     Defendants also sell products for the Glock/P80 design they manufacture themselves.

86.     Defendants market their in-house Glock/P80 Ghost Gun products under the "Patmos" brand.  According to JSD's website:  "Patmos Arms brings big-brand quality to the table but leaves the big-name price tag at the door.  Their aftermarket pistol barrels and slides are

---

[27] Polymer 80 Parts and Kits, JSD Supply, https://jsdsupply.com/brand/polymer-80 (last visited Dec. 10, 2023).

[28] Glock has sued Polymer80 for patent infringement.  See Glock, Inc. v. Polymer80, Inc., No. 23-cv-0086 (D. Nev.).

engineered to exacting OEM [original equipment manufacturer] standards to give you perfect fitment on all compatible pistols."[29]

87.     Other Ghost Gun Kits and Ghost Gun Frames similarly emulate other name-brand handguns.

88.     For example, JSD has pioneered an un-serialized clone of Sig Sauer's P320 handgun.  Sig Sauer's frame, known as its Fire Control Unit, or "FCU", sits within its grip and houses the trigger mechanism and other internal components, and can readily combine with original manufacturer-made and/or aftermarket parts to make a firearm.  JSD's MUP-1 Frame is an unserialized, unfinished clone of the P320 FCU, and is specifically designed to allow users to make a Sig Sauer-style Ghost Gun.

89.     In addition to selling the MUP-1 Frame and its associated jig and finishing tools, JSD also sells bundles of parts and accessories, i.e., everything needed to readily make a Sig Sauer-style Ghost Gun.

## II.     New Jersey's Ghost Gun Laws

### A.     The Evolution of New Jersey Ghost Gun Law

90.     New Jersey's Legislature has recognized and responded to the dangers presented by Ghost Guns and the Ghost Gun industry's increasingly sophisticated practices.  It has, among other things, prohibited outright the purchase or possession of Ghost Guns, Ghost Gun Kits, and Ghost Gun Frames; it has maintained longstanding prohibitions on conspiring in or facilitating direct criminal violations; and it has most recently mandated point-of-sale controls for all Ghost Gun Parts.

---

[29]  Patmos Arms, JSD Supply, https://jsdsupply.com/brand/patmos-arms (last visited Dec. 10, 2023).

### 1.   New Jersey Bans Ghost Gun Kits and Frames

91.    In November 2018, New Jersey enacted P.L. 2018, c.138 (<u>codified at</u> N.J.S.A. 2C:39-9), amending New Jersey's criminal firearms code by creating new felony prohibitions related to Ghost Guns.  Particularly relevant here is N.J.S.A. 2C:39-9(k):

> <u>Purchasing firearm parts to manufacture a firearm without a serial number</u>. In addition to any other criminal penalties provided under law, a person who, with the purpose to manufacture or otherwise assemble a firearm and without being registered or licensed do so as provided in chapter 58 of Title 2C of the New Jersey Statutes, purchases or otherwise obtains separately or as part of a kit a firearm frame or firearm receiver which is not imprinted with a serial number registered with a federally licensed manufacturer or any combination of parts from which a firearm without a serial number may be readily manufactured or otherwise assembled, but which does not have the capacity to function as a firearm unless manufactured or otherwise assembled is guilty of a crime of the third degree. Notwithstanding the provisions of N.J.S. 2C:1-8 or any other law, a conviction under this subsection shall not merge with a conviction for any other criminal offense and the court shall impose separate sentences upon a violation of this subsection and any other criminal offense.
>
> As used in this subsection, "firearm frame or firearm receiver" means the part of a firearm that provides housing for the firearm's internal components, such as the hammer, bolt or breechblock, action, and firing mechanism, and includes without limitation any object or part which is not a firearm frame or receiver in finished form but is designed or intended to be used for that purpose and which may readily be made into a firearm frame or receiver through milling or other means.

(underlining added to statute heading for clarity).

92.    When signing the bill enacting this provision, New Jersey Governor Phil Murphy explained that Ghost Guns "giv[e] the public at large the ability to build their own unregistered, unsafe, and untraceable firearm. . . . [K]its to assemble ghost guns will no longer be allowed in New Jersey."  Likewise, then-Attorney General Gurbir Grewal explained that "[G]host guns put the safety of our residents and our law enforcement officers at risk, because they give anyone—

25

even terrorists, felons, or domestic abusers—access to an untraceable gun. . . . Governor Murphy

and the Legislature [have provided] additional tools to rid our streets of these dangerous

weapons."

### 2. New Jersey Then Bans Possessing or Trafficking Ghost Guns

93.     In 2019, recognizing that Ghost Gun Kits acquired and assembled into Ghost

Guns were being resold on the black market, New Jersey introduced new prohibitions on the use

and trafficking of Ghost Guns.  This legislation created two new provisions of the criminal code.

See P.L. 2019, c.165.

94.     First, the legislation added a new prohibition on firearms without a serial number

to Section 39-3, which enumerates "Prohibited Weapons and Devices":

> Firearms without a serial number. Any person who knowingly
> possesses a firearm manufactured or otherwise assembled using a
> firearm frame or firearm receiver as defined in subsection k. of
> N.J.S. 2C:39-9 which is not imprinted with a serial number
> registered with a federally licensed manufacturer including, but not
> limited to, a firearm manufactured or otherwise assembled from
> parts purchased or otherwise obtained in violation of subsection k.
> of N.J.S. 2C:39-9, is guilty of a crime of the third degree.

N.J.S.A. 2C:39-3(n) (underlining added to statute heading for clarity).

95.     Second, the legislation added a new prohibition on transporting firearms without a

serial number to Section 39-9, which contains restrictions on unlicensed weapons transport:

> Transporting a manufactured firearm without a serial number. In
> addition to any other criminal penalties provided under law, a person
> who transports, ships, sells, or disposes of a firearm manufactured
> or otherwise assembled using a firearm frame or firearm receiver as
> defined in subsection k. of this section which is not imprinted with
> a serial number registered with a federally licensed manufacturer,
> including but not limited to a firearm manufactured or otherwise
> assembled from parts purchased or otherwise obtained in violation
> of subsection k. of this section, is guilty of a crime of the second
> degree."

N.J.S.A. 2C:39-9(n) (underlining added to statute heading for clarity).

96.     New Jersey's longstanding prohibitions on conspiring to commit a crime, N.J.S.A. 2C:5-2, or serving as an accomplice in the commission of a crime, N.J.S.A. 2C:2-6, complement these criminal prohibitions applicable to purchasers of Ghost Gun Kits and Ghost Gun Frames, and to users and traffickers of Ghost Guns.  See also N.J.S.A. 2C:1-3 (defining territorial applicability of New Jersey criminal laws).

### 3.     New Jersey's Statutory Public Nuisance Law

97.     In July 2022, New Jersey enacted P.L. 2022, c.56 (codified at N.J.S.A. 2C:58-33–36), a civil liability statute imposing obligations on "gun industry members" and creating a civil cause of action for the Attorney General to enforce those new obligations, as well as existing ones.

98.     N.J.S.A. 2C:58-35 ("Section 58-35") provides, as to liability:

> (a)(1) A gun industry member shall not, by conduct either unlawful in itself or unreasonable under all the circumstances, knowingly or recklessly create, maintain, or contribute to a public nuisance in this State through the sale, manufacturing, distribution, importing, or marketing of a gun-related product.

> (a)(2) A gun industry member shall establish, implement, and enforce reasonable controls regarding its manufacture, sale, distribution, importing, and marketing of gun-related products.

99.     N.J.S.A. 2C:58-34 ("Section 58-34") applies these prohibitions and mandates to all Ghost Gun industry actors and products.  Under Section 58-34:

> "Gun industry member" means a person engaged in the sale, manufacturing, distribution, importing, or marketing of a gun-related product, and any officer, agent, employee, or other person authorized to act on behalf of that person or who acts in active concert or participation with one or more such persons.

> "Gun-related Product" means any firearm, ammunition, ammunition magazine, firearm component or part including, but not limited to, a firearm frame and a firearm receiver, or firearm accessory, which product was, or was intended to be, sold, manufactured, distributed, imported, or marketed in this State, or

which product was possessed in this State and as to which it was reasonably foreseeable that the product would be possessed or used in this State.

"Public nuisance" means any condition which injures, endangers, or threatens to injure or endanger or contributes to the injury or endangerment of the health, safety, peace, comfort, or convenience of others or which otherwise constitutes a public nuisance under common law.

100. Section 58-34 also defines "reasonable controls" as "reasonable procedures, safeguards, and business practices that are designed to," among other things:

(1) prevent the sale or distribution of a gun-related product to a straw purchaser, a firearm trafficker, a person prohibited from possessing a firearm under State or federal law, or a person who the gun industry member has reasonable cause to believe is at substantial risk of using a gun-related product to harm themselves or unlawfully harm another or of unlawfully possessing or using a gun-related product; . . .

(3) ensure that a gun industry member complies with all provisions of State and federal law and does not otherwise promote the unlawful sale, manufacture, distribution, importing, marketing, possession, or use of a gun-related product.

**4. New Jersey Notifies the Public that Ghost Gun Product Sales Will Not Be Tolerated, Including by Out-of-State Actors**

101. The Attorney General has put the public and the Ghost Gun industry on notice about the dangers of Ghost Guns, and the applicability of New Jersey law to members of the Ghost Gun industry who target, serve, or aid the New Jersey Ghost Gun market. In 2018, shortly after the State first criminalized Ghost Gun Kits and Ghost Gun Frames, the Attorney General sent public letters to Ghost Gun industry members, warning them to "cease and desist from selling and advertising 'ghost guns' to residents of New Jersey," noting that "these weapons are

illegal in our state."[30]  In 2019, New Jersey sued one such out-of-state Ghost Gun Kit seller, entering into a settlement in 2021.[31]

102.    New Jersey has, in fact, issued public statements about the threat that <u>Defendants'</u> Ghost Guns pose to New Jersey.  In October 2021, New Jersey arrested a Morris County resident who purchased over a dozen Ghost Gun Kits from a JSD table at an Eagle Gun Show in Allentown, Pennsylvania, and had more illegal weaponry in his home.  New Jersey's then-Acting Attorney General announced the arrest in a joint press conference with the Pennsylvania Attorney General, stating:  "We are committed to shutting down the pipeline of illegal firearms into New Jersey, especially the untraceable 'ghost guns' that are quickly becoming a favorite of criminals."[32]

### B.    New Jersey Firearms Purchase and Possession Laws

103.    New Jersey's prohibitions against transactions in Ghost Guns, Ghost Gun Kits, and Ghost Gun Frames—and its point-of-sale-requirements for transactions in all Ghost Gun Parts—complement New Jersey's laws concerning those persons who cannot lawfully purchase or possess a firearm, and concerning the required steps for obtaining a lawful firearm.

104.    In New Jersey, no person may purchase a firearm without first receiving a state-issued Firearms Identification Card ("FID") and, in the case of a handgun, a separate permit to

---

[30] N.J. Attorney General, <u>Letter to Ghost Gun Industry Members</u> (Jun. 12, 2018), https://nj.gov/governor/news/news/docs/Ghost_Gun_Letter.pdf.

[31] N.J. Attorney General, <u>AG Grewal Announces First-in-the-Nation Settlement with Ghost Gun Company</u> (Mar. 18, 2021), https://www.njoag.gov/ag-grewal-announces-first-in-the-nation-settlement-with-ghost-gun-company.

[32] Mike Catalini, <u>New Jersey, Pennsylvania Collaborate in Ghost Gun Case</u>, <u>Associated Press</u> (Oct. 29, 2021), https://apnews.com/article/pennsylvania-new-jersey-gun-politics-0d26d82649361995be8f991428752d39.

purchase a handgun.  N.J.S.A. 2C:58-3.[33]  To be issued an FID or a handgun purchase permit, a person must meet certain qualifications.  These include having no prior conviction for a crime in New Jersey or its felony counterpart in any other state or federal jurisdiction, being over the age of 18 (or 21 for a handgun), and not being subject to a domestic violence restraining order.  In addition, at the point of sale, all firearms transactions must go through a licensed gun dealer, who must first complete a National Instant Criminal Background Check on the purchaser before consummating the transaction.

105.    People with prior convictions for, among other offenses, aggravated assault, aggravated sexual assault, carjacking, robbery, racketeering, domestic violence, or firearms trafficking are all disqualified from possessing a firearm under any circumstance.  N.J.S.A. 2C:39-7; N.J.S.A. 2C:39-5(j).  There are additional public safety restrictions of this type.  For example, the Prevention of Domestic Violence Act of 1991 and the Extreme Risk Protective Order Act of 2018 restrict access to firearms for individuals at an elevated risk of harming themselves or others.  N.J.S.A. 2C:25-17 et seq.; N.J.S.A. 2C:58-20 et seq.

**C.    Trafficking Indicators**

106.    New Jersey has also recently enacted legislation that codifies when firearms trafficking can be presumed.  See Real Accountability for Consequences of Unlawful Trafficking of Firearms Act, P.L. 2023, c.148 (S. 3150 (2022)).

107.    This law expressly permits the trier of fact in a criminal case to infer that a seller-defendant has the requisite intent to commit a firearm trafficking violation under certain circumstances.  Specifically, this inference may be made if the seller:

---

[33]  There are limited exceptions, such as for transactions between immediate family members or law enforcement.

(1) transferred or planned to transfer the firearm within forty-five days of their own purchase and receipt of the firearm;

(2) sold the other person three or more firearms within a one-year period;

(3) received compensation for the firearm that was significantly above the fair market value;

(4) did not conduct the transaction through a licensed retail dealer; <u>or</u>

(5) did not abide by the requirements of N.J.S.A. 2C:58-3(a)(3) or (b)(3) to complete a National Instant Criminal Background Check and did not provide a receipt or other documentation of the sale.

P.L. 2023, c.148 (underlining added to emphasize disjunctive).

108. Out-of-state conduct is "sufficient for prosecution if the defendant knew or should have known that the recipient of the firearm intended to possess, transfer, dispose, sell, or otherwise transport the firearm in this State." <u>Ibid.</u>

## III. Defendants' History of Developing and Operating a Robust, Integrated Ghost Gun Business

### A. Vinroe Founds JSD Supply and Targets New Jersey Through Eagle Gun Shows

109. Vinroe established JSD Supply in 2013. Initially, JSD sold Ghost Gun Kits, Ghost Gun Frames, and other Ghost Gun Parts made by other manufacturers, including Polymer80. Vinroe has since built the company into a major integrated retailer, manufacturer, and patent-holding inventor of a wide range of gun parts, deliberately offering Ghost Gun Kits, Ghost Gun Frames, and other Ghost Gun Parts to the New Jersey market.

110. Rather than building geographically fixed, capital-intensive brick and mortar storefronts, Vinroe identified two alternative ways for JSD Supply to reach its customer base: online sales and gun shows.

111.    Gun shows became key to JSD's access to the New Jersey market.  Online sales are not conducive to cash payment and create attendant records; they also require shipment to the purchaser's address.  By contrast, at a gun show, products are readily obtained for cash in person, at the point of sale.  This allowed JSD's Ghost Gun business to target New Jersey customers while consummating the illegal Ghost Gun product transactions just outside of New Jersey's borders, and without leaving any paper trail.

112.    The largest and most prominent gun show operator in Pennsylvania, Defendant Eagle Shows, provided JSD with multiple venues near the New Jersey border for JSD to market and sell Ghost Gun products.  Eagle Shows, then operating under separate ownership as Eagle Arms Productions, held near-weekly gun-show bazaars in Pennsylvania, frequently in locations close to New Jersey.  These Eagle Gun Shows allowed vendors to sell any variety of guns, gun parts, and gun paraphernalia.  Eagle Shows did not limit or control its vendors' sales of Ghost Gun Kits, Ghost Gun Frames, and other Ghost Gun Parts.

**B.     JSD Expands into Manufacturing**

113.    Having already built JSD into a major retailer of other companies' Ghost Gun products, and having used Eagle Shows to sell to the high-demand New Jersey market, Vinroe then expanded his business.

114.    Beginning around 2018, JSD started designing and manufacturing its own Ghost Gun Products, expanding its business beyond simply being a retailer of third-party products.

115.    Having observed the Polymer80 Ghost Gun's dominance in the market for clones of Glock guns, JSD aimed to do the same for Sig Sauer designs.  According to Vinroe, the Sig

Sauer P320, an increasingly popular design known for its modularity, was "going to be the next AR15, at least for the pistol world."[34]

116.    JSD launched Vinroe's proprietary MUP-1 Frame, with its accompanying jig for making a P320 Ghost Gun clone.  Bringing these products to market, and cornering that market through a patent, positioned JSD as the dominant player in the world of unserialized Sig Sauer Ghost Gun clones.

### C.    Vinroe Purchases Eagle Shows, Giving Him Control of the Point of Sale

117.    By 2020, JSD had become the country's largest retailer of Ghost Gun Frames, and was emerging as a leading manufacturer in the Ghost Gun market.  That year saw rapid expansion of its sales to New Jersey residents and others at Eagle Gun Shows.  But then, action by the Pennsylvania Attorney General threatened to derail its business.

118.    On March 7, 2021, the Pennsylvania Attorney General announced the interdiction and arrest of two Ghost Gun trafficking networks that were sourcing their Ghost Guns from vendors at Eagle Gun Shows.

119.    Shortly thereafter, Kim Stolfer, President of Firearms Owners Against Crime, confronted Vinroe at the next Eagle Gun Show about JSD's role in providing Ghost Guns to criminals.  Vinroe refused to change his business practices.

120.    Eagle Shows' then-ownership, however, did agree to change its policy.  On March 15, 2021, the Pennsylvania Attorney General announced that Eagle Shows had agreed to halt the sale of Ghost Gun Kits and Ghost Gun Frames at its gun shows, stating:  "Ghost guns are quickly becoming the weapon of choice for criminals and fueling the gun violence epidemic.

---

[34] John Crump Live, The Patron Saint of 80s with St. Jordan Vinroe!, YouTube (Dec. 29, 2021), https://www.youtube.com/watch?v=u1NshwJ5lKM.

These DIY gun kits should be subject to the same background checks and qualifications as fully functioning firearms to prevent criminals who are not legally able to purchase or possess guns from getting their hands on these deadly, untraceable weapons."[35]

121.    Eagle Shows' agreement to stop the sale of Ghost Gun Kits and Ghost Gun Frames at its shows threatened to end JSD's access to the New Jersey market.

122.    Vinroe responded by mobilizing his customers and fan base to vigorously oppose Eagle's decision.

123.    Three days later, on March 18, 2021, Eagle Shows reversed course.  JSD would be allowed to continue selling Ghost Gun Kits, Ghost Gun Frames, and Ghost Gun Parts at Eagle Shows, as long as customers simply claimed that they could legally own a firearm and were not bringing unfinished frames to any jurisdiction where they were illegal.  Eagle Shows did not require JSD to maintain such documentation, however, nor did it even require customers to present an ID or other verification.[36]

124.    Apparently, even this minimal requirement—which would have done nothing more than take Ghost Gun customers at their word—was too restrictive for Vinroe.  It also underscored that JSD's access to the New Jersey market was vulnerable to Eagle's decisions.

---

[35]   AG Shapiro, PA Largest Gun Show Promoter Reach Agreement to Ban Sale of Ghost Gun Kits, Pennsylvania Attorney General (Mar. 15, 2021), https://www.attorneygeneral.gov/taking-action/ag-shapiro-pa-largest-gun-show-promoter-reach-agreement-to-ban-sale-of-ghost-gun-kits.

[36]   Dan Zimmerman, Sorry Josh, Eagle Arms Productions Will Allow Sales of 'Ghost Gun' Build Kits After All, The Truth About Guns (Mar. 18, 2021), https://www.thetruthaboutguns.com/sorry-josh-eagle-arms-productions-will-allow-sales-of-ghost-gun-build-kits-after-all.

125.     Thus, on or about December 17, 2021, Vinroe simply acquired Eagle Shows.[37] As one publication applaudingly described it, "if you can't beat them, then buy them."[38]

126.     In the immediate next days, Eagle Shows held a gun show less than 30 miles from Camden, New Jersey, at the Greater Philadelphia Exposition Center in Oaks, Pennsylvania.  As described by John Crump of ammoland.com:  "Not only were unfinished frame and receiver kits sold once again everywhere at the gun show, but JSD Supply hosted educational classes that helped buyers of P80s finish their [Ghost Gun] kits into fully functional firearms."[39]  The show also hosted demonstrations on 3D printing of Ghost Gun Frames.

127.     The ammoland.com story included several photographs—one of JSD's Ghost Gun Frame finishing class, and another of Vinroe posing, with a minor, holding a boxing championship-style belt with the twin insignia of Eagle Shows and JSD Supply:

---

[37]  Special Announcement, JSD Supply, Deal Town (Dec. 25, 2021), https://deal.town/jsd-supply/special-announcement-PKY8C268M.  According to the Pennsylvania Secretary of State's website, the principal address for Patriot Enterprises Worldwide LLC and JSD Supply's owner are the same.

[38]  John Crump, JSD Supply Acquires Gun Show that Was Forced to Ban Them, AmmoLand (Dec. 21, 2021), https://www.ammoland.com/2021/12/jsd-supply-acquires-gun-show-that-was-forced-to-ban-them.

[39]  Id.





**D.    JSD Supply and Eagle Shows Combine and Expand Their Ghost Gun Strategy**

128.    Vinroe's purchase of Eagle Shows presented new and important opportunities for

Eagle Shows and JSD to mutually benefit from each other's businesses.

129.    JSD served as Eagle Shows' anchor retailer, drawing in entry-fee-paying and show-boosting foot traffic with JSD's prominence and market appeal in the Ghost Gun industry.

130.    Vinroe then used his control of Eagle to position JSD booths advantageously at Eagle Gun Shows and set favorable policies for Ghost Gun product sales, marketing, and instruction.  He discontinued Eagle's limited attempts to weed out Ghost Gun product purchasers who were felons or New Jersey residents.  Affirmatively aiming at New Jersey, he also moved Eagle Gun Shows to locations closer to the New Jersey border and targeted Eagle's marketing efforts at New Jerseyans.  People who purchase an online ticket to an Eagle Gun Show—including people from New Jersey who supply their email addresses and New Jersey physical addresses—and opt to receive Eagle emails are also automatically placed on the email lists of JSD and other Vinroe-affiliated companies.

131.    Eagle's policy changes under Vinroe attracted and benefitted other Ghost Gun product vendors at Eagle Shows besides JSD.  Under Vinroe's protective umbrella, these other vendors had a Ghost-Gun-aligned host in Eagle, with its new leader Vinroe able to coordinate with them to boost overall Ghost Gun product sales at Eagle Gun Shows.  Eagle, in turn, profited from these other vendors who paid direct fees to Eagle for the ability to sell their Ghost Gun products and helped to boost overall attendance and Eagle's associated entry fees.

132.    Illustrating the blurred lines between Eagle Shows and JSD under Vinroe's leadership, Vinroe has played the role of showman for both entities at the same shows.  On behalf of Eagle Shows, he has personally manned the entrances, greeting visitors and collecting admission tickets.  When speaking on Eagle Shows' behalf in interviews, he has worn JSD Supply t-shirts.  And he has aggressively promoted and sold JSD's products to customers, including Ghost Gun products sold to New Jersey residents.

37

133.    On Christmas Eve 2021, Vinroe celebrated the mutual benefits of the JSD-Eagle

union.  He wrote to JSD's email list—the size of which, upon information and belief,

dramatically expanded by incorporating Eagle's mailing list:

> As of December 17, 2021, Jordan Vinroe (Owner of JSD Supply) has acquired Eagle Shows gun show promotion in Pennsylvania. We are excited to be able to expand our business within the firearms industry.  Eagle Shows is the premiere gun show promoter in PA. Our grand opening weekend at the Oaks Pa show on December 17-19 resulted in record breaking attendance!  We will continue to bring you some of the biggest and best shows in the country.  We have already added 2 new shows to the line up and are anticipating a huge year for 2022.  Thank you for all of your support over the years!
>
> - Jordan Vinroe

134.    In March 2022, NBC News reported on the sales practices at Eagle Gun Shows

under Vinroe's ownership.[40]  NBC's report included video of a hidden-camera purchase of a

Polymer80 Ghost Gun Kit from a JSD table at an Eagle Gun Show in Oaks, Pennsylvania.  In the

video, the purchaser asked whether he needed to present identification or undergo a background

check.  The JSD worker responded no; all that was needed was money.  The purchase was then

made in cash.

135.    Discussing the Ghost Gun finishing and assembly process, the worker said that

the kit "comes with the drill bits" and explained "you just drill in three holes on each side" using

the jig and "cut these tabs off."  He added:  "there's tons and tons of videos online."

136.    Interviewed by NBC, Vinroe acknowledged that criminals would use his products

to quickly assemble Ghost Guns to commit crimes, yet still defended his sale of Ghost Gun Kits

for cash without background checks.  Asked directly whether he "bears responsibility" for

"handing [criminals] a piece that they could build in half an hour and turn into a gun," Vinroe

---

[40]  NBC News, Top Story with Tom Llamas - March 17, YouTube (Mar. 17, 2022), https://youtube.com/watch?v=-BUlEk8xwqw.

said: "I'm not a criminal . . . you can get keys and a pack of Budweiser and drunk drive and kill somebody too." Vinroe characterized his sales of Ghost Gun Kits as "like buying a lawn chair at WalMart—you can buy a lawn chair just for cash."

## IV.    Defendants Specifically Target Their Business to New Jersey

### A.    Defendants' Knowledge of New Jersey Law and Specific Targeting of the New Jersey Ghost Gun Market

137.    Defendants have publicly discussed New Jersey's criminal prohibitions against Ghost Guns, Ghost Gun Kits, and Ghost Gun Frames, confirming their understanding of those laws.  In one example, a primer posted to the Eagle Shows website in April 2022 explained that, in New Jersey, "[h]omemade firearms, like those assembled from the much demonized 80% lower, are illegal, as are the unmilled receiver blocks themselves."[41]

138.    The introduction to that same article says that "so many visitors" to Eagle Gun Shows "split[] their time between the Keystone state and our Eastern neighbor" (on a page titled, "Gun License in New Jersey – How to Buy in PA.").[42]

139.    Despite their demonstrated knowledge of New Jersey's prohibitions, and of their large New Jersey customer base, Defendants have continued to sell Ghost Gun Kits, Ghost Gun Frames, and other Ghost Gun Parts targeted at New Jersey residents.

140.    Defendants disregard rudimentary measures to exclude prospective New Jersey buyers of Ghost Gun Kits, Ghost Gun Frames, or parts bundles designed and promoted to make a Ghost Gun when combined with a 3D-printed Ghost Gun Frame.  Defendants likewise fail to

---

[41]  Gun License in New Jersey – How to Buy in PA, Eagle Shows (Apr. 28, 2022), https://eagleshows.com/gun-license-in-new-jersey-how-to-buy-in-pa.

[42]  Ibid.

implement basic safeguards to prevent the sale of any Ghost Gun Parts to New Jersey straw

purchasers,[43] firearms traffickers, or felons or other persons prohibited from possessing firearms.

141.   Defendants, for example, at Eagle Gun Shows:

- Do not require salespersons to ask purchasers about their state of residence;

- Do not require purchasers of Ghost Gun Kits, Ghost Gun Frames, or Ghost Gun Parts to display state identification;

- Do not subject purchasers of Ghost Gun Kits, Ghost Gun Frames, or Ghost Gun Parts to any verification process to ensure that they are legally allowed to own or possess a firearm in New Jersey, or have not been found to present a danger in possessing a firearm in New Jersey;

- Do not post clear signage warning New Jersey residents that Ghost Gun Kits and Ghost Gun Frames to make Ghost Guns—as well as completed Ghost Guns—are illegal under New Jersey law and could subject them to criminal penalties;

- Do not require their employees to refuse a sale to a purchaser who appears to be from New Jersey; and

- Routinely accept cash, leaving no paper trail for the transaction.

142.   To the contrary, Defendants purposefully solicit and target New Jersey buyers,

whom Vinroe has expressly recognized as a particularly eager and lucrative customer base for

his wares: "What's really good is when you get closer to places that are very restrictive, so a

New Jersey, New York, Connecticut, Washington State. Anywhere where their gun laws are

very strict, is where you see people wanting products the most."[44]

143.   Accordingly, Eagle has largely concentrated its shows in the eastern part of

Pennsylvania where they are accessible to New Jersey customers. Vinroe, since becoming

Eagle's owner, has only increased that overall eastward orientation, despite the fact that he and

---

[43]  The term "straw purchase" commonly refers to a situation where a person who can pass a background check purchases a firearm for someone who cannot, or for a person who does not otherwise want to be associated with the transaction.

[44]  Is It Local Interview, at 15:06.

his businesses are based close to the Ohio border in western Pennsylvania.  In the map below, the yellow pins are locations of Eagle Gun Shows since 2018 identifiable through public sources; the red star represents the area where Defendants, and Vinroe, are based:



144.    Not only do Defendants systematically operate gun shows close to the New Jersey border, they also actively advertise in New Jersey to attract New Jersey residents to those shows. Defendants have arranged, for example, to post billboard advertisements at milepost 70.2 on the New Jersey Turnpike in Cranbury, New Jersey, displaying the date and location of upcoming Eagle Gun Shows.  See ¶ 36, supra.

**B.      Ghost Gun Products Sold by Defendants to New Jerseyans Are Ubiquitous in New Jersey**

145.    Material numbers of New Jersey buyers have indeed been purchasing Defendants' Ghost Gun Kits, Ghost Gun Frames, and Ghost Gun Parts at Eagle Gun Shows, and promptly taking those products back to New Jersey.  Numerous New Jerseyans have been observed by law enforcement doing precisely that, and have been prosecuted accordingly.

146.     But the true magnitude of the influx of Defendants' Ghost Gun products into New Jersey cannot be known with certainty because the products, by design, are untraceable. Defendants further avoid traceability by conducting a large portion of their sales in cash.

147.     Nevertheless, police work by New Jersey law enforcement confirms Defendants' years-long pattern and practice of putting Ghost Guns into the hands of New Jerseyans.  The associated criminal activity detailed below illustrates how Defendants' sale of Ghost Gun products to New Jerseyans—without reasonable controls—directly threatens public safety in New Jersey.

1.     **New Jersey Residents Arrested for Unlawful Possession of Defendants' Ghost Gun Products**

148.     New Jersey law enforcement authorities have arrested numerous individuals returning to New Jersey from Eagle Gun Shows with Ghost Gun Kits, Ghost Gun Frames, and/or Ghost Gun Parts.  Most of these individuals were New Jersey residents who traveled to an Eagle Gun Show in a car with New Jersey license plates.  On information and belief, many (if not all) of them made or participated in a purchase while carrying New Jersey–issued identification, including in a visible manner.  Yet JSD or another Eagle vendor still sold these persons multiple Ghost Gun Kits—a telltale indicator of a purchaser's intent to traffic.  In several cases, Defendants' purchasers or purchasers' co-conspirators had prior criminal records that disqualified them from gun purchase or possession.

149.     These arrests occurred after the March 2021 announcement by the Pennsylvania Attorney General that vendors at Eagle Gun Shows (such as JSD Supply) had sold numerous Ghost Gun Kits to two separate Pennsylvania gun trafficking networks.  They include many arrests made after Vinroe's December 2021 acquisition of Eagle.

150.    Certain details about the events giving rise to such arrests are now public, and include the following:

a.    In September 2021, two North Jersey residents were arrested crossing back into New Jersey after going to JSD's table at Eagle's Allentown gun show. The items seized during those arrests included:

- o  Thirteen Polymer80 Ghost Gun Frames
- o  Two JSD jigs
- o  Additional Ghost Gun Parts to complete working firearms
- o  Sixteen illegal large capacity magazines, for handguns and assault rifles
- o  An AR-15-style Ghost Gun assault weapon made from Ghost Gun Parts purchased at a prior gun show (found during a search of one of their homes, after the arrest at the border)[45]

b.    In February 2022, three Camden, New Jersey residents went to a JSD table at an Eagle Gun Show in Oaks, PA, and purchased two bags' worth of Polymer80 Ghost Gun Frames and finishing kits.  Law enforcement searched their house and recovered:

- o  Two finished Ghost Guns
- o  Numerous additional Ghost Gun Parts and Ghost Gun manufacturing tools

Prosecutors charged each defendant with seven violations of 2C:39-9(k).  Law enforcement also identified a co-conspirator who had a prior conviction for child endangerment and thus was disqualified from purchasing or possessing a firearm.[46]

c.    In February 2022, a pair of Camden, New Jersey residents purchased at least seven Polymer80 Ghost Gun Kits from JSD at another Eagle Gun Show. One had a history of felony weapons possession. Law enforcement conducted a search and found the kits, plus:

- o  Two additional handguns
- o  Large capacity magazines[47]

d.    In March 2022, a Cherry Hill, New Jersey resident with a prior felony conviction attended an Eagle Gun Show in Allentown and walked out with:

- o  Five Polymer80 Ghost Gun Kits
- o  Associated parts to complete Ghost Guns
- o  Six 21-round large capacity magazines for a 9mm handgun

---

[45]  See New Jersey v. Pillus, Case No. MRS-21-001361.

[46]  See New Jersey v. DeJesus, Case No. CAM-22-000891.

[47]  See New Jersey v. Dupree, Case No. CAM-22-000837.

According to investigators, the man "stated that he observed a billboard advertising the Allentown Gun Show which peaked [sic] his interest;" "stat[ed] he didn't know he wasn't able to purchase the items, especially since they let him purchase it;" and "figured if it was illegal to purchase, they would ask him for identification or something, but they didn't ask him for nothing so he thought it was okay to buy."[48]

e.    In July 2022, two Trenton, New Jersey residents attended an Eagle Gun Show in Trevose, Pennsylvania, approximately nine miles from the New Jersey border.  They returned to Trenton with:

- o  Five Polymer80 Ghost Gun Kits
- o  Large capacity magazines
- o  Additional Ghost Gun Parts[49]

151.    Detailed information about more recent arrests is generally not public. Nevertheless, New Jersey law enforcement has arrested numerous persons since July 2022 returning to New Jersey with Ghost Gun Kits, Ghost Gun Frames, and Ghost Gun Parts from Eagle Gun Shows, including as recently as June 2023.[50]

### 2.    Other JSD Ghost Guns Are Recovered in New Jersey

152.    Law enforcement in New Jersey has also recovered and identified multiple Ghost Guns in New Jersey that appear to have JSD Ghost Gun Frames.  For example, in December 2019, a Sig Sauer style Ghost Gun was recovered from a Camden County drug dealer who used the gun to threaten his girlfriend, resulting in a domestic violence restraining order.[51]  Upon information and belief, JSD is the only manufacturer that has made unfinished clones of Sig Sauer handgun frames for sale to purchasers.

153.    Investigations conducted by other jurisdictions into Defendants' activities have revealed still further New Jersey sales.  The City of Philadelphia recently reported in litigation it

---

[48]  See New Jersey v. Rivera, Case No. CAM-22-001662.

[49]  See New Jersey v. Oliver, Case No. MER-22-002437.

[50]  See New Jersey v. Devine, Case No. MER-23-002011.

[51]  See New Jersey v. Smith, Case No. CAM-19-008659.

filed against JSD (as well as Polymer80):  "[W]hen investigators attended the Eagle Show in Oaks, Pennsylvania . . . they observed several buyers of [Ghost Gun Kits] with New Jersey IDs in their wallets."[52]

154.    Upon information and belief, the foregoing examples represent only a small fraction of Defendants' overall contribution of untraceable Ghost Guns to the Ghost Gun public nuisance in New Jersey.  Defendants are, upon information and belief, among the largest, if not the largest, purveyors to New Jersey residents of Ghost Gun products.

## V.    Defendants' Unlawful Conduct Contributes to a Public Nuisance in New Jersey

### A.    Ghost Guns Account for a Disproportionate, and Growing, Share of Crime Guns in New Jersey

155.    In 2022, <u>428</u> Ghost Guns were recovered from New Jersey crime scenes by New Jersey law enforcement authorities.  That was <u>four times</u> the number of Ghost Guns recovered in 2020, whereas overall firearms recoveries remained stable.

156.    There is good reason to believe these numbers significantly understate the percentage of crimes in which Ghost Guns were used because the Ghost Guns were thereafter not found or not correctly classified as Ghost Guns.[53]

157.    Ghost Guns already represent at least an <u>8 percent</u> (and growing) share of the recovered crime guns in New Jersey.  Considering that the quantity of serialized firearms had been growing in New Jersey for decades before Ghost Guns first came onto the scene in 2015,

---

[52]  Complaint ¶ 150, <u>City of Philadelphia v. Polymer80</u>, No. 230700362 (Phila. Ct. Com. Pl. July 5, 2023).

[53]  For example, Ghost Guns are often assembled incorporating parts that correspond to registered firearms.  As a result, those firearms may be misidentified as the serialized firearms from which such parts came, when they are in reality Ghost Guns that should have been included in the above tally.

and that, unlike serialized firearms, Ghost Guns are categorically illegal to possess in New Jersey, this 8 percent is a disproportionately high figure.

158.    The increasing proliferation of Ghost Gun involvement in criminal activity is not unique to New Jersey.  The federal Bureau of Alcohol, Tobacco, Firearms, and Explosives has reported that, from January 1, 2016 through December 31, 2021, law enforcement agencies in the United States recovered more than 45,000 suspected Ghost Guns from crime scenes, with the rate of recovery of Ghost Guns rapidly increasing:[54]



**B.      The Harms and Costs of Ghost Gun Violence**

**1.      Victims and Their Families**

159.    The most obvious harm from Ghost Gun violence is felt by its direct victims.  In 2021, for example, there were 276 gun-related homicides in New Jersey.[55]  In the same year, the

---

[54]  27 C.F.R. §§ 447–449 (2022).

[55]  WISQARS Fatal and Nonfatal Injury Reports, Ctrs. for Disease Control & Prevention, https://wisqars.cdc.gov/reports/?o=MORT&y1=2021&y2=2021&t=0&d=&i=3&m=20890&g=3 4&me=0&s=0&r=0&ry=0&e=0&yp=65&a=ALL&g1=0&g2=199&a1=0&a2=199&r1=INTEN T&r2=NONE&r3=NONE&r4=NONE (last visited Dec. 10, 2023).

number of non-fatal criminal shooting victims was several times greater.  As noted above, as of 2022, at least 8 percent of recovered crime guns are Ghost Guns.

160.     The mental health impacts on direct victims are also severe.  According to a study conducted by the University of Pennsylvania's Perelman School of Medicine, of 2629 shooting incidents surveyed, 31 percent involved one or more corresponding mental health–related emergency department visits in the 60 days following the shooting.[56]

### 2.     Family and Community Impacts

161.     Gun violence likewise impacts, profoundly, the families of victims, including mothers and fathers who have lost children to gun violence or children who have lost a parent to gun violence.

162.     Anyone who is present during gun violence faces risks to their own mental health. David Hemenway, Director of the Harvard Injury Control Research Center, explains that exposure to gun violence "increases the risk for psychiatric, emotional, behavioral, and health problems," including post-traumatic stress disorder, depression, anxiety, withdrawal, lowered academic performance, substance abuse, and delinquency.  Witnessing or being a direct victim of an act of gun violence also increases the risk that an individual will themselves become a perpetrator of violence.[57]

163.     As gun violence rises, feelings of lost safety pervade and impact communities; parents keep children closer to home; and businesses erect more safety measures, which can lead

---

[56]  Natasha Brown, How Gun Violence Is Impacting Mental Health of Philadelphia's Youth, CBS News Philadelphia (Feb. 27, 2023, 5:52 p.m.), https://www.cbsnews.com/philadelphia/news/philadelphia-gunviolence-teen-mental-health-nami.

[57]  Jeffrey B. Bingenheimer et al., Firearm Violence, Exposure and Serious Violent Behavior, 308 Science 1323 (2005).

to alienation within a community.  "The result may be blighted neighborhoods, playgrounds

abandoned to gang members, and business districts that close down at sunset."[58]

### 3.    Economic Costs

164.    In 2022, the National Institute for Criminal Justice Reform ("NICJR") set out to

measure the taxpayer cost of gun violence, specifically in the City of Newark.  NICJR estimated

that each homicide shooting costs taxpayers $2,188,700, and each non-fatal shooting costs

taxpayers $1,007,077.

165.    NICJR took into account six categories of costs:  crime scene response, hospital

and rehabilitation, criminal justice, incarceration, victim support (such as burial expenses)

through the New Jersey Victim of Crime Compensation Office, and lost tax revenue.

166.    Other substantial costs from gun violence include the strain on hospital systems,

out-of-pocket medical expenses, heightened insurance premiums, and the cost of additional law

enforcement resources to deter, interdict, and mitigate crime.

167.    Defendants—one of which claims to be the nation's largest retailer of Ghost Gun

Frames while the other holds some of the biggest gun shows in the country, and both of which

deliberately concentrate their businesses along the New Jersey border to attract New Jersey

residents—are responsible for a substantial share of these costs and for fueling the ongoing

public nuisance in New Jersey.

---

[58]  Philip J. Cook & Jens Ludwig, Gun Violence: The Real Costs 94 (2000).

## CAUSES OF ACTION

### Count One

**(Contribution to Public Nuisance by Conduct Unlawful in Itself)**
**(Public Law 2022, c. 56, N.J.S.A. 2C:58-35(a)(1))**

168.    The Attorney General repeats and realleges the foregoing allegations as if set forth in their entirety herein.

169.    The Attorney General brings this count pursuant to N.J.S.A. 2C:58-35.

170.    Under Section 58-35(a)(1), "[a] gun industry member shall not, by conduct [] unlawful in itself . . . , knowingly or recklessly create, maintain, or contribute to a public nuisance in this State through the sale, manufacturing, distribution, importing, or marketing of a gun-related product."

171.    A "'[g]un industry member' means a person engaged in the sale, manufacturing, distribution, importing, or marketing of a gun-related product, and any officer, agent, employee, or other person authorized to act on behalf of that person or who acts in active concert or participation with one or more such persons." N.J.S.A. 2C:58-34. A "'[p]erson' means any natural person, firm, corporation, company, partnership, society, joint stock company, or any other entity or association." Ibid.

172.    Defendants—who are a retailer and a gun show operator each engaged in and participating in the sale and marketing of gun-related products—are gun industry members within the meaning of Sections 58-34 and 58-35.

173.    "'Gun-related product' means any firearm, ammunition, ammunition magazine, firearm component or part including, but not limited to, a firearm frame and a firearm receiver, or firearm accessory . . . which product was possessed in this State and as to which it was

49

reasonably foreseeable that the product would be possessed or used in this State."

N.J.S.A. 2C:58-34.

174.    Ghost Gun Kits, Ghost Gun Frames, and other Ghost Gun Parts sold by or through Defendants to New Jersey purchasers are gun-related products within the meaning of Sections 58-34 and 58-35.

175.    Defendants' conduct has been "unlawful in itself."  Defendants have knowingly agreed to aid (and have aided) New Jersey residents' illegal possession of Ghost Guns, and Ghost Gun Kits and Ghost Gun Frames to make Ghost Guns.  Defendants have knowingly agreed to solicit (and have solicited) New Jersey residents' illegal possession of Ghost Guns and/or Ghost Gun Kits and Ghost Gun Frames to make Ghost Guns.  They have done so with the purpose of promoting or facilitating New Jersey residents' illegal possession of Ghost Guns, as well as of Ghost Gun Kits and Ghost Gun Frames to make Ghost Guns.

176.    Defendants' conduct aids, facilitates, promotes, solicits, and participates in violations of N.J.S.A. 2C:39-3(n), 2C:39-9(k), and 2C:39-9(n), and is itself in violation of these provisions.  See N.J.S.A. 2C:2-6.

177.    Defendants' conduct is also unlawful in itself in that Defendants have knowingly agreed to aid (and have aided) and knowingly agreed to solicit (and have solicited) New Jersey residents' illegal possession of Large Capacity Magazines.  Defendants have done so with the purpose of promoting or facilitating such illegal possession.  See N.J.S.A. 2C:39-3(j), 2C:2-6.

178.    Defendants' unlawful conduct consists of knowing acts or omissions that constitute knowing violations of N.J.S.A. 2C:58-35(a)(1), 2C:39-3(n), 2C:39-9(k), 2C:39-9(n), and 2C:39-3(j).

179.    Defendants' unlawful conduct in their selling, distributing, manufacturing, and/or marketing of Ghost Gun Kits, Ghost Gun Frames, and other Ghost Gun Parts has knowingly or recklessly created, maintained, or contributed to a public nuisance within the meaning of Section 58-35(a)(1).  "'Public nuisance' means any condition which injures, endangers, or threatens to injure or endanger or contributes to the injury or endangerment of the health, safety, peace, comfort, or convenience of others or which otherwise constitutes a public nuisance under common law."  N.J.S.A. 2C:58-34.

180.    Ghost Guns have increasingly proliferated in New Jersey, including among persons prohibited from purchasing or possessing a firearm on the basis of a prior felony or other disqualifier, or who hope to avoid or impede law enforcement.

181.    This condition injures and endangers the health, safety, peace, comfort, and convenience of New Jersey residents; threatens to injure and endanger the health, safety, peace, comfort, and convenience of New Jersey residents; and contributes to the injury and endangerment of the health, safety, peace, comfort, and convenience of New Jersey residents. Defendants have created, maintained, and/or contributed to this condition, and they have done so knowingly or recklessly.

182.    Defendants' violation of Section 58-35(a) entitles the Attorney General to "an injunction prohibiting [Defendants] from continuing that conduct or engaging therein or doing any acts in furtherance thereof."  N.J.S.A. 2C:58-35(b).  Such injunctive relief is necessary here to prevent further, continuing, and irreparable injury.

183.    The Attorney General is likewise entitled to an order providing for abatement of the nuisance(s) at Defendants' expense.

184.     The Attorney General is further entitled to recover damages, reasonable attorneys' fees, filing fees, reasonable costs of suit, and any other appropriate relief.  See N.J.S.A. 2C:58-35(b).

185.     Defendants' unlawful actions and/or omissions were undertaken with actual malice or accompanied by wanton and willful disregard of persons who foreseeably might be harmed by those actions or omissions, within the meaning of the Punitive Damages Act, N.J.S.A. 2A:15-5.12.  Defendants are therefore liable for punitive damages.

## Count Two

### (Contribution to Public Nuisance by Conduct Unreasonable Under the Circumstances) (Public Law 2022, c. 56, N.J.S.A. 2C:58-35(a)(1))

186.     The Attorney General repeats and realleges the foregoing allegations as if set forth in their entirety herein.

187.     The Attorney General brings this count pursuant to N.J.S.A. 2C:58-35(a)(1).

188.     Under Section 58-35(a)(1), "[a] gun industry member shall not, by conduct . . . unreasonable under all the circumstances, knowingly or recklessly create, maintain, or contribute to a public nuisance in this State through the sale, manufacturing, distribution, importing, or marketing of a gun-related product."

189.     Defendants' conduct in their selling, distributing, manufacturing and/or marketing of Ghost Gun Kits, Ghost Gun Frames, and other Ghost Gun Parts, or in facilitating the same, is unreasonable under all the circumstances.  See N.J.S.A. 2C:58-35(a)(1).

190.     Defendants' unreasonable conduct consists of knowing acts or omissions that constitute knowing violations of N.J.S.A. 2C:58-35(a)(1), 2C:39-3(n), 2C:39-9(k), 2C:39-9(n), and/or 2C:39-3(j).

191.    Defendants' conduct in their selling, distributing, manufacturing, and/or marketing of Ghost Gun Kits, Ghost Gun Frames, and other Ghost Gun Parts, or facilitating the foregoing, has knowingly and/or recklessly created, maintained, or contributed to a public nuisance in New Jersey, within the meaning of Section 58-35(a)(1).  "'Public nuisance' means any condition which injures, endangers, or threatens to injure or endanger or contributes to the injury or endangerment of the health, safety, peace, comfort, or convenience of others or which otherwise constitutes a public nuisance under common law."  See N.J.S.A. 2C:58-34.

192.    As a result of Defendants' actions, New Jersey has expended additional resources to deter, interdict, and mitigate crime effectuated or compounded by Ghost Guns.  Specifically, and among other things, New Jersey has incurred damages in the form of additional compensation to law enforcement officials, the hiring of additional law enforcement officials, increased crime lab and ballistics costs, and other costs to enforce the laws Defendants have undermined, as well as increased public health costs, mental health costs, educational costs, business loss, and other costs to the State resulting from Ghost Gun violence and the threat thereof, and of other Ghost Gun–adjacent crime and the threat thereof.

193.    Defendants' conduct in violation of Section 58-35(a) entitles the Attorney General to "an injunction prohibiting [Defendants] from continuing that conduct or engaging therein or doing any acts in furtherance thereof."  See N.J.S.A. 2C:58-35(b).  Such injunctive relief is necessary here to prevent further, continuing, and irreparable injury.

194.    The Attorney General is likewise entitled to an order providing for abatement of the nuisance(s) at Defendants' expense.

195.    The Attorney General is further entitled to recover damages, reasonable attorneys'
fees, filing fees, reasonable costs of suit, and any other appropriate relief.  See N.J.S.A. 2C:58-35(b).

196.    Defendants' unreasonable actions and/or omissions were undertaken with actual
malice or accompanied by wanton and willful disregard of persons who foreseeably might be
harmed by those actions or omissions, within the meaning of the Punitive Damages Act, N.J.S.A.
2A:15-5.12.  Defendants are therefore liable for punitive damages.

### Count Three

#### (Failure to Establish, Implement, and Enforce Reasonable Controls)
#### (Public Law 2022, c. 56, N.J.S.A. 2C:58-35(a)(2))

197.    The Attorney General repeats and realleges the foregoing allegations as if set
forth in their entirety herein.

198.    The Attorney General brings this count pursuant to N.J.S.A. 2C:58-35(a)(2).

199.    Under Section 58-35(a)(2), "a gun industry member shall establish, implement,
and enforce reasonable controls regarding its manufacture, sale, distribution, importing, and
marketing of gun-related products."

200.    "Reasonable controls" means "reasonable procedures, safeguards, and business
practices that are designed to," inter alia:

> (1) prevent the sale or distribution of a gun-related product to a straw
> purchaser, a firearm trafficker, a person prohibited from possessing
> a firearm under State or federal law, or a person who the gun
> industry member has reasonable cause to believe is at substantial
> risk of using a gun-related product to harm themselves or unlawfully
> harm another or of unlawfully possessing or using a gun-related
> product;
> …
> (3) ensure that a gun industry member complies with all provisions
> of State and federal law and does not otherwise promote the

54

unlawful sale, manufacture, distribution, importing, marketing, possession, or use of a gun-related product."

[See N.J.S.A. 2C:58-34.]

201.   Defendants have failed to "establish, implement, and enforce reasonable controls regarding [their] manufacture, sale, distribution, . . . and marketing" of Ghost Gun Kits, Ghost Gun Frames, and other Ghost Gun Parts in at least three respects:

     a.    First, Defendants lack "reasonable procedures, safeguards, and business practices that are designed to . . . prevent the sale or distribution of a gun-related product to a straw purchaser, a person prohibited from possessing a firearm under State [] law, or a person who the gun industry member has reasonable cause to believe is at substantial risk of using a gun-related product to harm themselves or unlawfully harm another or of unlawfully possessing or using a gun-related product."

     b.    Second, Defendants lack "reasonable procedures, safeguards, and business practices that are designed to . . . ensure they comply with all provisions of State [] law[.]"

     c.    Third, Defendants lack "reasonable procedures, safeguards, and business practices that are designed to . . . ensure that [they] . . . do[] not otherwise promote the unlawful sale, manufacture, distribution, [] marketing, possession, and use of a gun-related product."

202.   Defendants' failures to establish, implement, and enforce reasonable controls arise from knowing acts or omissions that constitute knowing violations of N.J.S.A. 2C:58-35(a)(2), 2C:39-3(n), 2C:39-9(k), 2C:39-9(n), and 2C:39-3(j).

203.   Defendants' conduct in violation of Section 58-35(a) entitles the Attorney General to "an injunction prohibiting [Defendants] from continuing that conduct or engaging therein or

doing any acts in furtherance thereof." See N.J.S.A. 2C:58-35(b).  Such injunctive relief is necessary here to prevent further, continuing, and irreparable injury.

204.    The Attorney General is likewise entitled to an order providing for abatement of the nuisance(s) at Defendants' expense.

205.    The Attorney General is further entitled to recover damages, reasonable attorneys' fees, filing fees, reasonable costs of suit, and any other appropriate relief.  See N.J.S.A. 2C:58-35(b).

206.    Defendants' actions and/or omissions in violation of Section 58-35(a)(2) were undertaken with actual malice or accompanied by wanton and willful disregard of persons who foreseeably might be harmed by those actions or omissions, within the meaning of the Punitive Damages Act, N.J.S.A. 2A:15-5.12.  Defendants are therefore liable for punitive damages.

## Count Four

### (Common Law Public Nuisance)

207.    The Attorney General repeats and realleges the foregoing allegations as if set forth in their entirety herein.

208.    The Ghost Gun Kits, Ghost Gun Frames, and other Ghost Gun Parts sold by Defendant JSD Supply or sold at shows operated by Defendant Eagle Shows to New Jersey purchasers are designed to be made and assembled into completed Ghost Guns.  Defendants know this when they sell, distribute, market, and promote Ghost Gun Kits, Ghost Gun Frames, and other Ghost Gun Parts, or facilitate the foregoing.

209.    The sale, distribution, marketing, and promotion of Ghost Gun Kits, Ghost Gun Frames, and other Ghost Gun Parts attract buyers who:  (a) are prohibited from purchasing or possessing a firearm under New Jersey law, including on the basis of a prior felony or other dangerousness that disqualifies them from gun ownership; (b) hope to avoid or impede law

enforcement investigation of guns, gun violence, or gun crime by using untraceable firearms; and/or (c) intend to traffic, sell, or similarly distribute Ghost Guns, Ghost Gun Kits, Ghost Gun Frames, and other Ghost Gun Parts to persons who meet the description of (a) or (b). Defendants know this.

210.    Defendants have failed to take meaningful steps to avoid selling Ghost Gun Kits, Ghost Gun Frames, and other Ghost Gun Parts to such purchasers, or to avoid facilitating the foregoing. To the contrary, Defendants have endeavored to remove barriers to such sales.

211.    New Jersey has, for years, banned the possession of Ghost Guns and of Ghost Gun Kits and Ghost Gun Frames to make Ghost Guns. N.J.S.A. 2C:39:3(n), 2C:39-9(k), 2C:39-9(n). Defendants know this.

212.    New Jersey prohibits persons who are subject to various statutory disqualifications from possessing any firearm. These include persons who, for example, have prior felonies, are minors, or have been determined to pose a risk to themselves or others. Defendants know this.

213.    New Jersey prohibits persons from purchasing a handgun without acquiring a handgun purchase permit or Firearms Identification Card ("FID"), and New Jersey subjects the availability of the FID to background checks in order to screen out persons who are statutorily disqualified from possessing a firearm. Defendants know this.

214.    Defendants understand New Jersey's Ghost Gun and other firearms laws to be more "restrictive" than those of Pennsylvania. Yet Defendants have failed to take reasonable measures to prevent or avoid the sale of Ghost Gun Kits, Ghost Gun Frames, and other Ghost Gun Parts to New Jersey residents or to others whom they have reason to know would likely be possessing, assembling, and/or using them in New Jersey.

215.     Rather, Defendants treat the differences between Pennsylvania law and New Jersey law as a business opportunity, and specifically target New Jersey customers for such transactions.

216.     Defendants have sold, or facilitated the sale of, Ghost Gun Kits, Ghost Gun Frames, and other Ghost Gun Parts to New Jersey residents at Eagle Gun Shows near the New Jersey border while knowing that:  (a) such items were likely to be brought into the State of New Jersey in violation of New Jersey laws, including N.J.S.A. 2C:39-9(k); (b) many such items would be assembled into or used to assemble a completed Ghost Gun that would be possessed in or transported into New Jersey in violation of N.J.S.A. 2C:39-3(n) and/or N.J.S.A. 2C:39-9(n); and (c) Ghost Guns, Ghost Gun Kits, Ghost Gun Frames, and other Ghost Gun Parts are particularly attractive to persons who are prohibited from purchasing or possessing a firearm on the basis of a prior felony or other dangerousness that disqualifies them from gun ownership, or who hope to avoid or impede law enforcement investigations of criminal activity by using untraceable firearms.

217.     New Jersey residents (and others) have purchased Ghost Gun Kits, Ghost Gun Frames, and other Ghost Gun Parts from Defendant JSD or at gun shows run by Defendant Eagle Shows and unlawfully brought such items into New Jersey.  A material number of those individuals have then unlawfully resold or distributed such items, or used such items to assemble Ghost Guns for their own unlawful possession or to unlawfully sell or distribute Ghost Guns. All of this was reasonably foreseeable by Defendants.

218.     Defendants' sale of Ghost Gun Kits, Ghost Gun Frames, and other Ghost Gun Parts has contributed and contributes to gun violence and crime in New Jersey.  This is because, among other things, Defendants:  (a) sold or sell, or facilitated or facilitate the sale of, Ghost Gun

Kits, Ghost Gun Frames, and other Ghost Gun Parts to individuals ineligible to purchase or possess a gun under New Jersey law as a matter of public safety, such as felons; (b) sold or sell, or facilitated or facilitate the sale of, Ghost Gun Kits, Ghost Gun Frames, and other Ghost Gun Parts to individuals who then distribute such products or finished Ghost Guns to persons who are ineligible for gun possession in New Jersey; (c) sold or sell, or facilitated or facilitate the sale of, Ghost Gun Kits, Ghost Gun Frames, and other Ghost Gun Parts to individuals who may be eligible to be licensed for gun ownership or purchase, but seek an unlicensed and illegal gun to avoid or impede law enforcement investigation of gun violence or criminal activity by using untraceable firearms; and (d) sold or sell, or facilitated or facilitate the sale of, Ghost Gun Kits, Ghost Gun Frames, and Ghost Gun Parts which, if used by anyone in the context of a crime or other incident, could not be traced by law enforcement, thus thwarting New Jersey's regulatory scheme designed to protect public health and safety.

219.    Defendants' sale, or facilitation of the sale, of Ghost Gun Kits, Ghost Gun Frames, and other Ghost Gun Parts unreasonably interferes with the right, common to the people of New Jersey, to be free of the dangers posed by Ghost Guns.  Defendants' actions significantly interfere with the public health, the public safety, the public peace, the public comfort, and the public convenience of New Jersey residents.

220.    Defendants know or have reason to know that their conduct has a significant effect on the right of New Jersey residents to be free of the dangers posed by Ghost Guns.

221.    Defendants' conduct at issue is proscribed by New Jersey state law banning New Jersey residents from possessing Ghost Guns, Ghost Gun Kits, and Ghost Gun Frames. Defendants know that such possession is illegal in New Jersey, yet have knowingly contributed to, and aided and abetted, such criminal activity by selling, and/or facilitating the sale of, Ghost

59

Gun Kits, Ghost Gun Frames, and other Ghost Gun Parts to New Jersey residents and others they have reason to know are likely to enter New Jersey.

222.    Since July 2022, New Jersey has required gun industry members to establish, implement, and enforce reasonable controls regarding their manufacture, sale, distribution, and marketing of all gun-related products, which Defendants have failed to do.

223.    Defendants' conduct is of a continuing nature and has produced a permanent or long-lasting effect, which includes increased violence, injury, legitimate fear of violence, and inability to enjoy public peace, comfort, and convenience, suffered on the part of New Jersey residents.

224.    Defendants' conduct at issue consists of knowing acts or omissions that constitute knowing violations of N.J.S.A. 2C:58-35(a)(1), 2C:39-3(n), 2C:39-9(k), 2C:39-9(n), and 2C:39-3(j).

225.    The Attorney General has the legal right to remedy a public nuisance by virtue of his police power.  This includes seeking relief to cease and abate that nuisance and/or fund the cost of abatement.

226.    Injunctive relief is necessary to prevent continuing injury.  These injuries, including increased violence and the legitimate fear of violence, are irreparable and cannot be remedied by monetary relief alone.

## Count Five

### (Negligence)

227.    The Attorney General repeats and realleges the foregoing allegations as if set forth in their entirety herein.

228.    At all relevant times, Defendants knew or should have known that the Ghost Gun Kits, Ghost Gun Frames, and other Ghost Gun Parts to make Ghost Guns sold by Defendant JSD

Supply and/or sold at shows operated by Defendant Eagle Shows were being sold to New Jersey residents, or to others likely to take such items to New Jersey, where many would sell them or completed Ghost Guns to secondary purchasers based in New Jersey.

229.    At all relevant times, Defendants owed the State of New Jersey and its residents a duty to exercise reasonable care and not expose others to foreseeable risks of injury.

230.    Defendants knew or should have known that their Ghost Gun Kits, Ghost Gun Frames, and other Ghost Gun Parts to make Ghost Guns attract buyers who:  (a) are prohibited from purchasing or possessing a firearm, including on the basis of a prior felony or other dangerousness that disqualifies them from gun ownership; (b) hope to avoid or impede law enforcement investigation of guns, gun violence, or gun crime by using untraceable firearms; and/or (c) intend to traffic, sell, or similarly distribute Ghost Guns, Ghost Gun Kits, Ghost Gun Frames, and other Ghost Gun Parts to persons who meet the description of (a) or (b) above.

231.    Defendants knew or should have known that such persons are likely to use those Ghost Gun Kits, Ghost Gun Frames, and other Ghost Gun Parts to make Ghost Guns in a manner that is dangerous to the public, or to provide such products or completed Ghost Guns to secondary persons who are likely to use such products in a manner that is dangerous to the public.

232.    Defendants further knew or should have known that selling or facilitating the sale of Ghost Gun Kits, Ghost Gun Frames, and other Ghost Gun Parts to make Ghost Guns to any New Jersey resident would foreseeably harm New Jersey residents and the State because, amongst other things, Ghost Guns are far more difficult to police, regulate, and trace.

233.     Defendants knew or should have known that their conduct in selling or facilitating the sale of Ghost Gun Kits, Ghost Gun Frames, and other Ghost Gun Parts to make Ghost Guns would foreseeably harm New Jersey residents and the State of New Jersey.

234.     Defendants' duties are further informed by New Jersey laws prohibiting the possession, assembly, and/or transport of Ghost Guns, Ghost Gun Kits, and Ghost Gun Frames. These laws are intended to curb violent gun crime, prevent access to guns by persons prohibited from possessing them, and protect public safety in New Jersey.

235.     Defendants breached their duty of reasonable care to New Jersey residents and the State of New Jersey by selling or facilitating the sale of Ghost Gun Kits, Ghost Gun Frames, and other Ghost Gun Parts without adequate or reasonable procedures or restraints, as alleged herein.

236.     Defendants knew or should have known that their conduct in selling or facilitating the sale of Ghost Gun Kits, Ghost Gun Frames, and other Ghost Gun Parts would result in substantial injuries and damages in New Jersey, including gun violence, gun crime, and other crime caused by Ghost Guns made from Ghost Gun Kits, Ghost Gun Frames, and other Ghost Gun Parts.

237.     Defendants' negligence has proximately harmed and continues to harm New Jersey residents, including through harm to gun violence victims injured by Defendants' purchasers (or secondary purchasers) using Defendants' Ghost Gun products.  Defendants' negligence has furthermore proximately and foreseeably caused the State of New Jersey to expend excess monies for police (including overtime), laboratory costs, emergency services, coroner and morgue services, pension benefits, health care, social services, and other necessary facilities and services.

238.     Defendants' negligence consists of knowing acts or omissions that also constitute knowing violations of N.J.S.A. 2C:58-35(a)(1), 2C:39-3(n), 2C:39-9(k), 2C:39-9(n), and 2C:39-3(j).

239.     The Attorney General seeks appropriate remedies on behalf of the State and in the Attorney General's <u>parens patriae</u> capacity for the benefit of the general public and as are necessary to protect the safety, health, and welfare of New Jersey's residents.

240.     Defendants' negligent actions and/or omissions were undertaken with actual malice or accompanied by wanton and willful disregard of persons who foreseeably might be harmed by those actions or omissions, within the meaning of the Punitive Damages Act, N.J.S.A. 2A:15-5.12.  Defendants are therefore liable for punitive damages.

## Count Six

### (Negligent Entrustment)

241.     The Attorney General repeats and realleges the allegations of the above paragraphs as if set forth at length herein.

242.     At all relevant times, Defendants owed New Jersey residents and the State a duty of care as set forth herein.

243.     The Ghost Gun Kits, Ghost Gun Frames, and other Ghost Gun Parts sold by Defendant JSD and/or sold at shows operated by Defendant Eagle Shows to New Jersey purchasers were dangerous instrumentalities that Defendants knowingly placed into the hands of New Jersey residents and others likely to possess them in New Jersey or provide them to secondary persons in New Jersey.

244.     Defendants had reason to know that this conduct entrusted dangerous instrumentalities to persons who were incompetent, unfit, inexperienced, and/or reckless in

possession of such instrumentalities, and/or were prohibited by New Jersey law from possessing such dangerous instrumentalities.

245.   On information and belief, such individuals have foreseeably used Defendants' products to injure and/or kill New Jersey residents or others in the State of New Jersey.

246.   Such harms are to foreseeable victims and are the natural and proximate result of Defendants' behavior.

247.   Defendants' conduct has proximately harmed and continues to harm New Jersey residents, including through harm to gun violence victims injured by Defendants' purchasers (or secondary purchasers) using Defendants' Ghost Gun products.  Defendants have furthermore proximately and foreseeably caused the State of New Jersey to expend excess monies for police (including overtime), laboratory costs, emergency services, coroner and morgue services, pension benefits, health care, social services, and other necessary facilities and services.

248.   Defendants' negligent entrustment consists of knowing acts or omissions that constitute knowing violations of N.J.S.A. 2C:58-35(a)(1), 2C:39-3(n), 2C:39-9(k), 2C:39-9(n), and 2C:39-3(j).

249.   The Attorney General seeks appropriate remedies on behalf of the State and in the Attorney General's parens patriae capacity for the benefit of the general public and as are necessary to protect the safety, health, and welfare of New Jersey's residents.

250.   Defendants' negligent actions and/or omissions were undertaken with actual malice or accompanied by wanton and willful disregard of persons who foreseeably might be harmed by those actions or omissions, within the meaning of the Punitive Damages Act, N.J.S.A. 2A:15-5.12.  Defendants are therefore liable for punitive damages.

## **Count Seven**

### **(Civil Conspiracy)**

251.    The Attorney General repeats and realleges the allegations of the above paragraphs as if set forth at length herein.

252.    Defendants Eagle Shows and JSD have agreed to work together, and in concert with one another, to commit the unlawful acts and acts through unlawful means described above.

253.    Such acts are unlawful, or committed through unlawful means, because they violate, inter alia, N.J.S.A. 2C:58-35(a); common law public nuisance; and N.J.S.A. 2C:39:3(n), 2C:39-9(k), and 2C:39-9(n).

254.    As to each of these laws, at least one Defendant has committed overt acts in furtherance of the violation thereof.

255.    The Attorney General seeks damages in an amount to be proven at trial, including special damages resulting from:

a.    Injury and death to New Jersey residents;

b.    Health care costs and business loss to New Jersey residents;

c.    Additional State resources to deter, interdict, and mitigate crime effectuated or compounded by Ghost Guns—specifically, and among other things, additional compensation paid to law enforcement officials, the hiring of additional law enforcement officials, increased crime lab and ballistics costs, and other costs to enforce the laws Defendants have undermined, as well as increased public health costs, mental health costs, educational costs, and other costs; and

d.    Endangerment to, and the threat of endangerment to, the health, safety, peace, comfort, and convenience of New Jersey residents and law enforcement.

256.    New Jersey seeks appropriate remedies to be proven at trial.

257.    Defendants' conduct at issue consists of knowing acts or omissions that constitute knowing violations of N.J.S.A. 2C:58-35(a)(1), 2C:39-3(n), 2C:39-9(k), 2C:39-9(n), and 2C:39-3(j).

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff the Attorney General of the State of New Jersey

respectfully requests judgment in his favor and against Defendants as follows:

A.      Ordering injunctive relief as is necessary to prevent continuing harm;

B.      Ordering Defendants to pay accrued and future costs that the State of New Jersey and any other person or entity incurs in abating the public nuisances that Defendants have created, maintained, or contributed to;

C.      Awarding the Attorney General monetary damages and punitive damages in an amount to be determined at trial, including interest thereon;

D.      Awarding the Attorney General restitution in an amount to be determined at trial;

E.      Awarding the Attorney General all costs and expenses incurred in connection with this action, including attorneys' fees; and

F.      Awarding the Attorney General such other and further relief as the Court deems just and proper.

Dated: December 12, 2023
Newark, NJ

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
Attorney for Plaintiff

By: */s/*       David Leit
David Leit [024351995]
Emily Erwin [405362022]
Jonathan B. Mangel [281382018]
Giancarlo Piccinini [414322022]
Attorney General of New Jersey
Division of Law
124 Halsey Street
Newark, NJ 07101
Tel.: (973) 648-7453
david.leit@law.njoag.gov

PILLSBURY WINTHROP SHAW PITTMAN LLP
Special Counsel to the Attorney General

Kenneth W. Taber (*pro hac vice forthcoming*)
Max A. Winograd (*pro hac vice forthcoming*)
31 West 52nd Street
New York, NY 10019
Tel.: (212) 858-1000
kenneth.taber@pillsburylaw.com
max.winograd@pillsburylaw.com

Shani Rivaux (*pro hac vice forthcoming*)
600 Brickell Avenue
Suite 3100
Miami, FL 33131
Tel.: (786) 913-4882
shani.rivaux@pillsburylaw.com

## CERTIFICATION OF COMPLIANCE

I certify that confidential personal identifiers will be redacted from all documents submitted in the future in accordance with <u>R.</u> 1:38-7(b).

> MATTHEW J. PLATKIN
> ATTORNEY GENERAL OF NEW JERSEY
> Attorney for Plaintiff
>
>
> By: ___/s/ David Leit_____
>         David Leit
>         Assistant Attorney General

Dated: December 12, 2023
Newark, New Jersey

## DESIGNATION OF TRIAL COUNSEL

Pursuant to <u>R.</u> 4:25-4, Assistant Attorney General David Leit is hereby designated as trial

counsel on behalf of the Plaintiff.

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
Attorney for Plaintiff


By:   /s/ David Leit
David Leit
Assistant Attorney General

Dated: December 12, 2023
Newark, New Jersey

# EXHIBIT C

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
Richard J. Hughes Justice Complex
25 Market Street
P.O. Box 112
Trenton, New Jersey 08625
Attorney for Plaintiff

By:    David Leit (Attorney ID No. 024351995)
     *Assistant Attorney General*
     (609) 414-4301
     David.Leit@law.njoag.gov

| | |
|---|---|
| MATTHEW J. PLATKIN, Attorney General of the STATE OF NEW JERSEY,<br><br>Plaintiff,<br><br>v.<br><br>Point Blank Guns and Ammo LLC,<br><br>Defendant. | SUPERIOR COURT OF NEW JERSEY CHANCERY DIVISION – GENERAL EQUITY, MORRIS COUNTY<br><br>DOCKET NO.:_____<br><br>Civil Action |

## COMPLAINT

The New Jersey Attorney General (the "Attorney General"), by and through his undersigned counsel, hereby alleges as follows against defendant Point Blank Guns and Ammo LLC ("Point Blank Guns and Ammo" or "the Store"):

## INTRODUCTION

1.    In July 2022, the New Jersey Legislature enacted a law specifying duties of New Jersey gun industry members.  The law granted the Attorney General an exclusive cause of action to remedy violations.  See P.L. 2022, c.56, N.J.S.A. 2C:58-35 ("Section 58-35").

2.      Among the law's provisions, Section 58-35(a)(2) requires New Jersey gun industry members to "establish, implement, and enforce reasonable controls" in their sale of ammunition, ammunition magazines, and other "gun-related product[s]."  The law defines "Reasonable controls" to mean, among other duties, the establishment of "reasonable procedures, safeguards, and business practices that are designed to:  (1) prevent the sale or distribution of a gun-related product to . . . a person prohibited from possessing a firearm under State or federal law."

3.      Section 58-35(a)(2) therefore obligates New Jersey gun dealers, when selling ammunition or magazines, to take affirmative steps to determine that the buyer may lawfully possess a firearm.  This legal obligation protects the public by recognizing the reality that persons who may not lawfully possess firearms sometimes acquire them unlawfully.  Thus, the Legislature has provided two safety measures:  a seller is required to conduct a check when someone purchases a firearm, and, as a backstop, also when a person purchases ammunition for a firearm.

4.      In New Jersey, only a person with one of two applicable firearms permits, or who is a particular current or former public safety official and therefore exempt from the permit requirement, may possess a gun.  In addition, minors, and persons with felony records or subject to a court dispossession order, are prohibited from obtaining a permit or possessing a firearm. Thus, in order to comply with Section 58-35(a)(2)'s requirement that a seller implement "reasonable controls" to ensure that ammunition is not sold to "a person prohibited from possessing a firearm," sellers must require ammunition and magazine buyers to present either a New Jersey firearms permit or a document demonstrating they are exempt from the permit requirement.

5.      Point Blank Guns and Ammo is a state and federally licensed gun dealer in East Hanover, New Jersey.  It is therefore a "gun industry member" within the meaning of Section 58-35(a)(2).

6.      In March 2024, Point Blank Guns and Ammo sold a handgun ammunition magazine to a first-time customer.  The customer had no prior relationship with the store or the salesperson.  The customer paid in cash.  The store did not ask to see, and did not review, any type of identification, permit, or credential.

7.      In May 2024, the same salesperson at Point Blank Guns and Ammo sold a 1,000-round <u>case</u> of .223 caliber rifle ammunition—a high-velocity, military-standard ammunition often used in AR-15-style rifles—to a different first-time customer.  The customer had no prior relationship with the store or the salesperson.  The customer paid in cash.  The Point Blank Guns and Ammo salesperson did not ask to see, and did not review, any type of identification, permit, or credential.

8.      Point Blank Guns and Ammo's practice of selling ammunition and magazines without implementing "reasonable controls" to "prevent the sale or distribution of a gun-related product to . . . a person prohibited from possessing a firearm" violates Section 58-35(a)(2) and threatens public safety.

9.      The Attorney General brings this suit to prevent Point Blank Guns and Ammo's continued endangerment of the people of New Jersey.

## THE PARTIES

10.      Plaintiff is the Attorney General of the State of New Jersey.  The Attorney General is authorized and charged with the responsibility to enforce Section 58-35.  The Attorney General brings the Section 58-35 claims in this action by and through the Statewide Affirmative Firearms Enforcement Office ("SAFE").  SAFE was created within the Office of the

Attorney General by Attorney General Administrative Executive Directive No. 2022-08, which also delegated to SAFE the Attorney General's statutory authority under Section 58-35.

11.      Defendant Point Blank Guns and Ammo is a licensed retail firearms dealer organized on February 9, 2023 as a limited liability company under the laws of the State of New Jersey.  It received its New Jersey firearms retail license, SFL#4143, on December 7, 2023.  It operates a store under the business name "Point Blank Guns and Ammo" at 393 Route 10 East, East Hanover, New Jersey 07936.  At that retail location, Point Blank Guns and Ammo sells guns, ammunition, gun accessories, and other gun-related products.

## JURISDICTION AND VENUE

12.      Jurisdiction over Point Blank Guns and Ammo is proper because it is a business incorporated, licensed to do business, and operating in New Jersey, and because its unlawful conduct took place in New Jersey.

13.      Pursuant to Rule 4:3-2(a)(2), venue is proper in this court because the cause of action arose in Morris County, where Point Blank Guns and Ammo is located, and where Point Blank Guns and Ammo engages in the illegal conduct at issue in this case.  This case is filed in the Chancery Division-General Equity because the Attorney General principally seeks equitable relief.  R. 4:3-1(a)(1).

## FACTS

**A.      New Jersey's Firearms Industry Sales Practices Law**

14.      The Legislature enacted Section 58-35 in July 2022.[1]  Among its provisions, Section 58-35(a)(2) provides that "A gun industry member shall establish, implement, and

---

[1]  See P.L. 2022-56, N.J.S.A. 2C:58-33 to -36.

enforce reasonable controls regarding its manufacture, sale, distribution, importing, and

marketing of gun-related products."

      15.     Section 58-35(a)(2) incorporates three defined terms, which are set out in N.J.S.A.

2C:58-34:

- "Gun industry member" "means a person engaged in the sale, manufacturing, distribution, importing or marketing of a gun-related product, and any officer, agent, employee, or other person authorized to act on behalf of that person or who acts in active concert or participation with one or more such persons."

- "Gun-related product" "means any firearm, ammunition, ammunition magazine, firearm component or part including, but not limited to, a firearm frame and a firearm receiver, or firearm accessory, which product was, or was intended to be, sold, manufactured, distributed, imported, or marketed in this State, or which product was possessed in this State and as to which it was reasonably foreseeable that the product would be possessed or used in this State."

- "Reasonable controls" "means," (in relevant part), "reasonable procedures, safeguards, and business practices that are designed to (1) prevent the sale or distribution of a gun-related product to a . . . person prohibited from possessing a firearm under State or federal law[.]"

      16.     Section 58-35's requirements supplement pre-existing laws and apply to a broader

scope of products than many of those other laws.  For instance, N.J.S.A. 2C:58-2 establishes

conditions for the retail dealing of "firearms" and contains additional provisions concerning the

sale of "handgun ammunition," whereas Section 58-35(a)(2) goes further, since it additionally

concerns the retail sale or distribution of any "gun-related product," including any ammunition or

ammunition magazine.  New Jersey gun industry members must comply with both laws.

      17.     Under Section 58-35(a)(2), a New Jersey gun industry member must establish,

implement, and enforce reasonable affirmative measures to ensure that a purchaser of

ammunition or an ammunition magazine is not a "person prohibited from possessing a firearm

under State or federal law."  This requires retail firearms dealerships to take meaningful steps to

determine the purchaser's ability to lawfully "possess" a firearm.  They may not sell

ammunition, magazines, or other "gun related product[s]" without doing so.

18.     Section 58-35(a)(2)'s purchaser verification requirement for all gun-related

products extends well-settled point-of-sale requirements New Jersey has long applied for sales of

other products.  For example, New Jersey's licensed gun dealers may not sell most firearms or

handgun ammunition to would-be purchasers unless the purchaser possesses and exhibits a valid

and applicable state firearms permit.  See N.J.S.A. 2C:58-2(a)(4)-(5); N.J.S.A. 2C:58-3.3(b).

Gun dealers must also comply with federal point-of-sale requirements.  E.g., 18 U.S.C. § 922(t).

Sellers of handguns and handgun ammunition are subject to additional requirements related to

obtaining and recording purchaser identity information.  See N.J.S.A. 2C:58-2(b); N.J.A.C.

13:54-3.14(b).

**B.     State Laws Concerning "Persons Prohibited from Possessing a Firearm"**

19.     In enacting Section 58-35, the Legislature relied on pre-existing laws that define

who is a "person prohibited from possessing a firearm under State or federal law."

20.     Most relevantly, N.J.S.A. 2C:39-5 ("Section 39-5," titled "Unlawful possession of

weapons") prohibits a person from "knowingly [having] in his possession any

handgun . . . without first having obtained a permit to carry the same as provided in N.J.S.A.

2C:58-4."  See N.J.S.A. 2C:39-5(b).  Section 39-5 also prohibits a person from "knowingly

[having] in his possession any rifle or shotgun without having first obtained a firearms purchaser

identification card in accordance with the provisions of N.J.S.A 2C:58-3."  See N.J.S.A. 2C:39-

5(c).

21.     Under N.J.S.A. 2C:39-6 ("Section 39-6", titled "Exemptions"), Section 39-5's

possession prohibitions "do[] not apply" to certain categories of active public safety personnel.

See N.J.S.A. 2C:39-6(a) – (c), (n).  Likewise, qualified retired law enforcement officers within

the meaning of 18 U.S.C. § 926(c) who are carrying that statute's required identification are also

exempt.  See also N.J.S.A. 2C:39-6(*l*).  Absent one of these exemptions, only a person with a

valid New Jersey firearms purchaser identification card or handgun carry permit may lawfully

"possess" a firearm in New Jersey.

22.     Additional state and federal statutes prohibit certain categories of persons from

possessing a firearm independent of Section 39-5.  These additional disqualifiers include

N.J.S.A. 2C:39-7 (identifying "certain persons not to have weapons or ammunition") and 18

U.S.C. § 922(g) (identifying "person[s]" who may not "possess in or affecting commerce, any

firearm or ammunition").  A person may also be subject to a court order prohibiting them from

having a firearm.  See, e.g., N.J.S.A. 2C:58-20 to -31 ("Extreme Risk Protective Order Act of

2018"); 2C:25-17 to -35 ("Prevention of Domestic Violence Act of 1991"); 2C:14-13 to -21

("Victim's Assistance and Survivor Protection Act"); 2C:12-14 (providing for temporary

protection order).

23.     New Jersey has separate laws governing the issuance of the relevant firearms

permits.  Those laws harmonize Section 39-5's requirement of a permit for lawful firearms

possession with the additional, independent disqualifiers against firearms possession.  N.J.S.A.

2C:58-3(c) states that the firearms purchaser identification card necessary to possess a rifle or

shotgun "shall not be issued" to, among others, persons statutorily disqualified from having a

firearm or adjudicated to be disqualified from having a firearm.  N.J.S.A. 2C:58-4(c) likewise

requires that an applicant for a handgun carry permit demonstrate that they are "not subject to

any of the disabilities set forth in N.J.S.A. 2C:58-3."  Those disabilities include, but are not

limited to: (i) having been convicted of certain enumerated types of crime, including: "any crime

in [New Jersey] or its felony counterpart in any other state or federal jurisdiction" and "a

disorderly persons offense in [New Jersey] involving an act of domestic violence… or its felony or misdemeanor counterpart… in any other state or federal jurisdiction,"; (ii) being under the age of 18 years for a firearms purchaser identification card or under 21 years for a permit to purchase a handgun; (iii) being subject to or ha[ving] violated a temporary or final domestic violence restraining order prohibiting the possession of firearms.  <u>See</u> N.J.S.A. 2C:58-3(c)(1), (4), and (6).

      **C.**    **Point Blank Guns and Ammo Sells Ammunition and Magazines, For Cash, to Unverified Purchasers.**

      24.    On March 20, 2024, an individual known to the Attorney General's Office entered the Point Blank Guns and Ammo store and retrieved a Glock Model 22 .40 caliber 10-round pistol magazine from a display shelf and approached a salesperson in order to purchase it.  At the sales counter, the store's computer system suddenly failed.  The salesperson told the individual that the magazine would normally cost "twenty-three [dollars]" but to just pay "twenty cash" instead because the system failure prevented the salesperson from making change.  The individual paid in cash.  No receipt was generated.  <u>See</u> Pictures A and B below.

<u>Pictures A and B:  Magazine sold by Point Blank Guns and Ammo on March 20, 2024</u>[2]

---

[2] Due to the computer system failure, the store was unable to generate a sales receipt.





25.     The salesperson never asked to see a firearms purchaser identification card, a handgun carry permit, or a document demonstrating that the individual did not need a permit.  The salesperson never asked if the purchaser could lawfully possess a firearm in New Jersey.  The salesperson did not take any measures to ensure that the purchaser was not "a person prohibited from possessing a firearm."  N.J.S.A. 2C:58-34.

26.     On May 30, 2024, a second individual known to the Attorney General's Office entered the Point Blank Guns and Ammo store and asked about buying .223 caliber rifle ammunition.  The customer asked for a cash price on a 1,000-round case of ammunition.  The salesperson retrieved a case containing 50 boxes of 20 rounds each and quoted a cash price of $848.16.  The individual bought the case, paying cash.  See Pictures C and D below.

Picture C:  Case of .223 caliber rifle ammunition, purchased from Point Blank Guns and Ammo on May 30, 2024



Picture D:  Point Blank Guns and Ammo sales receipt, May 30, 2024

**POINT BLANK GUNS & AMMO**
393 RT 10 EAST STE B
EAST HANOVER, NJ 07936
9737537733

**Default**

Cashier: John
30-May-2024 12:43:39P

| 1 | PMC 223 Case 55gr | | $799.00 |
|---|---|---|---|

| **Subtotal** | | | **$799.00** |
|---|---|---|---|
| **Cash Discount** | | | **-$31.96** |

| Sales Tax | 6.625% | | $50.82 |
|---|---|---|---|
| Credit Card | 3.95% | | $30.30 |
| Convenience Fee | | | |
| **Total Taxes** | | | **$81.12** |

| **Total** | | | **$848.16** |
|---|---|---|---|
| CASH SALE | | | $848.16 |
| Cash tendered | | | $850.00 |
| Change | | | $1.84 |

Online: https://clover.com/p
/M6ZR8MVEH96X2

Clover ID: A2K0KF8ST9ZDG
Payment M6ZR8MVEH96X2

Clover Privacy Policy
https://clover.com/privacy

**Default**

Server: John
30-May-2024 12:43:39P

Printed: 12:44:28P
Sent: 12:44:25P

--------------------------
PMC 223 Case 55gr
--------------------------

Clover ID: A2K0KF8ST9ZDG

13

27.     The salesperson never asked to see a firearms purchaser identification card, a handgun carry permit, or a document demonstrating that the individual did not need a permit. The salesperson never asked if the purchaser could lawfully possess a firearm in New Jersey. The salesperson did not take any measures to ensure that the purchaser was not "a person prohibited from possessing a firearm." N.J.S.A. 2C:58-34.

**D.      Point Blank Guns and Ammo Fails to Establish, Implement, and/or Enforce Reasonable Controls to Prevent Sales to Persons Prohibited from Possessing Firearms.**

28.     Point Blank Guns and Ammo's verification-less cash sales of .223 caliber rifle ammunition and a pistol magazine—across two different dates, involving two different purchasers, and processed by the same store employee—lacked procedures, safeguards, and/or business practices to ensure that the purchaser was not "a person prohibited from possessing a firearm under State or federal law." N.J.S.A. 2C:58-34.

29.     Point Blank Guns and Ammo has not established, implemented, and enforced reasonable procedures, safeguards, and business practices that are designed to prevent the sale of a gun-related product to a person prohibited from possessing a firearm.

## CAUSES OF ACTION

### Count One

**(Failure to Establish, Implement, and Enforce Reasonable Controls)
(Public Law 2022, c. 56, N.J.S.A. 2C:58-35(a)(2))**

30.     Under N.J.S.A. 2C:58-35(a)(2), "a gun industry member shall establish, implement, and enforce reasonable controls regarding its manufacture, sale, distribution, importing, and marketing of gun-related products." Those "reasonable controls" include "reasonable procedures, safeguards, and business practices that are designed to . . . prevent the

sale or distribution of a gun-related product to . . . a person prohibited from possessing a firearm under State or federal law." See N.J.S.A. 2C:58-34.

31.     Defendant Point Blank Guns and Ammo is a "gun industry member" within the meaning of Section 58-35.

32.     Point Blank Guns and Ammo's sales of ammunition and ammunition magazines in New Jersey are sales of "gun-related products" within the meaning of Section 58-35.

33.     Point Blank Guns and Ammo's sales of ammunition and ammunition magazines lack "reasonable procedures, safeguards, and business practices that are designed to . . . prevent the sale or distribution of a gun-related product to . . . a person prohibited from possessing a firearm under State or federal law."  N.J.S.A. 2C:58-34.

34.     Point Blank Guns and Ammo has failed, and continues to fail, to establish, implement and enforce reasonable controls regarding its sale of ammunition and ammunition magazines.

35.     Point Blank Guns and Ammo's conduct violates Section 58-35(a)(2).

36.     It is a public nuisance to engage in conduct that violates Section 58-35(a)(2).  See N.J.S.A. 2C:58-35(a)(3).

37.     Because Point Blank Guns and Ammo has violated Section 58-35(a), the Attorney General commenced this action seeking "an injunction prohibiting [defendant] from continuing that conduct or engaging therein or doing any acts in furtherance thereof."  See N.J.S.A. 2C:58-35(b).  Such injunctive relief is necessary here to prevent further, continuing, irreparable injury.

38.     The Attorney General also seeks its reasonable attorneys' fees, filing fees, and reasonable costs of suit, as well as any other appropriate relief.  Ibid.

## PRAYER FOR RELIEF

**WHEREFORE,** the Attorney General requests judgment in his favor and against

defendant Point Blank Guns and Ammo as follows:

A.  Ordering injunctive relief as necessary to prevent continuing harm, such as
    ordering Point Blank Guns and Ammo to, at minimum, establish, implement,
    and enforce a requirement that purchasers of gun-related products exhibit for
    inspection a valid firearms purchaser identification card, a valid permit to
    carry a handgun, or a valid credential or identification demonstrating
    exemption from N.J.S.A. 2C:39-5;

B.  Pursuant to N.J.S.A. 2C:58-35(b), awarding the Attorney General the costs
    and expenses incurred in connection with this action, including attorneys'
    fees, filing fees, and reasonable costs of suit; and

C.  Awarding the Attorney General such other and further relief as the court
    deems just and proper.

Dated:  November 13, 2024
Newark, New Jersey

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
Attorney for Plaintiff

By:  */s/ David Leit*
    David Leit [024351995]
    *Assistant Attorney General*
    New Jersey Office of the Attorney General
    Division of Law
    P.O. Box 45029
    Newark, NJ 07101

## CERTIFICATION OF COMPLIANCE

I certify that confidential personal identifiers will be redacted from all documents submitted in the future in accordance with <u>Rule</u> 1:38-7(b).

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
Attorney for Plaintiff


By:    <u>  */s/ David Leit*     </u>
           David Leit
           *Assistant Attorney General*

Dated: November 13, 2024
Newark, New Jersey

### DESIGNATION OF TRIAL COUNSEL

Pursuant to <u>Rule</u> 4:25-4, Assistant Attorney General David Leit is hereby designated as

trial counsel on behalf of the Plaintiff.

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
Attorney for Plaintiff


By:   <u>*/s/ David Leit*</u>
        David Leit
        Assistant Attorney General

Dated: November 13, 2024
Newark, New Jersey

# EXHIBIT D

**MATTHEW J. PLATKIN**
**ATTORNEY GENERAL OF NEW JERSEY**
Division of Law
124 Halsey Street
P.O. Box 45029
Newark, New Jersey 07101
*Attorney for Plaintiff*

By:    David E. Leit [024351995]
      *Assistant Attorney General*
      Tel: (609) 414-4301
      David.Leit@law.njoag.gov

[Additional attorneys listed on signature page]

| | |
|---|---|
| MATTHEW J. PLATKIN, Attorney General of the STATE OF NEW JERSEY,<br><br>      Plaintiff,<br><br>      v.<br><br>GLOCK, INC.; GLOCK Ges.m.b.H, an Austrian company;<br><br>      Defendants. | SUPERIOR COURT OF NEW JERSEY<br>CHANCERY DIVISION<br>ESSEX COUNTY<br><br>DOCKET NO.:_____<br><br><u>Civil Action</u> |

## **COMPLAINT**

The New Jersey Attorney General (the "Attorney General"), by and through his undersigned counsel, hereby alleges as follows against Glock, Inc. and Glock Ges.m.b.H. (together with Glock, Inc., "Glock").

## **INTRODUCTION**

1.      On April 8, 2023, at a public housing complex in Newark, a shooter fired twenty-eight rounds from a Glock nine-millimeter ("9mm") handgun in just over one second, seriously injuring three people.  This was possible because his Glock 9mm handgun had been "switched"

from an ordinary handgun into a machine gun, by affixing a thumbnail-sized add-on component called an "auto sear" or "switch."

2.      Glock switches are small pieces of metal or plastic, that often resemble a small Lego brick.  They fit into the rear of Glock handguns, weapons that have become ubiquitous in the United States.  These switches can be purchased for under $20 and, in less than five minutes, can be easily fitted onto the back of a Glock handgun, immediately allowing the gun to fire as an automatic machine gun.[1]

3.      In the United States, machine guns have a long history and tradition of heightened regulation, since at least 1934, when federal rules addressing the use and possession of machine guns by ordinary citizens were put into place, in response to widespread gang violence enabled by long-barreled machine guns firing in fully automatic mode.  Today, the same problem has recurred, only now the machine guns are easily concealable handguns.

4.      Glocks with switches ("Switched Glock Machine Guns") can fire at a rate of 1,200 rounds per minute—faster than many fully automatic firearms used by the U.S. military. They fire so fast, and with a recoil so difficult to control, that the result is typically an uncontrolled "spray" of bullets over a wide area.

5.      Glock handguns, ostensibly sold to American civilians as semi-automatic weapons, can easily be switched into machine guns because Glock deliberately designed them that way.  In 1982, Glock introduced its inaugural 9mm semi-automatic handgun model, under the "G17" name.  Glock designed that pistol with a "striker-fired" design, where machine gun functionality—the ability to automatically fire a rapid burst of bullets with a single trigger pull—

---

[1] Fox 4 Dallas-Fort Worth, ATF Shows How a Glock Switch Works, FOX 4 (June 10, 2024), https://www.youtube.com/watch?v=Tmyk9qm3wkQ.

is inherent to the core design.  That ability is inhibited by a single hinged internal piece, called the "trigger bar."  When the G17's trigger is pulled, the trigger bar lowers, releasing the spring-loaded striker.  The trigger bar then immediately reverts back into place to restrain additional firing.  But, if the trigger bar is simply held down while the trigger remains pulled, the G17 will fire continuously, as a machine gun, until the ammunition runs out.  The design of the G17 and Glock's other U.S. handguns—which all share a common design platform—makes it easy for the weapon's user to insert a small external add-on component into the back of the gun, which holds down the trigger bar.  In short, it is simple to unleash Glock handguns' inherent ability to fire as a machine gun.

6.      Glock has known about its handguns' intrinsic ability to function as handheld machine guns from near the inception of the G17.  Glock itself readily exploited this feature when it developed and released the successor version of the G17, the G18, which it markets to military and police customers.  The only significant design change in the G18 is the addition of an external toggle that can either (i) hold the trigger bar down with each trigger pull so the weapon fires in machine gun mode, or (ii) allow the trigger bar to revert back after each trigger pull so the weapon fires in semi-automatic mode.

7.      As early as 1988, Glock's founder, Gaston Glock, even developed and exhibited his own early prototype of a Glock switch, demonstrating it on a G17 to a then 22-year old Venezuelan individual named Jorge Leon.  Leon later patented a design that has become the basis for the now-ubiquitous aftermarket Glock switches.

8.      Glock was also well aware that this ready manipulability of its handguns' trigger bar could have vast implications for public safety:  this feature of Glock's design was so obvious and easy to exploit that even Leon, an individual unaffiliated with Glock, could independently

3

conceive, construct, and market a prototype to make a G17 fire in automatic mode. Unsurprisingly, when Leon's designs became public, it did not take long for aftermarket Glock switches to appear in the outside world, unleashing Glock handguns' inherent machine gun capabilities, and giving civilians access to firearms with the same rapid-fire lethality as the automatic weaponry Glock markets and sells to militaries and police around the world.

9.      Today's Glock switches are made easily and cheaply, and can be affixed to the machine gun-friendly Glock platform in a matter of just minutes.

10.     In New Jersey, like in other states, Switched Glock Machine Guns are increasingly found on our streets and roadways, in our parks and homes, and, more recently, on our college campuses.  These weapons have caused death and destruction throughout the country, and have been recovered with increasing frequency in connection with homicides, aggravated assaults, batteries, kidnappings, burglaries, home invasions, carjackings, and attempted robberies.  For example:

    a.      In October 2019, in Newark, law enforcement officers arrested an armed robbery suspect in possession of a Switched Glock Machine Gun equipped with a large capacity magazine, who had bragged about the gun's Glock switch in a text message containing two photos of the weapon, writing "it has a switch on the back you can shoot one at a time <u>or three at a time</u> I'm out here acting crazy."[2]

    b.      As noted above, in April 2023, in Newark, a defendant was in possession of a Switched Glock Machine Gun and a 30-round extended magazine, which had been used only four days prior to fire 28 rounds at a Newark housing complex, injuring three individuals.[3]

    c.      In June 2023, in Vineland, a woman called the police when her intimate partner, who was suffering from a mental health crisis, threatened to use a firearm to kill

---

[2] Compl., <u>United States v. West</u>, No. 20-CR-164 (D.N.J. Jan. 7, 2020), ECF 1 (emphasis added).

[3] Compl., <u>United States v. Muhammad</u>, No. 23-CR-16048 (D.N.J. Apr. 13, 2023), ECF 1; <u>see also</u> Press Release, <u>Member and Associate of Newark Street Gang Charged with Unlawful Possession of Machinegun Used in Shooting of Three People</u>, U.S. Aʈʈ'ʏ's Oғғ., Dɪsʈ. oғ N.J. (Apr. 13, 2023), <u>https://www.justice.gov/usao-nj/pr/member-and-associate-newark-street-gang-charged-unlawful-possession-machinegun-used</u>.

himself while children were present; he was found to be in possession of a Switched Glock Machine Gun.[4]

d.   In June 2023, in Haledon, a man with a criminal record was arrested in possession of a Switched Glock Machine Gun equipped with a 22-round large capacity magazine loaded with 19 rounds.  In ordering his pretrial detention, the judge placed particular weight on the fact that the Glock was capable of "fully automatic firing with the flick of a switch;" expressed "grave concerns due to the ongoing and escalating gun violence plaguing Passaic County;" and emphasized that "the firearm recovered was not an ordinary firearm but was equipped with an illegal adapter which made it capable of firing fully automatic rendering it a machine gun."[5]

e.   In January 2024, in Trenton, law enforcement authorities executing a search warrant of the premises of a person suspected of weapons trafficking discovered a Switched Glock Machine Gun with large capacity magazines along with 30 rounds of ammunition.[6]

f.   In April 2024, in New Brunswick, a man shot at least eight rounds on a public street, just blocks away from Rutgers University's College Avenue campus, striking two victims, severely wounding one of them.[7]  When police officers arrested him for the shooting the next day, he was in possession of a Switched Glock Machine Gun and two large capacity magazines.[8]  He pleaded guilty to attempted murder and related crimes.[9]

g.   In June 2024, in Vineland, police officers arrested a man for pointing a Switched Glock Machine Gun with a 15-round large capacity magazine at a victim while stating that there was going to be a "problem."[10]

11.   Switched Glock Machine Guns have been increasingly associated with minors in New Jersey, both as perpetrators and as victims of gun violence.  For example:

---

[4] Mot. Certification at 1, State v. Rodriguez, No CUM-23-1268 (N.J. Super. Ct. May 30, 2024); Compl., State v. Rodriguez, No CUM-23-1268 (N.J. Super. Ct. June 15, 2023).

[5] Order for Detention, State v. Miller, No. PAS-23-2995 (N.J. Super. Ct. July 6, 2023).

[6] Compl., State v. Jackson, No. MER-24-223 (N.J. Super. Ct. Jan. 18, 2024).

[7] Compl., State v. Farmer, No. MID-24-1724 (N.J. Super. Ct. Apr. 6, 2024).

[8] Compl., State v. Farmer, No. MID-24-4369 (N.J. Super. Ct. Apr. 11, 2024).

[9] Plea Forms, State v. Farmer, No. MID-24-1724 (N.J. Super. Ct. July 24, 2024).

[10] Compl., State v. Goldsboro, No. CUM-24-1354 (N.J. Super. Ct. June 23, 2024).

a.  In November 2020, Newark police officers found a 17-year-old victim shot dead from a gunshot wound to the head, and a spent 9mm bullet shell casing near the body.[11]  The shooter was 18 years old on the date of the shooting.  In May 2023, he was found in possession of a Switched Glock Machine Gun equipped with a 23-round magazine.[12]

b.  In Monmouth County, between January and July 2024, a crew of co-conspirators that included a minor committed a spree of 44 home burglaries, a robbery, and 38 auto thefts.[13]  A Switched Glock Machine Gun with a 21-round magazine was found on one of the co-conspirators at the time of his arrest.[14]

12.  Examples outside of New Jersey involving minors and Switched Glock Machine Guns further demonstrate the threat.  In March 2024, eight teens were shot by three masked shooters at a SEPTA bus stop in Philadelphia.[15]  A .40 caliber Switched Glock Machine Gun, with an extended magazine and laser sight, was recovered during the arrest of one teenage suspect.[16]  In Chicago, in February 2023, police officers recovered three Switched Glock Machine Guns in the bedroom of a 16-year-old who has since been sentenced for killing two other teenagers at a high school.[17]  In April of that same year, police in Alabama arrested three teenage and three adult co-conspirators in connection with a mass shooting at a sixteenth

---

[11] Compl., State v. Harcourt, No. ESX-23-2563 (N.J. Super. Ct. Mar. 13, 2023); Opp'n Br. Mot. to Suppress, State v. Harcourt, No. ESX-23-2563 (N.J. Super. Ct. Sept. 19, 2023.

[12] Compl., United States v. Harcourt, No. 23-CR-890 (D.N.J. May 18, 2023), ECF 1.

[13] Compl., State v. Buie, No. MON-24-2172 (N.J. Super. Ct. July 22, 2024).

[14] Ibid.

[15] Jianna Cousin, Leah Sarnoff, Victoria Arancio, and Emily Shapiro, 17-year-old Boy Shot 9 Times at Philadelphia Bus Stop, in Critical Condition; 7 Others Hurt, Gunmen at Large, ABC NEWS (Mar. 7, 2024), https://abcnews.go.com/US/7-hurt-mass-shooting-septa-bus-stop-philadelphia/story?id=107859180.

[16] Corey Sharber, Two 18-year-olds Charged in Mass Shooting at SEPTA Bus Stop, WHYY (Mar. 11, 2024), https://whyy.org/articles/two-18-year-olds-charged-in-mass-shooting-at-septa-bus-stop.

[17] ABC7 Chicago Digital Team, Teen Pleads Guilty to Murder in Deadly Shooting Outside Benito Juarez High School in 2022, ABC7 EYEWITNESS NEWS (June 18, 2024), https://abc7chicago.com/post/benito-juarez-shooting-christian-acevedo-pleads-guilty-murder/14970355.

birthday party, where three teenagers and one adult were killed with a Switched Glock Machine Gun.[18]  Thirty-two others were wounded, and 89 shell casings were recovered at the scene.[19]

13.     Switched Glock Machine Guns have become glorified in pop culture and on social media, acquiring a special cachet among gangs, in particular.  For example, the Newark housing complex shooter mentioned in Paragraph 1 bragged about his Switched Glock Machine Gun on social media, where he gestured as if holding a gun.  His post contained music with the lyrics: "[p]ut that switchy on ya man, he ain't get up . . . . bullets f***in' up his body, he doin' sit ups."[20]

---

[18] Jemma Stephenson & Alander Rocha, 'Somebody killed my son:' Grief Persists with Few Answers After Saturday Shooting, ALABAMA REFLECTOR (Apr.17, 2023, 6:15PM), https://alabamareflector.com/2023/04/17/somebody-killed-my-son-grief-persists-with-few-answers-after-saturday-shooting; Bill Hutchinson, 'I feel terrified': Inventor of 'Glock switch' Technology Says He Regrets Creation, GMA (June 24, 2024, 5:04AM), https://www.goodmorningamerica.com/news/story/feel-terrified-inventor-glock-switch-technology-regrets-creation-111271476; WSFA 12 News Staff, Dadeville Mass Shooting Suspect to be Tried as an Adult, WSFA 12  (Sept. 13, 2023, 12:09PM), https://www.wsfa.com/2023/09/13/dadeville-mass-shooting-suspect-be-tried-an-adult.

[19] Bill Hutchinson, 'I feel terrified': Inventor of 'Glock switch' Technology Says He Regrets Creation, GMA (June 24, 2024, 5:04AM), https://www.goodmorningamerica.com/news/story/feel-terrified-inventor-glock-switch-technology-regrets-creation-111271476.

[20] Compl., United States v. Muhammad, No. 23-CR-16048 (D.N.J. Apr. 13, 2023), ECF 1; see also Press Release, Member and Associate of Newark Street Gang Charged with Unlawful Possession of Machinegun Used in Shooting of Three People, U.S. ATT'Y'S OFF., DIST. OF N.J. (Apr. 13, 2023) https://www.justice.gov/usao-nj/pr/member-and-associate-newark-street-gang-charged-unlawful-possession-machinegun-used.

14.     The popular association of the Glock brand with machine gun functionality runs so deep that many third-party auto sears are even sold with a copied Glock logo printed on them:[21]



15.     The easy switchability of Glock handguns into machine guns are part of what attracts criminals and gangs to Glock handguns.  This extra appeal contributes to Glock's profits.

16.     Glock knows that its guns are switched from handguns into automatic weapons far more often than handguns manufactured by <u>every</u> other gun manufacturer.

17.     Glock could easily change the design of its handguns to thwart switches, yet has not done so in the U.S. civilian market.  For example, in Europe, it offers the G46, an alternate product design that is not susceptible to the use of switches.

18.     Glock's civilian U.S. products could likewise be re-designed with simple modifications to no longer accommodate switches.  But in the United States, Glock continues to

---

[21] Press Release, <u>Federal Authorities Seize Over 350 Website Domains Used to Import Illegal Switches and Silencers from China</u>, U.S. ATT'Y'S OFF., DIST. OF MASS. (Sept. 11, 2024), <u>https://www.justice.gov/usao-ma/pr/federal-authorities-seize-over-350-website-domains-used-import-illegal-switches-and</u>.

manufacture, market, and distribute weapons to civilians that it knows are easily, and ubiquitously, switched to machine guns.

19.     Glock has failed to take meaningful steps to prevent the use of its handguns as machine guns.  To the contrary, Glock's official company Facebook page has, <u>for years</u>, featured direct links to videos glorifying the power of Switched Glock Machine Guns.  Anyone searching Glock's Facebook page for "switch" or "auto," will find these machine gun-glamorizing videos among the top results.

20.     Glock's conduct described herein and its large-scale distribution of switchable handguns through New Jersey gun dealers threatens and harms the State and its residents.  Glock's purposeful and irresponsible decision to put profits over safety fuels gun violence and causes many New Jersey residents to justifiably fear using the public streets, parks, schools, and transportation otherwise available to them.

21.     Through this lawsuit, the Attorney General seeks an Order enjoining Glock from continuing to market and distribute easily switched handguns to civilian consumers in New Jersey.[22]  The Attorney General also seeks abatement and restitution for the endangerment and harm that Glock has knowingly and foreseeably caused, and continues to cause, to New Jerseyans and the State through its unreasonable, unlawful, and dangerous conduct.

## THE PARTIES

22.     Plaintiff is the Attorney General of the State of New Jersey.  The Attorney General is authorized and charged with the responsibility to enforce the State's Firearms Industry

---

[22] The Attorney General does not seek any relief with respect to the sales or marketing of Glock pistols, as currently designed, to law enforcement.  Law enforcement officers may legally possess fully automatic weapons when they are on duty.  This lawsuit is focused exclusively on Glock's conduct with respect to the civilian market in New Jersey.

Public Safety Law, N.J.S.A. 2C:58-35 ("Section 58-35"). The Attorney General brings claims under Section 58-35 by and through the Statewide Affirmative Firearms Enforcement Office ("SAFE"). SAFE was created within the Office of the Attorney General by Attorney General Administrative Executive Directive No. 2022-08, which also delegates to SAFE the Attorney General's statutory authority under Section 58-35.

23.   The Attorney General also asserts in this case the State's proprietary interest and, under the Attorney General's <u>parens patriae</u> authority, New Jersey's quasi-sovereign interests in protecting the safety, health, and welfare of its residents.

24.   Defendant Glock, Inc. is a firearm importer, manufacturer, and dealer located in Smyrna, Georgia. It is incorporated under the laws of the State of Georgia as a domestic for-profit corporation with its principal place of business at 6000 Highlands Parkway SE, Smyrna, Georgia, 30082. Glock handgun sales in the United States earn the company hundreds of millions of dollars in annual revenue. Glock, Inc. is directly and materially involved in the assembly, design, marketing, advertising, and distribution of Glock handguns for civilians, including those residing in New Jersey. Glock, Inc. distributes its products in New Jersey primarily, if not exclusively, through a network of authorized dealers located in or near New Jersey.

25.   Defendant Glock Ges.m.b.H ("Glock Limited") is an Austrian limited liability company, with its principal place of business in Deutsch-Wagram, Austria. Glock Limited designs, manufactures, assembles, markets, advertises, distributes, and sells Glock handguns. Glock, Inc. then imports those handguns and component parts into the United States. Glock, Inc. uses Glock Limited's component parts to assemble handguns that are distributed throughout the United States, including to civilian residents of New Jersey. According to court filings, Glock,

Inc. is the only company in the United States with which Glock Limited directly does business. Operating through Glock, Inc. and the Glock, Inc. dealer network, Glock Limited knowingly places its handgun products into the stream of commerce, with the intention that those products reach New Jersey civilian residents.  Glock Limited and INC Holding GmbH, an Austrian holding company, jointly own Glock, Inc.

26.     Glock Limited is the "center for the company's multifaceted operations."  In addition to producing Glock handguns at its production facility, Glock Limited operates a "global administrative division, encompassing sales, logistics, exports, marketing, and training."[23]

27.     Glock Limited and its founder and CEO, Gaston Glock, created Glock Inc. to sell its products in the United States,[24] including in New Jersey, from which Glock Limited generates substantial revenue.[25]

28.     From the creation of Glock, Inc., executives and other employees of Glock Limited, including Gaston Glock, personally participated in, and directed the activities of, Glock Inc.[26]

29.     Until his death in 2023, Gaston Glock maintained control over both Glock Limited and Glock Inc., operating both as a unified enterprise to sell Glock handguns.  Gaston

---

[23] Glenn Adam Kendrick, Glock International, a Global Symphony of Excellence, 33 GLOCK ANN. (2024), https://us.glock.com/-/media/Global/US/old/US-Site/00-Owner-Downloads/2024-Annual-and-BG/GLOCK-ANNUAL-2024.ashx.

[24] Ibid.

[25] BARRETT PAUL, GLOCK: THE RISE OF AMERICA'S GUN (2012).

[26] Ibid.

Glock frequently traveled around the United States, from a home in Georgia, to market Glock handguns.[27]

30.    Glock Limited controls and directs the activities of Glock Inc. so that it can access the U.S. market, including the New Jersey market.[28]

31.    For customers, Glock Limited draws no meaningful distinction between Glock Limited and Glock Inc., presenting its marketing, sales, and service information using simply the name "Glock."

32.    For many years, Glock Limited manufactured all Glock handguns that were sold in the United States.  In 2013, Glock, Inc. began to manufacture handguns in the United States using component parts supplied by Glock Limited from Austria.  As of 2022, public reporting indicates that Glock Limited still manufactures the majority of Glock handguns sold in the United States.[29]

33.    Glock Limited controls the design and production standards used in Glock, Inc.'s assembly facilities in the United States.  According to Glock Limited's website, Glock Inc.'s American facility "follows [the] same production standards and procedures as the facilities in Austria."[30]  Glock, Inc. and Glock Limited have conspired with one another, and continue to conspire, to have large numbers of Glock handguns that are readily susceptible to being switched

---

[27] Ibid.

[28] Ibid.

[29] Charlie Gao, Made in America: Why Glock Manufacturing Is Set to Grow in the United States, THE NAT'L INTEREST (Aug. 6, 2021), https://nationalinterest.org/blog/reboot/made-america-why-glock-manufacturing-set-grow-united-states-191274.

[30] Glock Company, GLOCK, https://eu.glock.com/en/Explore-GLOCK/GLOCK-Company (last visited Dec. 10, 2024).

into automatic weapons reach New Jersey civilians and civilians in other states of the United States.

34.    The Defendants are hereafter collectively referred to as "Glock" in this Complaint.

35.    Glock sells and distributes firearms to civilians in the United States, including in New Jersey, primarily through firearms dealers.  As part of this distribution network, Glock maintains formal affiliate relationships with certain dealers, including approximately 50 New Jersey gun stores, and helps them market Glock products.  Glock identifies these dealers for the New Jersey public on its website.

## JURISDICTION AND VENUE

36.    This Court's jurisdiction is proper because the action arises from the Defendants' deliberate targeting of New Jersey residents as customers and deliberate partnering with New Jersey businesses, including New Jersey gun stores, as well as Defendants' regular, repeated, and systematic contacts with New Jersey.  Defendants have also engaged, including in concert with one another, in intentional acts directed to New Jersey, and therefore could reasonably anticipate being haled into court in New Jersey.

37.    Defendants have deliberately solicited, approved, and/or partnered with New Jersey-based gun stores in the sale of switchable Glock handguns; worked together with dealers in and around New Jersey to sell switchable Glock handguns to New Jersey civilians; marketed and advertised switchable Glock guns to New Jersey civilians; designed, manufactured, and sold switchable Glock handguns calculated to be purchased by New Jersey civilian residents and/or possessed in New Jersey; worked in concert and in conspiracy with one another to knowingly do all of the same, and, through their New Jersey business dealings, deliberately profited from the New Jersey civilian market for switchable Glock handguns.

38.     This Court has personal jurisdiction over Glock, Inc. because these claims arise out of and/or relate to Glock, Inc.'s business in the State of New Jersey.  Glock, Inc. designs, assembles, and imports firearms, and then engages, directly and through its agents and distribution network, in systematic and ongoing business transactions targeting civilian residents of New Jersey for marketing and sales of its switchable handguns.  Glock, Inc. works directly with retailers, distributors, and other entities located in New Jersey to effectuate its goal of marketing and selling its handguns in this State, availing itself of the benefits of the New Jersey market.  Glock Inc.'s further acknowledges that it targets New Jersey residents on the "Glock Warranty Form," available on the Glock website, which gives specific instructions to "residents of . . . New Jersey" who wish to have their Glock handguns repaired.[31]

39.     This Court has personal jurisdiction over Glock Limited because it is the principal designer and manufacturer of Glock handguns and works in concert with Glock, Inc. with respect to Glock, Inc.'s foregoing U.S. activities, including its targeting of the New Jersey market.  In addition, Glock Limited manufactures its Glock handguns and handgun components itself, and intentionally distributes them into the United States via Glock's affiliated distributors and dealers therein, including those in New Jersey.  Glock Limited also conspires with Glock, Inc. with respect to the following coordinated activities.  Glock Limited therefore has sufficient minimum contacts with New Jersey, and engages in purposeful availment of the laws of New Jersey, sufficient to warrant the Court's exercise of personal jurisdiction over Glock Limited, fully in accordance with due process.

---

[31] GLOCK Warranty Form 8522, Downloadable Materials, GLOCK, https://us.glock.com/en/downloadable-materials (last visited Dec. 10, 2024).

40.     Pursuant to <u>Rule</u> 4:3-2(a)(2) of the New Jersey Court Rules, venue is proper in this Court because the causes of action arose, in part, in Essex County.  Glock has done business in Essex County, and Defendants' unlawful acts have affected Essex County residents, among others.

**FACTS**

I.     **Glock's Switchable Handgun Design**

A.     **Machine Guns**

41.     Machine guns are firearms capable of "automatic fire," which generally means a weapon that permits rapid and continuous fire until either the trigger is released or the weapon runs out of ammunition.  Typically, in a single second, they can shoot a dozen rounds (or more).

42.     As in many other jurisdictions, firearms are classified as machine guns under New Jersey law based on the trigger's role in the mechanics of firing a shot.  N.J.S.A. 2C:39-1(i) defines a "[m]achine gun" as "any firearm, mechanism or instrument not requiring that the trigger be pressed for each shot and having a reservoir, belt or other means of storing and carrying ammunition which can be loaded into the firearm, mechanism or instrument and fired therefrom.  A machine gun also shall include, without limitation, any firearm with a trigger crank attached."

43.     Federal law is similar.  Under 26 U.S.C. § 5845(b), "[t]he term 'machinegun' means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.  The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."

15

44.     Under each definition, a firearm that can fire multiple rounds when the trigger is pulled and held is a machine gun.  This includes a firearm that is toggleable between multiple modes, one of which is a machine gun mode.

45.     New Jersey has longstanding restrictions on machine guns—including absolute prohibitions on their possession, manufacturing, transport, shipping, sale, and disposal—absent a specific license.  N.J.S.A. 2C:39-5(a); 2C:39-9(a)(i).  N.J.S.A. 2C:39-5(a) ("Section 39-5(a)") makes it illegal to "possess[] a machine gun or any instrument or device adaptable for use as a machine gun, without being licensed to do so as provided in [N.J.S.A.] 2C:58-5."[32]  N.J.S.A. 2C:39-9(a) ("Section 39-9(a)") makes it illegal to "manufacture[], cause[] to be manufactured, transport[], ship[], sell[] or dispose[] of any machine gun without being registered or licensed to do so.").

46.     At the federal level, access to machine guns has been regulated since the 1930s, because of their frequent use in crime, their increasing use in deadly shootings and massacres,[33] and the "immense danger" their rapid-fire capability posed to the public.  United States v.

---

[32] N.J.S.A. 2C:58-5 provides for strict licensure requirements for machine guns in New Jersey.  For example:

> Any person who desires to purchase, possess and carry a machine gun or assault firearm in this State may apply for a license to do so by filing in the Superior Court in the county in which he resides, or conducts his business if a nonresident, a written application setting forth in detail his reasons for desiring such a license.  The Superior Court shall refer the application to the county prosecutor for investigation and recommendation.  A copy of the prosecutor's report, together with a copy of the notice of the hearing on the application, shall be served upon the superintendent and the chief police officer of every municipality in which the applicant intends to carry the machine gun or assault firearm, unless, for good cause shown, the court orders notice to be given wholly or in part by publication.

N.J.S.A. 2C:58-5(a).  Additionally, "[n]o license shall be issued to any person who would not qualify for a permit to carry a handgun under [N.J.S.A.] 2C:58-4, and no license shall be issued unless the court finds that the public safety and welfare so require."  Id. 2C:58-5(b).

[33] National Firearms Act, BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES (Apr. 7, 2020), https://www.atf.gov/rules-and-regulations/national-firearms-act.

O'Brien, 560 U.S. 218, 230 (2010).  Since 1986, when Congress last amended these laws, machine guns have been generally prohibited for civilians.[34]

47.     Because machine guns are classified as such based on how the trigger controls shooting, machine guns can come in all shapes and sizes.  Rifles can be machine guns; shotguns can be machine guns; and—at issue here—handguns can be machine guns.[35]

48.     In contrast, a "semi-automatic" firearm "means a firearm which fires a single projectile for each single pull of the trigger and is self-reloading or automatically chambers a round, cartridge, or bullet."  See N.J.S.A. 2C:39-1(x).  Semi-automatic weapons are not machine guns and are not subject to the heightened restrictions applicable to machine guns.[36]

49.     Most modern handguns (whether pistols or revolvers) sold to consumers in the United States are semi-automatic weapons.  See N.J.S.A. 2C:39-9(k) ("'Handgun' means any pistol, revolver or other firearm originally designed or manufactured to be fired by the use of a single hand.").

**B.     Glock's Striker-Fired Pistol Design**

50.     Glock specializes in the design, manufacture, and distribution of handguns that have polymer frames, self-reloading operation, and striker-fired firing mechanisms.  Over the years, Glock's handguns have become the most popular brand of handguns sold to U.S. consumers, U.S. law enforcement, and military customers.

---

[34] See Firearms Owners' Protection Act, Pub. L. No. 99-308, § 109(a), 100 Stat. 460 (1986).

[35] Firearms - Guides - Importation & Verification of Firearms - National Firearms Act Definitions - Machinegun, BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, https://www.atf.gov/firearms/firearms-guides-importation-verification-firearms-national-firearms-act-definitions-0 (lasted updated Apr. 26, 2018).

[36] The ability of semi-automatic weapons to automatically chamber or self-reload differentiates semi-automatics from firearms designs that require manual or mechanical reloading or chambering.

17

51.     Glock handgun frames consist of the grip and frame rails, upon which the upper assembly (i.e., the slide and barrel) sits and operates.  Because they are made mostly of polymer—i.e., predominantly plastic rather than steel or wood—Glock frames are cheap and easy to produce and sell.

52.     Glock handguns have self-reloading operation, meaning that the mechanics of shooting a round will automatically place a new round in the chamber without any additional action by the shooter.  During a shot, specialized components extract the spent casing and eject it through an opening in the slide, allowing a spring in the magazine to push a new round upwards into the chamber, thus immediately reloading the gun for a new shot.

53.     Glock handguns' striker-fired firing mechanism involves a spring-loaded striker (i.e., firing pin) that initiates a shot when the striker is released by lowering the trigger bar.  The trigger bar is on a hinge and, when the gun is inactive, the end of the trigger bar is raised and restrains the spring-loaded striker.  The trigger bar is connected to the trigger, and pulling the trigger causes the end of the trigger bar to lower—thus releasing the spring-loaded striker and firing a shot if the gun is loaded.  These features differentiate Glock's design from firearms with other firing mechanisms that were more prevalent prior to Glock's launch, such as "hammer-fired" guns, for which the trigger caused a cocked-hammer mechanism to slam the striker forward.

54.     The physics of a self-reloading striker-fired handgun naturally lends itself to automatic performance.  When a shot is fired, the force of the explosion causes the slide to propel backwards and forwards again instantaneously.  The force of the return brings the striker and its firing pin back towards a freshly chambered round.  Unless the striker is restrained on its

return, it will slam against the new round and fire shots again and again without requiring any further involvement of the trigger.

55.     Thus, to prevent fully automatic operation of a handgun constructed in this manner, there must be a mechanism to interrupt the striker, and thereby prevent additional shots until the trigger is pulled again.  In Glock's U.S. handguns, that function is ordinarily performed by the trigger bar, which hinges back into place immediately following a shot.

**C.     Glock Developed and Released to Consumers a Handgun Design Readily Switchable into a Machine Gun.**

56.     The mechanics of Glock's self-reloading, striker-fired handgun means that it is, by design, inherently and readily capable of either semi-automatic or fully automatic function. The difference rests in the operation of the simple—and readily manipulable—trigger bar, which can either (a) revert to its raised, striker-restraining position after a shot, thereby blocking the next shot, or instead (b) revert to its raised position only upon the release of the trigger, which will allow shots to fire continuously until the trigger is released or the ammunition is exhausted.

57.     Indeed, one of Glock's earliest innovations was to make and market a handgun with a trigger bar that could operate either automatically or semi-automatically based on the setting of an external toggle.  And, even in Glock handgun models that are marketed as semi-automatic handguns, Glock's design situates the trigger bar so that it can all too easily be accessed and manipulated by an external part to allow the firearm to operate automatically.

58.     This specific design feature of Glock handguns to readily support either semi-automatic or automatic operation, including through external manipulation, has been obvious from the outset to insiders and outsiders alike.  And Glock's founder played a leading role in demonstrating and marketing it.

1.   **Glock Releases the G17 as its First Non-Prototype Handgun on its Dual-Functionality Platform.**

59.     Glock launched its handgun business just over forty years ago, in the 1980s.  Its inaugural model, known as the G17, is a 9mm pistol handgun equipped with a semi-automatic trigger bar and a deliberately removable backplate.  Glock's founder and principal Gaston Glock obtained a U.S. patent for the G17 design, as its inventor, in April 1982.[37]

60.     As Glock touts on its website, "[i]n the early 1980's, the semi-automatic GLOCK service pistol was born in response to meet the needs of the Austrian military.  It's [sic] polymer frame and the developed SAFE ACTION® System revolutionized the pistol market." [38]

61.     Glock has long heralded the design it launched as "innovative" and distinct in its simplicity.  Even "[t]oday, the GLOCK pistol is made from an average of only 35 parts, which is significantly fewer than any other pistol on the market and makes it more durable, reliable, and easier to maintain."[39]

62.     The original G17 design remains the foundation of Glock's handgun business.  New models are named serially from the G17 onward, and are generally typified by differences in size, differences in ammunition used, or both.  Nearly all Glock handguns released since the first G17 have involved only marginal design tweaks, without significant changes to the fundamental mechanics or core features.  Popular models in the United States include the G19 (a compact frame that shoots 9mm), the G22 (a .40 caliber with a standard-sized frame), and others.  Over the years, Glock has also issued updated "generations" of like-model types—from the

---

[37] U.S. Patent No. 4,539,889 (filed Apr. 29, 1982).

[38] History: Perfection Continues, GLOCK, https://us.glock.com/en/learn/brand/history (last visited Dec. 6, 2024).

[39] Ibid.

original Gen1 to the latest Gen5—featuring minor changes such as adding finger grooves to the grip.

63.     Other than the operation of the easily manipulable trigger bar, nothing about the G17 design—or the design of Glock's subsequent U.S. models on the same base platform—made the gun fire semi-automatically rather than automatically.  Thus, the G17 and its successors, because of Glock's design choices, have always been fully capable of automatic operation when the trigger bar remains lowered for as long as the shooter continues to pull the trigger.  Glock's leaders quickly exploited the obvious optionality this conferred.

### 2.     Making Only a Minor Internal Component Change, Glock Releases and Markets the G18.

64.     With the G17 patented and receiving a positive reception among European militaries, Glock sought to better establish its business in the U.S. market.  Led by Gaston Glock, Glock established a U.S. headquarters in Smyrna, Georgia in 1986.

65.     Shortly after establishing those U.S. operations, Glock launched its second handgun model, the G18.  Built on the same basic design as the G17, the G18 had the same frame size and 9mm ammunition caliber.  Where the G18 differed was that it featured an external toggle (i.e., a "selector switch") that reached through a cut-out on the slide that, based on the toggle's setting, could manipulate the trigger bar and make the gun function either automatically or semi-automatically.

66.     Specifically, when the toggle on the G18 is set to automatic, the trigger bar will revert back to its raised position after a shot only when the trigger is released.  Thus, pulling and holding the trigger once will cause the striker to slam repeatedly against round after round, firing them until the trigger is released or the magazine is fully expended.

67.     Glock sold and marketed the G18—and continues to sell and market it in Europe—as a machine gun.

68.     Glock's recent promotional materials for the G18 confirm that it is, for all intents and purposes, a machine gun version of the G17.  In Glock's own words, "[r]eleased in 1987 the pistol has the same characteristics like other previous models and the frame size of the service pistol classic G17."[40]

69.     Indeed, the automatic-from-the-outset G18 was so similar to the G17, apart from the change in trigger bar function, that, upon information and belief, Glock did not apply for a separate patent for the fully automatic G18, presumably because the G18's specifications fell within the design already patented for the G17.[41]

70.     The G18 is a machine gun in every practical sense of the term.  In promoting the G18, Glock's European website—accessible from the United States—promises "[f]ully automatic 9mm firepower" and says "the rate of fire in full-automatic-mode is approximately 20 rounds per second"[42]—or 1,200 rounds per minute.

71.     Glock's invention and promotion of the G18 confirms its early knowledge—and acknowledgement to the world—of the inherent ability of Glock's base handgun design to support both automatic and semi-automatic functionality.

72.     Moreover, by designing the G18 to feature "an external fire selector at the rear of the slide," Glock deliberately enabled G18 users to "switch from semi-automatic to full-

---

[40] G18, GLOCK, https://eu.glock.com/en/products/pistols/g18 (last visited Dec. 10, 2024).

[41] See U.S. Patent No. 4,539,889 (filed Apr. 29, 1982).

[42] G18, GLOCK, https://eu.glock.com/en/products/pistols/g18 (last visited Dec. 10, 2024).

automatic firing mode."[43]  The G18 thus, like today's Switched Glock Machine Guns, specifically featured an external component designed to manipulate the trigger bar to enable (or restrain) automatic fire.

73.     Through the G18, Glock thus identified, marketed, and demonstrated the easy <u>external</u> on-off switchability that was integral to its design.  Glock continues to promote the external switchability of its core firearm design in its G18 marketing materials.

### 3.     Gaston Glock and Jorge Leon Separately Invent an External Devices that Allow a G17 to Function Like the G18 Machine Gun.

74.     Around the time that the G18 went to market, Jorge Leon, a 22-year old Venezuelan inventor, began studying the firing mechanism of the G17.  A government agency in Venezuela had indicated that the G17 would be more desirable to procure if it possessed an external safety against accidental discharge.  Leon set out to design and market such a safety in response.

75.     While working on that project, Leon realized that if he inserted a small external component through the G17's removable backplate, he could cause the G17's trigger bar to remain lowered after a pull of the trigger until the trigger was released.  This enabled the G17 to fire automatically, functioning as a handheld machine gun.  Though this result was not the safety function sought by the Venezuelan government, Leon believed that there could be a market for this type of simple add-on component, too.

76.     Leon designed and prototyped a component that allowed the weapon's user to toggle between automatic operation and semi-automatic operation, just like on the G18.

---

[43] <u>Ibid.</u>

77.     Beger, C.A., a distributor of Glock handguns in Venezuela, learned of Leon's prototype, and passed the information on to Glock's founder and leader, Gaston Glock.

78.     In April of 1988, Beger invited senior officials from Venezuelan military and law enforcement agencies to meet Gaston Glock in Caracas and to discuss and demonstrate the G17. They also invited Leon.

79.     At a Caracas shooting gallery, in the presence of Beger, Venezuelan military and police officials, and Leon, Gaston Glock fired and demonstrated the G17.  He then took a small prototype switch from his pocket, detached the gun's backplate, and affixed that switch to his gun.  Gaston Glock raised the gun again and fired it as a handheld machine gun, in bursts of automatic fire.

80.     Leon recognized that Gaston Glock was using an auto sear, similar in function to, yet different in design and appearance from, the one he had designed.

81.     After the demonstration concluded, Leon met with Gaston Glock.  Leon held and examined Gaston Glock's switch.  The two devices' basic function—to hold down the trigger bar following a single trigger pull to maintain the trigger bar's lowered position until the trigger is released—was the same; the difference was that Gaston Glock's switch, when inserted, enabled the G17 to fire only as a machine gun, while Leon's prototype had a toggle that allowed the user to select between semi-automatic and fully automatic machine gun modes.  Physically, Leon's prototype was blocky and sat mostly external to the gun, to accommodate his selector mechanism.  Gaston Glock's switch, by contrast, fit mostly internal to the gun, with a rear flush plate that neatly replaced the original backplate.

82.     Gaston Glock asked to see Leon's device, but Leon had not brought his prototype to the demonstration.

83.     Leon was later invited to Gaston Glock's hotel, and Leon brought his fire selector system device with him.  Following breakfast together, Gaston Glock and Leon went to Gaston Glock's hotel room.  Once there, Gaston Glock examined Leon's prototype, which was affixed to an unloaded G17.  Gaston Glock then pulled and released the trigger to evaluate the switched gun's action and understand how the trigger bar mechanics operated after affixing Leon's device.

84.     Based on this meeting 36 years ago, Gaston Glock knew first-hand that an outsider in South America—far from Glock's European or Georgia operations—could design and make a simple add-on component that turned a G17 into a machine gun.

85.     Years later, Leon successfully applied to patent his design as the "Fire Selector System for Glock (FSS-G)."  His patent application described his invention in nearly the exact same terms that Glock used to describe the G18.[44]  Leon was awarded his patent in 1998 and marketed it to military and law enforcement customers.[45]

86.     After Leon's design became public, it did not take long for Switched Glock Machine Guns to show up in connection with crimes in the United States.  For example, an ATF investigation in 2002 and 2003 of a South American arms trafficker who had been in business since 1999 resulted in the recovery of seven Switched Glock Machine Guns and an additional nine Glock switches from persons arrested in the United States.[46]

---

[44] Compare U.S. Patent No. 5,705,763 (filed July 18, 1996), with G18, GLOCK, https://eu.glock.com/en/products/pistols/g18 (last visited Dec. 10, 2024) (describing "fire selector" "switch" to "full-automatic firing mode").

[45] Chris Hrapsky, Glock Switch Creator Would 'Rather Invent Any Other Thing' in Wake of Unintended Consequences, KARE 11 (Feb. 7, 2024, 10:31 PM), https://www.kare11.com/article/news/local/kare11-extras/dangers-of-the-controversial-glock-switch-as-told-by-its-inventor/89-9fd2745b-4616-4f8e-b993-3a7249d10f85.

[46] Internet Arms Trafficking, BUREAU OF ALCOHOL , TOBACCO, FIREARMS & EXPLOSIVES, https://www.atf.gov/our-history/internet-arms-trafficking (last updated May 15, 2020).

### 4.   The Mechanics of Glock Switches

87.    Today, after-market Glock switches often resemble the mechanics and design set forth by Leon in his patent.  Like Leon's design, they sit externally against the rear of the slide and tend to come with peg-shaped "selectors" that, like the G18's external selector switch, allow the user to toggle between semi-automatic and fully automatic modes.

88.    Certain other prevalent switches cause U.S.-marketed Glock handguns to fire only fully automatically, like the switch that Gaston Glock brought to Venezuela and demonstrated to Leon in 1988.

89.    Visually, Glock switches containing selectors look like "very small Lego piece[s],"[47] that can be attached to the back of handguns, as seen on the right in the image of a switched Glock below.[48]



---

[47] Julia Rothman & Shaina Feinberg, This $20 Device Turns a Handgun Into an Automatic Weapon, N.Y. TIMES (July 1, 2022), https://www.nytimes.com/2022/07/01/business/auto sears-handgun-automatic.html.

[48] Marek Mazurek, South Bend Police Seeing More Modified Handguns; New Bill Would Ban Glock 'Switch' Devices, SOUTH BEND TRIBUTE (Mar. 23, 2023, 6:17AM), https://www.southbendtribune.com/story/news/local/2023/03/23/indiana-moves-closer-to-banning-device-that-turns-handguns-automatic/70037462007.

90.    They are approximately the size of a dime:[49]



91.    Either style of Glock switches works through the operation of a protrusion called a disconnector, which inserts into the slide from the rear: [50]



---

[49] BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, ATF FIREARMS & AMMUNITION TECHNOLOGY DIVISION TECHNICAL BULLETIN 17-04 (2017), United States v. Freitas, No. 20-CR-223 (N.D. Cal. May 29, 2020), ECF 42, Ex. 5; see also Travis Breese, Focus: Dime-Sized Device Is Creating Mini-machine Guns in Louisville, WHAS 11 (Oct. 6, 2022, 9:32 PM), https://www.whas11.com/article/news/investigations/focus/focus-glock-switches-handgun-conversion-louisville-minors-no-more-red-dots-kentucky/417-e7aedde6-0ec0-49b8-a0a6-b5ef9f64a2e8 ("It's no bigger than a dime, but it turns a semi-automatic Glock pistol into a fully automatic gun.").

[50] What's Full Auto Glock Switch and What's It Installation Guide?, VITO WHISPER (Aug. 21, 2023), https://vitowhisper.com/whats-full-auto-glock-switch-and-whats-it-installation-guide; Lynda Cohen, N.J. Among

92.     Once installed, the disconnector manipulates the trigger bar to change how it responds to the action of the trigger.  As noted above, absent the switch, pulling the trigger of a U.S.-marketed Glock firearm will cause the trigger bar to descend—freeing the spring-loaded striker to release and initiate the first shot—but the trigger bar will immediately revert back into raised position, restraining the striker and preventing automatic fire.  With the switch installed, however, the trigger bar will stay down so long as the trigger is still being pulled.  Thus, pulling the trigger and holding it will allow the gun to continue firing, again and again, as a machine gun, as the slide reciprocates with recoil.

93.     Affixing a switch to a Glock handgun is easy and requires no particular sophistication.  This is in contrast to most other handguns, even other "striker-fired" handguns, which do not easily accept auto sears, and instead require time-consuming and cumbersome work to be switched into automatic weapons.

94.     For generations 1 through 4 ("Gen1" through "Gen4") of Glock's handgun models, affixing a switch involves simply using a screwdriver to slide out the rear removable plastic backplate of the gun's slide, and placing the auto sear into the backplate's position.  Countless videos available online explain how to easily do so in just a few minutes.[51]

95.     Glock has produced and distributed these Gen1 to Gen 4 handguns for nearly four decades now, since Glock's 1986 entry into the U.S. market.  Those models, including both guns

---

Attorneys General Looking into Glock Machine Gun Conversion, BREAKING AC (Mar. 26, 2024), https://breakingac.com/news/2024/mar/26/nj-among-attorneys-general-looking-into-glock-machine-gun-conversion.

[51] See, e.g., Letreactcom, How to Install Glock Full Auto Switch, FACEBOOK (June 20, 2022, 1:29 AM), https://www.facebook.com/100063815394590/videos/how-to-install-glock-full-auto- switch/1185300678678624; Knifehomes, How to Install Glock Full Auto Switch, FACEBOOK (Apr. 17, 2021, 3:12  AM), https://www.facebook.com/kniveshomes/videos/how-to-install-glock-full-auto- switch/227916132441449; BaaSicStuff, Auto Conversion for Any Glock Pistol, in 90 Sec, YOUTUBE (Mar. 23, 2023), https://www.youtube.com/watch?v=fSCVPVysdwg.

sold recently and those sold decades ago, are now ubiquitous among crime gun recoveries in New Jersey and elsewhere.  In addition, even though they are not Glock's latest models, Glock continues to market and distribute Gen3 and Gen4 handguns to civilian consumers in New Jersey and elsewhere through its distribution network and approved partner dealers.

96.      Glock's Generation 5 ("Gen5") line of handgun models, which entered the market in 2017, require only minor filing or clipping of a small plastic tab, on the rear of the frame, before an auto sear may be affixed.  This presents no meaningful obstacle or deterrent to criminals seeking to switch their Glock handguns to machine gun configuration.  A Glock Gen5 handgun can still be switched to a fully automatic machine gun configuration in a matter of minutes without any particular expertise.  One online video with over 731,000 views provides step-by-step instructions on how to switch a Gen5 handgun in mere minutes, while noting that the user "only had to take that little notch off," which "wasn't that big of a deal."[52]

## II.      Glock Knows That its Handguns Are Ubiquitously Used as Machine Guns.

### A.      Background

97.      Auto sears are cheap and easy to acquire.  Readymade versions can be found online for as little as $20.[53]  They can also be printed using a 3D printer in about twelve minutes

---

[52] Royal Range USA, Full Auto Glock 17 GEN5!!!, YOUTUBE (Aug. 30, 2017), https://www.youtube.com/watch?v=JSIX0HsczlY.

[53] Julia Rothman & Shaina Feinberg, This $20 Device Turns a Handgun Into an Automatic Weapon, N.Y. TIMES (July 1, 2022), https://www.nytimes.com/2022/07/01/business/auto-sears-handgun-automatic.html.

at a cost of just nine cents.[54]  They are often created using downloadable blueprints that are readily available online.[55]

98.     Many auto sears are made in China and marketed online as other household or recreational products.  Once imported to the United States, they are widely available within the criminal gun market.

99.     In light of these commonly used methods to obtain them, auto sears are nearly impossible to trace and intercept, and are impossible to eradicate.[56]

**B.     The Devastating Impact of Switched Glock Machine Guns**

100.     A Switched Glock Machine Gun can, like the G18, fire up to 1,200 rounds per minute—a faster rate of fire than the standard M4 machine gun used by the United States military.[57]  As a recent federal complaint filed against an accused auto sear trafficker notes, the defendant bragged that his auto sears were compatible with a Gen5 Glock handgun and could make it fire "30 rounds in two seconds."[58]  By contrast, an unswitched Glock handgun can fire only as fast as the shooter can repeatedly pull and release the trigger, which varies based on skill and experience level, but would never remotely approach the rate of fire of a Switched Glock Machine Gun.

---

[54] STATE OF NEW JERSEY COMMISSION OF INVESTIGATION, ILLEGAL FIREARMS: USE AND TRENDS IN NEW JERSEY, at A-6 (Sept. 2024), https://nj.gov/sci/home/sci-finds-existing-state-laws-need-revision-to-better-combat-homemade-ghost-guns-and-modified-firearms/documents/2024-10-SCI-Illegal-Firearms-Report.pdf.  Note: this cost does not include the cost of the printer itself.

[55] Id. at 5.

[56] Ibid.; State of New Jersey Commission of Investigation, SCI Public Hearing on Illegal Gun Trends, N.J. LEGIS. (Apr. 16, 2024), https://www.njleg.state.nj.us/archived-media/2024/CIR-meeting-list/media-player?committee=CIR&agendaDate=2024-04-16-10:00:00&agendaType=H&av=V.

[57] Press Release, Fort Worth Manufacturer Charged in Glock Switch Case, U.S. ATT'Y'S OFF., N. DIST. OF TEX., (Nov. 18, 2022), https://www.justice.gov/usao-ndtx/pr/fort-worth-manufacturer-charged-glock-switch-case.

[58] Compl. Aff. ¶ 7, United States v. Hendrie, No. 23-MJ-4115 (W.D.N.Y. July 20, 2023), ECF No. 1.

101.     Instances of recoveries and arrests involving Switched Glock Machine Guns have

been widely reported, including by the Bureau of Alcohol, Firearms, Tobacco and Explosives

("ATF"), since the early 2000s.  For example, more than twenty years ago, a publicly reported

ATF investigation resulted in dozens of arrests and the seizure of seven Switched Glock Machine

Guns and an additional nine Glock switches.[59]

102.     In recent years, Switched Glock Machine Guns have become increasingly

prevalent, with auto sears "everywhere on the street right now," according to Jefferey Boshek, a

21-year ATF veteran who now serves as the special agent in charge of the Dallas Field

Division.[60]

103.     A company that uses audio sensors to monitor gunfire has reported that there were

75,544 recorded rounds of "suspected automatic gunfire in 2022 in portions of 127 cities covered

by its microphones," representing a stunning "49 percent increase from the year before."[61]

According to law enforcement, this increase is attributable, in substantial part, to fully automatic

handguns being seen by teenagers as "status symbol[s] that provide[ ] a competitive

advantage."[62]  As another law-enforcement official explained, "[t]hey think it's cool, they think

it looks cool, sounds cool, they want to brag about having it."[63]

---

[59] Internet Arms Trafficking, BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, https://www.atf.gov/our-history/internet-arms-trafficking  (last updated May 15, 2020).

[60] Alain Stephens & Keegan Hamilton, The Return of the Machine Gun, THE TRACE (Mar. 24, 2022), https://www.thetrace.org/2022/03/auto-sears-gun-chip-glock-switch-automatic-conversion.

[61] Ernesto Londoño & Glenn Thrush, Inexpensive Add-on Spawns a New Era of Machine Guns, N.Y. TIMES (Aug. 12, 2023), https://www.nytimes.com/2023/08/12/us/guns-switch-devices.html.

[62] Ibid.

[63] Jeremy Harris, Illegal 'Glock Switch' Blamed for Increase of Rounds Being Fired in Western Washington Shootings, KPIC (Oct. 7, 2023, 11:02 AM), https://komonews.com/news/local/illegal-glock-switch-blamed-for-increase-bullets-rounds-fired-in-western-washington-shootings-ghost-guns-atf-machine-gun-gun-violence-crime-firearms-law-enforcement-police-seattle-spd-chief-adrian-diaz-investigations.

104.    One ATF agent describes the use of guns equipped with auto sears as "one of the scariest things" the agency has dealt with in decades.[64]

105.    As then-New Jersey State Police Lieutenant Colonel Joseph Brennan (RET.) observed in recent public testimony, "[t]here's more likelihood of unintended targets" with Switched Glock Machine Guns because the shooters "can't control where the bullets go."[65]  The uncontrolled spray of bullets from Switched Glock Machine Guns is, as noted above, an inevitable consequence of the enormous and uncontrollable recoil that necessarily comes from firing so many shots at once.

106.    Auto sears can be easily purchased by anyone online via popular social media platforms,[66] and anyone can learn how to install them with the help of online tutorials available on a variety of websites.  Frequently, these posts and videos refer specifically to switching Glock handguns into automatic weapons.[67]

107.    The epidemic of switched automatic handguns has been confirmed by federal, state, and local law enforcement around the country.  For example:

---

[64] Alain Stephens & Keegan Hamilton, The Return of the Machine Gun, THE TRACE (Mar. 24, 2022) (emphasis added), https://www.thetrace.org/2022/03/auto sears-gun-chip-glock-switch-automatic-conversion.

[65] STATE OF NEW JERSEY COMMISSION OF INVESTIGATION, ILLEGAL FIREARMS: USE AND TRENDS IN NEW JERSEY, at 4 (Sept. 2024), https://nj.gov/sci/home/sci-finds-existing-state-laws-need-revision-to-better-combat-homemade-ghost-guns-and-modified-firearms/documents/2024-10-SCI-Illegal-Firearms-Report.pdf.

[66] Chris Hrapsky, Glock Switch Creator Would 'Rather Invent Any Other Thing' in Wake of Unintended Consequences, KARE 11 (Feb. 7, 2024, 10:31 PM), https://www.kare11.com/article/news/local/kare11-extras/dangers-of-the-controversial-glock-switch-as-told-by-its-inventor/89-9fd2745b-4616-4f8e-b993-3a7249d10f85; Alain Stephens & Keegan Hamilton, Tiny 'Glock Switches' Have Quietly Flooded the US With Deadly Machine Guns, VICE (Mar. 24, 2022), https://www.vice.com/en/article/glock-switches-auto sears.

[67] See, e.g., Royal Range USA, Full Auto Glock 17 GEN5!!!, YouTube (Aug. 30, 2017), https://www.youtube.com/watch?v=JSIX0HsczlY ("Just to show you I'm gonna switch this. . . you have the full auto selection, what we've been shooting, and then you have the semi. Switch it to semi auto and we get back to the normal function.").

a.  Nationwide: ATF reported a 400% increase in recoveries of switched machine guns from 2020 to 2021[68] and a 570% increase in machine gun conversion parts recovered between 2017 and 2021 as compared to the previous five-year period.[69] These numbers prompted federal officials to directly contact Glock "in search of ways to modify the weapon to make it harder to attach switches."[70]

b.  Dallas: Officials reported a 2,750% increase in auto sear recoveries from 2021 to 2022.[71]

c.  Louisville: Officials reported an 800% increase in auto sear recoveries from 2021 to 2022.[72]

d.  St. Louis: Officials reported a 575% increase in auto sear recoveries from 2021 to 2022.[73]

e.  Oklahoma City: Officials reported a 500% increase in Glock switch recoveries from 2021 to 2022 and a nearly 330% increase from 2022 as of November 2023.[74]

---

[68] See Alain Stephens & Keegan Hamilton, The Sacramento Mass Shooting Likely Involved a Converted Machine Gun, Officials Say, THE TRACE (Apr. 7, 2022), https://www.thetrace.org/2022/04/sacramento-mass-shooting-auto sears-machine-gun.

[69] Ernesto Londoño & Glenn Thrush, Inexpensive Add-on Spawns a New Era of Machine Guns, N.Y. TIMES (Aug. 12, 2023), https://www.nytimes.com/2023/08/12/us/guns-switch-devices.html.

[70] Ibid.

[71] See Katy Blakey, Shootout with Dallas Murder Suspect Renews Focus on Illegal 'Glock Switches', NBC DFW (Nov. 21, 2023, 5:39 PM), https://www.nbcdfw.com/news/local/shootout-with-dallas-murder-suspect-renews-focus-on-illegal-glock-switches/3393818/.

[72] Travis Breese, Focus: Dime-Sized Device Is Creating Mini-machine Guns in Louisville, WHAS 11 (Oct. 6, 2022, 9:32 PM), https://www.whas11.com/article/news/investigations/focus/focus-glock-switches-handgun-conversion-louisville-minors-no-more-red-dots-kentucky/417-e7aedde6-0ec0-49b8-a0a6-b5ef9f64a2e8.

[73] See Rachel Lippmann, St. Louis-Area Police Are Seizing More Modified Handguns—Here's Why That's Bad News, ST. LOUIS PUB. RADIO (Jan. 5, 2023, 6:18 PM), https://www.stlpr.org/law- order/2023-01-05/st-louis-area-police-are-seizing-more-modified-handguns-heres-why-thats-bad-news.

[74] See Josh Dulaney, 3D Printed Device to Turn Pistols into Automatic Weapons Increasingly Used in Crimes in Oklahoma, Police Say, OKLAHOMAN (Nov. 29, 2023, 5:00 PM), https://www.oklahoman.com/story/news/2023/11/29/glock-switch-3d-printing-crime-on-the-rise-oklahoma-okc/71719158007.

C.   **Glock Knows Its Handguns Are Being Switched**

108.   Glock has been fully aware of the recent sharp increase in Switched Glock Machine Guns, even receiving direct outreach from the U.S. Federal Government.[75]

109.   On April 11, 2022, forty-one members of Congress published an open letter highlighting the increased use of auto sears in shootings nationwide, specifically identifying Glock-made handguns by name.[76]  In March of 2024, the City of Chicago sued Glock to stop it from continuing to flood switchable Glock handguns onto the streets of Chicago.[77]  On March 26, 2024, the New Jersey Attorney General, together with Attorneys General of eleven other states and the District of Columbia, sent Glock a letter demanding that Glock address the "mounting reports about devastation and public terror caused by Glock handguns that became illegal machine guns when fitted with cheap, ubiquitous inserts known as 'switches' or 'auto sears.'"[78]

110.   There have also been countless high-profile prosecutions, news articles, and public events in recent years that have identified the use—or intended use—of Switched Glock Machine Guns, including, for example, in:

---

[75] Ernesto Londoño & Glenn Thrush, Inexpensive Add-on Spawns a New Era of Machine Guns, N.Y. TIMES (Aug. 12, 2023), https://www.nytimes.com/2023/08/12/us/guns-switch-devices.html.

[76] Letter from Representative Fletcher et al., to Marvin Richardson, Acting Dir., BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES (Apr. 11, 2022), https://carbajal.house.gov/uploadedfiles/2022-04-11_letter_to_atf_on_auto_sears_final_copy.pdf.

[77] Compl. ¶ 13, City of Chicago v. Glock, Inc., No. 2024CH02216 (Cir. Ct. Cook Cnty. Mar. 19, 2024). In July of this year, Chicago then withdrew and refiled its suit against Glock to include, among other things, additional defendants and different causes of action while continuing to allege the same course of conduct. Compl. ¶ 133–82, City of Chicago v. Glock, Inc., No. 2024CH06875 (Cir. Ct. Cook Cnty. July 22, 2024).

[78] Letter from Attorney General Platkin Re: City of Chicago v. Glock, Inc., No. 2024CH02216 (Cir. Ct. Cook County), OFF. N.J. ATT'Y GEN. (Mar. 26, 2024); see also Press Release, AG Platkin Leads Coalition Telling Glock to Keep Evidence Related to Firearms' Easy Conversion Into Machine Guns, OFF. N.J. ATT'Y GEN. (Mar. 26, 2024), https://www.njoag.gov/ag-platkin-leads-coalition-telling-glock-to-keep-evidence-related-to-firearms-easy-conversion-into-machine-guns.

a.   The 2019 murder of four family members who had gathered to watch football in a backyard in Fresno, California.[79]

b.   The 2021 murder of a Houston police officer,[80] followed four months later by the shooting of three more Houston police officers.[81]

c.   The 2021 discovery of a Switched Glock Machine Gun hidden in the home of a self-described "incel" in Ohio, who intended to kill sorority members at a local university.[82]

d.   A 2022 mass shooting in Sacramento, California that resulted in the death of six people, including three innocent bystanders.[83]

e.   A 2022 New Year's Eve shooting in Mobile, Alabama, during which the shooter "fired a Glock .40 caliber pistol, which was illegally switched with a machinegun-conversion device and equipped with an extended magazine, into a crowd of revelers on Dauphin Street during Mobile's New Year's Eve celebration."[84]

111.   Switched Glock Machine Guns have become so ubiquitous that they are now commonly referenced by law enforcement authorities and in the popular media.  For example,

---

[79] See Alain Stephens & Keegan Hamilton, The Sacramento Mass Shooting Likely Involved a Converted Machine Gun, Officials Say, THE TRACE (Apr. 7, 2022), https://www.thetrace.org/2022/04/sacramento-mass-shooting-auto sears-machine-gun.

[80] Miya Shay, Bodycam Video of Shootout that Killed Officer Shows Suspect Used Illegally Modified Gun, Police Say, ABC (Oct. 12, 2021), https://abc7.com/houston-police-shooting-bodycam-video-deon-ledet-william-bill-jeffrey/11118603; Local Heroes Who Paid the Ultimate Sacrifice: Houston Police Officers Killed in the Line of Duty at 124, HOUSTON POLICE DEP'T MUSEUM  (June 2023), https://www.houstontx.gov/police/museum/ultimate_sacrifice_book.pdf.

[81] Joel Eisenbaum, HPD Shootout: Illegally Modified Gun Used to Injure 3 HPD Officers Shoots 50 Rounds in 5 Seconds, CLICK2HOUSTON (Jan. 28, 2022), https://www.click2houston.com/news/local/2022/01/29/hpd-shootout-illegally-modified-gun-used-to-injure-3-hpd-officers-shoots-50-rounds-in-5-seconds.

[82] Alain Stephens & Keegan Hamilton, The Return of the Machine Gun, THE TRACE (Mar. 24, 2022), https://www.thetrace.org/2022/03/auto-sears-gun-chip-glock-switch-automatic-conversion (emphasis added).

[83] Sam Stanton, Three Charged with Murder in Connection with Sacramento Mass Shooting. Here's What We Know, THE SACRAMENTO BEE (May 3, 2022), https://www.sacbee.com/news/local/crime/article261026102.html.

[84] Press Release, Mobile Man Sentenced to Ten Years in Prison for Possessing and Firing an Illegal Machinegun During New Year's Eve Celebrations, U.S. ATT'Y'S OFF., S. DIST. OF ALA., (Sept. 18, 2023), https://www.justice.gov/usao-sdal/pr/mobile-man-sentenced-ten-years-prison-possessing-and-firing-illegal-machinegun-during.

federal prosecutors and agents around the country regularly refer to "Glock Switches" in statements to the public.[85]

112.    Additionally, the phrase "Glock Full Auto Switch" has been among the most frequent firearm-related internet search terms in the United States in recent years.[86]  There is a Wikipedia page devoted solely to the term "Glock Switches."[87]

---

[85] Press Release, Indictment: So-call 'Glock Switches' Would Have Turned Pistols int Machinegun, U.S. ATT'Y'S OFF., S. DIST. OF KAN., (May 30, 2019), https://www.atf.gov/es/news/press-releases/indictment-so-called-%E2%80%98glock-switches%E2%80%99-would-have-turned-pistols-machineguns; Press Release, Brooklyn Park Felon Indicted for Possessing a Firearm, Glock Switch, U.S. ATT'Y'S OFF., DIST. OF MINN., (May 26, 2022), https://www.atf.gov/news/press-releases/brooklyn-park-felon-indicted-possessing-firearm-glock-switch; Press Release, Norfolk Man Sentenced for Possessing Glock Switches and Glock Handgun in Furtherance of Drug-Trafficking Crime, U.S. ATT'Y'S OFF., E. DIST. OF VA., (Aug. 26, 2022), https://www.atf.gov/news/press-releases/norfolk-man-sentenced-possessing-glock-switches-and-glock-handgun-furtherance-drug; Press Release, Fort Worth Manufacturer Charged in Glock Switch Case, U.S. ATT'Y'S OFF., N. DIST. OF TEX., (Nov. 18, 2022), https://www.atf.gov/news/press-releases/fort-worth-manufacturer-charged-glock-switch-case; Press Release, Jacksonville Man Sentenced to Five Years in Federal Prison for Selling Machinegun-Conversion Device to Undercover Agent, U.S. ATT'Y'S OFF., M. DIST. OF FLA., (Dec. 2, 2022), https://www.atf.gov/news/press-releases/jacksonville-man-sentenced-five-years-federal-prison-selling-machinegun-conversion-device; Press Release, Starkville Man to Serve 5 Years in Prison for Possessing a Glock Switch, U.S. ATT'Y'S OFF., N. DIST. OF MISS., (Aug. 11, 2023), https://www.atf.gov/news/press-releases/starkville-man-serve-5-years-prison-possessing-glock-switch; Press Release, Trafficker of 3D-Printed "Glock Switches" and "Auto-Sears" Sentenced to Over Seven Years in Federal Prison, U.S. ATT'Y'S OFF., S. DIST. OF IND., (Sept. 14, 2023), https://www.atf.gov/news/press-releases/trafficker-3d-printed-%E2%80%9Cglock-switches%E2%80%9D-and-%E2%80%9Cauto-sears%E2%80%9D-sentenced-over-seven-years-federal; Press Release, Possession of "Glock Switches" Leads to 65 Month Sentence in Federal Prison for Purcell Man, U.S. ATT'Y'S OFF., S. DIST. OF OKLA., (Oct. 6, 2023), https://www.atf.gov/news/press-releases/possession-%E2%80%9Cglock-switches%E2%80%9D-leads-65-month-sentence-federal-prison-purcell-man; Press Release, Cincinnati Man Pleads Guilty to Possessing Glock Switch, U.S. ATT'Y'S OFF., S. DIST. OF OHIO, (Oct. 27, 2023), https://www.atf.gov/news/press-releases/cincinnati-man-pleads-guilty-possessing-glock-switch; Press Release, Franklin Man Sentenced to Two Years in Federal Prison for 3-D Printing and Trafficking Firearms and Glock Switches, U.S. ATT'Y'S OFF., S. DIST. OF IND., (Jan. 5, 2024), https://www.justice.gov/usao-sdin/pr/franklin-man-sentenced-two-years-federal-prison-3-d-printing-and-trafficking-firearms; Press Release, New York Man Sentenced to More Than 10 Years in Prison for Trafficking Firearms and Methamphetamine, U.S. ATT'Y'S OFF., DIST. OF MASS., (Jan. 18, 2024), https://www.atf.gov/news/press-releases/new-york-man-sentenced-more-10-years-prison-trafficking-firearms-and-methamphetamine; Press Release, Violent Felon Armed With Switch Charged With Firearm Crime, U.S. ATT'Y'S OFF., N. DIST. OF TEX., (Aug. 12, 2024), https://www.justice.gov/usao-ndtx/pr/violent-felon-armed-switch-charged-firearm-crime; Press Release, Dallas Gang Member Arrested With Switch Detained Pending Trial, U.S. ATT'Y'S OFF., N. DIST. OF TEX., (Nov. 19, 2024), https://www.justice.gov/usao-ndtx/pr/dallas-gang-member-arrested-switch-detained-pending-trial; Internet Arms Trafficking, BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, https://www.atf.gov/our-history/internet-arms-trafficking (last updated May 15, 2020).

[86] U.S. DEP'T OF JUST., ATF, NATIONAL FIREARMS COMMERCE AND TRACKING ASSESSMENT: FIREARMS IN COMMERCE 37 (May 5, 2022), https://www.atf.gov/firearms/docs/report/national-firearms-commerce-and-trafficking-assessment-firearms-commerce-volume.

[87] Glock Switch, WIKIPEDIA, https://en.wikipedia.org/wiki/Glock_switch (last visited Dec. 10, 2024).

113.    In pop music "Glock switches" and idioms of "spraying" or "blitzing" victims with Glock handguns have become common.  For example, the 2022 song "Jimmy Cooks" by Drake featuring 21 Savage—which debuted at #1 on the U.S. Billboard Hot 100[88] and has been streamed more than one billion times on Spotify[89]—includes the lyric: "[t]his Glock .45 came with a switch."[90]  21 Savage previously referenced Switched Glock Machine Guns in "Glock In My Lap," in which he warns he would "[s]pray the whole block, I don't give a damn."[91] Another example is the 2021 song "Danny Block" from rapper Lil Zay Osama, which includes the lyrics: "I just got a brand new Glock with a fifty and a switch . . . I just popped one of my opps, I'm finna go do another hit."[92]

114.    In the 2021 song "Glock With A Switch," rapper Virgil Gibson, known as PGF Nuk, waves switched Glock handguns to the lyrics: "Four Nick with a drum,[93] a Glock with a switch . . . I won't miss, not shootin' off corners, we run up and blitz."[94]  PGF Nuk continued

---

[88] Gary Trust, Drake & 21 Savage's 'Jimmy Cooks' Soars in at No. 1 on Billboard Hot 100, BILLBOARD (June 27, 2022), https://www.billboard.com/music/chart-beat/drake-21-savage-jimmy-cooks-number-1-hot-100-1235106933/.

[89] Drake, Jimmy Cooks (feat. 21 Savage), on HONESTLY, NEVERMIND, SPOTIFY https://open.spotify.com/track/3F5CgOj3wFlRv51JsHbxhe (last visited Dec. 11, 2024) (showing 1,084,018,113 unique streams).

[90] Rania Aniftos, Here Are the Lyrics to Drake's 'Jimmy Cooks' Feat. 21 Savage, BILLBOARD (July 6, 2022), https://www.billboard.com/music/lyrics/drake-21-savage-jimmy-cooks-lyrics-1235111311/.

[91] Glock in My Lap – 21 Savage & Metro Boomin, GENIUS (Oct. 2, 2020), https://genius.com/21-savage-and-metro-boomin-glock-in-my-lap-lyrics.

[92] Lil Zay Osama, Danny Block, LYRICS.AZ (Aug. 26, 2021), https://lyrics.az/lil-zay-osama/-/danny-block.html. Last year, Lil Zay Osama was arrested in Chicago for possession of multiple illegal weapons, including a Switched Glock Machine Gun.  See Gabriel Bras Nevares, Lil Zay Osama Arrested For Gun Possession & Robbery: Report, HOT NEW HIP HOP (Dec. 15, 2023), https://www.hotnewhiphop.com/745197-lil-zay-osama-arrest-gun-theft-hip-hop-news.  He was also arrested in late 2022 for illegal firearm possession after allegedly leaving a Switched Glock Machine Gun in the back of an Uber in New York City.  See Bill Donahue, Rapper Lil Zay Osama Facing Federal Gun Charge After Allegedly Leaving Loaded Glock in Uber, BILLBOARD (Jan. 26, 2024), https://www.billboard.com/business/legal/lil-zay-osama-facing-federal-gun-charge-loaded-glock-uber-1235590157/.

[93] A likely reference to a .45-caliber pistol with a high-capacity drum magazine.

[94] PGF Nuk, PGF Nuk—"Glock With A Switch" (Music Video) Shot by @LouVisualz, YOUTUBE (Nov. 30, 2021), https://m.youtube.com/watch?v=otQPnIO5Yfs&pp=ygUScGdmIG51ayBnbG9jayB3aXRo.  In March 2022, two

promoting Glock switches in his 2022 album "Switch Music,"[95] advertised on residential neighborhood billboards:[96]



The titular song opens with the lyrics "You got a switch, I got a switch . . . we can blitz," and the chorus mimics a machine gun's sound.[97]

115.  Frequently, auto sear makers even print Glock logos on their switches[98]—a marking that Glock has had trademarked since 1986.[99]  Glock surely knows that auto sears with its logo are being sold, and that the makers of such auto sears benefit from associating

Switched Glock Machine Guns were recovered in 20-year-old Gibson's car, and he was indicted for using a machine gun during a violent crime.  Indictment, United States v. Gibson, No. 1:24-CR-339 (N.D. Ill. July 11, 2024).

[95] PGF Nuk – Switch Music, GENIUS (July 8, 2022), https://genius.com/albums/Pgf-nuk/Switch-music.

[96] Frank Main et al., In Chicago, Handguns Turned into High-Capacity Machine Guns Fuel Deadly Violence, NPR (Oct. 28, 2022, 5:00AM), https://www.npr.org/2022/10/28/1131026241/chicago-handgun-violence-auto sears-machine-gun.

[97] PGF Nuk – Switch Music, GENIUS (July 8, 2022), https://genius.com/Pgf-nuk-switch-music-lyrics.

[98] See, e.g., Dan Zimmerman, VIDEO: Young Teens Show Off Their Illegal GLOCK Full-Auto Switches, THE TRUTH ABOUT GUNS (Sept. 29, 2022), https://www.thetruthaboutguns.com/video-young-teens-show-off-their-illegal-glock-full-auto-switches;  Peter Yankowski,  More 'Switches' that Convert Weapons into Machine Guns Turning up in CT, Police Say, CT INSIDER (Sept. 12, 2022, 2:54PM), https://www.ctinsider.com/news/article/More-switches-that-convert-weapons-into-17435267.php.

[99] Glock—Trademark Details, JUSTIA TRADEMARKS, https://trademarks.justia.com/734/83/glock-73483803.htmlh (last visited Dec. 10, 2024).

themselves with the Glock brand by implying to buyers that their auto sears are associated with or authorized by Glock.  Yet, to the best of the Attorney General's knowledge, Glock has never taken any legal action to stop such misuse of its trademarks, thereby acquiescing to such use by auto sears manufacturers.[100]



116.    Glock switches have become so deeply associated with Glock itself that customers have mailed them to the company's headquarters for repairs.[101]

117.    On social media, including on Glock's own official site with millions of followers, Glock makes no effort to discourage the use of its products as Switched Glock Machine Guns.  To the contrary, Glock's official Facebook page, which Glock's United States website invites consumers to "Follow," provides access to videos and comments glamorizing the use of Switched Glock Machine Guns.  Glock's Facebook page, whose content Glock controls, has 1.8 million "likes" and 1.9 million "followers."

---

[100] Press Release, <u>Federal Authorities Seize Over 350 Website Domains Used to Import Illegal Switches and Silencers from China</u>, U.S. ATT'Y'S OFF., DIST. OF MASS. (Sept. 11, 2024), <u>https://www.justice.gov/usao-ma/pr/federal-authorities-seize-over-350-website-domains-used-import-illegal-switches-and</u>.

[101] Chip Brownlee, <u>ATF Director Urges Action on Auto Sears 'Flooding our Communities'</u>, THE TRACE (Mar.1, 2023), <u>https://www.thetrace.org/2023/03/atf-auto sears-dettelbach-machine-gun</u>.

39

118.    Glock sets the settings of its Facebook business page so that the page displays not only Glock's own postings, but also any third-party postings that tag Glock.

119.    As of October 28, 2024, users of Glock's Facebook page can readily see a March 2021 posting, where an individual has written, with emojis mixed in: "I want a switch so bad and a 100 round clip."  That post is followed by 38 responses, many enthusiastic about obtaining Glock switches and shooting switched Glock guns, others warning of their danger, as well as a larger number of other "likes" and shares.

120.    That same posting then shows a July 2017 video, again viewable on Glock's own Facebook page at least as of October 28, 2024, depicting an individual rapidly firing a Switched Glock Machine Gun.  The video caption, written in Spanish, states, "[d]isparando una Glock 17 en modo FULL AUTO con balas explosivas….simplemente impresionante!" (capitalization original).  This translates to: "[s]hooting a Glock 17 in FULL AUTO mode with explosive bullets…..simply impressive!"  This posting has continued to be viewable at least as of October 28, 2024, within Glock's own Facebook page and is most easily found via an internal search of the word "switch."

121.    During the seven years Glock's Facebook page has featured the 2017 video, and the three and half years it has featured the 2021 video, the public has added many comments in response.  Glock did not "untag" itself, report the posts as featuring illegal weapons, add a disclaimer, or remove the posts and comments from Glock's Facebook Page.  Glock instead allowed the videos to remain, benefitting from the attention that machine gun switchability brings.

122.    Additional videos on Glock's Facebook page, which were prominently featured around the time of their original posting, pop up to this day with other obvious searches.  A

simple search of the word "auto" on Glock's Facebook page, for example, produces various videos depicting Switched Glock Machine Guns, including a video from as early as 2015. That video, which viewers have been readily able to access through Glock's Facebook page, features a man declaring that he has a "Glock 19; auto sear. . . twelve hundred rounds a minute." He then proceeds to shoot hundreds of rounds in less than a minute using large capacity magazines. The caption to the video states "Must Watch! – Check Out this guy burning through some ammo with a full-auto <u>Glock</u>."[102] This video alone has 12,000 views. One of the comments, also visible through Glock's Facebook page, states: "[w]ow auto mode and never malfunction but hows the target [sic]."

## III. Glock Refuses Minor Design Changes to Its Civilian Handguns that Could Substantially Inhibit, if Not Block Entirely, Machine Gun Functionality.

123.    Notwithstanding all of Glock's knowledge about the switchability of its design and the ubiquitous civilian use of its handguns as machine guns, Glock has not taken genuine steps to modify its handgun design to preclude or make more difficult the affixation of a switch—which currently can be accomplished in a manner of minutes by laypersons. This is despite the fact that such changes could be made without impairing Glock handguns' safety or functionality or making them unreasonably expensive.

124.    As one example, Glock could have simply made its back plate far more difficult for a layperson to remove, for instance through the use of specialized screws or proprietary fasteners.[103]

---

[102] Emphasis in the original signifies that Glock's Facebook page was tagged and this now appears in Glock's "mentions" tab.

[103] Champe Barton, <u>Glock Could Make It Harder to Outfit Its Pistols With Switches — For a Price</u>, THE TRACE (Sept. 4, 2024), https://www.thetrace.org/2024/09/glock-switch-lawsuits-pistol-design.

125.    As another example, striker-fired handguns made by Glock's peer manufacturers (such as Smith & Wesson or Sig Sauer) often separate out the key internal components, making it more difficult to manipulate the parts on those guns that are analogous to Glock handguns' trigger bar.  Also, or alternatively, the positioning of the rear side rails on such firearms physically blocks the use of an auto sear from the rear.  These alternative internal design features make these other handguns far less switchable than U.S. handguns that use the Glock platform.[104]

126.    These safer approaches to striker-fired handgun design implemented by Glock's peers are well illustrated by the Sig Sauer P320.  In a P320, the trigger bar does not itself restrain the spring-loaded striker but rather serves as a lever upon a separate component known as the sear, and, in that design, it is the hinged sear that lowers to initiate firing and then returns to a raised position to restrain firing.  This separation of these key parts and their respective positioning impedes the use of a switch.  The position of the rear rail impedes the use of a switch, too.  These features and their distinct positioning are readily visible in this overhead image of a P320 without its slide:[105]



---

[104] Ibid.

[105] Compl. ¶ 58, City of Chicago v. Glock, Inc., No. 2024CH06875 (Cir. Ct. Cook Cnty. July 22, 2024).

127. A third option, demonstrated by Glock itself, fuses these concepts. Glock's new G46 handgun design, which is currently sold only in Europe, has a backplate and striker that make up a single metal piece, such that the backplate cannot be removed (to attach a switch) without altogether disabling the gun. The G46 confirms that Glock has the technical capability to prevent its civilian market guns from being switched into machine guns.

128. Yet, when the ATF asked Glock to find a way to modify its other handgun models to make it more difficult to attach auto sears, Glock reportedly said it could not and would not do so.[106]

129. In the United States, Glock continues to sell Gen3 and Gen4 handguns nationwide and has not made any change to their design.

130. As noted above, Glock has made only one modest, immaterial change to its Gen5 handgun series, by adding a small plastic piece that can easily be filed away in a few minutes. This minor modification was not a genuine, reasonable, bona fide solution to the problem presented by the ease with which Glock customers can switch their Glock handguns to operate as illegal machine guns. Thus, a material number of Gen5 handgun users continue to affix auto sears and use those guns as machine guns.

131. Glock has been contacted by news outlets regarding whether it will do anything to prevent the switchability of its guns to fully automatic configurations.[107] Glock has either remained silent in response or sought to cast blame elsewhere. As recently as summer of 2023,

---

[106] Ernesto Londoño & Glenn Thrush, Inexpensive Add-on Spawns a New Era of Machine Guns, N.Y. TIMES (Aug. 12, 2023), https://www.nytimes.com/2023/08/12/us/guns-switch-devices.html.

[107] See, e.g., Matt Caron, Glock Switches Turning up More and More at Local Shooting Crime Scenes, FOX61 (Nov. 7, 2022, 11:08PM), https://www.fox61.com/article/news/crime/glock-switches-connecticut-police-increase/520-8ce4912a-da29-4d61-9260-1f51bf8aa4b8; Alain Stephens & Keegan Hamilton, The Return of the Machine Gun, THE TRACE (Mar. 24, 2022), https://www.thetrace.org/2022/03/auto sears-gun-chip-glock-switch-automatic-conversion.

and despite the safer design of the G46 it sells in Europe, Glock falsely claimed that "the design of the pistol cannot be altered" to make it harder to convert it to a Switched Glock Machine Guns.[108]

132.    Glock's unconscionable decision not to implement a reasonable change is at the expense of public safety in New Jersey and elsewhere.

## IV.    Glock Distributes Its Switchable Handguns Directly into New Jersey, Including to Known High Crime Dealers.

133.    The threat posed by Switched Glock Machine Guns to New Jersey arises in large part from Glock's widespread distribution of its switchable handguns for sale to New Jersey civilian residents.  In particular, Glock distributes switchable guns to New Jerseyans through a network of affiliated gun dealers, including those that it has selected to serve as Glock-Authorized Dealers (categorized as "Glock Perfection" or "Stocking Dealers" on the company's website).  Glock-approved dealers selling switchable Glock handguns are easy to find in New Jersey, including through Glock's website.[109]  Glock's motto for these local dealer relationships is: "A Partnership that's Proven."[110]

134.    Glock's distribution into New Jersey is deliberate, and not incidental.  Glock carefully develops and maintains relationships with its authorized New Jersey dealers,

---

[108] Ernesto Londoño & Glenn Thrush, Inexpensive Add-on Spawns a New Era of Machine Guns, N.Y. TIMES (Aug. 12, 2023), https://www.nytimes.com/2023/08/12/us/guns-switch-devices.html.

[109] Glock's website allows users to view numerous Glock Pistols.  See GLOCK Pistols, GLOCK, https://us.glock.com/en/Pistols (last visited Dec. 11, 2024).  The website allows users to filter the pistols available for purchase, including the ability to select "Gen3" and "Gen4" models.  Ibid.  After applying the Gen3 and Gen4 filters, a user can see the Gen3 and Gen4 pistols that Glock sells and which of those pistols are only available for purchase by law enforcement.  Glock offers multiple Gen3 and Gen4 models for civilians, including four different 9x19mm pistols: the G17, G19, G26, and G34.  See ibid.; see also G17, GLOCK, https://us.glock.com/en/pistols/g17 (last visited Dec. 11, 2024); G19, GLOCK, https://us.glock.com/en/pistols/g19 (last visited Dec. 11, 2024); G26, GLOCK, https://us.glock.com/en/pistols/g26 (last visited Dec. 11, 2024); G34, GLOCK, https://us.glock.com/en/pistols/g34 (last visited Dec. 11, 2024).

[110] Dealers Only, GLOCK, https://us.glock.com/en/dealer-materials (last visited Dec. 11, 2024).

incentivizing them to join and remain in Glock's network of preferred dealers. Under these arrangements, gun stores apply to be "Glock Perfection" or "Stocking Dealers," and complete Glock's form "Dealer Program Agreement," in which they and Glock agree to various terms and conditions. In return, Glock advertises authorized dealers on its website—through the "Dealer Locator"[111] feature, which directs online customers to specific Glock dealers where they can purchase firearms—and the dealers are permitted to market themselves as authorized Glock dealers for sales to civilians.

135. Moreover, Glock encourages and solicits participation by New Jersey dealers in its preferred dealer program with free merchandise and other perks and sends its representatives to authorized dealers to ensure cross-promotion. The "benefits" that Glock touts on its website for dealers in the Stocking Program include, for example, not only Glock "parts and apparel" and "promotional materials" but also assistance for the dealer's "advertising" as well as Glock itself including the store "in the GLOCK marketing effort including the dealer locator."[112]

136. In driving its New Jersey business, Glock exercises considerable contractual power regarding its affiliated gun dealers' practices. The Glock Dealer Agreement, which dealers and Glock, Inc. enter into to govern their business relationship, allows Glock to dictate terms by which dealers must abide in exchange for the right to purchase Glock products and sell them to civilian customers.

137. Glock's New Jersey affiliate network is extensive: a recent search on the "Glock Dealer" page of Glock's website for "New Jersey" identified at least 50 New Jersey Glock dealers. These dealers are each authorized by Glock, and thus work closely with Glock, to

---

[111] Dealer/Range Locator, GLOCK, https://us.glock.com/en/dealer-locator-usa (last visited Dec. 11, 2024).

[112] GLOCK Stocking Dealer Program, GLOCK, https://us.glock.com/en/Dealers (last visited Dec. 11, 2024).

maximize sales of easily switched Glock handguns to civilian consumers in New Jersey. Glock, on its website, provides the names and addresses of all 50 stores and lists the various partnership programs and certifications each such store has with Glock. Anyone looking for the closest New Jersey gun store selling switchable Glocks can simply search "New Jersey, USA" on Glock's website[113] and find a map with pinned locations of distributors throughout the State:



138. Notably, Glock's New Jersey dealer network includes gun dealers that have been identified as the retailer-sources of outsized numbers of New Jersey crime guns. Glock knows this because, under a federally run law enforcement program, Glock receives a notification every time a law enforcement agency requests to "trace" the origin of a recovered crime gun and is obligated to assist law enforcement in identifying the retailer-source of the gun. Information

---

[113] See Dealer/Range Locator, GLOCK, https://us.glock.com/en/dealer-locator-usa (last visited Dec. 11, 2024).

about certain retailer-sources is also shown by public ATF data from the years 2017-2021,[114] which identified the two New Jersey municipalities that supplied the most guns recovered from criminals in that time period: Belleville and Vineland.

139.    In Belleville during that time, there was only one licensed gun dealer selling firearms:  Bullet Hole Shop & Range ("Bullet Hole").  Bullet Hole is a longstanding Glock dealer, and the 2017-2021 ATF data shows Glock 9mm pistols and Glock .40 caliber pistols as the second and fifth most numerous make and type of recovered crime guns statewide.

140.    Bullet Hole has touted, and continues to tout, its multilayered partnership with Glock, advertising that "[w]e are a Glock LE Dealer, Glock Perfection Dealer, & Glock Stocking Dealer," and that its owner "is a certified Glock Armorer."[115]  That certification requires that Bullet Hole has received specific instruction from Glock.[116]  Glock, on its own website, not only displays Bullet Hole as a partnership store but includes a red "P" insignia, a purple "S" insignia, and a blue "B" insignia.  These indicate, respectively, that Bullet Hole is certified by Glock as a "Perfection Dealer," a "Stocking Dealer," and a "Blue Label Dealer" (for police sales).



---

[114] U.S. Dep't of Just., ATF, National Firearms Commerce and Trafficking Assessment (NFCTA): Crime Guns: New Jersey – State Report 1 (last reviewed by ATF on Feb. 21, 2023), https://www.atf.gov/firearms/docs/report/new-jersey-state-report.

[115] Our Products, Bullet Hole Shop & Range, https://bulletholenj.com/products (last visited Dec. 10, 2024).

[116] The schedule for various courses, including those that are part of Glock's "Armorer" program, are available on Glock's website.  See Training Schedule, Glock, https://glocktraining.com/Schedule.aspx (last visited Dec. 11, 2024).

141.     In Vineland, the second-highest New Jersey crime gun source municipality, there are three dealers selling contemporary firearms, and at least two of the three—Butch's Gun World and the Gun Rack—are touted by Glock as being a partner "Stocking" distributor:



142.     Moreover, at least one of those stores, Butch's Gun World, has a history of ATF infractions, and received a warning letter from the ATF showing multiple infractions.

143.     Glock continues to sell switchable Glock handguns to and through Butch's Gun World and the Gun Rack.  On Butch's website, on a rotating banner of "Top Brands We Carry," Glock is prominently shown:



144.    Specific models of switchable Glocks are also listed for sale, together with an indication of whether they are currently in stock.  As of December 2024, Butch's Gun World advertised 475 Glock handguns of various types, all of which are readily switchable:[117]



145.    Seventeen Glock handgun variations were listed as presently available in the store:[118]



---

[117] <u>Handguns</u>, BUTCH'S GUN WORLD, https://www.butchsgunworldnj.com/product-category-group/handguns (last visited, and prices as of, Dec. 11, 2024).

[118] <u>Ibid.</u> (filtering by "Available In-Store Today").

146.     Similarly, on the store's Facebook Page, in a posting made in 2023 but still readily visible, Glock is prominently featured (including easily switchable Glock handguns listed above images of rifles):[119]



147.     As for the Gun Rack, the store's Instagram account features pictures of the Glock handguns they sell:[120]



---

[119] Butch's Gun World, FACEBOOK, https://www.facebook.com/p/Butchs-Gun-World-100090933438327/ (last visited, and prices as of, Dec. 11, 2024).

[120] The_Gun_Rack, INSTAGRAM, https://www.instagram.com/the_gun_rack/?hl=en (last visited Dec. 11, 2024).

148.   Of course, beyond the formal New Jersey partnerships, switchable Glock handguns also enter the New Jersey market through partner dealers who are located in Pennsylvania or other neighboring states as well as through dealers, including in New Jersey, who are not on Glock's website as preferred partners but nevertheless sell such Glock handguns. Glock is also the source of these dealers' switchable Glock handguns.

## V.   Switched Glock Machine Guns Have Wreaked Havoc in New Jersey and Contributed to a Deadly Public Nuisance.

149.   Glock's large-scale distribution of switchable handguns has had an all too predictable adverse impact in New Jersey.  Switched Glock Machine Guns have repeatedly been used to end lives, cause injuries, commit crimes, and endanger people's lives throughout New Jersey:

   a.   In May 2020, in Newark, a defendant with a prior criminal record was selling drugs on the street; when apprehended by police officers he was in possession of a Switched Glock Machine Gun equipped with an 11-round large capacity magazine.[121]

   b.   In November 2020 in Newark, an 18-year-old shot and killed a 17-year-old victim; in May 2023, he was found in possession of a Switched Glock Machine Gun equipped with a 23-round magazine.[122]

   c.   In June 2023, in Newark, law enforcement officers executed a search warrant on a known gang member with prior convictions for gun offenses including threatening to shoot his girlfriend; the officers found him in possession of a Switched Glock Machine Gun equipped with a large capacity magazine loaded with 30 rounds.[123]

   d.   In September 2023, in Trenton, a defendant with a criminal record was apprehended in possession of a Switched Glock Machine Gun with a large

---

[121] Compl., United States v. Reynolds, No. 2:21-CR-410 (D.N.J. May 4, 2020), ECF 1.

[122] See Compl., State v. Harcourt, No. ESX-23-2563 (N.J. Super. Ct. Mar. 13, 2023); Opp'n Br. Mot. to. Suppress, State v. Harcourt, No. Esx-23-2563 (N.J. Super. Ct. Sept. 19, 2023); Compl., United States v. Harcourt, No. 23-CR-890 (D.N.J. May 18, 2023), ECF 1.

[123] Compl., United States v. Sutton, No. 2:23-MJ-12085 (D.N.J. June 2, 2023), ECF 1; Compl., State v. Sutton, No. ATL-22-1361 (N.J. Super. Ct. Apr. 30, 2022).

capacity magazine loaded with hollow point bullets;[124] while his case was pending he committed a gun-point home invasion of an occupied residence where he threatened to shoot the victim in the head.[125]

e.   In January 2024, in Trenton, a defendant with a criminal record suspected of stealing multiple cars was apprehended with three switchable Glocks, one of which was a Switched Glock Machine Gun, as well as a large capacity magazine, hollow point bullets, and narcotics.[126]

f.   In January 2024, in Camden, police officers apprehended a defendant suspected in recent shootings who was livestreaming videos of himself and others with guns, and was in possession a Switched Glock Machine Gun as well as a 30-round large capacity magazine.[127]

g.   In March 2024, in Irvington, law enforcement authorities executing a search warrant on a suspected weapons trafficker apprehended the suspect with, amongst other guns, a Switched Glock Machine Gun with a 26-round large capacity magazine.[128]

h.   In April 2024, in Paterson, a known gang member with prior convictions, including convictions for more than one shooting, fled from police officers while possessing a Switched Glock Machine Gun with a large capacity magazine.[129]

i.   In April 2024, in Camden, multiple defendants selling drugs from their car were found in possession of a Switched Glock Machine Gun with a 30-round large capacity magazine loaded with hollow point bullets, along with more than 50 bags of heroin and cocaine packaged for sale.[130]

j.   In April 2024, in Newark, defendants with criminal records who were selling narcotics on the street fled from officers by car and then on foot; officers found in

---

[124] Compl., State v. Grant, No. MER-23-3371 (N.J. Super. Ct. Sept. 26, 2023).

[125] Compl., State v. Grant, No. MER-24-2014 (N.J. Super. Ct. June 23, 2024).

[126] Compl., State v. Myles, No. MER-24-166 (N.J. Super. Ct. Jan. 14, 2024).

[127] Compl., State v. Medley, No. CAM-24-511 (N.J. Super. Ct. Jan. 19, 2024).

[128] Compl., State v. Flythe, No. ESX-24-2941 (N.J. Super. Ct. Mar. 29, 2024).

[129] Compl., United States v. Durham, No. 2:24-MJ-12180 (D.N.J. June 17, 2024), ECF 1; Compl., State v. Durham, No. PAS-23-4567 (N.J. Super. Ct. Oct. 12, 2023); Compl., State v. Durham, No. PAS-20-808 (N.J. Super. Ct. Mar. 5, 2020).

[130] Compls., State v. Clayton, No. CAM-24-2796 (N.J. Super. Ct. Apr. 20, 2024).

the car a Switched Glock Machine Gun along with another handgun and two large capacity magazines.[131]

k.   In May 2024, in Paterson, a defendant robbed a woman at gunpoint using a Switched Glock Machine Gun equipped with a 12-round large capacity magazine, then ran from and struggled with responding police officers, injuring one of them.[132]

l.   In May 2024, in Essex County, a defendant suspected of trafficking weapons in New Jersey sold guns, ammunition, and Glock switches to undercover law enforcement officers and when apprehended was in possession of a Switched Glock Machine Gun, and twenty switches.[133]

m.   In May 2024, in Atlantic City, a defendant who was the subject of a long-term narcotics investigation was found in possession of two guns, including a Switched Glock Machine Gun equipped with a large capacity magazine, and heroin in an amount consistent with a large-scale narcotics sale operation.[134]

n.   In June 2024, in Cumberland County, federal agents with the Department of Homeland Security, while executing a search warrant based on a controlled delivery of a mail order Glock switch, recovered a Glock with a micro rifle-conversion kit[135] as well as thirty-six large capacity magazines.[136]

o.   In June 2024, in Camden, a defendant selling narcotics on the street ran from officers while in possession of a loaded Switched Glock Machine Gun.[137]

p.   In June 2024, in Asbury Park, police officers arrested a defendant who was in possession of cocaine and packaging material for sale along with two switchable Glocks—one of which was a Switched Glock Machine Gun equipped with a large capacity magazine;[138] while the case was pending the defendant obtained another

---

[131] Compl., State v. Lowery, No. ESX-24-3583 (N.J. Super. Ct. Apr. 19, 2024).

[132] Compls., State v. Newland, No. PAS-24-2390 (N.J. Super. Ct. May 21, 2024); Order for Detention at 2, State v. Newland, No. PAS-24-2390 (N.J. Super. Ct. May 24, 2024).

[133] Compl., United States v. Carter, No. 2:24-MJ-10118 (D.N.J. May 16, 2024), ECF 1.

[134] Compl., State v. Gibbs., No. ATL-24-2152 (N.J. Super. Ct. May 21, 2024).

[135] A micro rifle-conversion kit is a drop-in stock for a handgun that converts it into a small rifle (similar to a Tommy Gun) that fires a pistol round, such that together with a switch would make the gun operate like an automatic rifle/a carbine rather than an automatic pistol.

[136] Compl., State v. Hovern, No. CUM-24-1243 (N.J. Super. Ct. June 6, 2024).

[137] Compls., State v. Rodriguez, No. CAM-24-4153 (N.J. Super. Ct. June 9, 2024 and June 12, 2024).

[138] Compl., State v. Alvarado, No. MON-24-2232 (N.J. Super. Ct. June 13, 2024).

gun and was arrested again in Asbury Park while in possession of the gun in public.[139]

q.   In July 2024, in Monmouth County, law enforcement officers arrested a defendant with a Switched Glock Machine Gun with a 21-round large capacity magazine; at the time of his arrest he was wanted in connection with <u>44</u> occupied-home burglaries, one robbery, and <u>38</u> high-end auto thefts.[140]

150.   Glock's unreasonable and unlawful practices of designing, manufacturing, assembling, marketing, advertising, and distributing into New Jersey large numbers of switchable guns significantly contributes to the danger that exists on New Jersey's streets, college campuses, private and public homes, and neighborhoods.  By continuing to market and distribute a handgun that is so easily switchable into a machine gun—and failing to take even modest steps at any point along the chain of distribution to reduce the prevalence or allure of Switched Glock Machine Guns—Glock has made New Jersey less safe.  It has done so in order to sell more guns, putting profit over people's lives.

**CAUSES OF ACTION**

**Count One**

**Contribution to Public Nuisance by Conduct Unreasonable Under the Circumstances in Violation of Public Law 2022, c. 56, N.J.S.A. 2C:58-35(a)(1)**

151.   The Attorney General repeats and realleges the foregoing allegations as if set forth in their entirety herein.

152.   The Attorney General brings this count pursuant to N.J.S.A. 2C:58-35.

153.   Under Section 58-35(a)(1) "[a] gun industry member shall not, by conduct [] unreasonable under all the circumstances . . . , knowingly or recklessly create, maintain, or

---

[139] Compl., <u>State v. Alvarado</u>, No. MON-24-2938 (N.J. Super. Ct Aug. 1, 2024); Order for Detention, <u>State v. Alvarado</u>, No. MON-24-2938 (N.J. Super. Ct. Aug 7, 2024).

[140] Compl., <u>State v. Buie</u>, No. MON-24-2172 (N.J. Super. Ct. July 22, 2024).

54

contribute to a public nuisance in this State through the sale, manufacturing, distribution, importing . . . of a gun-related product."

154.    Defendants are each a "gun industry member" under Sections 58-34 and 58-35.

155.    The switchable Glock handguns described herein are "gun-related product[s]" under Sections 58-34 and 58-35.

156.    Defendants' conduct in their designing, manufacturing, assembling, advertising, marketing, and distributing easily switchable Glock handguns, when a reasonable alternative design could impede such machine gun functionality, is unreasonable under all the circumstances described herein.  See N.J.S.A. 2C:58-35(a)(1).

157.    Defendants' unreasonable conduct consists of knowing acts or omissions that constitute knowing violations of N.J.S.A. 2C:58-35(a)(1), 2C:39-5(a), 2C:39-9(a), and 2A:58C-2.

158.    Defendants' unreasonable conduct has knowingly or recklessly created, maintained, or contributed to a public nuisance within the meaning of Section 58-35(a)(1). "'Public nuisance' means any condition which injures, endangers, or threatens to injure or endanger or contributes to the injury or endangerment of the health, safety, peace, comfort, or convenience of others or which otherwise constitutes a public nuisance under common law." N.J.S.A. 2C:58-34.

159.    Defendants' unreasonable conduct has foreseeably and proximately created, maintained, or contributed to this harm.

160.    Switched Glock Machine Guns have increasingly proliferated in New Jersey, including among persons prohibited from purchasing or possessing a firearm on the basis of a

prior felony or other disqualifier, and are particularly popular among gang members.  Switched Glock Machine Guns are becoming increasingly central to violent gun crimes in the State.

161.    This condition injures and endangers the health, safety, peace, comfort, and convenience of New Jersey residents; threatens to injure and endanger the health, safety, peace, comfort, and convenience of New Jersey residents; and contributes to the injury and endangerment of the health, safety, peace, comfort, and convenience of New Jersey residents. Defendants have created, maintained, and/or contributed to this condition, and have done so knowingly or recklessly.

162.    Defendants' violation of Section 58-35(a) entitles the Attorney General to "an injunction prohibiting [Defendants] from continuing that conduct or engaging therein or doing any acts in furtherance thereof."  N.J.S.A. 2C:58-35(b).  Such injunctive relief is necessary here to prevent further, continuing, and irreparable injury.

163.    The Attorney General is likewise entitled to an order providing for abatement and restitution, including disgorgement of profits.

164.    The Attorney General is further entitled to recover reasonable attorneys' fees, filing fees, reasonable costs of suit, and any other appropriate relief.  See N.J.S.A. 2C:58-35(b).

### Count Two

**Contribution to Public Nuisance by Conduct Unlawful in Itself in Violation of Public Law 2022, c. 56, N.J.S.A. 2C:58-35(a)(1) (Causes to be Manufactured under Section 2C:39-9(a))**

165.    The Attorney General repeats and realleges the foregoing allegations as if set forth in their entirety herein.

166.    The Attorney General brings this count pursuant to N.J.S.A. 2C:58-35.

167.    Under Section 58-35(a)(1), "[a] gun industry member shall not, by conduct []
unlawful in itself . . . , knowingly or recklessly create, maintain, or contribute to a public
nuisance in this State through the sale, manufacturing, distribution, importing, or marketing of
gun-related product."

168.    Section 2C:39-9(a) makes it illegal to "cause[] to be manufactured . . . any
machine gun without being registered or licensed to do so."

169.    N.J.S.A. 2C:39-1(i) defines "Machine gun" as "any firearm, mechanism or
instrument not requiring that the trigger be pressed for each shot and having a reservoir, belt or
other means of storing and carrying ammunition which can be loaded into the firearm,
mechanism or instrument and fired therefrom.  A machine gun also shall include, without
limitation, any firearm with a trigger crank attached."

170.    Defendants' conduct has been "unlawful in itself."  Through the actions described
herein, Defendants have knowingly caused machine guns to be manufactured.

171.    Defendants' unlawful conduct in causing machine guns to be manufactured has
knowingly or recklessly created, maintained, or contributed to a public nuisance within the
meaning of Section 58-35(a)(1).  "'Public nuisance' means any condition which injures,
endangers, or threatens to injure or endanger or contributes to the injury or endangerment of the
health, safety, peace, comfort, or convenience of others or which otherwise constitutes a public
nuisance under common law."  N.J.S.A. 2C:58-34.

172.    Defendants' unlawful conduct has foreseeably and proximately created,
maintained, or contributed to this harm.

173.    Switched Glock Machine Guns have increasingly proliferated in New Jersey,
including among persons prohibited from purchasing or possessing a firearm on the basis of a

prior felony or other disqualifier, and are particularly popular among gang members.  Switched Glock Machine Guns are becoming increasingly central to violent gun crimes in the State.

174.    This condition injures and endangers the health, safety, peace, comfort, and convenience of New Jersey residents; threatens to injure and endanger the health, safety, peace, comfort, and convenience of New Jersey residents; and contributes to the injury and endangerment of the health, safety, peace, comfort, and convenience of New Jersey residents. Defendants have created, maintained, and/or contributed to this condition, and have done so knowingly or recklessly.

175.    Defendants' violation of Section 58-35(a) entitles the Attorney General to "an injunction prohibiting [Defendant] from continuing that conduct or engaging therein or doing any acts in furtherance thereof."  N.J.S.A. 2C:58-35(b).  Such injunctive relief is necessary here to prevent further, continuing, and irreparable injury.

176.    The Attorney General is likewise entitled to an order providing for abatement and restitution, including disgorgement of profits.

177.    The Attorney General is further entitled to recover reasonable attorneys' fees, filing fees, reasonable costs of suit, and any other appropriate relief.  See id. 2C:58-35(b).

### Count Three

**Contribution to Public Nuisance by Conduct Unlawful in Itself in
Violation of Public Law 2022, c. 56, N.J.S.A. 2C:58-35(a)(1)
(Aiding and Abetting Violations of Sections 2C:39-5(a) and 2C:39-9(a))**

178.    The Attorney General repeats and realleges the foregoing allegations as if set forth in their entirety herein.

179.    The Attorney General brings this count pursuant to N.J.S.A. 2C:58-35.

Under Section 58-35(a)(1), "[a] gun industry member shall not, by conduct [] unlawful in itself . . . , knowingly or recklessly create, maintain, or contribute to a public nuisance in this State through the sale, manufacturing, distribution, importing, or marketing of a gun-related product."

180.    Section 2C:39-5(a) makes it illegal to "possess[] a machine gun or any instrument or device adaptable for use as a machine gun, without being licensed to do so as provided in [N.J.S.A.] 2C:58-5."  Section 2C:39-9(a) makes it illegal to "manufacture[], cause[] to be manufactured, transport[], ship[], sell[] or dispose[] of any machine gun without being registered or licensed to do so."

181.    N.J.S.A. 2C:39-1(i) defines "Machine gun" as "any firearm, mechanism or instrument not requiring that the trigger be pressed for each shot and having a reservoir, belt or other means of storing and carrying ammunition which can be loaded into the firearm, mechanism or instrument and fired therefrom.  A machine gun also shall include, without limitation, any firearm with a trigger crank attached."

182.    Defendants' purposeful conduct aids, agrees to aid, facilitates, promotes, solicits, and participates in violation of Section 2C:39-5(a) and Section 2C:39-9(a) and is itself in violation of these provisions.  See N.J.S.A. 2C:2-6.  Defendants have knowingly aided and abetted the illegal possession of machine guns in New Jersey.  And Defendants have knowingly aided and abetted the manufacture, transport, shipment, sale (including resale), and/or disposal of machine guns.  Defendants' conduct has therefore been "unlawful in itself."

183.    Defendants' unlawful conduct in their designing, assembling, advertising, selling, distributing, manufacturing, and/or marketing of switchable Glock handguns, which Defendants know can function as machine guns, has knowingly or recklessly created, maintained, or contributed to a public nuisance within the meaning of Section 58-35(a)(1).

"'Public nuisance' means any condition which injures, endangers, or threatens to injure or endanger or contributes to the injury or endangerment of the health, safety, peace, comfort, or convenience of others or which otherwise constitutes a public nuisance under common law." Id. 2C:58-34.

184.   Defendants' unlawful conduct has foreseeably and proximately created, maintained, or contributed to this harm.

185.   Switched Glock Machine Guns have increasingly proliferated in New Jersey, including among persons prohibited from purchasing or possessing a firearm on the basis of a prior felony or other disqualifier, and are particularly popular among gang members.  Switched Glock Machine Guns are increasingly central to violent gun crimes in the State.

186.   This condition injures and endangers the health, safety, peace, comfort, and convenience of New Jersey residents; threatens to injure and endanger the health, safety, peace, comfort, and convenience of New Jersey residents; and contributes to the injury and endangerment of the health, safety, peace, comfort, and convenience of New Jersey residents. Defendants have created, maintained, and/or contributed to this condition, and has done so knowingly or recklessly.

187.   Defendants' violation of Section 58-35(a) entitles the Attorney General to "an injunction prohibiting [Defendants] from continuing that conduct or engaging therein or doing any acts in furtherance thereof."  Id. 2C:58-35(b).  Such injunctive relief is necessary here to prevent further, continuing, and irreparable injury.

188.   The Attorney General is likewise entitled to an order providing for abatement and restitution, including disgorgement of profits.

189.     The Attorney General is further entitled to recover reasonable attorneys' fees, filing fees, reasonable costs of suit, and any other appropriate relief.  See ibid.

### Count Four

**Contribution to Public Nuisance by Conduct Unlawful in Itself in
Violation of Public Law 2022, c. 56, N.J.S.A. 2C:58-35(a)(1)
(Product Liability Act, N.J.S.A. 2A:58C-2)**

190.     The Attorney General repeats and realleges the foregoing allegations as if set forth in their entirety herein.

191.     The Attorney General brings this count pursuant to N.J.S.A. 2C:58-35.

192.     Under Section 58-35(a)(1), "[a] gun industry member shall not, by conduct [] unlawful in itself . . . , knowingly or recklessly create, maintain, or contribute to a public nuisance in this State through the sale, manufacturing, distribution, importing, or marketing of gun-related product."

193.     Defendants' conduct has been "unlawful in itself."  Glock has violated the New Jersey Products Liability Act, N.J.S.A. 2A:58C-2, as described below in connection with Count Six.

194.     Defendants' unlawful conduct in violation of the New Jersey Products Liability Act has knowingly or recklessly created, maintained, or contributed to a public nuisance within the meaning of Section 58-35(a)(1).  "'Public nuisance' means any condition which injures, endangers, or threatens to injure or endanger or contributes to the injury or endangerment of the health, safety, peace, comfort, or convenience of others or which otherwise constitutes a public nuisance under common law."  N.J.S.A. 2C:58-34.

195.     Defendants' unlawful conduct has foreseeably and proximately created, maintained, or contributed to this harm.

196.    Switched Glock Machine Guns have increasingly proliferated in New Jersey, including among persons prohibited from purchasing or possessing a firearm on the basis of a prior felony or other disqualifier, and are particularly popular among gang members.  Switched Glock Machine Guns are increasingly central to violent gun crimes in the State.

197.    This condition injures and endangers the health, safety, peace, comfort, and convenience of New Jersey residents; threatens to injure and endanger the health, safety, peace, comfort, and convenience of New Jersey residents; and contributes to the injury and endangerment of the health, safety, peace, comfort, and convenience of New Jersey residents. Defendants have created, maintained, and/or contributed to this condition, and has done so knowingly or recklessly.

198.    Defendants' violation of Section 58-35(a) entitles the Attorney General to "an injunction prohibiting [Defendants] from continuing that conduct or engaging therein or doing any acts in furtherance thereof."  N.J.S.A. 2C:58-35(b).  Such injunctive relief is necessary here to prevent further, continuing, and irreparable injury.

199.    The Attorney General is likewise entitled to abatement and restitution, including disgorgement of profits.

200.    The Attorney General is further entitled to recover reasonable attorneys' fees, filing fees, reasonable costs of suit, and any other appropriate relief.  See N.J.S.A. 2C:58- 35(b).

## Count Five

### Failure to Establish, Implement, and Enforce Reasonable Controls in Violation of Public Law 2022, c. 56, N.J.S.A. 2C:58-35(a)(2)

201.    The Attorney General repeats and realleges the foregoing allegations as if set forth in their entirety herein.

202.    The Attorney General brings this count pursuant to N.J.S.A. 2C:58-35(a)(2).

203.     Under Section 58-35(a)(2), "a gun industry member shall establish, implement, and enforce reasonable controls regarding its manufacture, sale, distribution, importing, and marketing of gun-related products."

204.     "Reasonable controls" means "reasonable procedures, safeguards, and business practices that are designed to," among other things:

(3) ensure that a gun industry member complies with all provisions of State [] law and does not otherwise promote the unlawful sale, manufacture, distribution, importing, marketing, possession, or use of a gun-related product; and

(4) ensure that the gun industry member does not engage in an act or practice in violation of any of the regulatory provisions governing firearms set forth in chapters 39 and 58 of Title 2C of the New Jersey Statutes or engage in conduct that constitutes a violation of P.L.1960, c.39 (C.56:8-2) or any regulations promulgated thereunder.

205.     Defendants have failed to "establish, implement, and enforce reasonable controls regarding [its] manufacture, sale, distribution, . . . and marketing" of easily modifiable Glocks in at least two respects:

206.     First, Defendants lack "reasonable procedures, safeguards, and business practices that are designed to . . . ensure they comply with all provisions of State [] law[.]"

207.     Second, Defendants lack "reasonable procedures, safeguards, and business practices that are designed to . . . ensure that [it] . . . does not otherwise promote the unlawful sale, manufacture, distribution, [] marketing, possession, and use of a gun- related product."

208.     Defendants' failures to establish, implement, and enforce reasonable controls arise from knowing acts or omissions that constitute knowing violations of N.J.S.A. 2C:58-35(a)(2), 2C:39-5(a), 2C:39-9(a), and 2A:58C-2.

209.     Defendants' violation of Section 58-35(a)(2) has foreseeably and proximately caused harm to New Jersey.

210.    Defendants' conduct in violation of Section 58-35(a) entitles the Attorney General to "an injunction prohibiting [Defendants] from continuing that conduct or engaging therein or doing any acts in furtherance thereof." <u>See</u> N.J.S.A. 2C:58-35(b).  Such injunctive relief is necessary here to prevent further, continuing, and irreparable injury.

211.     The Attorney General is likewise entitled to an order providing for restitution, including abatement and disgorgement of profits.

212.    The Attorney General is further entitled to recover reasonable attorneys' fees, filing fees, reasonable costs of suit, and any other appropriate relief.  <u>See</u> N.J.S.A. 2C:58- 35(b).

### <u>Count Six</u>

### Violation of New Jersey Product Liability Act
### N.J.S.A. 2A:58C-2

213.    The Attorney General repeats and realleges the foregoing allegations as if set forth in their entirety herein.

214.    The Attorney General brings this count pursuant to N.J.S.A. 2A:58C-2.

215.    Defendants designed, manufactured, assembled, marketed, advertised, distributed and sold Glock handguns that are defective in that their design embraces machine gun functionality and the handguns can be readily switched into dangerous and illegal machine guns.

216.    A Glock handgun is not "reasonably fit, suitable, or safe" for civilian use when it can be so easily switched into a machine gun, and when such machine gun functionality is intrinsic to the core design.  <u>See</u> N.J.S.A. 2A:58C-2.

217.    The condition of Glock handguns being easily switched into machine guns existed when the product left Defendants' control.

218.    Glock has long known about this defective condition.

219.     Glock did not utilize a reasonable alternative design, or take any other reasonable measures, that would remedy this defect by adopting design features for Glock handguns sold to New Jersey civilians that would make them meaningfully more difficult to switch.

220.     Switchable Glocks have proximately caused harm to the State and its residents; Switched Glock Machine Guns have wreaked havoc and violence on the streets of New Jersey.

221.     It was foreseeable to Glock that New Jersey and its residents would be harmed by Glock's practice of designing, manufacturing, assembling, marketing, advertising, distributing, and selling handguns so easily switched into dangerous machine guns.

222.     Glock knows, and has long known, that its handguns were designed to embrace machine gun functionality and are easily and frequently switched into deadly machine guns; Glock also knows such machine guns have been used to menace communities across the country, including throughout New Jersey.

223.     The Attorney General seeks an injunction prohibiting Glock from continuing that conduct, or engaging therein or doing any acts in furtherance thereof.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff the Attorney General of the State of New Jersey respectfully

requests judgment in his favor and against Defendants as follows:

 a. Ordering injunctive relief as to civilian consumers in New Jersey as is necessary to prevent continuing harm, including an order enjoining Glock from distributing readily switchable handguns for sale to New Jersey civilian consumers;

 b. Awarding the Attorney General an order of abatement of the nuisance at the Defendants' expense;

 c. Awarding the Attorney General restitution in an amount to be determined at trial, including disgorgement of profits;

 d. Awarding the Attorney General all costs and expenses incurred in connection with this action, including attorneys' fees; and

 e. Awarding the Attorney General such other and further relief as the Court deems just and proper.

Dated:  December 12, 2024
Newark, New Jersey

      **MATTHEW J. PLATKIN**
      **ATTORNEY GENERAL OF NEW JERSEY**
      *Attorney for Plaintiff*

      By:  */s/ David E. Leit*
       David E. Leit [024351995]
       *Assistant Attorney General*
       Jonathan B. Mangel [281382018]
       Loren N. Miller [411632022]
       Giancarlo G. Piccinini [414322022]
       *Deputy Attorneys General*
       New Jersey Office of the Attorney General
       Division of Law
       124 Halsey Street
       P.O. Box 45029
       Newark, New Jersey 07101
       David.Leit@law.njoag.gov
       Jonathan.Mangel@law.njoag.gov
       Loren.Miller@law.njoag.gov
       Giancarlo.Piccinini@law.njoag.gov

**PILLSBURY WINTHROP SHAW PITTMAN LLP**
*Special Counsel to the Attorney General*

Kenneth W. Taber (*pro hac vice* forthcoming)
Christopher C. Caffarone (*pro hac vice*
forthcoming)
31 West 52nd Street
New York, New York 10019
Tel: (212) 858.1000
Facsimile: (212) 858.1500
kenneth.taber@pillsburylaw.com
christopher.caffarone@pillsburylaw.com

Michael H. Borofsky (*pro hac vice*
forthcoming)
401 Congress Avenue, Suite 1700
Austin, Texas 78701
Tel: (512) 580-9600
Facsimile: (512) 580-9601
michael.borofsky@pillsburylaw.com

Thomas L. Howard III (*pro hac vice*
forthcoming)
Nicole Steinberg (*pro hac vice* forthcoming)
1200 Seventeenth Street NW
Washington, D.C. 20036
Tel: (202) 663-8000
Facsimile: (202) 663-8007
thomas.howard@pillsburylaw.com
nicole.steinberg@pillsburylaw.com

Lindsey Mitchell (*pro hac vice* forthcoming)
609 Main Street, Suite 2000
Houston, Texas 77002
Tel: (713) 276-7686
Facsimile: (713) 276-7673
lindsey.mitchell@pillsburylaw.com

## <u>CERTIFICATION OF COMPLIANCE</u>

I certify that confidential personal identifiers will be redacted from all documents

submitted in the future in accordance with <u>Rule</u> 1:38-7(b).

**MATTHEW J. PLATKIN**
**ATTORNEY GENERAL OF NEW JERSEY**
*Attorney for Plaintiff*

By: */s/ David E. Leit*
David E. Leit
*Assistant Attorney General*

Dated:  December 12, 2024
Newark, New Jersey

## <u>DESIGNATION OF TRIAL COUNSEL</u>

Pursuant to <u>Rule</u> 4:25-4, Assistant Attorney General David Leit and Special Counsel to

the Attorney General Kenneth W. Taber are hereby designated as trial counsel on behalf of the

Plaintiff.

                                          **MATTHEW J. PLATKIN**
                                          **ATTORNEY GENERAL OF NEW JERSEY**
                                          *Attorney for Plaintiff*

                                          By: <u>*/s/ David E. Leit*</u>
                                          David E. Leit
                                          *Assistant Attorney General*

Dated:  December 12, 2024
Newark, New Jersey