# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

NATIONAL SHOOTING SPORTS
FOUNDATION,

    *Plaintiff*,

v.

MATTHEW J. PLATKIN,
Attorney General of New Jersey,

    *Defendant*.

)
)
)
)
)
)
)
)
)
)
)
)

No. 3:22-cv-06646-ZNQ-TJB

# MEMORANDUM IN SUPPORT OF
# PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION ................................................................................................. 1

JURISDICTION .................................................................................................... 6

ARGUMENT ....................................................................................................... 7

I.    NSSF Is Likely To Succeed On The Merits ................................................... 7

      A.    A1765 Is Preempted ......................................................................... 7

      B.    At a Minimum, A1765 Is Preempted to the Extent It Requires
            Neither Knowing Violations nor Proximate Cause ............................ 16

      C.    A1765 Violates the Commerce Clause ............................................. 20

      D.    A1765 Violates the First Amendment .............................................. 26

      E.    A1765 Is Void for Vagueness .......................................................... 33

      F.    A1765 Violates the Second Amendment .......................................... 37

II.   The Remaining Factors All Favor Injunctive Relief .................................... 37

CONCLUSION ................................................................................................... 40

# TABLE OF AUTHORITIES

## Cases

*44 Liquormart, Inc. v. Rhode Island*,
　517 U.S. 484 (1996).............................................................. 26, 28, 29

*A.S. Goldmen & Co. v. N.J. Bur. of Sec.*,
　163 F.3d 780 (3d Cir. 1999) .............................................................24

*Ashcroft v. Free Speech Coalition*,
　535 U.S. 234 (2002).............................................................30

*Baggett v. Bullitt*,
　377 U.S. 360 (1964).............................................................31

*Bank of Am. Corp. v. City of Miami*,
　581 U.S. 189 (2017).............................................................19

*Bigelow v. Virginia*,
　421 U.S. 809 (1975).............................................................28

*BMW of N. Am., Inc. v. Gore*,
　517 U.S. 559 (1997).............................................................25

*Broadrick v. Oklahoma*,
　413 U.S. 601 (1973).............................................................30

*Brown v. Entm't Merchants Ass'n*,
　564 U.S. 786 (2011).............................................................. 26, 27, 30

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
　447 U.S. 557 (1980).............................................................27

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
　142 S.Ct. 1464 (2022).............................................................26

*City of Cincinnati v. Discovery Network, Inc.*,
　507 U.S. 410 (1993).............................................................29

*City of New York v. Beretta U.S.A. Corp.*,
　524 F.3d 384 (2d Cir. 2008) ..................................................... *passim*

*Comptroller of Treasury of Maryland v. Wynne*,
  575 U.S. 542 (2015)......................................................................................24

*Connally v. Gen. Constr. Co.*,
  269 U.S. 385 (1926)......................................................................................34

*Cramp v. Bd. of Pub. Instruction of Orange Cty.*,
  368 U.S. 278 (1961)......................................................................................34

*Ctr. for Investigative Reporting v. Se. Penn. Transp. Auth.*,
  975 F.3d 300 (3d Cir. 2020)........................................................................40

*District of Columbia v. Beretta U.S.A. Corp.*,
  940 A.2d 163 (D.C. 2008)...........................................................................15

*Edgar v. MITE Corp.*,
  457 U.S. 624 (1982)......................................................................................24

*Ex parte Young*,
  209 U.S. 123 (1908)........................................................................................6

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972)......................................................................................34

*Greater New Orleans Broad. Ass'n, Inc. v. United States*,
  527 U.S. 173 (1999)......................................................................................28

*Greater Phila. Chamber of Com. v. City of Phila.*,
  949 F.3d 116 (3d Cir. 2020) .......................................................................29

*Hazardous Waste Treatment Council v. South Carolina*,
  945 F.2d 781 (4th Cir. 1991) ......................................................................40

*Holmes v. Secs. Inv. Prot. Corp.*,
  503 U.S. 258 (1992)......................................................................................19

*Ileto v. Glock, Inc.*,
  565 F.3d 1126 (9th Cir. 2009) ......................................................... 3, 15, 16

*In re Acad., Ltd.*,
  625 S.W.3d 19 (Tex. 2021) .........................................................................38

*Jam v. Int'l Fin. Corp.*,
  139 S.Ct. 759 (2019)..........................................................................................19

*Johnson v. United States*,
  576 U.S. 591 (2015)..........................................................................................36

*Kansas v. Garcia*,
  589 U.S. 191 (2020)............................................................................................7

*Lorillard Tobacco Co. v. Reilly*,
  533 U.S. 525 (2001)..........................................................................................28

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
  597 U.S. 1 (2022)..............................................................................................37

*N.Y. Times Co. v. Sullivan*,
  376 U.S. 254 (1964)..........................................................................................33

*NAACP v. Button*,
  371 U.S. 415 (1963)..........................................................................................31

*Nat'l Pork Producers Council v. Ross*,
  598 U.S. 356 (2023)..........................................................................................24

*Nat'l Shooting Sports Found. v. Att'y Gen.*,
  80 F.4th 215 (3d Cir. 2023)..............................................................................5, 6

*Reno v. ACLU*,
  521 U.S. 844 (1997)..................................................................................... 31, 32

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011)............................................................................. 27, 29, 33

*Thornhill v. Alabama*,
  310 U.S. 88 (1940)............................................................................................32

*Townsend v. Pierre*,
  110 A.3d 52 (N.J. 2015)....................................................................................19

*United States v. Oakland Cannabis Buyers' Coop.*,
  532 U.S. 483 (2001)..........................................................................................40

*United States v. Rahimi*,
    602 U.S. 680 (2024)....................................................................37

*United States v. Williams*,
    553 U.S. 285 (2008)....................................................................36

*Veterans Guardian VA Claim Consulting LLC v. Platkin*,
    --- F.4th ----, 2025 WL 968517 (3d Cir. Apr. 1, 2025) ................................. 7, 37

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
    455 U.S. 489 (1982)....................................................................34

## Constitutional Provisions

U.S. Const. art. I, §8, cl. 3 ..............................................................23

U.S. Const. amend. XIV, §1 ............................................................. 34

## Statutes

15 U.S.C. §7901(a)(4)..................................................................14

15 U.S.C. §7901(a)(5) ............................................................. 1, 13, 18

15 U.S.C. §7901(a)(6) ............................................................. 14, 25, 35

15 U.S.C. §7901(a)(7) ............................................................. 14, 37

15 U.S.C. §7901(b)(1)..................................................................14

15 U.S.C. §7902(a) ............................................................... 1, 8, 9

15 U.S.C. §7903(5)(A)............................................................ *passim*

N.J. Stat. Ann. §2C:58-33 ..............................................................29

N.J. Stat. Ann. §2C:58-33(a) ........................................................ 12, 15

N.J. Stat. Ann. §2C:58-33(c)............................................................8

N.J. Stat. Ann. §2C:58-34 ........................................................ 2, 17, 19, 26

N.J. Stat. Ann. §2C:58-35 ......................................................... 7, 12

N.J. Stat. Ann. §2C:58-35(a)..........................................................21

N.J. Stat. Ann. §2C:58-35(a)(1) .......................................................... *passim*

N.J. Stat. Ann. §2C:58-35(a)(2) ................................................... 1, 3, 8

N.J. Stat. Ann. §2C:58-35(b) ..................................................... 23, 35

N.J. Stat. Ann. §2C:58-35(c) ...............................................................17

N.J. Stat. Ann. §2C:58-35(e) .............................................. 8, 19, 25, 35

**Other Authorities**

Amended Compl., *Platkin v. Patriot Enters. Worldwide LLC*,
   No. MER-C-000093-23 (N.J. Super. Ct. Ch. Div. Dec. 14, 2023) ....................22

*Black's Law Dictionary* (11th ed. 2019) ..................................................20

Ramsin Canon, *Instead of Criminalizing Individuals, Let's Take Down
   the Gun Industry*, Truthout (Aug. 9, 2019), https://bit.ly/33pUk8r ..................39

Compl., *Platkin v. Glock, Inc.*, No. ESX-C-000286-24
   (N.J. Super. Ct. Ch. Div. Dec. 12, 2024) ..................................... 9, 20

Compl., *Platkin v. Butch's Gun World*, No. CUM-C-000037-24
   (N.J. Super Ct. Ch. Div. Nov. 13, 2024) ..............................................13

Compl., *Platkin v. Point Blank Guns & Ammo LLC*, No. MRS-C-
   000123-24 (N.J. Super. Ct. Ch. Div. Nov. 13, 2024) ............................13

Nat'l Shooting Sports Found., *Firearms and Ammunition Industry
   Economic Impact Report* (2025), https://rb.gy/4xwpxd ...................................25

*Restatement (Second) of Torts* (1977) ....................................................33

**INTRODUCTION**

In 2005, Congress passed the Protection of Lawful Commerce in Arms Act to stamp out efforts to use nebulous state-law "reasonableness" standards to hold law-abiding manufacturers and sellers of firearms liable for harms caused by criminals who misuse their products. That purpose is evident on the statute's face: Congress declared in the text that the PLCAA's core aim is to prevent lawsuits seeking redress from businesses engaged in lawful commerce "for the harm caused by those who criminally or unlawfully misuse firearm products … that function as designed and intended." 15 U.S.C. §7901(a)(5). To that end, the PLCAA broadly preempts any "civil action" "against a manufacturer or seller of a [firearm or related] product" seeking "damages … or other relief" for injuries "resulting from the … misuse of a [firearm or related] product by … a third party." *Id.* §§7902(a), 7903(5)(A). That rule is subject to only a narrow set of enumerated exceptions, all for suits involving direct and unambiguous misconduct by the manufacturer or seller itself.

New Jersey Assembly Bill 1765 (2022) is an unabashed attempt to end-run the PLCAA. Under A1765, a manufacturer or seller of firearms and related products may be held liable if it fails to "establish, implement, and enforce *reasonable* controls regarding its manufacture, sale, distribution, importing, and marketing of gun-related products," N.J. Stat. Ann. §2C:58-35(a)(2) (emphasis added), which the statute (unhelpfully) defines to mean "*reasonable* procedures, safeguards, and

business practices that are designed to … prevent the loss … or theft of a gun-related product" and "prevent the sale or distribution of a gun-related product to … a person prohibited from possessing a firearm," *id.* §2C:58-34 (emphasis added). "A gun industry member" may also be held liable if it "recklessly … contribute[s]," "through the sale, manufacturing, distribution, importing, or marketing of a gun-related product" and "by conduct … *unreasonable under all the circumstances*," to "a public nuisance," *id.* §2C:58-35(a)(1) (emphasis added), which the statute (again unhelpfully) defines to mean "any condition which … contributes to the injury or endangerment of the health, safety, peace, comfort, or convenience" of the public, *id.* §2C:58-34. A1765 thus allows licensed manufacturers and sellers of firearms and related products to be held liable under nebulous state-law "reasonableness" standards for harms caused by third parties who misuse their lawful products. In other words, it authorizes exactly what the PLCAA squarely prohibits.

New Jersey believes that the PLCAA's so-called "predicate exception," which allows suits alleging that a manufacturer or seller "knowingly violated a State … statute applicable to the sale or marketing of the product" if "the violation was a proximate cause of the harm for which relief is sought," 15 U.S.C. §7903(5)(A)(iii), permits it to revive the very suits that Congress passed the PLCAA to inter simply by enshrining the same ahistorical common-law theories into statutes. But statutory text, structure, and context—not to mention common sense—foreclose any effort to

"allow the predicate exception to swallow the statute." *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 403 (2d Cir. 2008). The predicate exception instead exempts actions against industry members only when they are predicated on the *knowing* violation of a law that imposes clear and concrete obligations or prohibitions on them. It does not implicate statutes that, like A1765, merely impose generic duties of reasonableness for courts to develop after the fact and disregard *mens rea* and proximate cause in the process, thus operating no differently from the novel common-law actions that motivated Congress to enact the PLCAA in the first place. *See Ileto v. Glock, Inc.*, 565 F.3d 1126, 1135-36 (9th Cir. 2009).

Indeed, this Court has already recognized as much. In granting NSSF's motion for a preliminary injunction in 2023, this Court was clear: "To read A1765 as fitting within the predicate exception would run afoul of the goals of the PLCAA and would, in fact, 'gut the PLCAA,' as NSSF suggests." Dkt.17 at 13. As the Court explained, "[i]t is contrary to the PLCAA" to impose liability on an industry member that "conducted its lawful business in a manner" that did *not* violate any extant "concrete obligation with which industry members [could] confidently ensure compliance" but which the state nonetheless deems "'unreasonable under all the circumstances.'" *Id.* at 12 (quoting N.J. Stat. Ann. §2C:58-35(a)(1)). What was true then is equally true now: "NSSF is likely to succeed on the merits that A1765 does not fall within the predicate exception … and is therefore preempted." *Id.* at 14.

3

That is reason enough to enjoin A1765 anew, but additional reasons abound. While this Court declined to address issues beyond preemption the last time around, the Court went out of its way to note its "additional[] concerns as to whether A1765 can survive on Constitutional grounds." *Id.* And A1765 plainly cannot. A1765 regulates commerce in and speech relating to lawful firearms even when the commerce and speech take place *entirely outside of New Jersey*, in clear violation of the Commerce Clause, which prohibits states from directly regulating out-of-state commerce even when it has effects within the state. The statute unconstitutionally restricts and chills speech and invites arbitrary enforcement by imposing liability on industry members for marketing their products "unreasonably," and it green-lights the imposition of liability based on truthful, non-misleading speech about lawful products, all without proof of reliance, in clear violation of the First Amendment. And it tramples Second Amendment rights and is void for vagueness to boot.

The remaining factors again favor NSSF. The balance of equities and "public interest" still "weigh in favor of" "a preliminary injunction." *Id.* at 17-19. And every dollar NSSF and its members are forced to spend trying to decipher and "comply with the statute"—or else face "prosecution and fees … for noncompliance"—is still irreparable injury due to "the Eleventh Amendment." *Id.* at 17.

The only question, then, is whether NSSF and its members face a real prospect of prosecution under A1765. While that may not have been clear to the Third Circuit

two years ago, the answer is now plainly yes. Mere months after the Attorney General secured dismissal on appeal in the initial round of this case—which he accomplished by "disavow[ing]" any intent to "prosecut[e] [NSSF] or its members just for participating in 'lawful commerce'" and promising not to file suits against "industry members" seeking redress for the misconduct of third-party criminals, *NSSF v. Att'y Gen.*, 80 F.4th 215, 221-22 (3d Cir. 2023)—the Attorney General turned around and did exactly what he swore he would not. The Attorney General has now sued an NSSF member under A1765 alleging that its manufacture, sale, and marketing of one of the most popular handguns in the country contributes to a public nuisance—and seeking damages to redress injuries caused by criminals who misuse those handguns—even though that handgun is lawful in all 50 states, New Jersey included. And that is not all. The Attorney General has sued multiple industry members for otherwise-lawful commerce in firearms that he claims violates A1765's nebulous commands. And just a few weeks ago, he entered a consent decree with an industry member deeming it liable for violating A1765 based on no violation of anything other than A1765's gestalt "unreasonableness" provision. *See* Dkt.50.

This cannot be allowed to continue. What NSSF has been worried about from the start is that the Attorney General will use A1765 to sue its members on the theory that lawful commerce in lawful arms is "misconduct." And it is now clear beyond cavil that the Attorney General intends to do just that—as he is already using A1765

to foist liability on industry members for commercial conduct that does not violate any extant concrete law. Indeed, as reflected in NSSF's declarations, he is using it to foist liability on industry members for conduct in which they are presently engaged, eliminating all doubt that the threat of enforcement is real and imminent. This Court should once again enjoin enforcement of A1765.

## JURISDICTION

NSSF challenges A1765 under 42 U.S.C. §1983, *Ex parte Young*, 209 U.S. 123 (1908), and the Constitution. This Court has jurisdiction under 28 U.S.C. §1331.

To be sure, "the Third Circuit held that NSSF lacked standing" in 2023. Dkt.55 at 1. But the state secured that decision only by "disavow[ing]" any intention to "prosecut[e] [NSSF] or its members just for participating in 'lawful commerce'" and promising not to file suits against "industry members" seeking redress for the misconduct of third-party criminals. *NSSF*, 80 F.4th at 221-22. As this Court recently recognized, however, those promises were short-lived. More to the point, "the new enforcement proceedings filed by the Attorney General—which had not been filed at the time the Third Circuit issued its decision—[not only] constitute extraordinary circumstances that warrant reopening the case," but make "clear" beyond cavil that NSSF "now" has Article III standing. Dkt.55 at 2-3; *see* pp.37-40, *infra* (detailing how NSSF members engage in conduct the state is now targeting).

## ARGUMENT

This Court should grant an injunction because NSSF "is likely to succeed on the merits," i.e., its "odds" of prevailing at the end of the day "are 'significantly better than negligible'"; NSSF and its members "more likely than not" "will suffer irreparable injury without preliminary relief"; and the balance of equities and the public interest favor NSSF as well.  *Veterans Guardian VA Claim Consulting LLC v. Platkin*, --- F.4th ----, 2025 WL 968517, at *2 (3d Cir. Apr. 1, 2025).

## I.    NSSF Is Likely To Succeed On The Merits.

### A.    A1765 Is Preempted.

When a federal law "imposes restrictions" and "a state law confers rights … that conflict with the federal law, the federal law takes precedence and the state law is preempted."  *Kansas v. Garcia*, 589 U.S. 191, 202 (2020).  That is exactly the situation here.  The PLCAA imposes clear restrictions:  Courts may not hear any "civil action … against a manufacturer or seller of a [firearms] product … for damages … or other relief, resulting from the criminal or unlawful misuse of a [firearm] product by … a third party."  15 U.S.C. §7903(5)(A).  A1765 in turn confers rights that conflict with the PLCAA:  It authorizes the state to impose nebulous tort-style liability on "gun industry members" and to recover from them damages and other relief resulting from an unrelated third party's misuse of the member's products.  N.J. Stat. Ann. §2C:58-35.  A1765 is therefore preempted.

1. The PLCAA preempts state efforts to subject those who manufacture or sell

firearms or firearm-related products to liability for harms "resulting from the criminal or unlawful misuse of a [firearm] product by … a third party."  15 U.S.C. §7903(5)(A).  That is precisely what A1765 seeks to do.  Indeed, saddling firearm industry members with liability for injuries "resulting from" third parties' misuse of their products is the statute's whole point.  As its codified findings explain, A1765 is designed to facilitate efforts to hold liable those engaged in the lawful "sale, manufacture, distribution, and marketing of … legal[] gun-related products" for conduct that does not violate any extant concrete prohibition and then to make them pay to redress harms resulting from "gun violence."  N.J. Stat. Ann. §2C:58-33(c).  And A1765 does just that.  It subjects industry members to liability for their "sale, manufacturing, distribution, importing, or marketing" anytime that conduct is deemed (1) to "contribute to" "a[] condition which … contributes to the injury or endangerment of the health, safety, peace, comfort, or convenience" of the public, *id.* §§2C:58-34, -35(a)(1), or (2) to have been insufficiently "reasonable" (at least in the eyes of the state) to keep firearms and related products out of the hands of third parties who may misuse them, *id.* §2C:58-35(a)(2).  And the statute expressly authorizes remedies designed to redress harms caused by "intervening … criminal actions by third parties."  *Id.* §2C:58-35(e).  A1765 thus seeks to revive exactly the kind of suits that the PLCAA says "may not be brought."  15 U.S.C. §7902(a).

One need look no further than the Attorney General's recent enforcement

action against an NSSF member (Glock) to see how A1765 ushers in exactly what the PLCAA sought to usher out. In that action, the Attorney General seeks to make Glock pay for "burglaries," "carjackings," "kidnappings," and "homicides" committed by criminals who illegally altered their lawful Glock pistols into illegal machineguns and then used them to cause terror. Compl. ¶10, *Platkin v. Glock, Inc.*, No. ESX-C-000286-24 (N.J. Super. Ct. Ch. Div. Dec. 12, 2024) ("*Glock* Compl."). According to the Attorney General, simply because Glock is allegedly aware that criminals have sometimes illegally altered its products, its decision not to stop selling its market-leading handguns constitutes a "fail[ure] to 'establish, implement, and enforce reasonable controls regarding [its] manufacture, sale, distribution, … and marketing.'" *Id.* ¶205. While those allegations are baseless, that is beside the point. What matters is that A1765 seeks to revive exactly the kind of suits—based on "the criminal or unlawful misuse of" an industry member's lawful products—that the PLCAA says "may not be brought." 15 U.S.C. §§7902(a), 7903(5)(A).

The only question, then, is whether A1765 falls within any of the PLCAA's exceptions. It does not. The state has previously argued that A1765 fits within the so-called "predicate exception," which exempts "an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought." *Id.* §7903(5)(A)(iii). As this Court

previously explained, however, the state is wrong.  The predicate exception cannot sensibly be read to exempt any and all statutes that apply to the firearms industry, as that "would allow the predicate exception to swallow the statute, which was intended to shield the firearms industry from vicarious liability for harm caused by firearms that were lawfully distributed into primary markets." *City of New York*, 524 F.3d at 403; *accord* Dkt.17 at 13.  Nor can it sensibly be read to exempt the very suits the PLCAA was enacted to foreclose.  Rather, text, context, and common sense all make clear that the predicate exception exempts only statutes that impose clear obligations or prohibitions directly on industry members, not ones that, like A1765, impose only duties of care vis-à-vis the misconduct of third parties.  *See* Dkt.17 at 12-14.

Starting with the statutory text, the term "applicable" in §7903(5)(A)(iii) must be read "in the context of the surrounding language and of the statute as a whole." *City of New York*, 524 F.3d at 400.  And "both the specific and broader context in which 'applicable to' is used" provide clear indications that the predicate exception applies only to laws that impose concrete obligations and prohibitions directly on manufacturers and sellers vis-à-vis manufacturing and sales.  Dkt.17 at 12.  "The predicate exception exempts only those civil actions that require proof that the actor *knowingly* violated the relevant statute." *Id.* (citing 15 U.S.C. §7903(5)(A)(iii)). That presumes some requirement sufficiently concrete that a manufacturer or seller can actually *knowingly* violate it.  A manufacturer can knowingly comply (or not)

with a command to manufacture in certain ways, and a seller can knowingly comply (or not) with a command to conduct a background check for firearm and handgun ammunition sales, or to keep specified records, or to not sell to someone known to be prohibited from possessing a gun.  But it is hard to fathom how an industry member who complies with all of the multitude of federal, state, and local laws that explicitly state what it may and may not do would "know" that it nonetheless has failed to employ "reasonable procedures, safeguards, and business practices," or has conducted its lawful business in a manner so "unreasonable under all the circumstances" that it can be said to have "contribute[d] to" "a[] condition which … contributes to the injury or endangerment of the health, safety, peace, comfort, or convenience of others."  N.J. Stat. Ann. §§2C:58-34, -35(a)(1)-(2); *see* Dkt.17 at 12.

"Congress's illustrative examples within the PLCAA further support this position." Dkt.17 at 13.  "The general language … []providing that predicate statutes are those 'applicable to' the sale or marketing of firearms[] is followed by the more specific language referring to statutes imposing record-keeping requirements on the firearms industry, 15 U.S.C. §7903(5)(A)(iii)(I), and statutes prohibiting firearms suppliers from conspiring with or aiding and abetting others in selling firearms directly to prohibited purchasers, 15 U.S.C. §7903(5)(A)(iii)(II)." *City of New York*, 524 F.3d at 402.  "Thus, the general 'applicable to' language must be 'construed to embrace only objects similar to those enumerated by' the two specific examples that

follow," as this Court held.  Dkt.17 at 13 (quoting *City of New York*, 524 F.3d at 402).

And each of those examples requires a violation *of a concrete obligation or prohibition*.  The first requires a knowing violation of a recordkeeping requirement, *e.g.*, knowingly entering false information, knowingly failing to enter appropriate information, or aiding, abetting, or conspiring with someone to make a false statement material to the lawfulness of a sale.  15 U.S.C. §7903(5)(A)(iii)(I).  The second requires a knowing violation of the obligation not to knowingly facilitate straw purchases, *e.g.*, by aiding, abetting, or conspiring to sell a firearm to someone the seller knows or has reasonable cause to believe is buying it for a prohibited person.  *Id.* §7903(5)(A)(iii)(II).  Those examples look nothing like A1765, which essentially just commands members of the firearms industry to conduct their operations "reasonably," without giving any guidance as to which controls and procedures are "reasonable" or what conduct is "unreasonable under all the circumstances," and which could cover circumstances that become evident only long after the manufacture or sale.  *See* N.J. Stat. Ann. §2C:58-35(a)(1), (a)(2).[1]

None of this is hypothetical.  Neither state nor federal law requires retailers to demand any form of identification from or secure any kind of background check on

---

[1] The examples Congress provided in §7903(5)(A)(iii) differ from A1765 in another respect too.  Whereas the examples are keyed to "sale[s]" and "marketing," A1765 is all about, and triggered by, remote and downstream "gun violence" and "criminal actions by third parties."  N.J. Stat. Ann. §§2C:58-33(a), 2C:58-35.

customers who purchase magazines or rifle ammunition (beyond verifying that a purchaser of the latter is over the age of 18). Yet according to the Attorney General, a federally licensed firearm dealer that fails to do so has not employed "reasonable controls" and has therefore contributed to a public nuisance in violation of A1765. *See, e.g.*, Complaint, *Platkin v. Point Blank Guns & Ammo LLC*, No. MRS-C-000123-24 (N.J. Super. Ct. Ch. Div. Nov. 13, 2024) ("*Point Blank* Complaint"); Complaint, *Platkin v. Butch's Gun World*, No. CUM-C-000037-24 (N.J. Super Ct. Ch. Div. Nov. 13, 2024). It is a mystery how a retailer who meticulously complies with all regulations on the books is supposed to know in real time that failing to do something *no law requires* is so unreasonable as to expose the retailer to potential liability, let alone be made to pay to redress violence perpetrated by third parties.

The PLCAA's enumerated findings reinforce the conclusion that the predicate exception applies only to laws that impose concrete obligations or prohibitions, not just duties of care. As the statute explains, its chief aim is to foreclose efforts to hold those engaged in "the lawful design, manufacture, marketing, distribution, importation, or sale … of firearms or [related] products" "liable for the harm caused by those who criminally or unlawfully misuse firearms [or related] products that function as designed and intended." 15 U.S.C. §7901(a)(5). And as the Second Circuit has recognized, the term "lawful" there means "done in compliance with statutes like those described in" the immediately preceding finding—*i.e.*, "the Gun

13

Control Act of 1968, the National Firearms Act, and the Arms Export Control Act." *City of New York*, 524 F.3d at 402-03; *see* 15 U.S.C. §7901(a)(4). Those statutes do not impose amorphous commands to manufacture, sell, or market firearms "reasonably." They are comprehensive regulatory regimes that impose concrete obligations and prohibitions with which industry members can confidently ensure compliance (or, conversely, can sensibly be said to violate *knowingly*) in real time. "A1765 does just the opposite." Dkt.17 at 13.

Finally, as this Court previously acknowledged, reading the predicate exception to exempt statutes like A1765 would effectively "gut the PLCAA." *Id.* The problem Congress had with the pre-PLCAA tort suits was that they sought to "expand civil liability" well beyond its traditional moorings, constituting "an abuse of the legal system." 15 U.S.C. §7901(a)(6)-(7). Congress thus opted "[t]o prohibit [such] causes of action" entirely, without regard to whether they are brought pursuant to tort law or a statute codifying it and no matter how monikered. *Id.* §7901(b)(1). That is why, for instance, the District of Columbia's highest court held that a law making industry members "'strictly liable in tort' for … injuries resulting from the discharge of an assault weapon" they made or sold could not serve as a predicate statute, as it "merely" "impose[d] a duty to pay compensation" if "a person is … injured by the discharge of an assault weapon," and thus is no different from the sprawling claims Congress set out to inter. *District of Columbia v. Beretta U.S.A.*

14

*Corp.*, 940 A.2d 163, 167, 170-72 (D.C. 2008).  In short, "Congress clearly intended to preempt common-law claims, such as general tort theories of liability," like "negligence and nuisance."  *Ileto*, 565 F.3d at 1135.  And as *Ileto* squarely held, the PLCAA effectuates that intent by preempting such claims even when they are premised on a statute codifying those common-law theories.  *Id.* at 1135-36.

It thus makes no difference that A1765 is a statute.  *Id.* at 1138 ("Congress intended to preempt general tort law claims" even when a state "codifie[s] those claims in its civil code"); *Beretta*, 940 A.2d at 168-72 (same).  The state legislature itself acknowledged that a suit based on exactly the same theories of liability could not be sustained under the common law.  N.J. Stat. Ann. §2C:58-33(a).  It cannot be that the same suit is just fine so long as a state codifies that theory in a statute.  Congress' aim in the PLCAA was not to prompt states to codify their novel theories and reinitiate the same litigation all over again.  It wanted to foreclose the kind of regulation-via-litigation that pre-PLCAA suits sought to accomplish—i.e., using "judicial evolution" to hold industry members liable after the fact for conduct that complied with applicable laws and regulations at the time.  *Ileto*, 565 F.3d at 1136.

If New Jersey really wants to ban Glock's exceedingly popular handguns, or to impose prophylactic identification requirements to acquire a magazine, then it should do so directly—through legislation for which it can be held accountable and that can be challenged preemptively for compliance with the Constitution.  The

15

whole point of the PLCAA is to protect industry members from being haled into court and threatened with liability after the fact for conduct that purportedly violates an obligation that they did not even know existed at the time. That is why Congress crafted a narrow exception only for clear requirements that could be complied with (or knowingly violated) in real time—not for "general tort theories that happened to have been codified." *Id.* To ascribe a contrary meaning to the predicate exception would produce absurd results, as it not only would make the PLCAA trivially easy to evade, but also would make preemption of virtually identical suits grounded in virtually identical departures from traditional legal principles turn on whether and how a state has codified those newfangled theories. That would defy "Congress' intention to create national uniformity." *Id.* Simply put, any reading of the predicate exception that would allow states to sneak in through the back door the very claims Congress tossed out the front would put the PLCAA at war with itself.

**B.    At a Minimum, A1765 Is Preempted to the Extent It Requires Neither Knowing Violations nor Proximate Cause.**

Even assuming A1765 qualified as "a State or Federal statute applicable to the sale or marketing of the product," 15 U.S.C. §7903(5)(A)(iii), *but see* Dkt.17 at 12-14, that would not be enough to rescue it from the preemptive force of the PLCAA. The predicate exception exempts only "an action in which a manufacturer or seller of a qualified product *knowingly* violated a State or Federal statute applicable to the sale or marketing of the product, *and the violation was a proximate cause of the*

*harm for which relief is sought*." 15 U.S.C. §7903(5)(A)(iii) (emphases added).  Yet A1765 authorizes actions that do not comply with either italicized condition.

First, A1765 does not require a violation of either of its categories of prohibited activities to be "knowing."   The first category—"creat[ing], maintain[ing], or contribut[ing] to" "a[] condition which … contributes to the injury or endangerment of the health, safety, peace, comfort, or convenience of others"— explicitly permits liability for "reckless[]" violations.  N.J. Stat. Ann. §§2C:58-34, 2C:58-35(a)(1).  And the second category—the absence of "reasonable controls"— does not require any *mens rea*; it sets up a strict liability offense based on any failure to "establish, implement, and enforce" "reasonable procedures, safeguards, and business practices that are designed to" achieve sweeping goals regarding the manufacture, sale, or marketing of "gun-related products."  *Id.* §§2C:58-34, 2C:58-35(a)(2).  Industry members can thus violate A1765 under that amorphous command even if (as will generally be true) they did not *know* that their "procedures, safeguards, and business practices" were "unreasonable" at the time they were undertaken.  And lest there be any doubt about what role intent has to play for either kind of violation, A1765 makes clear that the answer is none:  "To prevail in an action under this section, the Attorney General shall not be required to demonstrate that the gun industry member acted with the purpose to engage in any public nuisance or otherwise cause harm to the public."  *Id.* §2C:58-35(c).

Those are no minor deviations. The predicate exception makes a "knowing[]" state of mind an essential element for a reason. 15 U.S.C. §7903(5)(A)(iii). And while Congress obviously did not give industry participants blanket immunity to violate the law or to preempt all state efforts to regulate them, Congress did very much want to ensure that those engaged in "the *lawful* design, manufacture, marketing, distribution, … or sale … of firearms or ammunition products" could *not* be held "liable for the harm caused by those who criminally or unlawfully misuse firearm products or ammunition products that function as designed and intended." *Id.* §7901(a)(5) (emphasis added). Indeed, one of the central features of the suits that led to the PLCAA was that they sought to make industry members pay for the criminal acts of third parties based on generic theories of "unreasonable" practices, even if the industry members had complied with the many regulations that govern the industry. *See, e.g.*, *City of New York*, 524 F.3d at 399, 403. By exempting only laws that impose liability only if a defendant "knowingly" violates them, Congress ensured that the predicate exception would not enable states to evade the PLCAA's core command by sneaking the same sweeping unreasonableness theories into their statutes. Yet that is exactly what New Jersey has tried to accomplish via A1765.

Making matters worse, A1765 does not require proximate causation in the ordinary sense. The predicate exception requires the conduct that violates the underlying statute to *be* "a proximate cause of the harm" for which redress is sought.

15 U.S.C. §7903(5)(A)(iii).  New Jersey tried to write around that command by simply declaring that remote sales and marketing practices, perhaps decades and thousands of miles removed from the ultimate harm, "shall be *deemed* to constitute a proximate cause" of downstream gun violence any time such violence by "intervening" criminals could be reasonably foreseeable.  N.J. Stat. Ann. §§2C:58-34, 2C:58-35(e).  But in requiring "proximate cause," Congress plainly did not mean "whatever a state defines to be proximate cause, no matter how attenuated"; it meant "to incorporate the well-settled meaning of the common-law term[] it use[d]." *Jam v. Int'l Fin. Corp.*, 586 U.S. 199, 210-11 (2019).  And, under the common law, not only is "foreseeability alone [] not sufficient to establish proximate cause," *Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 201 (2017), but there must be a "direct relation between the injury asserted and the injurious conduct alleged," *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992).  Yet A1765 explicitly discards any such inquiry.  While the common law in New Jersey (and elsewhere) generally treats criminal misconduct as an intervening cause that *defeats* proximate cause for events occurring earlier in the causal chain, *see, e.g.*, *Townsend v. Pierre*, 110 A.3d 52, 61 (N.J. 2015), A1765 expressly inverts the common-law rule that Congress incorporated into the PLCAA, deeming conduct many steps removed to be a proximate cause of far-downstream criminal acts.  Indeed, A1765's use of the word "deemed"—a word of forced equivalence, *see* Deem, *Black's Law Dictionary* (12th

ed. 2024) ("To treat (something) as if (1) it were really something else, or (2) it has qualities that it does not have")—is a telltale sign that A1765 does *not* use proximate cause the way the common law and Congress understood that phrase.

Again, the recent lawsuit against Glock is a prime example: The state seeks to hold Glock liable for downstream harm caused by the criminal conversion and criminal misuse of legal Glock pistols (which citizens to this day can lawfully purchase and possess in New Jersey). *See generally Glock* Compl. By deploying a novel variant of "proximate cause" that is explicitly designed to facilitate the very thing the PLCAA forbids—*i.e.*, holding industry members responsible for the criminal misuse of their products by third parties—A1765 once again contravenes the PLCAA. NSSF is exceedingly like to succeed on its preemption claim.

### C. A1765 Violates the Commerce Clause.

1. Industry members may be held liable under A1765 for their out-of-state conduct, even if they never manufacture, market, or sell anything in New Jersey and even if everything they did was perfectly lawful where they did it. That is the definition of directly regulating out-of-state conduct. And that is unconstitutional.

As an initial matter, A1765 is not limited to defendants that conduct business in the state. A1765 defines "[g]un industry member" to "mean[] a person engaged in the sale, manufacturing, distribution, importing or marketing of a gun-related product" (and "any officer, agent, employee, or other person authorized to act on

behalf of that person or who acts in active concert or participation with one or more such persons"). N.J. Stat. Ann. §2C:58-34. None of the "sale, manufacturing, distribution, importing or marketing"—i.e., the conduct that violates the statute—needs to take place in New Jersey for an industry member to come within A1765's terms. To be sure, the definition of "[g]un-related product"—which is used in both of §58-35(a)'s substantive provisions—is limited to a product that was either "sold, manufactured, distributed, imported, or marketed in this State" ("or was intended to be") or that was "foreseeabl[y]" "possessed or used in this State." *Id.* But A1765 does not regulate products; it regulates conduct. *See id.* §2C:58-35(a). And nothing in the statute requires that the defendant being sued actually did anything in New Jersey. Put differently, all of a firearm manufacturer's "s[ales], manufactur[ing], … [and] marketing" are fair game for liability under A1765, *no matter where that conduct occurs*, anytime any of its products is "sold" (or even just "possessed or used") in New Jersey, even if the manufacturer itself never sold anything in the state.

This is clear in the text and structure of the statute—and, indeed, is the whole point. Start with §58-35(a)(1). Under that provision, an out-of-state manufacturer can be held liable, and made to pay various forms of monetary recompense to the state, *see id.* §58-35(b), if a court finds that its out-of-state "manufacture … of [its] gun-related product[s]" was "unreasonable" and "contribute[d] to a public nuisance in this State," even if it was not "unlawful" where it occurred (or in New Jersey).

So, for instance, the Attorney General could sue a Pennsylvania-based industry member for the lawful sale *in Pennsylvania* of firearms that are legal there but illegal in New Jersey, on the theory that industry member is responsible for any harms caused by persons who purchase those firearms *in Pennsylvania* and bring them into New Jersey and use them to commit crimes in New Jersey. Once again, this is not hypothetical; the Attorney General has already deployed A1765 in exactly that manner. *See* Amended Compl., *Platkin v. Patriot Enters. Worldwide LLC*, No. MER-C-000093-23 (N.J. Super. Ct. Ch. Div. Dec. 14, 2023) (suing two industry members for selling in Pennsylvania firearm kits that are lawful there but unlawful in New Jersey and seeking to make them pay to redress criminal misuse of such kits in New Jersey). Even if the products were fully lawful where they were made, and even if the industry member complied with all of the many federal, state, and local regulations governing the manufacture of firearms, the manufacturer could still be sued under A1765 if *someone else* misuses one of its arms in New Jersey.

Section 58-35(a)(2) is, if anything, even more problematic. That provision requires firearm industry members to "establish, implement, and enforce reasonable controls" "that are designed," among other things, to "prevent the loss … or theft of [their] product[s] from [their] facilities." N.J. Stat. Ann. §§2C:58-34, -35(a)(2). Under that provision, a manufacturer could be sued even if all its manufacturing takes place in Ohio and all its sales are made to distributors in the Midwest, if anyone

sells—or even just possesses—even one of its products in New Jersey. And that is not even the half of it. Imagine that a gang member in Texas breaks into a retailer in Houston and steals a 20-round magazine. If the thief later moves to Trenton and brings the magazine along, the retailer in Houston could be sued under A1765 on the theory that it failed to "implement" sufficiently "reasonable procedures" *in Texas* to "prevent the … theft of a gun-related product from a gun industry member" *in Texas*. *Id.* §§2C:58-34, -35(a)(2). Sellers and distributors, no less than manufacturers, are on the hook for all of their business practices (even if they are fully compliant with all concrete federal, state, and local regulations), no matter where they are, anytime they are even one link in a long chain that leads to gun crime in New Jersey.

In short, A1765 allows New Jersey to impose liability on out-of-state industry members even when they do not manufacture, market, or sell any product in the state, or even intend for their products to wind up in the state. As long as just one of the industry member's products ends up being used to cause some sort of harm in the state and a judge or jury thinks the industry member could have done more to prevent that outcome, the industry member faces the prospect of crushing liability—and "an injunction prohibiting the gun industry member from continuing that conduct"—even if that conduct remains lawful where it occurs. *Id.* §2C:58-35(b).

None of that is constitutional. The Supreme Court and the Third Circuit have long and consistently held that the Commerce Clause, U.S. Const. art. I, §8, cl. 3,

prohibits a state from "'directly regulat[ing]'"—that is, imposing liability based upon—conduct that takes place "'wholly outside the State' and involve[s] individuals 'having no connection with [it].'" *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 n.1 (2023) (italics omitted) (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 641-43 (1982) (plurality op.)); *see also A.S. Goldmen & Co. v. N.J. Bur. of Sec.*, 163 F.3d 780, 786 (3d Cir. 1999) ("If the transaction to be regulated occurs 'wholly outside' the boundaries of the state, the regulation is unconstitutional."). To the extent A1765 applies to conduct that takes place out of state, it is unconstitutional, as another federal court recently held as to a similarly sweeping state firearm law. *See NSSF v. Bonta*, 718 F.Supp.3d 1244, 1256 (S.D. Cal. 2024) (enjoining a California firearm law under which "an out-of-state industry member— who does no business in California—may be liable for transactions that involve no California parties or destinations," on the ground that it "reaches beyond California's borders and directly regulates out-of-state commercial transactions").

2.      In addition to prohibiting states from directly regulating conduct that takes place entirely outside of their borders even when it may have in-state effects, the Commerce Clause "prohibit[s] States from discriminating against or imposing excessive burdens on interstate commerce." *Comptroller of Treasury v. Wynne*, 575 U.S. 542, 549 (2015). A1765 violates that command too.

Whatever New Jersey may think of the firearms industry, Congress has made

24

its own judgment, recognizing that the industry not only is critical to ensuring that law-abiding Americans can exercise their Second Amendment rights, but contributes to a vibrant sector of America's economy. That is precisely why Congress declared in 2005 that the type of liability A1765 seeks to impose "constitutes an unreasonable burden on interstate and foreign commerce of the United States." 15 U.S.C. §7901(a)(6). And the importance of the firearm industry has only grown since then. In 2024, for instance, the industry generated more than $91 billion in economic activity nationwide. NSSF, *Firearms and Ammunition Industry Economic Impact Report* 3 (2025), https://rb.gy/4xwpxd. That translates to helping employ more than 380,000 people—almost all of them outside of New Jersey—and generating almost $11 billion in federal, state, and local taxes in 2024 alone. *Id.* at 2-3.

A1765 discriminates against all that economic activity, which is flourishing elsewhere but languishing in New Jersey, *see id.* at 4. And A1765 undoubtedly burdens that economic activity; indeed, in Congress' estimation, efforts to impose liability for "criminal actions by third parties," N.J. Stat. Ann. §2C:58-35(e), inflict "an unreasonable burden on interstate and foreign commerce of the United States," 15 U.S.C. §7901(a)(6). A1765 inflicts that economic burden, moreover, in an effort to impose its own views of gun policy on the rest of the country. But "a State may not impose economic sanctions … with the intent of changing … lawful conduct in other States." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 572 (1997).

### D.    A1765 Violates the First Amendment.

In addition to regulating the manufacture and sale of firearms, A1765 regulates (and allows courts to enjoin) speech protected by the First Amendment based on vague and unconstitutional standards.  A1765 defines "[g]un industry member[s]"—the only entities to which it applies—to include those engaged in "marketing."  N.J. Stat. Ann. §2C:58-34.  It authorizes liability for contributing to a public nuisance "through … marketing."  *Id.* §2C:58-35(a)(1).  And it orders industry members to use "reasonable controls regarding … marketing."  *Id.* §2C:58-35(a)(2).  That is not remotely consistent with the First Amendment.  *See 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 489 (1996) (marketing is protected speech).  Laws that single out speech on the basis of content or viewpoint are subject to the strictest of scrutiny, which they "rare[ly]" survive.  *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790-91, 799 (2011).  A1765 does both.  And far from being narrowly tailored or closely drawn to achieve a compelling government interest, A1765 is radically overbroad in relation to any legitimate objective it may further.

1.    A1765 plainly regulates speech based on its content or "the topic discussed."  *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022).  After all, the statute does not apply to *all* marketing; it applies only to "marketing *of a gun-related product*."  N.J. Stat. Ann. §2C:58-35(a)(1)-(2) (emphasis added).  Indeed, A1765 does not even apply to all speech about firearms—

only that of "[g]un industry member[s]," those "engaged in the sale, manufacturing, distribution, importing or marketing of a gun-related product." *Id.* §2C:58-34. And it is not hard to discern why New Jersey has trained its sights on gun-related speech by gun-related actors: Their speech is uniquely likely to communicate a *viewpoint* the state disfavors. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564 (2011).

The topics and views New Jersey has singled out in A1765 do not fall into any "well-defined and narrowly limited classes of speech" unprotected by the First Amendment. *Brown*, 564 U.S. at 791. To be sure, the First Amendment does not preclude liability for false, deceptive, or otherwise "misleading" commercial speech. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 564 (1980). But A1765 does not even purport to target speech that is false or misleading. It authorizes the imposition of liability for speech about a product—one expressly protected by the Constitution, no less—*even when that speech is truthful*. Tellingly, the words "false," "misleading," and "deceptive" appear nowhere in the statute. A manufacturer that publishes advertisements containing *entirely accurate* specifications of its lawful products—ammunition size, magazine capacity, weight, retail price, etc.—could still be liable under A1765 if its advertisements were later deemed to (somehow) have undermined the "comfort" or "convenience" of New Jersey residents. N.J. Stat. Ann. §§2C:58-34, -35(a)(1). So could an industry member that fails to establish a "reasonable procedure" with respect to its marketing

27

materials—again, no matter how accurate they are. *Id.* §§2C:58-34, -35(a)(2). And a retailer that did nothing more than just put a sign up in its storefront window informing potential customers that it sells Glock handguns could be held liable for "contributing" to the harms caused by criminals who illegally convert those legal (and popular) handguns into illegal machineguns. *See generally* Glock Compl.

None of that is consistent with the First Amendment. Truthful speech promoting lawful products is protected by the First Amendment even if the product is known to have deleterious health effects. *See, e.g.*, *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) (tobacco); *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 184-85 (1999) (gambling); *44 Liquormart*, 517 U.S. at 504 (liquor); *Bigelow v. Virginia*, 421 U.S. 809, 818-25 (1975) (abortion). The mere fact that a product is dangerous does not transform promotion of that product into a tort for which liability may be imposed. And that is of course true *a fortiori* when it comes to products that not only are legal, but are protected by the Second Amendment. *See, e.g.*, *Junior Sports Mags. Inc. v. Bonta*, 80 F.4th 1109, 1116-17 (9th Cir. 2023) (invalidating a similar restriction on firearm-related marketing).

A1765 thus strikes at the heart of the First Amendment, which furnishes no less protection for truthful commercial speech than for other kinds of speech. After all, "bans that target truthful, nonmisleading commercial messages rarely protect consumers from [the] harms" that may justify greater regulation of commercial

speech. *44 Liquormart*, 517 U.S. at 502-03. And states may not "underestimate[] the value" of speech just because it is commercial. *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 419-24 (1993); *see also Sorrell*, 564 U.S. at 566.

2.    That means New Jersey must affirmatively prove that A1765 satisfies heightened scrutiny. *See Veterans Guardian*, 2025 WL 968517, at *3 ([NSSF] has a reasonable probability of showing … that New Jersey's law burdens [its members'] speech. So the state must show that its law satisfies the First Amendment."). Indeed, given the statute's speaker, viewpoint, and content discrimination, strict scrutiny should apply. *See Greater Phila. Chamber of Com. v. City of Philadelphia*, 949 F.3d 116, 139 (3d Cir. 2020). But no matter which version of heightened scrutiny applies, the state must prove that A1795 is "narrowly tailored to the interest it promotes." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 609-10 (2021). And when a law pursues the state's purported aims "by means" both "seriously underinclusive" and "seriously overinclusive," that "raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown*, 564 U.S. at 802, 805.

Just so here. For one thing, A1765 is "wildly underinclusive." *Id.* at 801-02. While it is ostensibly motivated by a desire to resolve a purported "epidemic of gun violence," N.J. Stat. Ann. §2C:58-33, A1765 does *nothing* to police the conduct of criminals who misuse firearms to perpetrate that problem. Nor does it regulate vast

29

swaths of speech—action and horror films, direct incitements to violence, etc.—that may actually encourage criminal gun violence. A1765 is thus wildly underinclusive even just vis-à-vis the regulation of speech. *See Brown*, 564 U.S. at 801-02.

A1765 is "vastly overinclusive" as well, *id.* at 804, as it imposes sweeping liability for *any* firearms-related marketing that could later be thought to "contribute to a public nuisance" in New Jersey, even if it is entirely truthful, non-misleading speech. Indeed, A1765's scope is breathtaking: In any case of gun violence, countless firearm industry members—perhaps thousands of miles away from New Jersey and decades before anyone suffers injury—will have engaged in truthful advertising of their products. Any such advertisements later deemed to have indirectly *contributed* to problems in New Jersey, even without the industry member's knowledge, could be grounds for liability for a criminal's misuse of their products. To be grounds for liability under A1765, the marketing does not even have to have led to the purchase of the firearm used to perpetrate crimes. In short, A1765 "prohibit[s] or chill[s]" vast swaths of fully protected expression, *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002), destroying the "breathing space" that "the First Amendment needs," *Broadrick v. Oklahoma*, 413 U.S. 601, 611 (1973).

3.     In its effort to sweep up far more protected speech than could conceivably be necessary to accomplish any permissible state objectives, A1765 also suffers from a fatal vagueness problem. Vagueness "raises special First Amendment

concerns because of its obvious chilling effect on free speech." *Reno v. ACLU*, 521 U.S. 844, 871-72 (1997). After all, vague laws risk chilling would-be speakers by forcing them "to 'steer far wider of the unlawful zone'" than they otherwise would "if the boundaries of the forbidden areas were clearly marked." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964). For that reason, laws touching on speech must themselves speak "only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963).

A1765 does precisely the opposite. Indeed, the statute makes it virtually impossible for regulated parties to tell what speech is and is not permitted, leaving them with no realistic choice but to err on the side of refraining from exercising their First Amendment rights. By its terms, A1765 renders unlawful any marketing that could be said to have "recklessly" "contribute[d] to a public nuisance," N.J. Stat. Ann. §2C:58-35(a)(1), and it defines "public nuisance" so broadly as to sweep in, e.g., truthful marketing that "contributes to the injury or endangerment of the health, safety, peace, comfort, or convenience of others" or is not subject to sufficiently "reasonable procedures, safeguards, and business practices," *id.* §2C:58-34. A1765 thus necessarily "will provoke uncertainty among speakers," *Reno*, 521 U.S. at 871, as such incomprehensible and subjective abstractions do not articulate *at all*—let alone articulate with "narrow specificity"—what kind of speech may later be deemed to have contributed to a "public nuisance." *Any* advertisement for a lawful product *anywhere* can be grounds for liability if it is later deemed to have indirectly

*contributed* to gun-related problems in New Jersey. By contrast, the "legitimate" sweep of the statute's marketing provisions is miniscule—particularly given that A1765 elsewhere contemplates full compliance with state and federal laws relating to marketing of firearms. *See id.* §2C:58-34. A1765's vague command to speak "reasonably" is all but certain to chill constitutionally protected speech.

That profound uncertainty not only "raises special First Amendment concerns because of its obvious chilling effect on free speech," but creates a "risk of discriminatory enforcement," which makes the chilling effect even more acute. *Reno*, 521 U.S. at 871-72. A1765 threatens liability for any marketing that the state could later say was not subject to reasonable controls. But under our constitutional framework, the state does not get to decide, after the fact, whether speech was reasonable. Unless commercial speech is false or inconsistent with traditional, clear, and *ex ante* restrictions on speech, the First Amendment fully protects it, even if others might deem the speech "unreasonable." And the threat of discriminatory enforcement is all the more pervasive when, as here, a law "does not aim specifically at evils within the allowable area of State control but, on the contrary, sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech or of the press." *Thornhill v. Alabama*, 310 U.S. 88, 97 (1940). That inherent vagueness dooms A1765 under the First Amendment as well.

Moreover, even when speech about a product is actually false or misleading,

the traditional principles that govern judicial actions for misrepresentations, including proof of reliance, have always required a substantial link between the speech and the claimed injury. *See, e.g.*, *Restatement (Second) of Torts* §525 (Oct. 2024 Update). Indeed, if liability could be imposed for misleading (or even truthful) speech at the behest of plaintiffs who did not rely on it and cannot demonstrate injury from it, then the threat of massive liability could inhibit a speaker from voicing his view "even though [he] believe[s] [it] to be true and even though it is in fact true." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964). Yet A1765 does not even require proof of reliance. Nor does it require a plaintiff to trace alleged injuries directly to the speech in question. Under A1765, an industry member's speech is "deemed to constitute a proximate cause of the public nuisance if the harm to the public was a reasonably foreseeable effect of such conduct, notwithstanding any intervening actions, including, but not limited to, criminal actions by third parties." N.J. Stat. Ann. §2C:58-35(e). The First Amendment demands more, particularly of content- and speaker-based restrictions on speech. *See Sorrell*, 564 U.S. at 565-66.

### E.    A1765 Is Void for Vagueness.

For many of the reasons A1765 is unconstitutionally vague with respect to protected speech, it is also unconstitutionally vague under the Due Process Clause with respect to all other conduct it polices. One of the few things that *is* clear about the statute is that it leaves industry members with no meaningful guidance on how

to conduct their businesses without running afoul of the statute.

The Fourteenth Amendment prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, §1. A law that forbids or requires an act "in terms so vague that men of common intelligence must necessarily guess at its meaning … violates the first essential of due process." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 390 (1926). The same is true of a law with terms so malleable that it authorizes "arbitrary [or] discriminatory enforcement." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

For reasons already discussed, "[t]he vice of unconstitutional vagueness is further aggravated" in the First Amendment context. *Cramp v. Bd. of Pub. Instruction of Orange Cnty.*, 368 U.S. 278, 287 (1961). But it is not just First Amendment concerns that demand regulation with especial precision. A more "stringent" vagueness test applies for statutes that "threaten to inhibit the exercise of constitutionally protected rights" of *any* kind, as well as for statutes that impose "quasi-criminal" penalties. *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982). The most protective vagueness standard known to our law thus applies here several times over. A1765 not only regulates speech protected by the First Amendment, but also restricts the conduct of those engaged in the lawful business of selling products protected by the Second Amendment to law-abiding citizens who are constitutionally entitled to possess them. The liability A1765

34

threatens is no small matter—"restitution; damages; reasonable attorneys' fees, filing fees, and reasonable costs of suit; and any other appropriate relief" flowing from downstream gun violence perpetrated by criminals, N.J. Stat. Ann. §2C:58-35(b), (e). A1765 thereby brings with it the "possibility of imposing liability on an entire industry," which "threatens the diminution of a basic constitutional right" enabled by that industry—namely, individuals' Second Amendment rights to keep and bear arms. 15 U.S.C. §7901(a)(6). As a result, A1765 is subject to a "stringent" vagueness test even apart from its direct regulation of speech.

A1765 flunks that test, as the prohibitions it imposes are hopelessly vague. The statute renders it unlawful to, *inter alia*, "recklessly … contribute to a public nuisance in [New Jersey] through the sale, manufacturing, distribution, importing, or marketing of a gun-related product" "by conduct either unlawful in itself *or unreasonable under all the circumstances*." N.J. Stat. Ann. §2C:58-35(a)(1) (emphasis added). Moreover, "all the circumstances" a court must consider include the circumstances of any nuisance itself, which may not come into being until long after the defendant has engaged in "the sale, manufacturing, distribution, importing, or marketing of a gun-related product." *Id.* There is thus no way to know *ex ante*— when a product is actually made, sold, or advertised—if a manufacturer or seller's conduct will or will not be deemed "unreasonable under all the circumstances."

But even if an industry member could somehow conceive of all relevant

circumstances yet to come, it remains a mystery what "reasonable controls" means—especially since the term is defined to mean something more than simply complying with the law. *See* N.J. Stat. Ann. §2C:58-34. And the statute's effort to supply a definition only makes matters worse: Rather than detail concrete obligations, A1765 commands industry members to adopt all procedures "designed to" "prevent" or "ensure" a litany of abstract goals including (but not limited to) preventing the loss or theft of firearms, preventing illegal arms trafficking, and so on. *Id.* What is more, rather than recycle pre-existing common-law nuisance principles, A1765 tasks industry members with predicting abstractions like what befits the "comfort" and "convenience" of state residents. *Id.* That is classic unconstitutional vagueness.

To be clear, "[w]hat renders [this] statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely *what that fact is*." *United States v. Williams*, 553 U.S. 285, 306 (2008) (emphasis added). The problem with A1765 is not mere imprecision at the margins, but the failure to articulate any cognizable standard whatsoever. Determining, for example, what promotes (or disserves) the public convenience invites "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *Id.* Indeed, A1765 is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). That is anathema to the Constitution.

### F.    A1765 Violates the Second Amendment.

Imposing novel liability for lawful commerce in firearms violates the Second Amendment.  There is no question that A1765 burdens Second Amendment activity, as the law singles out the act of manufacturing and selling constitutionally protected arms for the imposition of potentially massive liability.  The question is thus whether the state can prove that the burdens A1765 imposes are consistent with "this Nation's historical tradition of firearm regulation."  *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 (2022); *see United States v. Rahimi*, 602 U.S. 680, 689 (2024).  The answer is no.  As Congress explained in the PLCAA, efforts to hold those engaged in the lawful manufacture, marketing, and sale of firearms liable for the criminal misuse of their products by third parties are "based on theories without foundation in hundreds of years of the common law and jurisprudence of the United States."  15 U.S.C. §7901(a)(7).  Indeed, even the few courts that accepted such theories before the PLCAA did not do so until the turn of the twenty-first century.  Simply put, the novelty of A1765 lacks any historical pedigree, and violates the Second Amendment.

## II.    The Remaining Factors All Favor Injunctive Relief.

1.    NSSF and its members face irreparable injury multiple times over.  Most obviously, "a violation of First Amendment rights presumptively inflicts irreparable harm."  *Veterans Guardian*, 2025 WL 968517, at *2.  And beyond NSSF's constitutional claims, the PLCAA creates a substantive *immunity* from suit.

*See* 15 U.S.C. §7902(a); *In re Acad., Ltd.*, 625 S.W.3d 19, 32-36 (Tex. 2021). No court can make NSSF members whole for having to defend against suits that should never have been brought in the first place—particularly when they are brought by the state, which would be immune from any later suit to recoup monetary losses.

Nor can a court make members whole for the costs of coming into compliance (if that is even possible), let alone the costs of being held noncompliant, in light of sovereign immunity. That is why this Court previously found "that NSSF ha[d] satisfied the irreparable harm requirement." Dkt.17 at 18. And that conclusion is even more obviously correct now. NSSF members "in New Jersey" currently "keep[] for range use and sell[]" the very Glock pistols the Attorney General claims are a public nuisance. *E.g.*, Viden Decl. ¶24; Olenick Decl. ¶24. NSSF members also "manufacture[] and distribute[] striker-fire pistols that are substantially similar in design to the Glock pistols at issue in the [state's] lawsuit against Glock and that, like Glock pistols, can illegally be equipped with an illegal MCD," Tuason Decl. ¶26; Spadafore Decl. ¶24; Treadaway Decl. ¶27; McNamara Decl. ¶14; Griffith Decl. ¶¶17-19, and sell them "in New Jersey," *e.g.*, Hoffacker Decl. ¶25; Deeney Decl. ¶24. Furthermore, NSSF member Magpul, among others, "sells products that are compatible" with those firearms. Liptak Decl. ¶¶26-27; Treadaway Decl. ¶26. Several NSSF members, including Smith & Wesson and Daniel Defense, also "manufacture[] and distribute[] AR-15 style firearms, which numerous states and

litigants have alleged can be illegally converted into machineguns using an illegal MCD, auto sear, or other attachments, and thus could face opprobrium from New Jersey under A1765" under the same theory the Attorney General is pursuing against Glock, even though "AR-15 style firearms are not machineguns under governing law."  Cupero Decl. ¶26; Daniel Decl. ¶25; Reid Decl. ¶25; Spadafore Decl. ¶25; Griffith Decl ¶20.  And distributor members sell the aforementioned pistols and AR-15s.  Tyree Decl. ¶¶26-27; Dickson Decl. ¶¶26-27; Emonet Decl. ¶¶26-27.

Absent an injunction, licensed retailers and distributors may be forced to stop selling one of the most popular handguns in the country, and licensed manufacturers may be forced to stop making the most popular rifle in the country, out of fear that they will be tagged with the scarlet letter of noncompliance.  While that is staggering, it is not surprising.  Advocates behind the suits brought before the PLCAA was passed—and those behind A1765—have been remarkably frank about their aims: Win or lose, they seek to "unleash … attorneys general against the gun industry" to "critically weaken" it.  Ramsin Canon, *Instead of Criminalizing Individuals, Let's Take Down the Gun Industry*, Truthout (Aug. 9, 2019), https://bit.ly/33pUk8r.

To be sure, some NSSF members may be able to endure the cost of changing business practices or of facing a litigation firestorm for refusing.  But not all of them. A retailer recently acceded to violating A1765 based solely on not confirming that purchasers of magazines and rifle ammunition are not prohibited from possessing

firearms—which *neither state nor federal law requires*. Dkt.50. And multiple NSSF members have recently begun "training [their] employees" to (try to) comply with the new view of retailers' obligations that judgment embodies—and they will not be able to recoup any of the "time and money" spent doing so. *E.g.*, Hoffacker Decl. ¶¶27-28; Olenick Decl. ¶¶27-28; Viden Decl. ¶¶27-28; Deeney Decl. ¶¶27-28.

2.     The balance of equities and public interest once again favor NSSF as well. *See* Dkt.17 at 18-19.  A1765 encroaches on federal authority, flouting Congress' express designs. *See United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497-98 (2001). It burdens interstate commerce and foments interstate conflict by setting New Jersey up as the judge of lawful business practices in other states. *See Hazardous Waste Treatment Council v. South Carolina*, 945 F.2d 781, 795 (4th Cir. 1991). And it tramples on individual rights. *See Ctr. for Investigative Reporting v. Se. Pa. Transp. Auth.*, 975 F.3d 300, 317 (3d Cir. 2020). The public interest does not favor keeping in place a law that poses such a grave threat to fundamental rights. *See* Dkt.17 at 19. On the flip side, the Attorney General "does not have a legitimate interest in the enforcement of an unconstitutional law," and he has no basis to claim that he would suffer damages "in the event the Court issued a preliminary injunction." *Id.* at 18.

## CONCLUSION

The Court should grant a preliminary injunction.

Respectfully submitted,

s/Daniel L. Schmutter

PAUL D. CLEMENT
ERIN E. MURPHY
MATTHEW D. ROWEN
NICHOLAS A. AQUART*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

DANIEL L. SCHMUTTER
HARTMAN & WINNICKI, PC
74 Passaic Street
Ridgewood, NJ 07450
(201) 967-8040
dschmutter@hartmanwinnicki.com

* Supervised by principals of the firm who
are members of the Virginia Bar
(Application for admission *pro hac
vice* forthcoming)

April 11, 2025

*Counsel for Plaintiff*