**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| NATIONAL SHOOTING SPORTS FOUNDATION, <br><br> Plaintiff, <br><br> v. <br><br> MATTHEW J. PLATKIN, *Attorney General of New Jersey*, <br><br> Defendant. | Civil Action No. 22-6646 (ZNQ) (TJB) <br><br> **OPINION** |

**QURAISHI, District Judge**

    **THIS MATTER** comes before the Court upon a Motion for a Preliminary Injunction ("Motion," ECF No. 60) filed by Plaintiff National Shooting Sports Foundation ("NSSF") seeking to enjoin Defendant Matthew Platkin (the "Attorney General") from enforcing N.J. Stat. Ann. § 2C:58-33 to -36 (the "New Jersey Act"). (*See* ECF No. 60-22.)  NSSF filed a Moving Brief in support of the Motion ("Moving Br.," ECF No. 60-1), and various declarations and exhibits (ECF Nos. 60-2 to 60-21.)  The Attorney General filed a Brief in Opposition ("Opp'n Br," ECF No. 62), and various exhibits (ECF No. 62-1).  NSSF filed a Reply Brief.  ("Reply Br.," ECF No. 65.)  Also before the Court are letters from the parties regarding the impact of the recent decision by the Supreme Court of the United States in *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 145 S. Ct. 1556 (2025), and an amicus brief filed by three gun violence prevention groups including Brady: United Against Gun Violence, Everytown for Gun Safety, and Giffords Law

Center to Prevent Gun Violence (ECF No. 63).[1]  The Court held oral argument on June 25, 2025. Having considered the parties' submissions and the arguments presented at oral argument, the Court will **DENY** the Motion, **ABSTAIN** from reaching the merits, and **STAY** the case for the reasons set forth below.

## I.    BACKGROUND AND PROCEDURAL HISTORY

### A.    BACKGROUND

NSSF brings this lawsuit to challenge the New Jersey Act.  ("Am. Compl.," ECF No. 56, ¶ 1.)  NSSF is a Connecticut-based trade association for the firearm, ammunition, and hunting and sports industry.  (*Id.* ¶ 11.)  Defendant Attorney General of New Jersey is sued in his official and personal capacity.  (*Id.* ¶ 15.)  Because this case involves two statutes, the Protection of Lawful Commerce in Arms Act ("PLCAA") and the New Jersey Act, a brief discussion of them is warranted.

#### 1.    The PLCAA

Congress enacted the PLCAA in response to "[l]awsuits . . . commenced against manufacturers, distributors, dealers, and importers of firearms that operate as designed and intended, which seek money damages and other relief for the harm caused by the misuse of firearms by third parties, including criminals."  15 U.S.C. § 7901(a)(3); *Smith & Wesson Brands*, 145 S. Ct. at 1562 ("Congress enacted the [PLCAA] in response to a spate of litigation trying to hold gun companies liable in tort for harms 'caused by the misuse of firearms by third parties, including criminals.'" (quoting § 7901(a)(3)).)  Congress found that manufacturers and sellers of firearms "are not, and should not, be liable for the harm caused by those who criminally or

---

[1] On May 23, 2025, the Court granted amicus curiae's motion for leave to file an amicus brief and ordered that the brief be filed as a separate docket entry within five days.  (ECF No. 64.)  Amicus curiae have failed to file their brief as a separate docket entry.  Nonetheless, the Court has considered the proposed brief attached to their motion.

unlawfully misuse firearm products or ammunition products that function as designed and intended." 15 U.S.C. § 7901(a)(5). Congress found egregious "[t]he possibility of imposing liability on an entire industry for harm that is solely caused by others." *Id.* § 7901(a)(6).

Notably, Congress intended to preempt common-law claims, such as general tort theories of liability. *Id.* § 7902(a). Specifically, the PLCAA requires that federal courts "immediately dismiss[]" a "qualified civil liability action." *Id.* § 7902(b). The term "qualified civil liability action" means a

> civil action or proceeding or an administrative proceeding brought by any person against a manufacturer or seller of a qualified product, or a trade association, for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party, but shall not include [specified enumerated exceptions].

*Id.* § 7903(5)(A).

The PLCAA does not preempt actions to enforce federal law, when a manufacturer or seller unlawfully transferred a firearm, negligently entrusted a firearm, breached a contract, defectively made a product, or when, relevant here, "a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought." *Id.* § 7903(5)(A)(iii). This latter exception is known as the predicate exception. *Smith & Wesson Brands*, 145 S. Ct. at 1562.

### 2.    The New Jersey Act

In response to the "the unavailability of a robust public nuisance statute [that] has limited the State's ability to seek legal redress in situations where firearms manufacturers and retail dealers may have knowingly or recklessly taken actions that have endangered the safety and health of New

Jersey residents," the New Jersey Legislature passed the New Jersey Act, which was signed into law by Governor Philip D. Murphy on July 5, 2022.  *See* N.J. Stat. Ann. §§ 2C:58-33 to -36.

Section 2C:58-33 explains the Legislature's findings.  It provides that in addition to state court decisions, "federal law has created an additional barrier to" "pursu[ing] civil actions for abatement, damages, and other relief from the negligent, reckless, and, in some cases, illegal conduct of bad actors in the gun industry."  As a result, the Legislature found that

> it is necessary and proper to promote and protect the health, safety, and welfare of the people of New Jersey by requiring gun industry members to establish and implement reasonable procedures, safeguards, and business practices for the sale, manufacture, distribution, importing, and marketing of gun-related products and establishing a statutory cause of action for public nuisance violations available to the Attorney General to address injuries to public health and safety and to seek relief, including, but not limited to, abatement and other injunctive relief, damages, and attorneys' fees and costs.

*Id.*

One of the provisions at issue here, Section 2C:58-35(a), states that a gun industry member "shall not, by conduct either unlawful in itself or unreasonable under all the circumstances, knowingly or recklessly create, maintain or contribute to a public nuisance in this State through the sale, manufacturing, distribution, importing, or marketing of a gun-related product."  Further, a gun industry member must establish, implement, and enforce reasonable controls[2] regarding its manufacture, sale, distribution, importing, and marketing of gun-related products.  *Id.*  "Whenever

---

[2] "Reasonable controls" means "reasonable procedures, safeguards, and business practices that are designed to: (1) prevent the sale or distribution of a gun-related product to a straw purchaser, a firearm trafficker, a person prohibited from possessing a firearm under State or federal law, or a person who the gun industry member has reasonable cause to believe is at substantial risk of using a gun-related product to harm themselves or unlawfully harm another or of unlawfully possessing or using a gun-related product; (2) prevent the loss of a gun-related product or theft of a gun-related product from a gun industry member; (3) ensure that a gun industry member complies with all provisions of State and federal law and does not otherwise promote the unlawful sale, manufacture, distribution, importing, marketing, possession, or use of a gun-related product; and (4) ensure that the gun industry member does not engage in an act or practice in violation of any of the regulatory provisions governing firearms set forth in chapters 39 and 58 of Title 2C of the New Jersey Statutes."  Section 2C:58-34.

it appears to the Attorney General that a gun industry member has engaged" in conduct that violates Section 2C:58-35(b), the Attorney General may commence an action to obtain an injunction, "prohibiting the gun industry member from continuing that conduct or engaging therein or doing any acts in furtherance thereof," in addition to an order providing for abatement, restitution, damages, reasonable attorneys' fees, filing fees, and reasonable costs. *Id.* The Attorney General need not prove purpose by the gun industry member. *Id.*

### B.    PROCEDURAL HISTORY

#### 1.    <u>This Action</u>

NSSF filed its initial complaint on November 16, 2022, shortly after the New Jersey Act was enacted (Am. Compl. ¶ 7), and a first motion for a preliminary injunction thereafter. (ECF Nos. 1 (complaint), 4 (preliminary injunction motion).) The Court granted the motion on January 31, 2023. (ECF No. 18); *Nat'l Shooting Sports Found. v. Att'y Gen. of N.J.*, 2023 WL 1380388 (D.N.J. Jan. 31, 2023) (finding that the New Jersey Act was preempted by the PLCAA and that NSSF and its members will suffer irreparable harm). On August 17, 2023, the Third Circuit vacated the Court's decision on the basis that NSSF had failed to demonstrate Article III standing for its pre-enforcement challenge. *See Nat'l Shooting Sports Found. v. Att'y Gen. of N.J.*, 80 F.4th 215 (3d Cir. 2023) (remanding for an order to dismiss the case for lack of subject matter jurisdiction). Notably, at the time NSSF filed its complaint and of the Third Circuit's decision, the Attorney General had not yet brought an enforcement action under the New Jersey Act.

On February 6, 2025, approximately seventeen months after the Court entered an order dismissing the original action without prejudice for lack of subject matter jurisdiction, NSSF filed a motion to reopen the case and for leave to file an amended complaint (ECF No. 36). The motion to reopen came in part because the Attorney General brought five civil enforcement actions under Section 2C:58-35(a) after this case was dismissed. (Am. Compl. ¶¶ 8, 49.) One such enforcement

action, still pending, is against Glock, Inc. ("Glock"), an NSSF member.  (*Id.* ¶ 53; *see Platkin v. Glock, Inc.*, Civ. No. ESX-C-000286-24 (N.J. Super. Ct. Ch. Div.) (the "Glock Suit").)  The Court granted NSSF's motion to reopen and amend its complaint on April 2, 2025.  (ECF No. 55.)

The Amended Complaint asserts five causes of action: 1) preemption; 2) violation of the Commerce Clause; 3) violation of the First Amendment; 4) violation of the Second Amendment; and 5) violation of Due Process.  (*See generally* Am. Compl.)  NSSF seeks: 1) a declaration, pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, that the New Jersey Act is facially unconstitutional, or alternatively, as applied to NSSF and its members; 2) a preliminary injunction enjoining the Attorney General from enforcing the New Jersey Act; 3) a permanent injunction of the same; and 4) reasonable attorneys' fees, costs, and nominal damages.  (*Id.*)

### 2.    The Glock Suit

In the Glock Suit, the Attorney General asserts that Glock violated Section 2C:58-35(a) because its conduct in the designing, manufacturing, assembling, advertising, marketing, and distributing of handguns that can be easily switched or converted to a machine gun, is "unreasonable under all the circumstances."  (*See* "Ex. D," p. 215, ECF No. 56.)  In the Attorney General's view, Glock's "unreasonable conduct" constitutes knowing violations of Section 2C:58-35(a)(1) and other state laws, and contributes to a public nuisance.  (*Id.* at 216.)  The Attorney General also alleges that Glock failed to establish, implement, and enforce reasonable controls in violation of Section 2C:58-35(a)(2).  (*Id.* at 223.)

Other than providing a copy of the complaint filed in the Glock Suit, the parties here have failed to provide any information about that matter.  The Court, however, takes judicial notice of

the state docket and proceedings based on its authority under Fed. R. Evid. 201. Accordingly, the procedural history of the Glock Suit is as follows.[3]

The Attorney General filed a civil enforcement action against Glock on December 12, 2024. (D.E. No. 1.) On March 7, 2025, Glock filed a motion to dismiss. (D.E. No. 10.) Therein, Glock argues, like NSSF here, that the Attorney General's claims against Glock are barred by the PLCAA because this is a "qualified civil liability action" and the predicate exception does not apply. (D.E. Nos. 10, 44.) Glock also argues, like NSSF here, that the New Jersey Act violates the Commerce Clause, First Amendment, Second Amendment, and Due Process Clause. (D.E. Nos. 10, 44.) Oral argument on the motion to dismiss in the Glock Suit is scheduled for September 5, 2025. (D.E. No. 47.)

## II.    SUBJECT MATTER JURISDICTION

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

## III.    LEGAL STANDARD

"Preliminary injunctive relief is an extraordinary remedy and should be granted only in limited circumstances." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (internal quotation marks and citation omitted). The primary purpose of preliminary injunctive relief is "maintenance of the status quo until a decision on the merits of a case is rendered." *Acierno v. New Castle Cnty.*, 40 F.3d 645, 647 (3d Cir. 1994). This remedy should be granted only if movants establish that: 1) "they are likely to succeed on the merits of their claims"; 2) "they are likely to suffer irreparable harm without relief"; 3) "the balance of harms favors them"; and 4) "relief is in the public interest." *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 131 (3d Cir. 2017) (citation omitted); *Winter v. NRDC*, 555 U.S. 7, 20 (2008). "A plaintiff's failure to establish any

---

[3] The docket entries that follow are from the state court docket in the Glock Suit. *See* ESX-C-000286-24. The Court refers to the entries as "D.E. No." to avoid confusion with "ECF No."

element in its favor renders a preliminary injunction inappropriate." *NutraSweet Co. v. Vit-Mars Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999) (citation omitted).

## IV.    <u>DISCUSSION</u>

NSSF poses many arguments in support of its Motion for a Preliminary Injunction, but the Attorney General first challenges whether this case is even justiciable.  Specifically, he contends that NSSF continues to lack standing and that the Court should abstain from reaching the merits under *Younger v. Harris*, 401 U.S. 37 (1971).  (Opp'n Br. at 14–26.)

Fortunately, the law is clear as to which issue comes first.  Before determining whether to abstain under *Younger*, a court must first decide the "antecedent question" of whether it has Article III jurisdiction.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998) ("Article III jurisdiction is always an antecedent question."); *Juidice v. Vail*, 430 U.S. 327, 331 (1977) (noting that the court was "first obliged to examine the standing of appellees, as a matter of the case-or-controversy requirement associated with Article III" before addressing *Younger*); *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 23 (1987) (Marshall, J., concurring) ("There is no occasion to decide if abstention would have been proper unless the District Court had jurisdiction."); *Hamilton v. Bromley*, 862 F.3d 329, 334 (3d Cir. 2017) (same).

### A.    ARTICLE III STANDING

NSSF has the burden to establish its standing for "each claim" and "each form of relief." *Davis v. Federal Election Comm'n*, 554 U.S. 724, 734 (2008).  Article III of the United States Constitution confines the federal judicial power to the resolution of "Cases" and "Controversies." U.S. Const. Art. III.  For there to be a case or controversy under Article III, the plaintiff must have a "'personal stake' in the case." *TransUnion v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting *Raines v. Byrd*, 521 U.S. 811, 820 (1997)).  To have standing, a plaintiff must show that (1) he or she

suffered an injury-in-fact that is concrete, non-hypothetical, particularized, and actual or imminent; (2) the injury was likely caused by the defendant; and (3) the injury would likely be redressed by judicial relief.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  In order "[t]o establish [an] injury-in-fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (internal quotations omitted).

The inquiry must be adjusted where, as here, an association brings suit on behalf of its members.  In the Third Circuit, associational standing requires that "(1) the organization's members [] have standing to sue on their own; (2) the interests the organization seeks to protect are germane to its purpose; and (3) neither the claim asserted nor the relief requested requires individual participation by its members."  *Phila. Taxi Ass'n, Inc v. Uber Techs., Inc.*, 886 F.3d 332, 345 (3d Cir. 2018).  Regarding the third condition, individual participation, the Supreme Court has held that claims may be "properly resolved in a group context" if they do not require "individualized proof."  *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977).

The Third Circuit previously held that NSSF lacked associational standing.  *Nat'l Shooting Sports Found.*, 80 F.4th at 217–18.  It applied the test for a pre-enforcement challenge because there had not yet been an enforcement action filed by the Attorney General and there was uncertainty about whether the Attorney General "might sue" NSSF or its members.  *Id.* at 219, 222.  Specifically, the Third Circuit held that there was no "evidence that enforcement is looming," *id.* at 217, and concluded that NSSF failed to demonstrate the requirements for pre-enforcement challenges, namely that it or its members (1) intend to take action that is (2) "arguably affected with a constitutional interest" but is (3) arguably forbidden by the Law, and (4) the threat of enforcement against them is substantial."  *Id.* at 217–22.  Because NSSF's case was "not yet fully

formed," the Third Circuit ended its decision by noting that "this suit falls far short of even the 'normal' pre-enforcement challenge." *Id.* at 223.

As set forth above, since the Third Circuit's decision, the Attorney General has initiated five enforcement actions, including the Glock Suit.  Accordingly, the landscape has clearly changed and this matter is no longer a pre-enforcement challenge.  Additionally, there is no longer doubt about whether the Attorney General "might sue [NSSF] or its members." *Id.* at 222.  Glock— and four other gun manufacturers—have in fact been sued for allegedly lawful conduct; there is therefore a strong threat of enforcement.  *See id.* at 220 ("A strong sign of future enforcement is that a law has been enforced against the plaintiff, *a closely related party*, or others for similar conduct.") (emphasis added).[4]

Because this is no longer a pre-enforcement proceeding, NSSF need only demonstrate that it has associational standing as outlined above.  Here, application of the law to the facts is relatively straightforward.  First, Glock is a member of NSSF and would have standing on its own to bring the claims asserted here.  The Glock Suit in state court challenges Glock's "conduct in their designing, manufacturing, assembling, advertising, marketing, and distributing easily switchable Glock handguns" and suggests that such conduct "is unreasonable under all the circumstances." (Ex. D., p. 216 at ¶ 156.)  Insofar as the Glock Suit objects to Glock's marketing, it implicates the First Amendment.  Insofar as the Glock Suit threatens Glock's right to sell, it implicates both the Commerce Clause and Second Amendment.  It is therefore clear that Glock's legally protected interests are at stake, that it has suffered an injury-in-fact, and that it could sue on its own.  *See Cottrell v. Alcon Lab's*, 874 F.3d 154, 164 (3d Cir. 2017) ("[L]egally protected interests" may

---

[4] Further bolstering the threat of enforcement is that the Court is unsure how the New Jersey Act functions and what triggers the Attorney General's arguably selective enforcement, despite questioning by the Court for clarity at oral argument.  (*See* Tr. 25:17 to 35:1–7.)

arise from the Constitution, from common law, or "solely by virtue of 'statutes creating legal rights, the invasion of which creates standing.'" (quoting *Lujan*, 504 U.S. at 576–78)).

As to causation, the alleged harm to Glock is readily traceable to Defendant, given that the Attorney General is the main official responsible for enforcement of the New Jersey Act. *See Nat'l Shooting Sports Found. v. Bonta*, 718 F. Supp 3d 1244, 1250 (S.D. Ca. 2024). Lastly, the injury would be easily redressed by a remedy that this Court can provide, namely an injunction against the enforcement of the New Jersey Act. Accordingly, the Court finds that Glock would have standing to bring suit on its own behalf.

Second, NSSF also seeks to protect interests germane to its purpose. NSSF alleges that its mission is "to promote, protect, and preserve hunting and shooting sports by providing leadership in addressing industry challenges, advancing participation in and understanding of hunting and shooting sports, reaffirming and strengthening its members' commitment to the safe and responsible sale and use of their products, and promoting a political environment supportive of America's traditional hunting and shooting heritage." (Am. Compl. ¶ 12.) By bringing this lawsuit to defend its members' rights to engage in the otherwise legal manufacture and sale of firearms, NSSF is acting well within its stated purpose.

Finally, none of NSSF's claims require individual participation by Glock or other members because the issues in this case are purely legal and do not involve individualized proofs. Accordingly, the Court is satisfied that NSSF has demonstrated that it has associational standing to bring this suit on behalf of its members.

**B.      RIPENESS**[5]

In addition to standing, Article III requires that a case be ripe.  *Nat'l Shooting Sports Found.*, 80 F.4th at 219.  The Third Circuit found that NSSF's initial suit was not ripe because the threat of enforcement was not imminent.  *Id.* 217, 219.

The ripeness doctrine operates "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements."  *Foulke v. Twp. of Cherry Hill*, Civ. No. 23-2543, 2025 WL 1245759, at *6 (D.N.J. Apr. 30, 2025).  "The ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction."  *Id.* (internal quotation marks omitted).  A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.  *Texas v. U.S.*, 523 U.S. 296, 300 (1998).  Notably, ripeness requires an evaluation of "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.  *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149 (1967), *abrogated by Califano v. Sanders*, 430 U.S. 99 (1977).  Under the fitness prong, courts consider "whether the issues presented are purely legal, as opposed to factual."  *Phila. Fed'n of Teachers, Am. Fed'n of Teachers, Local 3, AFL-CIO v. Ridge*, 150 F.3d 319, 323 (3d Cir. 1998) (setting forth factors to consider: "whether the claim involves uncertain and contingent events that may not occur as anticipated or at all; the extent to which a claim is bound up in the facts; and whether the parties to the action are sufficiently adverse").  Under the hardship prong, courts consider whether the proponent of federal jurisdiction would suffer an "immediate and significant hardship should

---

[5] Although not raised by the parties, the Court *sua sponte* considers ripeness because the Third Circuit previously found this matter was not ripe and because the Court has an independent duty to confirm its jurisdiction.  *Felmeister*, 856 F.2d at 535 ("This court has recognized that considerations of ripeness are sufficiently important that we are required to raise the issue *sua sponte* even though the parties do not.").

judicial review . . . be deferred." *Felmeister v. Office of Atty. Ethics*, 856 F.2d 529, 537 (3d Cir. 1988).

Here, for the reasons that follow, both factors under the *Abbott* test are satisfied. As explained above, NSSF is no longer prematurely suing over a hypothetical harm to it or its members. In light of the five enforcement actions, two of which have now settled, there is a substantial risk of enforcement against NSSF and its members. Additionally, like in *Abbott*, the issues presented in this case are purely legal—that is, whether the PLCAA preempts the New Jersey Act and whether NSSF and its members' constitutional rights are violated by the New Jersey Act. Moreover, the Court finds that it would be a hardship to NSSF and its members were the issues raised in the Amended Complaint not reviewed by a court.[6] *Abbott Lab'ys*, 387 U.S. at 153.

Accordingly, the Court finds that this case is ripe for review.

## C.    *YOUNGER* ABSTENTION

The Court next considers whether to abstain under *Younger*. It is generally understood that when it has jurisdiction, a federal court's "obligation to hear and decide a case is 'virtually unflagging.'" *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)).

*Younger* recognizes a "far-from-novel" exception to that general rule. *Sprint*, 571 U.S. at 77. In *Younger*, the Supreme Court recognized "a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." 401 U.S. at 44.

---

[6] There is still hardship under *Abbott* were a court not to review the constitutional issues presented here although for the reasons explained later, this Court is not the proper court for review of the issues in the Amended Complaint at this juncture.

Abstention requires more than a co-pending state-court proceeding that involves the same subject matter. *New Orleans Public Service, Inc. v. Council of City of New Orleans*, 491 U.S. 350, 373 (1989) ("*NOPSI*") ("[T]here is no doctrine that . . . pendency of state judicial proceedings excludes the federal courts."). First, *Younger* applies to only three categories of ongoing state court proceedings: 1) criminal prosecutions; 2) "quasi-criminal civil enforcement actions"; and (3) "civil lawsuits with orders that are uniquely in furtherance of a state court's ability to perform its judicial functions." *Borowski v. Kean Univ.*, 68 F.4th 844, 849 (3d Cir. 2023) (citing *Sprint*, 571 U.S. at 78); *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 594 (1975). Here, there is no dispute that the Glock Suit is an ongoing civil enforcement proceeding. The dispute here is whether the Glock Suit constitutes a "quasi-criminal civil enforcement action" that satisfies the first element of *Younger*.

To assess whether the co-pending state court proceedings are "quasi-criminal" in nature in the wake of the Supreme Court's *Sprint* decision, the Third Circuit has advised district courts to consider whether:

> (1) the action was commenced by the State in its sovereign capacity, (2) the proceeding was initiated to sanction the federal plaintiff for some wrongful act, and (3) there are other similarities to criminal actions, such as a preliminary investigation that culminated with the filing of formal charges. . . . We also consider whether the State could have alternatively sought to enforce a parallel criminal statute.

*PDX N., Inc. v. Comm'r New Jersey Dep't of Lab. & Workforce Dev.*, 978 F.3d 871, 883 (3d Cir. 2020) (quoting *ACRA Turf Club, LLC v. Zanzuccki*, 748 F.3d 127, 138 (3d Cir. 2014)); *Sprint*, 571 U.S. at 79–80.

Second, if the Court concludes that the Glock Suit is "quasi-criminal in nature," it must then consider the *Middlesex* factors: 1) whether there is an ongoing judicial proceeding, 2) whether an important state interest is implicated in the state proceeding, and 3) whether the state

proceedings provide an adequate opportunity to present constitutional arguments. *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982).

Notably, courts have abstained under *Younger* when civil enforcement actions are typically initiated to sanction the federal plaintiff, *i.e.*, the party challenging the state action, for some wrongful act. *See, e.g.*, *Middlesex,* 457 U.S., at 433–434 (state-initiated disciplinary proceedings against lawyer for violation of state ethics rules). Additionally, courts abstain when a state actor is routinely a party to the state proceeding and often initiates the action. *See, e.g.*, *Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.*, 477 U.S. 619 (1986) (state-initiated administrative proceedings to enforce state civil rights laws); *Moore v. Sims*, 442 U.S. 415, 419–420 (1979) (state-initiated proceeding to gain custody of children allegedly abused by their parents); *Trainor v. Hernandez*, 431 U.S. 434, 444 (1977) (civil proceeding "brought by the State in its sovereign capacity" to recover welfare payments defendants had allegedly obtained by fraud); *Huffman*, 420 U.S. at 598 (state-initiated proceeding to enforce obscenity laws).

### 1.    Quasi-Criminal Civil Enforcement Action

Here, as stated, the first issue is whether the Glock Suit qualifies as "quasi-criminal" in nature. The Attorney General argues that the Glock Suit is comparable to a criminal prosecution and that it satisfies the factors established for determining whether a state action is akin to a criminal prosecution. (Opp'n Br. at 21, 22.) NSSF argues that the Attorney General conceded before the Third Circuit that the New Jersey Act is exclusively civil and seeks to regulate purely economic activity; therefore the Glock Suit cannot be a "quasi-criminal" civil enforcement action. (Reply Br. at 4 (relying on *Nat'l Shooting Sports Found.*, 80 F.4th at 222–23 (noting that the New Jersey Act is "exclusively civil")).)

First, NSSF's argument is unpersuasive because the issue of whether the civil enforcement action against Glock is "quasi-criminal" was not squarely before the Third Circuit. The issue of

whether the New Jersey Act was generally civil or criminal in nature simply arose because the Third Circuit was analyzing the risk of enforcement to NSSF and the ripeness of their case.  *Nat'l Shooting Sports Found.*, 80 F.4th at 222.

Second, for the reasons that follow, each factor clarified in *Sprint* supports a finding that the Glock Suit is a "quasi-criminal" civil enforcement action.  The Glock Suit was commenced by the Attorney General, representing the State of New Jersey in its sovereign capacity.  *See* N.J. Stat. Ann. § 2C:58-35(b); *Trainor*, 431 U.S. at 444.  The suit was also initiated to sanction Glock for an alleged wrong, namely that Glock permits its guns to be modified into machine guns in violation of the reasonable controls provisions and other provisions in Section 2C:58-35(a)(1). Additionally, the complaint in the Glock Suit cites Section 2C:39-9(a), a criminal statute that makes it illegal to manufacture, transport, ship, and dispose of any machine gun without being registered or licensed to do so.  The complaint in that case also makes clear that the Attorney General investigated Glock and its firearms while using resources similar to those used in a criminal enforcement action.[7]   Accordingly, the Court is satisfied that the Glock Suit is quasi-criminal in nature.

## 2.    The *Middlesex* Factors

The Court next considers the *Middlesex* factors.  The first factor is whether there is an ongoing judicial proceeding.  *Middlesex*, 457 U.S. at 432.  Here, the Glock Suit is an ongoing judicial proceeding that was initiated prior to NSSF seeking to reopen the case in this Court.  As noted, a motion to dismiss is pending in state and oral argument is scheduled to take place on that motion on September 5, 2025.

---

[7] As to whether the State could have alternatively sought to enforce a parallel criminal statute, nuisance statues are "closely related to criminal statutes," and the New Jersey Act is a public nuisance statute.  *See, e.g.*, *Huffman*, 420 U.S. at 604; *Mitchum v. Foster*, 407 U.S. 225, 228 (1972).

NSSF argues that the Glock Suit is not "ongoing" within the meaning of *Younger* because the initial complaint in this matter was filed before the Glock Suit. (Reply Br. at 4.) That argument ignores the Third Circuit's decision in this case that held that NSSF's initial suit was premature. *Nat'l Shooting Sports Found.*, 80 F.4th at 223 ("[NSSF's] case is not yet fully formed."). The initial federal complaint that was filed before the Glock Suit is effectively a nullity. Accordingly, the first *Middlesex* factor favors abstention because the Glock Suit qualifies as an ongoing judicial proceeding in state court.

The second *Middlesex* factor is whether there is an important state interest implicated in the state proceeding. New Jersey has evidenced a keen interest in both regulating firearms within its borders and protecting the citizens of New Jersey. The complaint in the Glock Suit alleges that "[i]n New Jersey . . . Switched Glock Machine Guns are increasingly found on our streets and roadways, in our parks and homes, and more recently, on college campuses. These weapons have caused death and destruction throughout the country, and have been recovered with increasing frequency." (ECF No. 56 at 165 ¶ 10.) The State of New Jersey fears that Glock's handguns "endanger[] the health, safety, peace, comfort, and convenience of New Jersey residents; threatens to injure and endanger the health, safety, peace, comfort, and convenience of New Jersey residents; and contributes to the injury and endangerment of the health, safety, peace, comfort, and convenience of New Jersey residents." (*Id.* at 223.) Based on a review of the operative complaint, the Glock Suit squarely addresses these important state interests. Therefore, the second *Middlesex* factor weighs in favor of abstention.

The third factor is whether the state proceedings provide an adequate opportunity to present constitutional arguments. Having reviewed the submissions before the state court, it is also clear that Glock raises constitutional arguments nearly identical to those presented by NSSF in this case.

In relevant part, Glock argues that the New Jersey Act is unconstitutional because it is preempted by the PLCAA, violates the First and Second Amendments, and violates the Commerce and Due Process Clauses of the federal Constitution.  (D.E. Nos. 10, 44.)

NSSF argues that *Younger* abstention cannot apply because NSSF is not a party to the Glock Suit.  However, *Younger* does not require perfect identity of parties.  It merely requires an "adequate opportunity to raise [federal] challenges."  *Sprint*, 571 U.S. at 81 (alteration in original). *Younger* abstention can reach a federal plaintiff's claims even when that plaintiff was a stranger to the state court proceeding.  *Burg v. Platkin*, Civ. No. 24-10076, 2024 WL 5198776, at *6, n.5 (D.N.J. Dec. 23, 2024).

On this point, the Supreme Court has twice recognized that "there plainly may be some circumstances in which legally distinct parties are so closely related that they should all be subject to the *Younger* considerations which govern any one of them."  *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 928 (1975); *Hicks v. Miranda,* 422 U.S. 332 (1975) (abstaining under *Younger* despite the fact that the federal plaintiff was not a defendant in the state court action because the federal plaintiff's interests were intertwined with the state defendant's interests, and a decision in the federal case would have interfered with the pending state prosecution).  The Eighth Circuit has also twice opined similarly on this issue.  *See Cedar Rapids Cellular Tel., L.P. v. Miller*, 280 F.3d 874, 881 (8th Cir. 2002) ("It is not a prerequisite to *Younger* abstention that the federal plaintiffs also be defendants in the action pending in state court."); *Tony Alamo Christian Ministries v. Selig*, 664 F.3d 1245, 1253 (8th Cir. 2012) (applying *Younger* abstention to an association who was not a defendant in the pending state action because the association's claims were "sufficiently related to, or inextricably intertwined" with the other parties, and the association "alleges standing based

on injuries that are either directly or indirectly derivative of those of the individual Plaintiffs.").[8]

Accordingly, the Court rejects NSSF's argument that *Younger* abstention is not applicable to this case.

The Court acknowledges two decisions in this Circuit that have found *Younger* inapplicable when the parties are different.  Each case, however, is distinguishable from the present matter.  In *FOCUS v. Allegheny Cnty. Ct. of Common Pleas*, 75 F.3d 834, 843 (3d Cir. 1996), FOCUS, an advocacy group and two of the group's members challenged a state court gag order in federal court.  FOCUS was not a party in state court, partly because the state court "rebuffed FOCUS' attempt to intervene" and "refused to entertain FOCUS' motion for a writ of mandamus."  *Id.* at 836.  The district court found that it lacked subject matter jurisdiction under the *Rooker-Feldman* doctrine and abstained under *Younger*. *Id.* at 837.  The Third Circuit reversed, finding that *Younger* did not bar FOCUS' claims in the federal challenge to the state court's gag order.  *Id.*  The Third Circuit reasoned that "the judge's refusal to accept or to rule upon FOCUS' motion to intervene means that FOCUS was never a party in state court—and there was no ongoing case for *Younger* purposes—until FOCUS filed its King's Bench petition in the Pennsylvania Supreme Court."  *Id.* at 843.  Notably, in *FOCUS*, the state court already adjudicated the constitutional issue at the time of the filing of the federal complaint, so "*Younger* abstention was improper."  *Id.*

Here, Glock's motion to dismiss is currently pending in state court, there has been no adjudication of the constitutional issues there—which are the same issues here—and NSSF has never been denied the opportunity to intervene or assert its rights in the Glock Suit.

---

[8] The Court recognizes that these decisions pre-date *Sprint*.  However, the Supreme Court has not overruled these propositions, and this issue was not before the Supreme Court in *Sprint*.

The second decision is *Argen v. Att'y Gen. New Jersey*, Civ. No. 21-2571, 2022 WL 3369109, at *1 (3d Cir. Aug. 16, 2022),[9] upon which NSSF relies.  (Reply Br. at 3.)  There, Surender Malhan ("Malhan"), a party to a state court family proceeding, and Paul Argen ("Argen"), a non-party to that proceeding but a subject of a gag order brought a federal lawsuit alleging that the gag order prevented Argen, a reporter, from interviewing Malhan, which violated his First Amendment rights.  *Id.*  The Third Circuit found *Younger* abstention inapplicable because Argen was not a party to the family court proceeding and because there was no ongoing state proceeding.  *Id.* at *5.

The question is whether NSSF's interests are intertwined with Glock's interests and whether they are closely related parties.  NSSF is a trade association and Glock is one of its members.  NSSF "serves the interests of its members, which are impaired by the threat of sweeping liability under [the New Jersey Act]."  (Am. Compl. ¶ 13.)  NSSF explicitly relies on the Glock Suit for its standing to bring its claims in this Court.[10]  To date, Glock is the only NSSF member who has been sued under the New Jersey Act.  Under the circumstances, it is clear that NSSF's and Glock's interests are intertwined, and the parties are closely related.

Finally, unlike in *FOCUS*, for reasons unknown to the Court, NSSF has not sought to intervene in the Glock Suit, despite a readily available mechanism to do so under the New Jersey

---

[9] This decision is not binding precedent.  *See* Third Circuit Internal Operating Procedures 5.7.

[10] It is inconsistent, and arguably disingenuous, for NSSF to rely on Glock for purposes of satisfying its Article III standing, but distance itself from Glock for the purposes of *Younger*.

Court Rules.[11]  At oral argument, when asked why NSSF did not seek to intervene in the Glock Suit, NSSF's counsel offered little of substance:

> Well, because we represent all manner of parties, so . . . .  Not all the issues that we teed up first, of course, in this lawsuit are teed up there.  So we represent distributor members.  We represent FFL dealer members.  Not all of those issues are teed up there, which is another reason why this isn't just a collateral attack on the Glock suit.  But, I mean, in terms of—and I don't want to get sort of too deep in the weeds of the facts of that suit precisely because that's not—it shows, along with the suits against *Buchess* and *Point Blank*, that there's clearly standing here.  But beyond that, it's neither here nor there.

(Tr. 18:18–25 to 19:1–9.)

The Court has reviewed the Glock Suit and finds that all of the challenges raised by NSSF here are also asserted by Glock in its defense.  It therefore remains unclear why NSSF is not intervening in the Glock Suit to assert—on behalf of all of its members— the same legal defenses one of its members is already asserting in state court.[12]

Generally speaking, abstention serves two purposes: "a proper respect for state functions," by restricting federal courts from interfering with ongoing state judicial proceedings and to restrain equity jurisdiction from operating when state courts provide adequate legal remedies for

---

[11] N.J. Ct. R. 4:33-2 provides that "[u]pon timely application anyone may be permitted to intervene in an action if the claim or defense and the main action have a question of law or fact in common.  When a party to an action relies on ground of claim or defense upon any statute or executive order administered by a state or federal governmental agency or officer, or upon any regulation, order, requirement or agreement issued or made pursuant to the statute or executive order, the agency or officer upon timely application may be permitted to intervene in the action.  In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties."  Although NSSF's time to intervene as of right has expired, NSSF may be permitted to intervene because it shares a claim or defense and there is a common question of law or fact.  *See id.*  In New Jersey, leave to intervene is "liberally construed" and the "decision to grant or deny permissive intervention 'vests considerable discretion in the trial court.'"  *New Jersey Dep't of Env't Prot. v. Exxon Mobil Corp.*, 181 A.3d 257, 265 (N.J. App. Div. 2018) (quoting *Evesham Township Zoning Board of Adjustment v. Evesham Township Council*, 430 A.2d 922 (N.J. 1981)).

[12] Absent a coherent explanation from NSSF, the Court will not presume NSSF's underlying motivations for renewing its suit here.  That being said, NSSF may have recognized a potential benefit in returning to the very forum and to the very judge that previously granted the emergent relief it now requests once again.

constitutional claims and there is no risk of irreparable harm.[13]  *Sprint*, 571 U.S. at 77.  Those purposes are served by abstaining when adjudication of the merits of a dispute would (1) interfere with the state court's application of nearly identical issues and (2) "demonstrate a lack of respect for the State as sovereign."  *NOPSI*, 491 U.S. at 369.  The Court finds that both purposes are served by abstaining in this case.

While the Court has already expressed its strong concerns about the problematic intersection between the New Jersey Act and the PLCAA in its prior decision on the motion for preliminary injunction—the Court is mindful to exercise judicial restraint and refrain from any effort to address the very issues that *Younger* abstention bars.  The Court must now deviate from its prior analysis due to changing circumstances and finds that the Glock Suit is precisely the type of "exceptional" civil enforcement proceeding for which *Younger* counsels abstention.  *Sprint*, 571 U.S. at 82.  Accordingly, NSSF has failed to demonstrate a likelihood of success on the merits.  The application for a preliminary injunction will therefore be **DENIED**.

## V.    <u>CONCLUSION</u>

For the reasons stated above, the Court will **DENY** Plaintiff's Motion for a Preliminary Injunction without prejudice.  The Court will **ABSTAIN** from further proceedings in this matter.  This matter will be **STAYED** pending the ongoing state court proceedings in *Platkin v. Glock, Inc.*, Civ. No. ESX-C-000286-24 (N.J. Super. Ct. Ch. Div).  The parties will also be **ORDERED** to send a copy of this Opinion, the accompanying Order, and a transcript of the parties' oral argument  to the state court assigned to the Glock Suit, and to apprise this Court within one week

---

[13] The Court does not reach whether NSSF has met its burden of demonstrating irreparable harm for purposes of the preliminary injunction, but notes that there is no irreparable harm because NSSF can seek to intervene in the Glock Suit and appeal any adverse decision through the New Jersey appellate system all the way up to the United States Supreme Court.  *See Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 485 (1975).  Insofar as the first two gateway factors for granting preliminary relief have not been met, the Court need not consider the remaining two.

of any decision from the state court. Finally, the Clerk's Office will be instructed to **ADMINISTRATIVELY TERMINATE** this matter pending further submission from the parties. An appropriate Order will follow.

Date: July 10, 2025

s/ Zahid N. Quraishi
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**